## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

TARA KULWICKI, on behalf of herself and all
others similarly situated,

     Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY,

     Defendant.

Case No. 3:22-CV-00229 (RNC)

July 28, 2023

**BRIEF OF AMICI CURIAE AUTISTIC SELF ADVOCACY NETWORK, AUTISTIC WOMEN & NONBINARY NETWORK, PROFESSOR KEVIN BARRY, CENTER FOR HEALTH LAW AND POLICY INNOVATION OF HARVARD LAW SCHOOL, CONNECTICUT TRANSADVOCACY COALITION, CONNECTICUT WOMEN'S EDUCATION & LEGAL FUND, DISABILITY RIGHTS EDUCATION & DEFENSE FUND, DR. AJ ECKERT, GLBTQ LEGAL ADVOCATES & DEFENDERS, LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC., PFLAG, POSITIVE WOMEN'S NETWORK-USA, AND TRANSGENDER LEGAL DEFENSE & EDUCATION FUND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................................ ii

Interests of Amici .................................................................................................................... 1

Introduction ............................................................................................................................. 6

Argument .................................................................................................................................. 8

    A.    Section 1557 Is a Vital Tool to Remedy Widespread Discrimination.......................... 8

    B.    TPAs Have Long Been Gatekeepers to Health Care and Control Access to Coverage for the Majority of Americans with Employer-Sponsored Insurance. ....................... 11

    C.    TPAs Are Independently Liable for Their Own Discriminatory Conduct Under Section 1557, So Wellstar Is Not a Necessary Party. .................................................. 12

    D.    The Real-World Effect of a Holding that Employers Are Necessary Parties in Section 1557 Suits Against TPAs Will Be to Deter Vulnerable Victims of Discrimination from Filing. ......................................................................................................................... 13

    E.    A Ruling in Aetna's Favor Will Create Confusion for Plaintiffs Without Title VII Claims. ......................................................................................................................... 15

    F.    A Ruling in Aetna's Favor Will Eviscerate the Ability of Victims of Systemic Discrimination to Seek Systemic Relief. .................................................................... 16

Conclusion .............................................................................................................................. 16

i

## TABLE OF AUTHORITIES

**CASES**

*BAGLY et al. v. U.S. Dep't of Health & Human Servs.*, District of Massachusetts Case No. 1:20-cv-11297-PBS.................................................................................................................10

*Berton v. Aetna, Inc.*, Northern District of California Case No. 4:23-01849-HSG ......................8

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018) .......................................................9, 12

*C.P. by and through Pritchard v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2022 WL 17788148 (W.D. Wash., Dec. 19, 2022) .........................................................5, 7, 13

*Dekker v. Weida*, No. 4:22CV325-RH-MAF, 2023 WL 4102243 (N.D. Fla. June 21, 2023) ........4

*Doe v. United Behav. Health*, 523 F. Supp. 3d 1119 (N.D. Cal. 2021).........................................13

*Domnister v. Exclusive Ambulette, Inc.*, 607 F.3d 84 (2d Cir. 2010) .............................................7

*Fain v. Crouch*, 618 F. Supp. 3d 313 (S.D. W. Va. 2022) ........................................................4, 9

*Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019) ...........................8

*Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306 (3rd Cir. 2007) ..................................6

*Goidel et al. v. Aetna, Inc.*, Southern District of New York Case No. Case No. 1:21-cv-07619 (VSB)........................................................................................................................................8

*In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, *as amended* (9th Cir. July 15, 1982) ...........................................................................................................16

*Kadel v. Folwell*, No. 1:19CV272, 2022 WL 17415050 (M.D.N.C. Dec. 5, 2022) ...................4, 9

*Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022)...........................................................................................4

*Lawrence v. Texas*, 539 U.S. 558 (2003)........................................................................................4

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015)...............................................................................4

*Romer v. Evans*, 517 U.S. 620 (1996).............................................................................................4

*Schmidt v. Kaiser Fund Health Plan of Wash.*, 965 F.3d 945 (9th Cir. 2020). .............................6

*Tovar v. Essentia Health*, 857 F.3d 771 (8th Cir. 2017).....................................................7, 13, 15

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020)........................................................................................................................................4

**STATUTES**

29 U.S.C. § 1104.................................................................................................................12

42 U.S.C. § 2000e..............................................................................................................15

42 U.S.C. § 18116.........................................................................................................6, 15

**OTHER AUTHORITIES**

AETNA, HEALTH PLAN & BENEFITS ADMINISTRATION FOR EMPLOYERS.........................................7

The ALS Association, Comment Letter on Nondiscrimination in Health Programs and Activities
    Proposed Rule [HHS-OS-2022-0012; RIN 0945-AA17] (Oct. 3, 2022) ...................................11

AUTISTIC HEALTH ADVOCACY NETWORK, HEALTH INSURANCE AND MEDICAID COVERAGE FOR
    AUTISM SERVICES: A GUIDE FOR INDIVIDUALS AND FAMILIES ...................................................11

CHAI R. FELDBLUM & VICTORIA A. LIPNIC, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
    SELECT TASK FORCE ON THE STUDY OF HARASSMENT IN THE WORKPLACE (June 2016)............14

Ethan C. Cicero et al., *Health Care Experiences of Transgender Adults: An Integrated Mixed
    Research Literature Review*, 42(2) ADVANCES IN NURSING SCI. 123 (April/June 2019)..............9

