# EXHIBIT B

```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
 2

 3   _____
                                   )
 4   TARA KULWICKI,                )
                                   ) No. 3:22-cv-00229-VDO
 5                                 )
                  Plaintiff,       ) January 17, 2025
 6                                 )
     v.                            ) 10:03 a.m.
 7                                 )
                                   ) 450 Main Street
 8   AETNA, INC., ET AL.,          ) Hartford, Connecticut
                                   )
 9                Defendants.      )
     _____)
10

11

                   TELEPHONIC STATUS CONFERENCE
12

13

     B E F O R E:
14

             THE HONORABLE VERNON D. OLIVER, U.S.D.J.
15

16

17

18

19

20

21

22

23

24
                         Official Court Reporter:
25                       Corinne T. Thomas, RPR
                         (203) 809-0848
```

```
 1   A P P E A R A N C E S:

 2   For the Plaintiff:

 3        LYNCH CARPENTER LLP
               1133 Penn Avenue, 5th Floor
 4             Pittsburgh, PA 15222
               (412) 322-9243
 5             E-mail:  Jamisen@lcllp.com
          BY:  JAMISEN A. ETZEL, ESQ.
 6
          SCOTT & SCOTT LLP
 7             156 South Main Street
               P.O. Box 192
 8             Colchester, CT  06415
               (860) 537-5537
 9             E-mail:  Ecomite@scott-scott.com
            BY:  ERIN GREEN COMITE, ESQ.
10               AMANDA MARIE ROLON, ESQ.

11   For the Defendants:

12        BAKER BOTTS, L.L.P.
               2001 Ross Avenue, Suite 900
13             Dallas, TX 75201
               (214) 953-6542
14             E-mail:  Earl.austin@bakerbotts.com
          BY:  EARL B. AUSTIN, III, ESQ.
15             SARAH REEVES, ESQ.

16        ROBINSON + COLE LLP
               One State Street
17             Hartford, CT  06103
               (860) 275-8200
18             E-mail:  Ttucci@rc.comcn
          BY:  THEODORE J. TUCCI, ESQ.
19

20

21

22

23

24

25
```

```
1                    (Call to Order, 10:03 a.m.)

2              THE COURT:  Good morning.  This is Judge

3    Oliver on civil matter 3:22-cv-00229, Kulwicki v.

4    Aetna, et al.

5              Let's begin please with counsel announcing

6    their appearances for the record beginning with

7    counsel for the plaintiff.  Good morning.

8              MR. ETZEL:  Good morning, Your Honor.  This

9    is Jamisen Etzel of Lynch Carpenter.

10             MS. COMITE:  Good morning, Your Honor.  This

11   is Erin Green Comite of Scott & Scott Attorneys At

12   Law LLP for plaintiff along with my colleague, Amanda

13   Rolon.

14             THE COURT:  Good morning to the three of you.

15             And for the defense.

16             MR. TUCCI:  Good morning, Your Honor.  This

17   is -- sorry.  Good morning, Your Honor.  This is Ted

18   Tucci from Robinson + Cole representing Aetna.  And

19   Mr. Austin will introduce himself and his colleague.

20             MR. AUSTIN:  Yes, Your Honor.  This is Earl

21   Austin of Baker Botts representing Aetna and my

22   colleague, Sarah Reeves, is also on.

23             THE COURT:  Good morning.  Good morning to

24   the three of you.

25             We're here for a few reasons; the primary
```

1    reason is for the pre-filing conference relating to

2    the anticipated motion of summary judgment from the

3    defense.  I have a few other things.  We also have

4    the proposed schedule, but there are a few things in

5    relation to the filings that I'd like to cover before

6    I have the parties essentially summarize for the

7    record their arguments and their response.

8          We have the answer to the amended complaint

9    filed back in April and then we had, December, the

10   motion for the pre-filing -- pre-motion conference,

11   and we have a proposed filing deadline schedule and

12   joint status report filed last week, February 14th

13   for the defense, plaintiff response March 19th,

14   defense reply April 4th.

15         Let's start please with the defense

16   summarizing their arguments in support of the motion

17   for summary judgment.

18         MR. AUSTIN:  Thank you, Your Honor.  This is

19   Earl Austin.

20         The defendant here is Aetna which was the

21   third-party administrator under a plan that was

22   sponsored by Wellstar Health which was the

23   plaintiff's employer.  It's a self-funded plan

24   governed under ERISA, self-funded meaning that

25   Wellstar funds the benefits, Wellstar owns the plan.

1    The plan pre-existed Aetna's retention as third-party

2    administrator.

3          The claim against Aetna is under the

4    Affordable Care Act and the argument is Aetna

5    discriminated against the plaintiff in enforcing the

6    terms of the plan.  Since the outset of the adoption

7    of the ACA Section 1557, there's been a question

8    about what is the -- what is the liability of a

9    third-party administrator like Aetna who is

10   administering a self-funded plan where it's the

11   employer that pays the bills and the employer that

12   owns the plan.

