IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| TARA KULWICKI, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>-v-<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. 3:22-cv-00229 (VDO) |

## DECLARATION OF JULIE EVANS

I, Julie Evans, do hereby declare and state as follows:

1. I am employed by Aetna Life Insurance Company. I have worked for Aetna Life Insurance Company, or other affiliates of Aetna Life Insurance Company, (collectively, "Aetna") for approximately 20 years. I am currently a Senior Account Executive at Aetna.

2. As a Senior Account Executive, my job involves management of Aetna's relationship with employee health plans for certain health system customers. In that capacity I managed Aetna's relationship with Wellstar Health System ("Wellstar"), which sponsors and funds the Wellstar Employee Medical Plan (the "Wellstar Plan") and was a customer of Aetna from 2016 to 2023.

3. I have personal knowledge of the following facts. If called as a witness in this action, I could and would testify competently to these facts.

4. I was deposed in this matter on October 24, 2024, and testified there about the facts recited in this declaration.

5. The Wellstar Plan is a health benefit plan sponsored by Wellstar for its employees. The Wellstar Plan is self-funded, meaning that Aetna is not the insurer and Wellstar itself pays all benefits under the Plan.

6. The Wellstar Plan predated Aetna's relationship with Wellstar.

7. In 2015, Wellstar undertook to retain a third party to provide claims administration services for the Wellstar Plan. With the assistance of Mercer, a national health benefits consulting firm that specializes in employee benefits plan strategy and design, Wellstar issued a Request for Proposal ("RFP"), which invited bids from Aetna and other bidders. Wellstar ultimately retained Aetna to serve as third party claims administrator ("TPA") for the Wellstar Plan beginning in the 2016 plan year.

8. Beginning in the fall of 2015, Mercer and Wellstar provided Aetna with the terms and benefit design of the existing Wellstar Plan. Mercer and Wellstar sent Aetna copies of the 2014 and 2015 plan documents for the Wellstar Plan and directed Aetna to those documents as the starting point for the plan document for the upcoming 2016 plan year.

9. It is my understanding that Mercer was responsible for drafting the 2016 Wellstar Plan document.

10. Wellstar, Mercer and Aetna worked collaboratively in the fall of 2015 and into 2016 to integrate the benefit design of the Wellstar Plan into Aetna's claims handling system. The parties jointly reviewed and discussed more than 500 individual benefit design and claims processing issues relating to the Wellstar Plan. Many were largely ministerial issues, such as how Aetna would code and process certain particular benefits or claims. *See, e.g.,* Evans Dep. Ex. 15 (AETNA-KULWICKI_0003562 (describing splitting the $10,000 infertility maximum to put $6,000 towards pharmacy benefits and $4,000 towards medical benefits)).

11. In other instances, however, Wellstar issued substantive directives to Aetna regarding such issues as what benefits the Plan would provide and with what limits, which benefits would be subject to specific medical necessity requirements and which would not, and what language would be used to describe the terms and limits of particular benefits. Mercer typically acted as an intermediary for these discussions, collecting and sharing information between the parties, posing questions to Aetna on behalf of Wellstar, and relaying Wellstar's directives to Aetna. Aetna often was not privy to the discussions between Mercer and Wellstar on these issues.

12. A typical example of the collaboration between Wellstar, Mercer and Aetna is reflected in a series of emails exchanged between the parties in October 2015. Evans Dep. Ex. 15 (AETNA-KULWICKI_0003562). There, a Mercer representative advised Aetna of Wellstar's decisions on various open benefit design and claims processing issues: "Hello Aetna Team, We have reviewed the outstanding items and have listed the Wellstar team responses below." *Id.* at 3566. The email then details Wellstar's decisions on numerous issues ranging from how copays would be handled to how benefit reimbursements would be calculated for various services to which of Aetna's programs would be incorporated into the Wellstar Plan and which would not. *Id.* at 3566-3568. The ensuing email exchanges show Wellstar issuing final decisions such as:

  a. Wellstar, in many cases through its consultant, directed the particular benefit language that would be used in certain sections of the 2016 Plan document. In some instances, Wellstar directed that the language from the existing Plan be used (*Id.* at 3562 ("WS Response: Use WellStar current bariatric standards attached in this email.")); in others, Wellstar elected to use language from Aetna. *Id.* ("WS Response: Use the Aetna standard and please have the return address listed as Aetna.").