CTR. FOR AM. PROGRESS, ADVANCING HEALTHCARE NONDISCRIMINATION PROTECTIONS FOR
    LGBTQI+ COMMUNITIES (Sept. 8, 2022).....................................................................................9

Douglas B. Jacobs & Benjamin D. Sommers, *Using Drugs to Discriminate—Adverse Selection
    in the Insurance Marketplace*, 372(5) N. ENGL. J. OF MED. 399 (Jan. 29, 2015)......................11

KAISER FAM. FOUND., EMPLOYER HEALTH BENEFITS 2022 ANNUAL SURVEY (2022) .................11

KATHERINE KEISLER-STARKEY & LISA N. BUNCH, U.S. DEPARTMENT OF COMMERCE,
    U.S. CENSUS BUREAU, HEALTH INSURANCE COVERAGE IN THE UNITED STATES: 2021 (Sept.
    2022)......................................................................................................................................11

Tara Lagu et al., *'I Am Not the Doctor for You': Physicians' Attitudes About Caring for People
    with Disabilities*, 41(10) HEALTH AFFS. 1387 (Oct. 2022) .........................................................9

ALEX MONTERO ET AL., KAISER FAM. FOUND., AMERICANS' CHALLENGES WITH HEALTH CARE
    COSTS (July 14, 2022) .............................................................................................................12

Movement Advancement Project, Employment Nondiscrimination ............................................15

NAT'L CTR. FOR TRANSGENDER EQUALITY, THE REPORT OF THE 2015 U.S. TRANSGENDER SURVEY,
    EXECUTIVE SUMMARY (Dec. 2016).....................................................................................12, 14

NAT'L TRANS. BAR ASSOC., REFLECTIONS ON THE NATIONAL TRANS BAR ASSOCIATION'S FIRST YEAR: WHERE WE'VE BEEN, WHERE WE'RE GOING & OUR SURVEY OF COMMUNITY NEEDS (2018) ................................................................................................................16

NAT'L WOMEN'S L. CTR., NOWHERE TO TURN: HOW THE INDIVIDUAL HEALTH INSURANCE MARKET FAILS WOMEN (2008) ................................................................................10

NAT'L WOMEN'S L. CTR., TURNING TO FAIRNESS: INSURANCE DISCRIMINATION AGAINST WOMEN TODAY AND THE AFFORDABLE CARE ACT (Mar. 1, 2012) ..........................................10

Press Release, Equal Employment Opportunity Commission, EEOC Releases Fiscal Year 2020 Enforcement and Litigation Data (Feb. 26, 2021) ......................................................14

Press Release, Nat'l Women's Law Ctr., Victory in Sex Discrimination Complaints Brought By NWLC: After Investigation by HHS, Employers Change Policies (Jan. 26, 2017), https://nwlc.org/press-release/victory-in-sex-discrimination-complaints-brought-by-nwlc-after-investigation-by-hhs-employers-change-policies/ .........................................................8

OUT2ENROLL, SUMMARY OF FINDINGS: 2023 MARKETPLACE PLAN COMPLIANCE WITH SECTION 1557 OF THE AFFORDABLE CARE ACT ..........................................................................9

Sara Rosenbaum, Joel B. Teitelbaum & Katherine Hayes, *Crossing the Rubicon: The Impact of the Affordable Care Act on the Content of Insurance Coverage for Persons with Disabilities*, 25 NOTRE DAME J.L. ETHICS & PUB. POL'Y 527 (2012) ..................................................10

Saraswathi Vedam et al., *The Giving Voice to Mothers Study: Inequity and Mistreatment During Pregnancy and Childbirth in the United States*, 16 REPROD. HEALTH 77 (June 11, 2019) ..........9

Lily Zheng, *Do Your Employees Feel Safe Reporting Abuse and Discrimination?*, HARV. BUS. REV. (Oct. 8, 2020) ............................................................................................................14

## INTERESTS OF AMICI CURIAE

*Amici* are legal and medical organizations and professionals engaged in advocacy for the transgender and gender diverse community, people capable of pregnancy, people living with HIV, AIDS, and other chronic illnesses, and people with disabilities, all of whom are severely impacted by discrimination in healthcare. *Amici* have an interest in this case because a ruling granting Aetna's Rule 12(b)(7) motion will damage the ability of health care consumers to challenge pervasive discrimination which originates with TPA plan design and is accomplished through TPAs' administration of self-funded health benefit plans.

The **Autistic Self Advocacy Network** (ASAN) is a national, private, nonprofit organization, run by and for autistic individuals. ASAN provides public education and promotes public policies that benefit autistic individuals and others with developmental or other disabilities. ASAN's advocacy activities include combating stigma, discrimination, and violence against autistic people and others with disabilities; promoting access to health care and long-term supports in integrated community settings; and educating the public about the access needs of autistic people. ASAN takes a strong interest in cases that affect the rights of autistic individuals and others with disabilities to participate fully in community life and enjoy the same rights as others without disabilities, including cases addressing the rights of disabled workers and the substantial portion of the autistic community that identifies as transgender, nonbinary, or gender nonconforming.

The **Autistic Women & Nonbinary Network** (AWN) provides community support and resources for Autistic women, girls, transfeminine and transmasculine nonbinary people, trans people of all genders, Two Spirit people, and all people of marginalized genders or of no gender. AWN is committed to recognizing and celebrating diversity and the many intersectional experiences in our community. AWN's work includes solidarity aid, community events,

1

publications, fiscal support, and advocacy to empower disabled and autistic people in their fight

for disability, gender, and racial justice.