13         The Office of Civil Rights in 2016 at the

14   outset of the Affordable Care Act implemented

15   guidelines that said that they in their enforcement

16   proceedings and their enforcement of work would focus

17   on the benefit design, who controlled the benefit

18   design of the plan, and the guidance expressly

19   acknowledged in the situation of a self-funded plan

20   that a third-party administrator typically has little

21   if any role in developing the benefit design.  That's

22   the DOCR regulations from 2016.

23         In 2020 at the time of the claims that's at

24   issue here, the regulations were even -- even made it

25   more clear that third-party administrators typically

have no role in this.  To get around that, the
plaintiffs alleged in their complaint that -- just as
sort of a boilerplate allegation that Aetna designed
the benefit, designed this plan for Wellstar and they
relied heavily on that and, of course, it was an
allegation, and I think the Court appropriately
acknowledged that, yes, that's the allegation and at
the motion to dismiss, we have to accept that as
true.

We requested some discovery on the benefit
design issue and the Court allowed it and we've now
done that discovery and the discovery, I think,
clearly shows that this was not a situation where
Aetna sold an off-shelf plan to Wellstar and Wellstar
simply adopted it.  That's not what happened.  There
was a pre-existing plan that already had an
infertility benefit subject to a medical necessity
requirement.  It's -- Aetna's medical definition of
infertility is essentially the same thing and, in
fact, the Wellstar witnesses testified that there
wasn't a material change between its plan and Aetna's
language.

There's extensive testimony about how the
plan came to be.  There was a -- Wellstar had a
benefits consultant, Mercer, which is a large

1    benefits consultant that helped them prepare the

2    plan.  There were -- the parties discussed 500

3    different items with Mercer shuttling back and forth

4    between Wellstar and Aetna and ultimately providing

5    Wellstar's determinations on what of Aetna's

6    particular policies they wanted to adopt and which

7    ones they wanted to reject and which ones they wanted

8    to modify.

9         During this process they specifically

10   discussed the infertility benefit.  Wellstar made

11   some substantial changes to it.  They had removed an

12   exclusion that would have been in the typical Aetna

13   policy.  And although they adopted the definition of

14   infertility that Aetna uses, they used the exact

15   language that's used, they rewrote it.  And I won't

16   argue that it's a material change, but it's

17   different.

18        And we think the record makes clear that the

19   decision of Wellstar to use any aspect of Aetna's

20   policy was Wellstar's decision.  It was their

21   considered judgment.  It wasn't something that Aetna

22   forced upon them.  In fact, the Wellstar witness

23   testified that they understood that they could remove

24   the medical necessity requirement for infertility,

25   they could remove the definition of infertility

1    altogether.  It was their call.

2        And we believe under those circumstances

3    given the focus of the OCR guideline and the ACA on

4    who controls the benefit design, that that's a

5    controlling factual question that will help us

6    resolve the case going forward on the legal issues.

7        The Court, of course, did rule on the motion

8    for joinder.  We could -- we've posed this as a

9    motion for summary judgment on the limited question

10    of plan design, but I think -- I do think we've

11    invested the time into the issue and it's a pivotal

12    issue and I'd be -- I just offer the possibility of

13    considering also how we use it because another

14    approach to this would be to renew the motion to

15    dismiss on the joinder issue.

16        And then subsequent to all of this when we

17    were doing all this discovery, right, literally just

18    at the last minute, we learned that the plaintiffs

19    had filed a case in Georgia against Wellstar

20    basically making the same arguments.  It's the

21    argument that the OCR says to make which is go after

22    the plan sponsor where they control the plan.  And

23    we've just felt like given the time we've invested in

24    developing these facts and the fact that we now have

25    a case in Georgia, that's -- Wellstar, that another

1   approach to this so that we may make whatever use
2   would be most beneficial to the case and to the Court
3   of this work that we've done, that we could also look
4   again at the motion to dismiss and to the joinder
5   issue.  So we've proposed it as an alternative motion
6   for that reason.
7           Broadly speaking, we feel like the facts have
8   now been developed on an issue that the regulations
9   make a pivotal one and we're open to however those
10  facts can be used -- can best be used to sort of
11  solve the problem that's now before the Court about
12  what do we do about this case where Aetna is being
13  sued as a surrogate for Wellstar and Wellstar is not
14  here but Wellstar is in a case that the plaintiffs
15  have filed in Georgia.  And that's sort of the
16  problem that's sitting on the Court's desk and we
17  propose to either deal with it through a summary
18  judgment or potentially through a renewal of the
19  motion to dismiss.
20          THE COURT:  Thank you, Attorney Austin, very
21  much for that.
22          Who will be summarizing the response for the
23  plaintiff, please?
24          MR. ETZEL:  I will, Your Honor.  This is
25  Jamisen Etzel.