    b. Wellstar directed that certain benefits would be covered regardless of medical necessity—a departure from Aetna's customary claims handling process. *Id.* ("WS Response: Nutritional counseling should continue to be covered regardless of medical necessity.")

    c. Wellstar chose not to implement a particular Aetna program for the Wellstar Plan. *Id.* ("WS Response: This program is not being implemented for 01/01. We will readdress this mid to next year.").

In each instance—whatever the result—the ultimate decision was Wellstar's, and Mercer incorporated Wellstar's directives into the Wellstar Plan document for 2016.

    13. Aetna maintains "Medical Clinical Policy Bulletins" ("CPBs") that provide clinical guidance for clinicians assessing medical necessity for various procedures. These CPBs do not replace or supersede plan coverage requirements.

    14. Aetna's CPB 327 addresses certain issues related to the medical condition of infertility. The CPB includes a definition of infertility but also provides that any customized plan provisions take precedence over the CPB with respect to specific coverage decisions.

    15. As part of the RFP process in 2015, Wellstar and Mercer requested, and Aetna provided, copies of Aetna's Clinical Policy Bulletins, including CPB 327. The Wellstar Plan Booklet went into effect on January 1, 2016, but Wellstar and Mercer continued throughout 2016 to review and revise the Plan's infertility benefit design. For example, Aetna's CPB 327 contained a provision indicating infertility services were not considered medically necessary in instances where the member or their partner had a previous sterilization procedure, with or without surgical reversal. Evans Dep. Ex. 7 (AETNA-KULWICKI_00009852 at 9859). In June 2016, a Wellstar member requested coverage that would be barred by this provision, and Wellstar and Mercer

questioned the exclusion, which was inconsistent with Wellstar's prior practice. Evans Dep. Ex. 6 (AETNA-KULWICKI_0003825). On June 24, 2016, I sent an email to Kirsten Girguis, Manager of Employee Benefits at Wellstar, acknowledging the question and offering to explore a solution: "[U]ltimately if WellStar wants it covered we WILL find a way!" *Id.*

16. On June 30, 2016, I followed up with another email to Ms. Girguis, summarizing the infertility policy as reflected in the 2016 Wellstar Plan Booklet and Aetna CPB 327. Evans Dep. Ex. 26 (AETNA-KULWICKI_0003820 at 3821-23). In that email, I quoted the definition of infertility in Aetna's CPB 327 verbatim and explained, "Basically – our coverage policy for infertility treatment, IVF, and Advanced Reproductive Technologies, applies the logic that services are covered when there is 'disease' which causes the infertility. When there is voluntary sterilization that took place – you are no longer treating a disease which is causing the infertility, rather it was a voluntary procedure which caused the infertility." *Id.* at 3821. I then advised, "I would caution you that if WellStar approves [the member's request for coverage] because you do not feel the sterilization should be taken into consideration, that we amend your plan in total to not apply this policy to ensure that all members are treated equally." *Id.* at 3823.

17. On October 25, 2016, Ms. Girguis replied to me: "Sorry this has taken a while for us to discuss and respond. Teresa [Hamilton at Wellstar] and I discussed and we do not want WellStar team members to be restricted from this benefit due to a past vasectomy. We have never restricted this benefit before and do not want to restrict it now. So for now, please let us know what we need to do to remove the vasectomy restriction…." *Id.* at 3821. On October 28, Janie Valencia, Senior Account Manager, at Aetna, advised Ms. Girguis, "We are changing the benefit to not apply the current restrictions effective 1/1/16." AETNA-KUWLICKI_003856 at 3857.