**Kevin Barry** is an associate dean and professor at the Quinnipiac University School of

Law in Connecticut. He and his students represent low-income people in a range of matters

through a combination of direct legal services and policy advocacy. His work includes engaging

in civil rights litigation and law reform efforts on behalf of transgender people and disabled

people who have experienced healthcare discrimination.

**Center for Health Law and Policy Innovation of Harvard Law School** (CHLPI)

advocates for legal, regulatory, and policy reforms in health and food systems, with a focus on

the health, public health, and food needs of systemically marginalized individuals, including

people living with HIV, hepatitis C, and other chronic illnesses and LGBTQ+ people. CHLPI's

broad range of initiatives aim to expand access to high-quality health care and more equitable

health care systems.

The **Connecticut TransAdvocacy Coalition** (CTAC), founded in 2003, is an all-

volunteer run grassroots organization with a mission to support, educate on behalf, and champion

the human rights of transgender, non-binary, gender diverse, and gender non-conforming

individuals (TNB+) in the State of Connecticut and beyond. CTAC's signature program is an

annual conference around the intersection of law, health care, policy and the TNB+ communities

(The Transgender Lives: The Intersection of Health and Law conference) to educate and

empower the TNB+ community, our supporters and allies, and service providers from all over

the New England region. CTAC partners with organizations across the state, region, and nation

to support TNB+ inclusive and protective policies and legislation, and to ensure the voices of

TNB+ individuals in the State are amplified, particularly the voice of those with intersecting

identities subject to amplified marginalization, such as BIPOC, LGBQ+, disabled, undocumented, and low-income TNB+ persons, and other multiply marginalized individuals.

**Connecticut Women's Education and Legal Fund** (CWEALF) is a non-profit women's rights organization. Using a justice and equity lens, CWEALF advocates for under-resourced, marginalized women in Connecticut. CWEALF addresses racial and gender inequities as well as advances the rights, opportunities, and status of women across the state of Connecticut through grassroots community organizing, legal education, and public policy advocacy. Since its founding in 1973, CWEALF has always been committed to advancing women's rights, including the prevention of discrimination based on gender, sexual orientation, and gender identity.

The **Disability Rights Education and Defense Fund** (DREDF) is a national law and policy center that protects and advances the civil and human rights of people with disabilities through legal advocacy, training, education, and development of legislation and public policy. DREDF is committed to promoting accessible and equally effective health care and eliminating persistent health disparities, which threaten to undermine the goals of nondiscrimination law.

**Dr. AJ Eckert** (he/they) is a physician licensed to practice medicine in the State of Connecticut. They serve as the Medical Director of Anchor Health's Gender & Life-Affirming Medicine (GLAM) Program. Anchor Health is Connecticut's leading health center for the LGBTQ community, serving over 3,000 patients with locations in Hamden and Stamford. Dr. Eckert is board certified in family medicine by the American Board of Osteopathic Family Physicians and has over 17 years' experience in LGBTQ health care, with 9 years as a provider of primary care and gender-affirming services.

Through strategic litigation, public policy advocacy, and education, **GLBTQ Legal Advocates & Defenders** ("GLAD") works in New England and nationally to create a just

society free of discrimination based on gender identity and expression, HIV status, and sexual

orientation. GLAD has litigated widely in both state and federal courts in all areas of the law to

protect and advance the rights of transgender and LGBQ people and people living with HIV and

AIDS. GLAD has a long history of advocacy for equal access to health care, including access to

fertility health care and family building, and to ensuring access to health care without

discrimination on the basis of sexual orientation and gender identity.

Founded in 1973, **Lambda Legal Defense and Education Fund, Inc.** (Lambda Legal) is

the nation's oldest and largest legal organization committed to achieving full recognition of the

civil rights of lesbian, gay, bisexual, transgender, and queer people and people living with HIV.

As such, Lambda Legal has served as counsel of record in some of the most important cases

regarding the rights of LGBT people and people living with HIV. *See, e.g., Obergefell v.*

*Hodges*, 135 S. Ct. 2584 (2015); *Lawrence v. Texas*, 539 U.S. 558 (2003); *Romer v. Evans*, 517

U.S. 620 (1996). What is more, Lambda Legal has served as counsel of record in cases

addressing the proper interpretation of the Patient Protection and Affordable Care Act (ACA)

and the significance of its protections for LGBTQ people and people living with HIV, as well as

successfully challenged discriminatory exclusions from coverage of gender-affirming medical

care contained in private and public health plans under Section 1557 of the ACA. *See, e.g.,*

*Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422 (4th Cir. 2021),

*cert. denied*, 142 S. Ct. 861 (2022); *Dekker v. Weida*, No. 4:22CV325-RH-MAF, 2023 WL

4102243 (N.D. Fla. June 21, 2023); *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 17415050, at

*4 (M.D.N.C. Dec. 5, 2022); *Fain v. Crouch*, 618 F. Supp. 3d 313 (S.D.W. Va. 2022); *Whitman-*

*Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020).

Most pertinent to the case at hand, Lambda Legal has established case law holding that a third-

party administrator is *independently* liable under Section 1557 of the ACA for its implementation and administration of a discriminatory exclusion within a self-funded ERISA health plan. *See C.P. by and through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-CV-06145-RJB, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022).