1    So first of all, I read their pre-motion

2    letter as contemplating making an argument based on

3    whether Wellstar was a necessary party which, as we

4    wrote in our response, is the exact issue that the

5    Court already decided.  I'm hearing now from

6    Mr. Austin's presentation it sounds more like he

7    wants to raise a direct legal argument that Aetna is

8    not liable at all under the ACA for its conduct

9    toward the plaintiff and we have a few responses to

10    that.

11    First of all, it has never been our theory

12    that the plaintiff's claim hinges completely on which

13    of the two parties was, quote, unquote, responsible

14    for drafting the plan language.  The facts show, and

15    this is pretty clear, I think, in both parties'

16    statements of facts -- the preliminary statements of

17    facts, that both Wellstar and Aetna had essentially

18    the exact same approach to the infertility benefits

19    that this case is about.

20    So it would not have mattered if Wellstar had

21    said, Aetna, let's just use your standard plan off

22    the shelf, or if Wellstar had said, let's use the

23    language that was part of our pre-existing plan,

24    because it's exactly the same.

25    And our argument is that the way it's

1    structured and the way it limits the availability of

2    certain treatment, coverage for certain treatment,

3    based on whether the person can establish the

4    definition -- that they meet the definition of

5    infertile, the way that is all set up discriminates

6    against people that are not involved in heterosexual

7    relationships.  And like I said, it would not have

8    mattered whether one -- whether Wellstar used

9    pre-existing language or just told Aetna to use

10   whatever Aetna's standard approach is because they're

11   exactly the same.

12          And our contention is regardless of the fact

13   of which party was the origin of that language,

14   because the truth is neither one of them were or both

15   of them were, either way Aetna is still liable for

16   its role in administering the plan.  It's the -- the

17   ACA was drafted by Congress and passed in part to

18   force companies like Aetna, the insurance companies

19   that are more powerful parties across the country in

20   terms of deciding how these health plans are

21   structured, it's to push them to make sure their

22   approach to these things is not discriminatory.

23          So we're happy to confront that specific

24   legal challenge if Aetna wants to make it, but to

25   date in the case they haven't wanted to do that.

 1    They've only wanted to argue that Wellstar has to be

 2    joined to this case, and as was covered in our motion

 3    to dismiss briefing, that's not true because

 4    Wellstar -- the fact that another party might also be

 5    liable for the same conduct doesn't make them

 6    necessary parties in a specific action.

 7         We can hold Aetna liable for its role and get

 8    money damages in this case and that's all that's

 9    required.  As long as we can do that and get our

10    damages from Aetna and it's not necessary that

11    Wellstar be a part of that, they're not really a

12    necessary party.  It's totally proper for us to bring

13    separate -- a separate claim in a separate case in

14    Georgia against Wellstar.  The two cases can proceed

15    independently and there's absolutely nothing wrong

16    with that.

17         I just want to make one other point which is

18    that because of the way we limited the discovery in

19    the -- you know, the first 90 days after the Court's

20    order on the motion to dismiss and the -- we extended

21    that a little bit, but Aetna was very clear that they

22    wanted to limit our ability to get discovery and to

23    only the plan design question.

24         If Aetna is now saying they want to make an

25    argument that they're entitled to summary judgment

1    because they're not liable at all under the ACA, I
2    think that requires us to have access to discovery
3    and the other actions that Aetna was involved in like
4    its decision to deny the plaintiff's claim, all of
5    the things that were going on on Aetna's side that
6    did involve Wellstar, because our claim is also that
7    Aetna is liable for those independent actions
8    regardless of what the plan language was.
9         So I'm not sure that based on the way Aetna
10   tried to set this up that it would be appropriate for
11   them to file the full challenge based on their theory
12   now that they're not liable at all under the ACA.  I
13   think that's not exactly what they were setting up
14   for the Court in limiting our discovery to the plan
15   design, but either way, we're happy -- we're happy to
16   address in this round Aetna's general argument that
17   it could only be liable if it was, like, literally
18   responsible for drafting the plan design language
19   without Wellstar's input.
20        I think that legal question is pretty simple
21   and most of the precedents that have already come out
22   based on whether insurers that are serving as
23   administrators for self-funded plans have any
24   liability in this situation, all those cases, I
25   think, so far have gone in our direction.

1           So we're happy to deal with that now, but I

2     think we would also be entitled to more discovery on

3     some of the post-design things because it was Aetna

4     and Aetna's letterhead and Aetna's personnel that

5     were interpreting the language of the plan at the

6     time they denied the plaintiff's claim and our theory

7     of the case is that they are also responsible under

8     the ACA for those actions irrespective of Wellstar's

9     existence.  So that's basically all I have to say

10    right now.

11          THE COURT:  Thank you, Attorney Etzel.

12          Attorney Austin, anything finally?

13          MR. AUSTIN:  I guess I would -- I don't want

14    to file a needless motion.  It sounds to me like --

15    the plaintiff's pled that Aetna was responsible for

16    the design.  They seem to be saying -- has a band in

17    that argument now.  They seem to be saying now that,

18    well, maybe really the plan was the same as

19    Wellstar's previous plan and that really -- it turns

20    out now we were wrong and Aetna really didn't design

21    this plan and they're arguing that doesn't matter.