5

18. In her October 25 email, Ms. Girguis of Wellstar also advised me, "I will comb through the information you gave me to see if we have any other issues we may need to discuss with infertility." *Id.* Neither Wellstar nor Mercer raised with Aetna any additional issues regarding the infertility benefit design.

19. On November 21, 2016, Matthew Ladden from Mercer circulated to Wellstar and Aetna a final draft of the Wellstar Plan Booklet, together with a redline showing numerous revisions to the document as directed by Wellstar.[1] Evans Dep. Ex. 27 (AETNA-KULWICKI_0013344); Evans Dep. Ex. 28 (AETNA-KULWICKI_0013717). With regard to the infertility benefit, the Mercer draft reflected the following:

   a. In the "Glossary" section, Wellstar opted to include a definition of "Infertile or Infertility," though Wellstar adopted language that deviated slightly from Aetna's CPB.[2] Ex. 28 at 98. In the "Basic Infertility Expenses" section, Wellstar provided that "Covered expenses include charges made by a physician to diagnose and to surgically treat the underlying medical cause of infertility." *Id.* at 42.

   b. In the "Comprehensive Infertility and Advanced Reproductive Technology (ART) Expenses" section, Wellstar removed the sterilization exclusion but retained a provision limiting infertility coverage to "A condition that is a demonstrated cause of infertility which has been recognized by a gynecologist,

---

[1] Although the 2016 Wellstar Plan Booklet was effective as of the beginning of the year, Wellstar and Mercer did not complete their review and revision of the final document until November. This a common occurrence, especially during the first year of a new TPA relationship.

[2] Aetna's CPB 327 referred to "frequent, unprotected heterosexual sexual intercourse." The definition Wellstar adopted for its 2016 Plan Booklet referred to "timed, unprotected coitus." Aetna was not consulted about, and I do not know, the origin of this modified language Wellstar chose to include as the definition of infertility.

or an infertility specialist, and your physician who diagnosed you as infertile, and it has been documented in your medical records." *Id.*

20. Wellstar's removal of the standard exclusion for individuals who underwent elective sterilization was a customized departure from Aetna's typical plan design—but Wellstar otherwise opted to retain the general design logic that infertility benefits are intended to address infertility as a medical condition.

21. In 2020, prior to the 2021 Plan year, Wellstar terminated its relationship with Mercer and retained a new benefit design consultant, Willis Towers Watson ("WTW"). Like Mercer, WTW specializes in employee benefits plan strategy and design. WTW provided plan design consulting services to Wellstar and the Wellstar Plan for the 2021 Plan—the plan under which Ms. Kulwicki sought infertility coverage.

22. The Wellstar Plan Booklet that WTW adopted for 2021 was very different in structure, format and language from the version prepared by Mercer from 2016 to 2020. With regard to the infertility benefit, WTW adopted the same modified definition of "infertility" as in the earlier Wellstar Plan documents but moved the definition from a Glossary to the "Basic Infertility Expenses" section. Evans Dep. Ex. 4 (Wellstar 007746 at 7823). Wellstar again adopted definitional language that deviated slightly from Aetna's CPB. *Id.* WTW also retained the language from the earlier Wellstar Plan documents that defined "infertility" as a medical condition. *Id.*

23. The 2021 Plan document WTW drafted for Wellstar structured its infertility benefit differently than Aetna's customary design, however. Aetna's standard plan design offers a "Basic Infertility" benefit and an optional "Comprehensive Infertility" benefit.[3] The Basic Infertility

---

[3] Wellstar elected to provide both basic and comprehensive infertility benefits in the Wellstar Plan.