Founded in 1973, **PFLAG** is an organization of LGBTQ+ people, parents, families, and allies working together to create an equitable and inclusive world. With hundreds of chapters, and hundreds of thousands of members and supporters, PFLAG supports families, educates allies, and advocates for just, equitable, and inclusive legislation and policies. PFLAG has a substantial interest in opposing health care discrimination against members of the LGBTQ+ community.

**Positive Women's Network-USA** (PWN-USA) is a national membership organization led by and for women and gender diverse people living with HIV. Our work centers the leadership of those most impacted by the HIV epidemic in the U.S., including Black, Indigenous and People of Color (BIPOC), queer and transgender people, low income and working class people, people involved in sex work, substance users, and immigrant and migrant populations. PWN-USA envisions a future in which our communities can access non-discriminatory, trauma-informed, comprehensive health care regardless of gender identity, country of origin, immigration status, or ability to pay; and in which all women and gender diverse people are able to control our own bodies, sexuality and reproductive possibilities free from stigma and discrimination.

The **Transgender Legal Defense and Education Fund** (TLDEF) is a non-profit organization that advocates on behalf of transgender individuals across the United States. TLDEF is committed to ensuring that transgender individuals receive the same rights and

protections under the law as cisgender individuals. TLDEF seeks to coordinate with other civil

rights organizations to address key issues affecting transgender individuals in the areas of

identity recognition, safety, access to health care, and freedom from discrimination. It also

provides public education on transgender rights.

## INTRODUCTION

Section 1557 of the Affordable Care Act ("ACA") established groundbreaking reforms to

health care and health insurance, providing protection to those who face discrimination in health

care because of their race, color, national origin, age, sex, or disability.[1] To accomplish its goal

of rooting out invidious discrimination in health care, Section 1557 imposes an affirmative

obligation not to discriminate on all "health programs and activities" any part of which receives

Federal financial assistance, including third-party administrators ("TPAs").[2] But, under the guise

of concern for the Plaintiff in this case and her absent former employer, Aetna is attempting to

weaponize Rule 19—a procedural device—not only to deter Section 1557 claims against its

discriminatory fertility policy, but also to deter victims of discrimination generally from bringing

Section 1557 claims for discriminatory benefit design in self-funded plans and erect a procedural

roadblock to plaintiffs who seek systemic relief for TPAs' systemic discriminatory practices.

Nothing in Rule 19 or Section 1557 compels this result. Wellstar has not claimed an

interest in this action, so the only question before the Court is whether in its absence the Court

can accord "complete relief" among the *existing* parties.[3] The answer is a resounding yes,

because TPAs are liable for their own violations of Section 1557 in plan design and

---

[1] *See* 42 U.S.C. § 18116.

[2] *Schmidt v. Kaiser Fund Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020).

[3] *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 313 (3rd Cir. 2007) ("'Completeness is determined on the basis of those persons who are already parties, and not as between a party and the absent person whose joinder is sought.'" (quoting *Angst v. Royal Maccabees Life Ins. Co.,* 77 F.3d 701, 705 (3d Cir.1996)).

administration.[4] The Plaintiff in this case seeks only two forms of relief, both of which a judgment against Aetna alone would provide. First, she seeks compensatory damages for economic harm proximately caused by Aetna's discriminatory actions—*not*, as Aetna contends, the payment of benefits under the Wellstar plan. Second, she seeks declaratory relief. Whether the outcome of this case is a finding that Aetna discriminated against the plaintiff in its plan design, administration, or both, the declaratory relief the plaintiff seeks will establish only whether and how Aetna violated the law, not whether or how Wellstar or any other employer did.

The Court should reject Aetna's invitation to become the first federal court in the nation to hold that an employer is a necessary party to a Section 1557 claim against a TPA not only because it is the legally incorrect result, but also because such a ruling would eviscerate the ability of victims of discrimination to challenge systemic practices at their root. A plaintiff should not be forced to sue an employer who has selected an off-the-shelf plan from an immense corporation like Aetna, which openly advertises its purported expertise in assessing whether the health plans it offers comply with the ACA.[5] Plaintiffs should be free to bring their claims solely against a TPA who designs discriminatory benefits plans and administers those plans according to its own broadly-applicable discriminatory policies, as is alleged in this case.[6]

---

[4] *Tovar v. Essentia Health* 857 F.3d 771, 778 (8th Cir. 2017) (where a TPA designs a discriminatory plan document which an employer then adopts, the plaintiff's injuries can be traceable to and redressable through damages against the TPA); *C.P. by and through Pritchard v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2022 WL 17788148, at *10 (W.D. Wash., Dec. 19, 2022) (holding that TPAs are independently liable under Section 1557 for their administration of discriminatory exclusions contained in ERISA health plans).

[5] Aetna's website advertises among its services, "Assess[ing] plan designs and wellness programs in line with health care reform[.]" AETNA, HEALTH PLAN & BENEFITS ADMINISTRATION FOR EMPLOYERS, https://www.aetna.com/administration.html (last visited July 27, 2023).

[6] *Domnister v. Exclusive Ambulette, Inc*., 607 F.3d 84, 90 (2d Cir. 2010) (plaintiff is free to construct their complaint as they see fit).

Moreover, plaintiffs should not be cut off from bringing class actions against TPAs under Section 1557. A class action is the appropriate vehicle to challenge a defendant's uniform practices that result in identical violations for numerous people. Aetna faces two other class actions challenging its unlawful infertility policy[7] and undoubtedly hopes to use a ruling in its favor in this case to prevent class certification in this matter and in those by arguing that individual issues predominate and manageability concerns militate against class certification.