22          If that's their position, then if they'll

23    stipulate to that, then I don't need a motion asking

24    the Court to make that finding.  That was the whole

25    point of the discovery was to get to the bottom of

1   this allegation that they made in their complaint
2   that now they seem to be withdrawing.  And they're
3   right that the underlying legal issue is if you
4   have -- no Court has addressed the question if you
5   have a third-party administrator who did not design
6   the plan and simply enforced the plan as written and
7   dictated by the self-funding plan's sponsor, can that
8   third party then be forced to pay out of its own
9   pocket for enforcing the plan.  No Court has ruled on
10  that issue.
11          The Court -- the closest is a *Pritchard* case
12  in Washington that's on appeal right now before the
13  Ninth Circuit, was argued this week.  I can only go
14  by the press reports, but the panel in that case
15  expressed skepticism that third-party administrators
16  could be liable for enforcing the terms of a
17  self-funded plan.  We will see how the case obviously
18  turns out, but it was argued earlier this week before
19  the Ninth Circuit.
20          I don't want to waste anyone's time with a
21  motion on a fact issue that apparently now is no
22  longer in dispute.  But if it's not, then I think we
23  can retreat a bit and decide now what do we do if
24  they're willing to concede.  If they're no longer
25  contending that we designed the plan and they'll

1    admit and stipulate that that's no longer their

2    position and that their position is that we can be

3    responsible independently for a plan we didn't

4    design, if they will take that position, then perhaps

5    we don't need a motion except to the extent that the

6    Court might want to consider whether Wellstar should

7    be in the case.

8         I don't think that disposes of that issue

9    particularly now that we have this case in Georgia,

10   but I don't want to waste anyone's time on a fact

11   that now apparently isn't in dispute.

12        THE COURT:  Thank you very much, Attorney

13   Austin.

14        Attorney Etzel, I'll turn to you probably one

15   last time before we pivot to a different issue in

16   response to Attorney Austin's comments right now.

17        MR. ETZEL:  Sure.  I think the way that Aetna

18   has been presenting this is sort of a false

19   construct.  It's not that, you know -- it's not that

20   we're contending -- we were never contending that our

21   case was only about exactly who wrote the literal

22   words as they appeared in this plan, because the

23   truth is, and I think it's very clear by both of the

24   parties' fact submissions, it's very clear that this

25   was a pretty standard way that companies handled

 1    these types of benefits for a long time.  That's not

 2    in dispute.

 3            So it's not a surprise that the Wellstar plan

 4    is substantively identical to what Aetna did have in

 5    house as its own plan.  The fact that Wellstar didn't

 6    have to say to Aetna we want your literal written

 7    terms right off the shelf, it's irrelevant because it

 8    would have been the exact same outcome had they done

 9    that because Aetna's plan structure was exactly the

10    same.

11            So Aetna in its world has the exact same plan

12    language and -- I'm just a little -- I'm a little

13    befuddled here because Attorney Austin, I think, has

14    sort of set up an argument based on whether Wellstar

15    is a necessary party and now we're pivoting to this

16    issue of are they liable.  This is the issue that we

17    were saying at the motion to dismiss stage they

18    should have been making rather than this necessary

19    party argument and now we're pivoting into the bigger

20    question.

21            And I just -- I don't want to say that we are

22    stipulating that Wellstar drafted the language

23    because I think the focus on which party drafted the

24    language isn't really that critical.  It doesn't

25    really matter.  Either way, the plan language that

```
1   was applied to the plaintiff was discriminatory.

2   Aetna was fully involved in that.

3        Aetna could have told Wellstar when Wellstar

4   was hiring Aetna, hey, you can't use this language

5   anymore, we determined that that's discriminatory.

6   They could have said that.  They could have done

7   their own compliance research and made that decision.

8   They chose not to even though internally -- we would

9   be able to show as the case goes on, internally Aetna

10  was aware that there were issues with designing the

11  plan this way, but they didn't put any pressure on

12  their clients to change the language.

13       And so I think those types of facts are

14  pretty critical in showing that Aetna is still liable

15  under the ACA for its role in this case.  So that's

16  why I'm -- I don't want to accept Mr. Austin's

17  construct that which parties, quote, unquote, drafted

18  the plan language is really that important to the

19  theory of liability in this case because it's not.

20  There's a lot more going on than just exactly where

21  these specific words came from and it ultimately

22  doesn't matter because the structures would have been

23  exactly the same no matter which party did it.

24  That's all I have for now.

25       MR. AUSTIN:  Your Honor, can I make one last
```

1    point just so something doesn't get lost?