7

benefit covers the diagnosis and treatment of medical conditions that may cause or contribute to infertility and requires no showing that the member is medically infertile. For example, there are many medical conditions that can cause infertility, and Aetna's standard Basic Infertility benefit covers the treatment of those conditions without any showing that the condition has resulted in infertility. If, after treating the condition, the member is shown to be infertile, then infertility treatments are available under Aetna's Comprehensive Infertility benefit.

24.     Moreover, at all relevant times Aetna's standard benefit covered a wide range of diagnostic testing, as well as both medical and surgical procedures, to address medical conditions that may cause or contribute to infertility. These services include lab studies, Ultrasounds, consultations, surgical treatments, laparoscopies, and corrective uterine surgery—again, without any showing of infertility.

25.     The Wellstar Plan, as developed by Mercer and later WTW, modified the structure of the Wellstar benefit. For example, while the Aetna standard benefit covers both medical and surgical treatments, the Wellstar Plan addressed only surgical services. Evans Dep. Ex. 4 (Wellstar 007746 at 7823 ("Covered expenses include changes made by a physician to diagnose and to surgically treat the underlying medical cause of infertility.")). Moreover, WTW's movement of the definition of infertility into the Basic Infertility section of the 2021 Wellstar Plan was inconsistent with Aetna's typical benefit descriptions.

26.     While Aetna assisted Wellstar in customizing its infertility benefit to remove the sterilization exclusion, Aetna was not otherwise privy to any communications between Wellstar and its consultants, Mercer and WTW, about further changes Wellstar elected to make to the design of its infertility benefit. For example, Aetna was not consulted about the changes Wellstar and/or

8

Mercer made to the definition of infertility or to structure of the Basic Infertility benefit as adopted for the Wellstar Plan.

27. In 2016, when Wellstar, Mercer and Aetna were collaborating on the 2016 Wellstar Plan Booklet, the parties also discussed Wellstar's compliance with Section 1557 of the Affordable Care Act. On October 12, 2016, I advised Ms. Girguis of Wellstar that "WellStar ultimately needs their counsel to agree and advise if they are subject to the act [ACA Section 1557]." AETNA-KULWICKI_0003865. On October 29, 2016, I advised WellStar that Aetna cannot provide legal advice to its self-insured customers, and WellStar should have its own counsel review the non-discrimination act for its applicability to their employee benefit plan. If any plan changes were going to be needed, I asked Wellstar to communicate those to Aetna before November 1 for implementation on the plan renewal date in 2017.

28. Throughout its time as a customer at Aetna, I am not aware that Wellstar or its consultants ever raised a concern to Aetna that any portion of the infertility benefit contained in the Wellstar Plan was inconsistent with Affordable Care Act's Section 1557, nor did Wellstar or Mercer direct any changes to the Wellstar Plan on that basis. Nor did Aetna provide advice to Wellstar on that issue. In the course of my involvement with Wellstar and the Wellstar Plan, I had numerous discussions with representatives of Wellstar and Mercer about Wellstar's ability to customize the benefit design of the Wellstar Plan. Wellstar did, in fact, customize various aspects of its Plan design, including the design of its infertility benefit. As the party sponsoring and funding the Wellstar Plan, Wellstar had the ability to customize the definition of infertility in its plan, and it did in fact do so when proposed its own infertility language for the Plan, and also when it eliminated an exclusion related to members with a history of sterilization. Wellstar could have gone further and eliminated the medical necessity requirements for infertility benefits altogether—

as it did for other medical services—or changed, or even eliminated altogether, the definition of infertility that appeared in the Wellstar Plan. Ultimately, Wellstar adopted some aspects of Aetna's customary infertility benefit, but made substantive changes to other aspects. Aetna thereafter handled claims administration for the Plan as directed by Wellstar, in accordance with the terms Wellstar adopted.

29. Pursuant to 28 U.S.C. § 1746(2), I declare, under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

Executed this 19th day of February, 2025
Indianapolis, Indiana

_____
Julie Evans