Finally, a ruling that employers are necessary parties to Section 1557 claims would deter victims of discrimination from asserting those claims and create confusion for plan members who do not have Title VII claims available to them. For all of these reasons, the Court should deny Aetna's motion under Rule 19 upon finding that it can grant the plaintiff complete relief against Aetna under Section 1557.

## ARGUMENT

### A.  Section 1557 Is a Vital Tool to Remedy Widespread Discrimination.

Since its enactment in 2010, healthcare consumers have successfully invoked Section 1557 to ensure that health plans cannot exclude coverage of gender transition-related care for transgender individuals, people on their parents' insurance plans cannot be denied maternity coverage, individuals cannot be denied fertility benefits because of their age, and health insurance companies have to provide information about their services in a range of languages and accessible formats.[8] Yet discrimination in health care remains widespread, particularly

---

[7] *Goidel et al. v. Aetna, Inc.*, Southern District of New York Case No. Case No. 1:21-cv-07619 (VSB) (on behalf of a proposed New York damages and injunctive relief class); *Berton v. Aetna, Inc.*, Northern District of California Case No. 4:23-01849-HSG (on behalf of a proposed California damages class and a national injunctive relief class).

[8] *See, e.g.*, *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1022 (W.D. Wis. 2019) (holding state Medicaid plan's exclusion of gender-affirming care violated the Medicaid Act, Affordable Care Act, and Equal Protection Clause); *see* Press Release, Nat'l Women's Law Ctr., Victory in Sex Discrimination Complaints Brought By NWLC: After Investigation by HHS, Employers Change Policies (Jan. 26, 2017),

against transgender and gender diverse people, people who can become pregnant, and people with disabilities.[9]

Categorial exclusions of gender affirming care remain widespread,[10] despite the fact that such clauses violate Section 1557.[11] Moreover, even where plans do not have categorical exclusions for gender-affirming care, transgender people are frequently denied coverage pursuant to restrictions that incorrectly label medically necessary surgical treatments of gender dysphoria as "cosmetic."[12] According to a 2022 study by the Center for American Progress, over 30% of transgender and nonbinary people and 47% of transgender and nonbinary people of color reported experiencing a denial of health insurance coverage in the year prior.[13]

---

https://nwlc.org/press-release/victory-in-sex-discrimination-complaints-brought-by-nwlc-after-investigation-by-hhs-employers-change-policies/.

[9] *See, e.g.*, Tara Lagu et al., *'I Am Not the Doctor for You': Physicians' Attitudes About Caring for People with Disabilities*, 41(10) HEALTH AFFS. 1387 (Oct. 2022), https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2022.00475 (describing focus group showing physicians' bias against and general reluctance to care for people with disabilities); Saraswathi Vedam et al., *The Giving Voice to Mothers Study: Inequity and Mistreatment During Pregnancy and Childbirth in the United States*, 16 REPROD. HEALTH 77 (June 11, 2019) (finding that one in six women surveyed experience mistreatment during pregnancy or childbirth, including being shouted at, scolded, threatened by medical professionals or being ignored, refused, or receiving no response in a reasonable time to requests for help); Ethan C. Cicero et al., *Health Care Experiences of Transgender Adults: An Integrated Mixed Research Literature Review*, 42(2) ADVANCES IN NURSING SCI. 123 (April/June 2019) (literature review revealing numerous obstacles to transgender adults accessing health care, including discrimination from health care professionals and restricted health insurance benefits for medically necessary care).

[10] *See* OUT2ENROLL, SUMMARY OF FINDINGS: 2023 MARKETPLACE PLAN COMPLIANCE WITH SECTION 1557 OF THE AFFORDABLE CARE ACT, https://docs.google.com/document/d/1Nb03wlNMSEMjejjmYQN6-BOss1cqeQiYcwuExZpDHe0/edit.

[11] *See Fain*, 618 F. Supp. 3d at 335 (holding state Medicaid plan's exclusion of gender-affirming care violated the Medicaid Act, Section 1557, and Equal Protection Clause); *Flack*, 395 F. Supp. 3d 1001 (holding state Medicaid plan's exclusion of gender-affirming care violated the Medicaid Act, Section 1557, and Equal Protection Clause); *Kadel*, No. 1:19CV272, 2022 WL 17415050, at *4 (M.D.N.C. Dec. 5, 2022) (holding state employee insurance plan's categorical exclusion of gender-affirming care violated Section 1557); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997, 1002–03 (W.D. Wis. 2018) (holding state employee insurance plan's exclusion of gender-affirming care violated Title VII, Section 1557, and the Equal Protection Clause).

[12] CTR. FOR AM. PROGRESS, ADVANCING HEALTHCARE NONDISCRIMINATION PROTECTIONS FOR LGBTQI+ COMMUNITIES (Sept. 8, 2022), https://www.americanprogress.org/article/advancing-health-care-nondiscrimination-protections-for-lgbtqi-communities/.

[13] *Id.*

Health plans also frequently target pregnancy-related care for discriminatory benefit exclusions. Prior to the ACA, insurers rejected health coverage for a variety of "preexisting conditions" tied to pregnancy, such as a prior pregnancy or Cesarean delivery.[14] And in a practice known as gender rating, insurers regularly charged women more than men for the same coverage, even when a plan excluded maternity coverage.[15] Although several important ACA provisions were enacted specifically to correct these insurer practices that discriminated against people who can become pregnant, gaps in the availability and affordability of pregnancy-related care remain. For example, health plans often contain categorical exclusions of pregnancy coverage for non-spousal dependents, *i.e.*, for adult children who are depends on their parents' plans.[16] Section 1557 was enacted alongside these specific ACA provisions as an important backstop against such discrimination in health coverage.