2         THE COURT:  Go ahead, please, Attorney

3    Austin.

4         MR. AUSTIN:  This issue of benefit design

5    isn't something I just pulled out of my hip pocket.

6    The Office of Civil Rights issued guidance in 2016 so

7    that everyone, plan sponsors, insurers, and the

8    public, would understand how the ACA -- this section

9    of the ACA should be interpreted and applied and they

10   identified the issue of benefit design as the pivotal

11   issue for who they would determine was the

12   responsible party in this instance of a self-funded

13   plan.

14        I didn't make this the issue.  It's been the

15   issue from the outset of the ACA which is why they

16   pled that we designed the plan in their pleading

17   because they wanted to satisfy that obligation.  The

18   fact -- if they are willing to now remove that issue

19   from the case, then maybe we can go a different

20   direction, although I still think the joinder issue

21   could be one the Court could entertain and I note

22   that -- in their response, they noted in a footnote

23   that the Court could reconsider the joinder motion on

24   some discovery.

25        So I just wanted to clarify why the benefit

```
 1   design issues is so pivotal here is because that's
 2   the law.
 3        MR. ETZEL:  And Your Honor, if I could just
 4   say one last thing.  My only point really here is
 5   that to date Aetna has not really teed up this
 6   argument.  All the way through this case so far the
 7   only thing they've been arguing is Wellstar is a
 8   necessary party.  They have not presented to the
 9   Court the actual argument that we are not liable
10   under Section 1557.
11        So it's -- this is a new angle now for the
12   first time we're hearing that Aetna seems ready to
13   raise that specific argument and that's the point
14   I've been trying to make and it's a pivot in terms of
15   the procedural argument.
16        MR. AUSTIN:  And I would just say
17   respectfully that's not true.  The reason they were
18   arguing -- that we've argued Wellstar is necessary is
19   because the pivotal issue is benefit design and
20   that's been our position all along.
21        THE COURT:  All right.  So Attorney Austin,
22   are you seeking to add were this to go to the
23   briefing stage and summary judgment as that initial
24   argument of liability that generally under the ACA or
25   simply limit the issue to --
```

```
 1          MR. AUSTIN:  I would like to discuss with my
 2   client because I thought that what we were dealing
 3   with was a factual contention that Aetna designed the
 4   plan.  That's why we requested discovery and why the
 5   Court, I understood, granted it is because they had
 6   made that a pivotal factual issue.  I came into the
 7   call today thinking that we would need the Court to
 8   rule on that issue, and then depending on how the
 9   Court ruled, we can then decide what would be the
10   next step.
11          If they're now taking that issue off the
12   table and they'll acknowledge that the plan Aetna was
13   a third-party administrator of was basically the same
14   plan that pre-existed for the practical purposes here
15   and they're no longer asserting that we designed the
16   plan, then that could change our position.  I'd have
17   to talk to my client, but I think we could -- I would
18   say this, I think that could tee up a legal question
19   that could cut through all of this which is the issue
20   that's pending before the Ninth Circuit right now in
21   Pritchard which is where it's acknowledged that the
22   benefit design was the plan sponsors and it wasn't
23   something that was forced upon them by the TPA, in
24   that scenario can the TPA be liable independently.
25          That's a question that's never been resolved.
```

1  It's before the Ninth Circuit right now, but I didn't

2  understand that we were there yet because I thought

3  we were still fighting over the issue about plan

4  design.  But if that's no longer the issue, we can

5  probably move on to the next step, but I'd have to

6  discuss it with my client because I haven't had that

7  discussion with them.

8        THE COURT:  I don't think Attorney Etzel

9  limited the scope of the claims as contained in the

10 amended complaint to which you filed an answer.

11       Let me ask Attorney Etzel, this case in

12 Georgia, is your firm involved in the case?  Are you

13 personally involved in this case with Attorney Green

14 and Attorney Roman?

15       MR. ETZEL:  I am.  Yes, I am in the case.

16 Attorney Green hasn't entered an appearance.  I have

17 discussed it with her.  She's aware of it, but right

18 now in the complaint, it's just my firm and local

19 counsel and I think we have another Pittsburgh-based

20 firm that's on that case with us.

21       THE COURT:  Okay.  Thank you, counsel.

22       Anything finally in response to Attorney

23 Austin's last comment for you, Attorney Etzel?

24       MR. ETZEL:  Yeah.  I will try to make it very

25 quick.  It's true in our complaint that we did allege

1    that -- you know, one of the facts we alleged was

2    that Aetna was responsible for the drafting of the

3    plan design.  It's true that that allegation exists.

4        I fully disagree with Mr. Austin's attempt to

5    pose that as the pivotal fact because it's never been

6    our position that it's a pivotal fact and because of

7    the way the facts have emerged about how Wellstar,

8    you know, did -- it did have a pre-existing plan, I'm

9    not going to dispute that fact, but the reality is

10    it's not as simple as just saying one of them drafted

11    it and the other one didn't because they were both

12    involved in this, it was a collaborative process, and

13    it's conveniently not that difficult for them to, you

14    now, finish this part of the plan because Aetna's

15    standard plan design was substantively the same.  So

16    they didn't need to change anything.