Further, although Section 1557 prohibits discrimination based on disability, health insurance companies employ a myriad of tactics that systematically exclude or limit health care coverage for individuals with disabilities and chronic conditions.[17] In addition to being subjected to financially burdensome premiums or the denial of coverage altogether, people with disabilities or chronic conditions face coverage caps, excessive co-pays, limited provider networks, and arbitrary deductible exclusions.[18] For example, many health insurers categorize all HIV

---

[14] NAT'L WOMEN'S L. CTR., NOWHERE TO TURN: HOW THE INDIVIDUAL HEALTH INSURANCE MARKET FAILS WOMEN (2008) (on file with NWLC).

[15] NAT'L WOMEN'S L. CTR., TURNING TO FAIRNESS: INSURANCE DISCRIMINATION AGAINST WOMEN TODAY AND THE AFFORDABLE CARE ACT (Mar. 1, 2012), https://nwlc.org/resource/turning-to-fairness-insurance-discrimination-against-women-today-and-the-affordable-care-act/.

[16] *See, e.g.*, *BAGLY et al. v. U.S. Dep't of Health & Human Servs.*, Dkt. No. 56 at 6–7, District of Massachusetts Case No. 1:20-cv-11297-PBS (June 17, 2021) (listing state employee health plans containing such exclusions).

[17] *See* Sara Rosenbaum, Joel B. Teitelbaum & Katherine Hayes, *Crossing the Rubicon: The Impact of the Affordable Care Act on the Content of Insurance Coverage for Persons with Disabilities*, 25 NOTRE DAME J.L. ETHICS & PUB. POL'Y 527, 532 (2012).

[18] *See id.* at 536–539.

medications in the highest cost-sharing tier, making these lifesaving treatments unattainable to those with limited means.[19] Insurers also restrict care for people with autism by limiting coverage to antiquated, ethically questionable interventions in lieu of more modern, evidence-based treatments.[20] Additionally, insurers routinely place subjective restrictions on specialty equipment essential for individuals with disabilities, including wheelchairs, hearing aids, ventilators, and communication devices.[21] Section 1557 enables plaintiffs to challenge these practices as discriminatory.

**B. TPAs Have Long Been Gatekeepers to Health Care and Control Access to Coverage for the Majority of Americans with Employer-Sponsored Insurance.**

TPAs play a central role in designing, implementing, and allowing health care discrimination. Most people in the United States depend on their employer or a family member's employer for health coverage.[22] Sixty-five percent of workers are covered by self-funded employer-sponsored health plans, in which the employer itself pays for the cost of covered medical treatment.[23] Many employers who offer self-funded insurance plans utilize major insurance companies like Aetna as their TPAs to both design and administer health plans.

---

[19] *See* Douglas B. Jacobs & Benjamin D. Sommers, *Using Drugs to Discriminate—Adverse Selection in the Insurance Marketplace*, 372(5) N. ENGL. J. OF MED. 399, 400 (Jan. 29, 2015).

[20] *See* AUTISTIC HEALTH ADVOCACY NETWORK, HEALTH INSURANCE AND MEDICAID COVERAGE FOR AUTISM SERVICES: A GUIDE FOR INDIVIDUALS AND FAMILIES, https://autisticadvocacy.org/wp-content/uploads/2015/07/Health-Insurance-and-Medicaid-Coverage-for-Autism-Services-A-Guide-for-Individuals-and-Families-7-9-15.pdf.

[21] *See* The ALS Association, Comment Letter on Nondiscrimination in Health Programs and Activities Proposed Rule [HHS-OS-2022-0012; RIN 0945-AA17] (Oct. 3, 2022), https://www.regulations.gov/comment/HHS-OS-2022-0012-68270.

[22] *See* KATHERINE KEISLER-STARKEY & LISA N. BUNCH, U.S. DEPARTMENT OF COMMERCE, U.S. CENSUS BUREAU, HEALTH INSURANCE COVERAGE IN THE UNITED STATES: 2021, at 2 (Sept. 2022), https://www.census.gov/content/dam/Census/library/publications/2022/demo/p60-278.pdf.

[23] KAISER FAM. FOUND., EMPLOYER HEALTH BENEFITS 2022 ANNUAL SURVEY, at 156 (Sect. 10 Plan Funding) (2022), https://files.kff.org/attachment/Report-Employer-Health-Benefits-2022-Annual-Survey.pdf.

As administrators, TPAs are responsible for denying or approving claims for medical treatment, while employers are responsible for payment of claims that are approved. In many cases, TPAs use longstanding, internal clinical policies to guide their decisions to approve or deny a claim for treatment. Thus, TPAs act as gatekeepers to medical care—if a claim is denied by a TPA, a plan participant has no choice but to pay out of pocket or to forgo treatment. Because of the extraordinarily high cost of health care, the denial of coverage for a treatment often means a patient must forgo that treatment.[24]

For many transgender people, 29% of whom live in poverty compared to 16% of their cisgender counterparts, a TPA denial realistically means forgoing treatment.[25] This is especially true for Black, Latinx, and disabled transgender adults, whose poverty rates (38%, 43%, and 45% respectively) are extraordinarily high.[26] Thus, for the transgender community in particular, Section 1557 claims against TPAs are a critical means to challenge discrimination and gain access to medically necessary gender-affirming care.[27]

### C. TPAs Are Independently Liable for Their Own Discriminatory Conduct Under Section 1557, So Wellstar Is Not a Necessary Party.