17        So the idea that just the very limited

18    concept of which party designed or drafted the plan

19    language is pivotal, that's something that we reject

20    entirely because our theory of this case is a lot

21    more nuanced than that.

22        It's also more simple in another way which is

23    that Aetna was still fully involved from beginning to

24    end.  Aetna was involved in how this plan came to be,

25    how it was administered, and how it resulted in our

1    plaintiff not getting coverage when she sought

2    treatment.

3        THE COURT:  I'm going to inquire and pull

4    back a little bit and ask about the nature of any

5    conversations between the parties understanding the

6    potential impact of this sort of agreement and

7    settlement and whatnot.

8        Have the parties been -- let me pull back and

9    ask, Attorney Austin, are you involved at all in that

10   Georgia case?  It sounds like no from your

11   description of it, like you're --

12       MR. AUSTIN:  No.  Yeah.  Because it's

13   strictly against Wellstar, so no, we're not involved.

14       THE COURT:  Just Wellstar?

15       MR. AUSTIN:  Correct.

16       THE COURT:  All right.  So have the parties

17   been discussing at all a potential of resolving one

18   or more of these issues and either narrowing the

19   scope of the litigation or reaching some sort of

20   disposition short of trial?  I do find these

21   pre-filing conferences helpful in that they focus the

22   parties' attention to the claims and you have the

23   preliminary 56 statement that also do the same.

24       So what's the status of any conversations

25   between the parties?

1            MR. AUSTIN:  I'll jump in.  We have not had

2    any serious conversations about resolution of the

3    underlying case.  I'd be happy to talk with them,

4    though, about narrowing the issues based on what's

5    occurred here today.  And I guess, you know when we

6    were at the motion to dismiss stage, you're at the

7    allegation and theory stage, but as we advance,

8    theory has to become supported by law and facts and

9    Mr. Etzel keeps arguing that they have this theory

10   that we can be liable and it's like I can sue

11   somebody without proving their negligence.  Well, no,

12   no, you can't.

13           You've can have a theory that they're liable,

14   but you have to meet the law and unfortunately for

15   him the law is that if we didn't design the plan as a

16   third-party administrator under the guidance that

17   existed under the ACA, we're not liable.  At least

18   that's our argument.  And if we can tee up that one

19   issue, then perhaps we can present the Court

20   something that would cut through this case, but I

21   didn't realize we were at that point.  I thought we

22   were still fighting over who was responsible for this

23   plan.

24           If we can have a -- if I can have a

25   discussion with Mr. Etzel about can we narrow this to

1    the narrow legal issues, then perhaps we can pursue

2    that.  I need to talk to my client because that's not

3    a discussion we've had with them.

4           THE COURT:  Thank you, counsel.

5           Attorney Etzel, what do you say?

6           MR. ETZEL:  Well, it's true we haven't had

7    any discussions regarding case resolution and I don't

8    really understand Mr. Austin's proposal about

9    narrowing anything because these are the arguments

10   that he's made.  He led with the motion to dismiss

11   that Wellstar was a necessary party.  We showed the

12   Court why that wasn't true.  Now he's saying he wants

13   to renew that argument based on essentially the same

14   concepts that they were a necessary party.  His

15   letter does not really grapple specifically with the

16   overall liability question.

17          And I do just want to point out that at the

18   motion to dismiss stage, we made it very clear in our

19   response that it was not solely our theory that the

20   plan design was the entire basis of liability.  The

21   theory -- because we've known from the beginning that

22   Wellstar was a self-funded plan.  So like, we knew

23   that Aetna could theoretically pivot into making the

24   argument that it wasn't responsible under the ACA

25   because it was just a third-party administrator and

1    we've already given the cases to the Court about that

2    issue, but up to now, Aetna has not wanted to

3    actually come and confront that argument.

4         So now that he's saying maybe we can narrow

5    something, I'm kind of at a loss as to what he means

6    because it was never our theory in the first place

7    that the plan design issue the way he is thinking

8    about it in his head is the whole end-all be-all of

9    Aetna's liability.

10         So I'm always happy to talk to him and see

11   what he's thinking about on this and we're always

12   happy to talk, have the broader conversation about

13   whether there's a way to resolve this, you know,

14   before continuing litigation.  We're always happy to

15   do that, but I'm not really sure right now exactly

16   what he's thinking about.  So that's all I can say.

17         THE COURT:  Thank you, Attorney Etzel.

18         We do have in the -- Attorney Austin, were

19   you going to say something?

20         MR. AUSTIN:  I don't want there to be any

21   confusion about it.  It sounds to me like their

22   position is that who designs the plan is not

23   material, that they can have an action of the ACA

24   against Aetna even acknowledging that Aetna played no

25   material role in the design of the plan.  I believe

1    the plan design is pivotal.  If we can take the plan

2    design issue off the table, then we can move forward

3    and test who is right given that set of facts.