Here, Plaintiff alleges Aetna violated the ACA both by designing and marketing a discriminatory plan, which Wellstar adopted, and by administering the Wellstar Plan.[28] These are

---

[24] *See* ALEX MONTERO ET AL., KAISER FAM. FOUND., AMERICANS' CHALLENGES WITH HEALTH CARE COSTS (July 14, 2022), https://www.kff.org/health-costs/issue-brief/americans-challenges-with-health-care-costs/#:~:text=High%20health%20care%20costs%20disproportionately%20affect%20uninsured%20adults%2C,or%20forgoing%20medical%20care%20due%20to%20the%20cost.

[25] NAT'L CTR. FOR TRANSGENDER EQUALITY, THE REPORT OF THE 2015 U.S. TRANSGENDER SURVEY, EXECUTIVE SUMMARY, at 3 (Dec. 2016), https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

[26] *Id.* at 4.

[27] *Boyden*, 341 F.Supp.3d at 987 ("The American Medical Association ("AMA"), the American Psychiatric Association ("APA"), the American Psychological Association, the American Counseling Association, the American Psychoanalytic Association, and the World Professional Association of Transgender Health ("WPATH"), all recognize the medical necessity of transition-related care for transgender people with gender dysphoria.").

[28] ECF No. 42 at ¶¶ 6–7, 11–13 (First Amended Complaint).

two separate bases for Section 1557 liability, but neither requires any relief be awarded against Wellstar itself.[29] Aetna's argument that Wellstar is a necessary party because Aetna cannot be liable for administering the plan (which it designed) according to its terms under ERISA was correctly rejected in *C.P. by and through Pritchard v. Blue Cross Blue Shield of Illinois*. In that case, the Court held that "ERISA's command at 29 U.S.C. § 1104 (a)(1)(D) to administer the exclusions as written is subservient to Section 1557, outlawing discrimination[.]"[30] A similar argument  was rejected in *Doe v. United Behavioral Health*, in which the plaintiff brought claims against a TPA for denying their benefits claims pursuant to an employer-sponsored plan's exclusion of applied behavior analysis treatment for autism.[31] The court granted the plaintiff's motion for summary judgment, holding that a TPA "cannot hide behind the plan terms" by claiming that it is performing only a ministerial function, and must comply with federal law—in that case the Mental Health Parity and Addiction Equity Act—even if the plan by its terms does not.[32] Aetna is not free to enforce discriminatory plan terms against LGBTQ plan members any more than it would be free to enforce a plan term that excluded women or people of a particular race from coverage.

### D.  The Real-World Effect of a Holding that Employers Are Necessary Parties in Section 1557 Suits Against TPAs Will Be to Deter Vulnerable Victims of Discrimination from Filing.

If the Court finds here that Wellstar is a necessary party—despite the fact that Plaintiff has asserted no claims against Wellstar and seeks no relief from Wellstar, and Wellstar has claimed no interested in this litigation—it will damage the ability of victims of discrimination to

---

[29] *Tovar*, 857 F.3d at 778 (established that where a TPA designs a discriminatory plan document which an employer then adopts, the plaintiff's injuries can be traceable to and redressable through a damages award against the TPA); *C.P. by and through Pritchard*, 2022 WL 17788148, at *10.
[30] *C.P. by and through Pritchard*, 2022 WL 17788148, at *10.
[31] *Doe v. United Behav. Health*, 523 F. Supp. 3d 1119, 1124–27 (N.D. Cal. 2021).
[32] *Id.* at 1127.

come forward with their claims by significantly raising the stakes of bringing such a claim. Suing one's employer necessarily entails greater risks for victims of health care discrimination than suing a TPA. A plaintiff who sues an employer directly risks retaliatory termination. Job loss, in turn, can lead not only to economic hardship but also to the loss of coverage for necessary medical care for comorbid conditions. These risks are even greater for transgender people, who disproportionately face employment discrimination, job instability, and unemployment.[33]

That retaliation for exercising one's rights under anti-discrimination laws is illegal does not mean that the fear of retaliation will not impact potential plaintiffs. Retaliation is the primary reason that so few employees report unlawful harassment and discrimination in the workplace, despite the prevalence of experiencing harassment and discrimination and longstanding legal protections.[34] Moreover, for employees whose employers do not know they are transgender, pregnant, HIV-positive, or disabled, being forced to sue their employers also entails exposure that could lead to discrimination, which could be avoided in a suit against a TPA only.