4         What I can't tell from Mr. Etzel is whether

5    he's really willing to pull the trigger and say,

6    okay, I will take the plan design issue off the table

7    because that will determine where we go, although I

8    would still say that the joinder issue, should the

9    Court choose to want to consider it, it's still there

10   simply because of the growing relevance of Wellstar

11   to this ultimate question.

12        But I'm -- my view is we've spent months

13   developing this issue and let's figure out how we

14   resolve it, can we resolve it by agreement at this

15   point, and then what do we do from there.  That's my

16   view.

17        THE COURT:  All right.  So we have the joint

18   status report filed.  We have the proposed briefing

19   schedule.  I don't think Attorney Austin -- and,

20   Attorney Etzel, if I'm wrong, let me know -- that the

21   plaintiff is willing to narrow or to file an amended

22   complaint narrowing the issue to either plan design

23   or liability.  The claim appears to be both and the

24   claim appears to be whether or not Wellstar used its

25   pre-existing definition and simply has Aetna as the

1    third-party administrator is not dispositive

2    because Aetna's definition were identical to those of

3    Wellstar.

4         I don't know that the plaintiff is willing to

5    narrow its issues in the manner you suggest, that

6    plan design -- take plan design off the table as

7    opposed to making both arguments.

8         Attorney Etzel.

9         MR. ETZEL:  Yeah, that's right.  I mean, I

10   think the issue too is what do we mean when we say

11   the word "plan design," because the fact -- both

12   parties' statements of facts, and, you know, we all

13   sat through the same depositions, it was a

14   collaborative process.  I mean, it wasn't like Aetna

15   took absolutely no hand in looking at what Wellstar's

16   previous plan was before it said, yes, we'll

17   administer this.

18        I mean, Aetna has to go through its own

19   compliance.  It has the right under its contract with

20   Wellstar to say to Wellstar, well, we can't do this

21   part of your plan because we think it's illegal.

22   They have that contractual right.

23        So as the parties are collaborating and

24   coming up what will the plan be that Aetna will

25   administer, Aetna had a hand in that.  So just the

1  idea that one party designed the plan and the other

2  one didn't, I think that's a false construct.  That's

3  not really true.

4       I think Aetna's challenge is going to be make

5  an argument that its role in all of this meant that

6  it had no liability under the ACA, whatever those

7  facts are, and we're going to dispute that, period.

8       THE COURT:  Okay.  As to the briefing

9  schedule since you spoke last, Attorney Etzel,

10  anything on that?

11       MR. ETZEL:  No.

12       THE COURT:  Okay.  Attorney Austin.

13       MR. AUSTIN:  Nothing on the schedule, no,

14  Your Honor.

15       THE COURT:  All right.  So I've covered

16  everything I need to.  The question is whether there

17  can be an accord reached and it appears not and

18  that's not surprising.  That's perfectly fine.

19       The schedule we have now is defense filing

20  February 14th, plaintiff March 19th, defense reply

21  April 4th.

22       Is that still fine with you, Attorney Austin?

23       MR. AUSTIN:  It is.

24       THE COURT:  Attorney Etzel?

25       MR. ETZEL:  Yup.

1          THE COURT:  If the parties meet, confer, and

2     come up with some other way to proceed, request

3     judicial intervention by way of a magistrate judge

4     and a pre-trial and pre-settlement conference, that's

5     just fine and encouraged by the Court.  We certainly

6     do encourage the parties to continue or begin

7     off-the-record conversations.  Failing that, we do

8     have our first date, February 14.

9          I do want to thank all counsel for their deep

10    knowledge of the case and the facts presented and the

11    record that has been presented to the Court in the

12    filings.  I thank you all very much.

13          Anything before we're done?

14         MR. AUSTIN:  This is Earl Austin.  I'm happy

15    to confer with Attorney Etzel about whether -- I

16    mean, I think this whole process is very helpful, I

17    think, and I have a better idea, I think, of what

18    their position is and let's say that we do talk and

19    somehow reach some agreement that might narrow the

20    issues or even obviate this particular motion or

21    perhaps refocus the motion, would it be appropriate

22    to reach out to the Court, advise the Court of that,

23    and then perhaps we could have another conference?

24         THE COURT:  Absolutely.

25         MR. AUSTIN:  Okay.

 1          MR. ETZEL:  Your Honor, I did have one other,

 2    I guess, kind of question just to put on the table

 3    which is, you know, in the context of all of this, we

 4    still have our basic schedule.  The way that we led

 5    up to this was Aetna wanted to do a limited motion

 6    about the plan design issue.  So up until now the

 7    discovery that we've been engaged in has been pretty

 8    much limited to that stuff.