The stakes are also high for spouses and other dependents of employees. Even assuming the employer is a covered entity under Section 1557 against whom the dependent could assert a

---

[33] "The unemployment rate among [transgender] respondents (15%) was three times higher than the unemployment rate in the U.S. population (5%), with Middle Eastern, American Indian, multiracial, Latino/a, and Black respondents experiencing higher rates of unemployment." *Supra* note 25, at 10. "One in six (16%) respondents who have ever been employed—or 13% of all respondents in the sample—reported losing a job because of their gender identity or expression in their lifetime." *Id.*

[34] Lily Zheng, *Do Your Employees Feel Safe Reporting Abuse and Discrimination?*, HARV. BUS. REV. (Oct. 8, 2020), https://hbr.org/2020/10/do-your-employees-feel-safe-reporting-abuse-and-discrimination; *see also* CHAI R. FELDBLUM & VICTORIA A. LIPNIC, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, SELECT TASK FORCE ON THE STUDY OF HARASSMENT IN THE WORKPLACE (June 2016), at Section C, https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686303. According to the EEOC's analysis of over 67,000 charges filed in the 2020 fiscal year, "retaliation remained the most frequently cited claim in charges filed with the agency—accounting for a staggering 55.8 percent of all charges filed—followed by disability, race and sex." Press Release, Equal Employment Opportunity Commission, EEOC Releases Fiscal Year 2020 Enforcement and Litigation Data (Feb. 26, 2021), https://www.eeoc.gov/newsroom/eeoc-releases-fiscal-year-2020-enforcement-and-litigation-data.

Section 1557 claim,[35] suing their spouse or parent's employer not only risks third-party retaliation against the employee, but also family discord. For example, consider a transgender 20-year-old on their parent's insurance plan whose parents reject their identity; such an individual risks further emotional and financial rejection if they are required to sue their parent's employer to obtain gender affirming health care.

### E. A Ruling in Aetna's Favor Will Create Confusion for Plaintiffs Without Title VII Claims.

Moreover, a ruling in Aetna's favor will sow confusion for plaintiffs who cannot bring Title VII claims in tandem with their Section 1557 claims. Only employers who are health programs or activities that receive Federal financial assistance are covered by Section 1557,[36] and employees of non-covered employers must rely on Title VII or state or local law for redress. However, spouses and dependents often do not have Title VII claims because they are outside of Title VII's zone of interests.[37] In addition, Title VII excludes employers with fewer than fifteen employees,[38] and for many there is no feasible alternative under state or local law. Seventeen states lack explicit protection against anti-transgender discrimination,[39] and Alabama, Georgia and Missouri do not prohibit sex discrimination in employment.[40] If it is not possible for people without claims against the relevant employers to obtain complete relief from TPAs, how are they to obtain relief at all?

---

[35] The plaintiff would need to bring a Section 1557 claim because a Title VII claim would likely be unavailable. *See Tovar*, 857 F.3d at 777 (upholding dismissal of plaintiff's Title VII claim on behalf of her dependent transgender son because he did not fall within the "zone of interests" protected by the employment discrimination statute).

[36] *See* 42 U.S.C. § 18116.

[37] *Tovar*, 857 F.3d at 775–77.

[38] *See* 42 U.S.C. § 2000e(b).

[39] Movement Advancement Project, Employment Nondiscrimination, https://www.lgbtmap.org/equality-maps/employment_non_discrimination_laws (follow "State" hyperlink) (last visited July 27, 2023).

[40] *Id.*

### F.   A Ruling in Aetna's Favor Will Eviscerate the Ability of Victims of Systemic Discrimination to Seek Systemic Relief.

It does not serve judicial economy to deprive plaintiffs of the ability to use Rule 23 to achieve a resolution of hundreds or thousands of claims in a single case, but that is what a ruling in Aetna's favor will do. Requiring the joinder of employers on Aetna's theory—that the employer's conduct is central to the liability determination—threatens creating circumstances in future litigation where individual issues nearly always predominate over common ones. Moreover, depending on the scope of the class and the number of employers to be joined, it could present insurmountable manageability challenges.[41] Individual employees will have difficulty retaining counsel to litigate relatively small claims,[42] and if Aetna's logic is accepted, even the ability of an individual plaintiff to enjoin Aetna from administering plans in a manner that violates Section 1557 would be eviscerated. According to Aetna, every single employer affected by such an injunction would need to be joined. Effectively, plaintiffs could be unable to achieve systemic relief for systemic practices through any procedural vehicle.

### CONCLUSION

For the foregoing reasons, Aetna's motion to dismiss should be denied.

---

[41] *See In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 856, *as amended* (9th Cir. July 15, 1982) (noting manageability challenges of "complexity and multiplicity" of issues and presence of numerous individual defendants).

[42] This is especially true for transgender plaintiffs. As the National Transgender Bar Association has noted, to represent transgender clients effectively, "Attorneys working with trans clients must be capable of educating tribunals and the public about trans issues where relevant, shielding their clients from anti-trans 'attacks or bias,' and must stay up-to date on 'emerging and constantly changing areas of trans law.'" NAT'L TRANSGENDER BAR ASSOC., REFLECTIONS ON THE NATIONAL TRANS BAR ASSOCIATION'S FIRST YEAR: WHERE WE'VE BEEN, WHERE WE'RE GOING & OUR SURVEY OF COMMUNITY NEEDS, at 1 (2018), https://transbar.org/reports-and-publications/. Finding attorneys with the cultural competency to effectively represent transgender clients can be challenging, particularly in the South and Midwest. *Id.* at 9.

DATED:  November 13, 2023                    Respectfully submitted,


_____
Emily Rock (CT State Bar No. 29766)
**SOLOMON CENTER FOR HEALTH LAW
AND POLICY**
Yale Law School
127 Wall Street
New Haven, CT 06511
Telephone: (203) 787-8149
emily.rock@yale.edu

Rebecca Peterson-Fisher (CA State Bar No.
255359)
**LIU PETERSON-FISHER LLP**
1204 Burlingame Ave., Suite 3
Burlingame, CA 94010
Telephone: 650.461.9000
Facsimile: 650.460.6967
Email: rpf@liupetersonfisher.com

17