 9          We still want to proceed with taking

10    discovery on all of the other stuff, you know, how

11    were things happening on Aetna's side, because Aetna,

12    you know, objected in the past when we've tried to

13    peer into some of the things that were going on on

14    its end, like how did it come up with its own

15    internal clinical policy bulletin.

16          So the question is do we continue going with

17    full discovery at this point and working towards our

18    class certification, you know, motion that eventually

19    we're going to want to file or, you know, is that not

20    go -- is Aetna going to try to continue objecting and

21    limiting -- objecting based on the sequencing of the

22    way they want to present the arguments?  And I think

23    it might be better to get that dealt with now rather

24    than through objections and meet and confers that

25    could drag out forever.

```
 1          THE COURT:  I agree in part.  You did raise

 2   the issue earlier in this conference, Mr. Etzel.  I

 3   don't know that Attorney Austin is willing to concede

 4   or agree right now -- I certainly could be wrong and

 5   if I am, someone tell me -- to reopen discovery past

 6   the issue of plan design.  That was the initial scope

 7   and the Court's initial issue -- order limited that

 8   discovery based on the content of the pre-filing

 9   letter and certainly as we've discussed today on the

10   potential scope, expanded scope of the claim relating

11   to liability or lack thereof of Aetna.

12          It would certainly be appropriate if counsel

13   were to -- and I think it probably saves more time to

14   meet, confer, seek consent, and file a consent motion

15   or a joint motion, but to the extent Attorney Austin

16   thought it over when Attorney Etzel brought it up

17   about a half an hour or so ago about expanding the

18   scope of discovery beyond planned design, what do you

19   say, Attorney Austin?

20          MR. AUSTIN:  I would need to confer with my

21   client.  I'd be happy to talk -- if I can get a

22   better understanding from Mr. Etzel about how he

23   envisions this design issue going forward on our

24   motion, then I might have a better position to think

25   through on the discovery.  I'll commit to conferring
```

```
1    with Mr. Etzel on that issue.  I think -- in fact, I
2    think we proposed a meet and confer on that issue for
3    next week, the middle of next week.
4        THE COURT:  I was going to suggest a deadline
5    exactly in the manner you had started to suggest,
6    Attorney Austin, for the parties to confer and if
7    there's simply not going -- if there's an agreement
8    to expand that scope, it'll take the form of a
9    consent motion that will quickly be entered as an
10   order through the Court.
11       But absent a deadline for the parties to meet
12   and confer and agree, I think the litigation will be
13   better served by a date by which Attorney Etzel files
14   the motion contested or otherwise and get that issue
15   resolved as indicated in pursuit of class
16   certification the plaintiff was seeking.
17       What do you say, Attorney Etzel?
18       MR. ETZEL:  Yeah.  Because our concern right
19   now is the current scheduling order has, like, a
20   class certification deadline in, I think, May, but
21   we've been a bit hampered in our ability to move
22   forward based on this limitation on discovery.  So
23   we're happy to meet and confer and maybe just come up
24   with a proposed schedule.
25       Based on what I'm hearing about the way
```

1    Attorney Austin wants to move forward, it sounds like

2    the full liability question he wants to raise now I

3    think might require more full discovery at least so

4    that we're not prejudiced in our ability to get

5    answers about some of the other things Aetna was

6    doing, but we can talk about it and come up with a

7    proposal.

8              THE COURT:  How about if the parties have a

9    joint or consent motion related to the scope of

10   discovery, that's filed by a week from today,

11   January 24th; otherwise, Attorney Etzel files what he

12   thinks is necessary in the interest of his client by

13   that following Monday, whatever date that is, 27 --

14   27th, and we'll take it from there.  And the Court

15   will look to expedite that in light of the existing

16   deadlines rather than automatically intending to

17   expand those beyond what's necessary, although it

18   certainly may be necessary as we approach February.

19             These dates will go out in a text order, but

20   that's my suggestion and if there's no objection,

21   that will be the order.

22             MR. AUSTIN:  I think that's fine here.

23             THE COURT:  Is that you, Attorney Austin?

24             MR. AUSTIN:  Yes.  I'm sorry.

25             THE COURT:  Thank you.

```
1            Attorney Etzel.

2            MR. ETZEL:  Nothing further.  That's fine.

3            THE COURT:  All right.  Thank you both,

4    counsel.  Thank you all very much and Court is in

5    recess.  Everyone have a good weekend.

6            (Proceedings adjourned, 10:54 a.m.)

7

8

9            C E R T I F I C A T E

10

11    RE:  TARA KULWICKI v. AETNA, INC., ET AL.
                No. 3:22-cv-00229-VDO
12

13            I hereby certify that the within and

14    foregoing is a true and accurate transcript taken in

15    the aforementioned matter to the best of my skill and

16    ability.

17

18            /s/ Corinne T. Thomas

19            CORINNE T. THOMAS, RPR
                Official Court Reporter
20            United States District Court
                    450 Main Street
21            Hartford, Connecticut 06103
                    (203) 809-0848
22

23

24

25
```