**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TARA KULWICKI, on behalf of herself and all others similarly situated, | Case No. 3:22-cv-00229-VDO |
| Plaintiff, | |
| -v- | |
| AETNA LIFE INSURANCE COMPANY, | February 19, 2025 |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,**
**RENEWED MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT OR,**
**IN THE ALTERNATIVE, MOTION TO TRANSFER**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.      PRELIMINARY STATEMENT ............................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ............................... 3

        A.      Statement of Undisputed Facts. ............................................... 3

        B.      Procedural Background. ........................................................... 15

III.    LEGAL STANDARDS .......................................................................... 18

IV.     ARGUMENT AND AUTHORITIES .................................................... 20

        A.      *Benefit Design:*  Aetna is entitled to partial summary judgment on the limited factual issue that Wellstar Health was responsible for the benefit design of the Wellstar Plan. ................................................................. 20

        B.      *Next Steps:*  The Court could next consider Plaintiff's novel legal theory under the ACA, but a better, more efficient, course would be to dismiss Plaintiff's complaint pursuant to Rule 19 or transfer this matter to Georgia pursuant to 28 USC § 1404(a). ........................................... 23

V.      CONCLUSION ..................................................................................... 36

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AEI Life, LLC v. Lincoln Ben. Life Co.*,
  305 F.R.D. 37 (E.D.N.Y. 2015) .................................................................36

*Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*,
  474 F. Supp. 2d 474 (S.D.N.Y. 2007) ........................................................36

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................18, 19

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) .....................................................................20

*Cuevas v. Joint Benefit Tr.*,
  No. 13–cv–00045-JST, 2013 WL 3578496 (N.D. Cal. July 12, 2013) .................34

*Curley v. Brignoli, Curley & Roberts Assocs.*,
  915 F.2d 81 (2d Cir. 1990) .......................................................................31

*Curtiss-Wright Corp. v. Schoonejongen*,
  514 U.S. 73 (1995) ..................................................................................25

*D.H. Blair & Co., Inc. v. Gottdiener*,
  462 F.3d 95 (2d Cir. 2006) .......................................................................35

*Direct Energy Mktg. Ltd. v. Duke/Louis Dreyfus, LLC*,
  50 F. App'x 469 (2d Cir. 2002) .................................................................29

*Egelhoff v. Egelhoff ex rel. Breiner*,
  532 U.S. 141 (2001) .................................................................................26

*Ente Nationale Idrocarburi v. Prudential Sec. Group, Inc.*,
  744 F. Supp. 450 (S.D.N.Y. 1990) ...........................................3, 31, 32, 33, 34

*Errico v. Stryker*,
  281 F.R.D. 182 (S.D.N.Y. 2012) ...........................................................31, 33

*Felix Cinematografica v. Penthouse Int'l Ltd.*,
  99 F.R.D. 167 (S.D.N.Y. 1983) .............................................................31, 34

*FMC Corp. v. Holliday*,
    498 U.S. 52 (1990)........................................................................................25

*Gibbs Wire and Steel Co., Inc. v. Johnson*,
    255 F.R.D. 326 (D. Conn. 2009)...................................................................19

*Glob. Crossing Bandwidth, Inc. v. Locus Telecomm., Inc.*,
    632 F. Supp. 2d 224 (W.D.N.Y. 2009)..........................................................20

*Gobeille v. Liberty Mut. Ins. Co.*,
    577 U.S. 312 (2016)........................................................................................25

*Greer v. Carlson*,
    No. 1:20-cv-05484 (LTS) (SDA), 2020 WL 8340068 (S.D.N.Y. Dec. 24, 2020) .................32

*Hall v. LHACO, Inc.*,
    140 F.3d 1190 (8th Cir. 1998) .......................................................................34

*In re Air Crash Disaster Near Warsaw, Poland on May 9, 1987*,
    979 F. Supp. 164 (E.D.N.Y. 1997) ................................................................20

*Kermanshah v. Kermanshah*,
    No. 08–CV–409 (BSJ) (AJP), 2010 WL 1904135 (S.D.N.Y. May 11, 2010).......................33

*Liberty Mut. Ins. Co. v. Donegan*,
    746 F.3d 497 (2d Cir. 2014)...........................................................................25

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985)........................................................................................25

*Polargrid LLC v. Videsh Sanchar Nigam Ltd.*,
    No. 04 CV 9578 (TPG), 2006 WL 2266351 (S.D.N.Y. Aug. 7, 2006) .................20

*Prasai v. Int'l Nepali Literary Soc'y*,
    No. 14-cv-4440 (ENV) (LB), 2014 WL 4207628 (E.D.N.Y. Aug. 25, 2014).......................32

*Protegrity Corp. v. Dataguise, Inc.*,
    No. 3:13-CV-00715 VLB, 2014 WL 4716444 (D. Conn. Sept. 22, 2014).......................19, 30

*Provident Tradesmens Bank & Tr. Co. v. Patterson*,
    390 U.S. 102 (1968)...........................................................................31, 32, 34

*Quinn v. Fishkin*,
    117 F. Supp. 3d 134 (D. Conn. 2015)............................................................19

*Religious Sisters of Mercy v. Becerra*,
    55 F.4th 583 (8th Cir. 2022) .........................................................................26

*Republic of Philippines v. Pimentel,*
    553 U.S. 851 (2008)...................................................................................34

*Shrader v. CSX Transp. Inc.,*
    70 F.3d 255 (2d Cir. 1995)..................................................................19, 30

*Sutherland v. Disability RMS,*
    No. 3:16-CV-00683-JHM, 2017 WL 403574 (W.D. Ky. Jan. 30, 2017) ...............34

*Sypher v Aetna Ins. Co.,*
    No. 13-10007, 2014 WL 1230028 (E.D. Mich. Mar. 25, 2014) .........................34

*Takeda v. Nw. Nat'l Life Ins. Co.,*
    765 F.2d 815 (9th Cir. 1985) ...............................................................34

*Van Dusen v. Barrack,*
    376 U.S. 612 (1964)............................................................................35

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Board,*
    956 F.2d 1245 (2d Cir. 1992)..............................................................19

*Williby v. Aetna Life Ins. Co.,*
    867 F.3d 1129 (9th Cir. 2017) .............................................................25

**STATUTES**

28 U.S.C. § 1404 ........................................................................... *passim*

29 U.S.C. § 1001 ...........................................................25, 26, 33, 34

29 U.S.C. § 1002 ........................................................................25

42 U.S.C. § 1331 ........................................................................18

42 U.S.C. § 2000e-5 .............................................................18, 30

42 U.S.C. § 18116 .....................................................................16

**RULES AND REGULATIONS**

Fed. R. Civ. P. 12 ........................................................................ *passim*

Fed. R. Civ. P. 19 ........................................................................ *passim*

Fed. R. Civ. P. 56 .........................................................3, 20, 21, 36

45 C.F.R. § 92.3 (2020) ...........................................................27

81 Fed. Reg. 31,375 (May 18, 2016) ......................................26

iv

85 Fed. Reg. 37,160 (June 19, 2020) .............................................................................27

89 Fed. Reg. 37522 (April 27, 2024) ..........................................................................28, 33

Plaintiff's Amended Complaint (the "Amended Complaint" or "Am. Compl.") asserts that her employer's health benefit plan is discriminatory but fails to name her employer, Wellstar Health, who controlled the benefit design of the Wellstar Plan under which Plaintiff seeks recovery. Aetna moves for partial summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP" or "Rule") 56 on the limited question that Wellstar Health was responsible for the design of the infertility benefit offered by the Wellstar Plan. Alternatively, Aetna renews its motion that Wellstar Health is a necessary and indispensable party to this action involving the Wellstar Plan and that this action must be dismissed pursuant to FRCP 12(b)(7) and 19 because the Court lacks jurisdiction over either Wellstar entity. Or, in the alternative, Aetna proposes that the Court transfer this matter pursuant 28 USC § 1404(a) to the Northern District of Georgia, where the court will have complete jurisdiction over all the parties.

## I.    PRELIMINARY STATEMENT

Plaintiff Tara Kulwicki brings this action because she was denied coverage for infertility treatment under the Wellstar Employee Medical Plan ("Wellstar Plan"), an employee health benefit plan sponsored and self-funded by her employer, Wellstar Health System, Inc. ("Wellstar Health"). Wellstar Health is a hospital and healthcare system based entirely in Georgia, where Plaintiff also resides. Aetna served as claims administrator for the Wellstar Plan from 2016 to 2023 and processed Plaintiff's benefit claim in 2021.

Plaintiff complains that the Wellstar Plan conditioned certain infertility benefits upon a showing that the member is medically infertile under a generally accepted definition of the medical condition of infertility. Plaintiff alleges that she is a homosexual woman and could not satisfy the medical definition of infertility as required by the Wellstar Plan.

Aetna moved to dismiss Plaintiff's Amended Complaint under Rule 12(b)(7) on the ground that Wellstar Health and the Wellstar Plan are necessary and indispensable parties under

Rule 19 over whom this Court cannot exercise jurisdiction because they are both Georgia residents. *See, generally,* Dkt. 50-1, 56, 99. Plaintiff opposed the motion principally on the ground that she alleged in her complaint that Aetna "designed" the pertinent terms of the Wellstar Plan specifically for adoption by Wellstar Health. *See* Dkt. 55 at 2, 9, 13-14. Plaintiff offered to conduct fact discovery on the allegation and noted that the Court could reconsider Aetna's motion with the benefit of that factual record. *See id.* at 14 n.7. Aetna thereafter requested, and the Court ordered, that the parties conduct "discovery relating to the Wellstar Plan design and Aetna's role with respect to said Plan." *See* Dkt. 116.

That discovery is now complete, with the result that Plaintiff now concedes that Wellstar was the master of its own Plan, and that Aetna administered the infertility benefit as Wellstar directed. Indeed, Plaintiff, though her same counsel, has now filed a separate action against Wellstar in Georgia making that very claim.

Aetna is entitled to partial summary judgment on the limited fact issue that Wellstar Health controlled the infertility benefit offered by its Wellstar Plan and that Aetna administered the Plan according to its terms and as Wellstar intended. That question is no longer in dispute,

Moreover, by filing a separate action making this very same claim against Wellstar in Georgia, Plaintiff effectively concedes that Wellstar is a necessary and indispensable party to this dispute. Plaintiff now seeks to proceed with *separate actions* seeking the *same ruling* (i.e., that the Wellstar Plan is discriminatory) against *two different parties*. Allowing parallel litigations in these circumstances, would be "a *sheer waste* not only of the litigants' time and effort….but, surely equally important, a squandering of judicial time and effort [that] simply defies common sense." *Ente Nationale Idrocarburi v. Prudential Sec. Group, Inc.*, 744 F. Supp. 450, 461 (S.D.N.Y. 1990) (original emphasis). In light of these two significant recent developments in

this action—the clear record that Wellstar Health controlled the infertility benefit in its Wellstar Plan and Plaintiff's new suit against Wellstar Health making that very claim—Aetna renews its motion to dismiss on the ground that Wellstar Health is a necessary and indispensable party who is not subject to jurisdiction or venue in this district.  Alternatively, Aetna requests that the Court transfer this matter pursuant 28 USC § 1404(a) to the Northern District of Georgia, where the court will have complete jurisdiction over all the parties.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Statement of Undisputed Facts.[1]

#### 1.    Plaintiff and the Wellstar Plan.

Plaintiff Tara Kulwicki, a Georgia resident, worked for Wellstar Cobb Hospital in Atlanta, Georgia, which is part of Wellstar Health System, Inc. ("Wellstar"), a hospital and healthcare system based entirely in Georgia.  Am. Compl. ¶¶ 5, 21, 26.

Plaintiff was enrolled in the Wellstar Employee Medical Plan ("Wellstar Plan"), an employee health benefit plan sponsored and self-funded by Wellstar.  *Id.* at ¶¶ 5, 26.

Defendant Aetna Life Insurance Company served as the claims administrator for the Wellstar Plan from 2016 to 2023.  *Id.* at ¶ 5.

In June 2021, Plaintiff requested infertility treatments, which Aetna denied on the ground that she did not meet the medical definition of infertility under the Wellstar Plan.  *Id.* at ¶ 44. Plaintiff alleges that she is a homosexual woman and cannot satisfy the medical definition of infertility as required by the Wellstar Plan.  *Id.* at ¶¶ 27-40.

---

[1] This Statement of Undisputed Facts recites verbatim Aetna's Rule 56(a)(1) Statement and is included here for the Court's convenience.

2.    **Piedmont Wellstar and Mercer.**

The Wellstar Plan predated Aetna's retention as claims administrator.  In 2015, the year prior to Aetna's involvement, Wellstar itself administered the Wellstar Plan through Piedmont Wellstar Health Plans ("Piedmont Wellstar"), a joint venture between Wellstar and Piedmont Healthcare, another Georgia-based healthcare system.   Barbara Corey 10/21/24 Deposition Transcript ("Corey Dep.") 28:2-11, 89:23-90:5, 90:24-91:20.

During this same period prior to 2016, Wellstar also sought advice from Mercer, a national health benefits consulting firm that specializes in employee benefits plan strategy and design.   Julie Evans 10/24/24 Deposition Transcript ("Evans Dep.") 20:14-18;  Corey Dep. 97:25-98:10.  Mercer provided plan design consulting services to Wellstar and the Wellstar Plan for many years prior to 2016.  Corey Dep. 101:3-16.

In 2015, Wellstar terminated its claims administration function through the Piedmont Wellstar joint venture and, through a bid process handled by Mercer, solicited and retained Aetna to serve as third party claims administrator ("TPA") for the Wellstar Plan beginning in the 2016 plan year.  Corey Dep. 28:2-11, 51:4-52:6, 89:16-22; Evans Dep. 20:14-21:7.

3.    **Creation of the 2016 Wellstar Plan Booklet.**

Beginning in the fall of 2015, Mercer and Wellstar provided Aetna with the terms and benefit design of the existing Wellstar Plan.  Evans Dep. 99:24-100:12.  Mercer and Wellstar sent Aetna copies of the 2014 and 2015 plan documents for the Wellstar Plan and directed Aetna to those documents as the starting point for the plan document for the upcoming 2016 plan year. *Id.*; Corey Dep. 95:11-97:1.

Mercer was responsible for drafting the 2016 plan document.  Corey Dep. 131:4-7; Evans Dep. 38:3-10, 99:24-100:12; *see also* Corey Dep. Exs. 14, 16.

4

Wellstar, Mercer and Aetna thereafter worked collaboratively to integrate the benefit design of the Wellstar Plan into Aetna's claims handling system.  Evans Dep. 107:7-16; Corey Dep. 112:4-9.

The parties jointly reviewed and discussed more than 500 individual benefit design and claims processing issues relating to the Wellstar Plan.  Evans Decl. ¶ 10.  Many were largely ministerial issues, such as how Aetna would code and process certain particular benefits or claims.  *See, e.g.,* Evans Dep. Ex. 15.

In other instances, however, Wellstar issued substantive directives to Aetna regarding such issues as what benefits the Plan would provide and with what limits, which benefits would be subject to specific medical necessity requirements and which would not, and what language would be used to define the terms and limits of particular benefits.  *See Id.* (noting, for example, to cover nutritional counseling regardless of medical necessity); Corey Dep. 55:10-16 (describing Wellstar's direction to remove an exclusion from the infertility benefit).

Mercer acted as an intermediary for these discussions, collecting and sharing information between the parties, posing questions to Aetna on behalf of Wellstar, and relaying Wellstar's directives to Aetna.  Evans Dep. 107:7-16, 20-22.  Aetna typically was not privy to the internal discussions between Mercer and Wellstar on these issues.  Evans Dep. 107:17-19.

The type of collaboration between Wellstar, Mercer and Aetna is reflected in a series of emails exchanged between the parties in October 2015.  Evans Dep. Ex. 15.  There, a Mercer representative advised Aetna of Wellstar's decisions on various open benefit design and claims processing issues:  "Hello Aetna Team, We have reviewed the outstanding items and have listed the Wellstar team responses below."  *Id.* at 3566.  Wellstar issued final Plan design decisions such as:

- Wellstar directed the particular benefit language to be used in the 2016 Plan document.  In some instances, Wellstar directed that the language from the existing Plan be used; in others, Wellstar elected to use language from Aetna.  *Id.* at 3562.

- Wellstar directed that certain benefits would be covered regardless of medical necessity—a departure from Aetna's customary claims handling process.  *Id.*

In the above instances, the ultimate decision was Wellstar's, and Mercer incorporated Wellstar's directives into the Wellstar Plan document for 2016.  Corey Dep. 100:2-7, 121:14-17; Evans Dep. 101:5-13.

### 4.    The Wellstar Plan, Infertility and Medical Necessity.

The Wellstar Plan historically offered coverage for infertility treatments, subject to a requirement of medical necessity.  The Wellstar Plan documents for 2014 and 2015, the two years prior to Aetna's engagement, both provided coverage for infertility and in vitro medical services and prescriptions, but required that covered services be medically necessary, which the Plan defined, in pertinent part, as follows:

- Commonly recognized throughout the provider's specialty as appropriate for the diagnosis and/or treatment of your condition, illness, disease, or injury.
- Provided in accordance with standards of good medical practice and consistent with scientifically based guidelines of medical, research, or healthcare coverage organizations or governmental agencies that are accepted by the Plan.

Corey Dep. Ex. 10 at 4975; Corey Dep. Ex. 11 at 3582.

The 2014 and 2015 Plans also excluded coverage for "[s]ervices not medically necessary as determined by the Plan Administrator."  Corey Dep. Exs. 10 at 4986, 11 at 3617.

### 5.    The Disease of Infertility, ASRM, and the Aetna CPB.

The American Society for Reproductive Medicine ("ASRM") historically recognized that "[i]nfertility is a disease which generates disability as an impairment of function" and defined the disease of infertility as follows:

> Infertility is a disease historically defined by the failure to achieve a successful pregnancy after 12 months or more of regular, unprotected sexual intercourse or due to an impairment of a person's capacity to reproduce either as an individual or with her/ his partner.[2]

Aetna has developed Medical Clinical Policy Bulletins ("CPBs") addressing various medical diseases and conditions to provide guidance in the administration its plans.

Aetna's CPB 0327 addresses the disease of infertility, and throughout the relevant time period, expressly adopted the ASRM definition of infertility:

> For purposes of this policy, a member is considered infertile if he or she is unable to conceive or produce conception after 1 year of frequent, unprotected heterosexual sexual intercourse, or 6 months of frequent, unprotected heterosexual sexual intercourse if the female partner is 35 years of age or older. Alternately, a woman without a male partner may be considered infertile if she is unable to conceive or produce conception after at least 12 cycles of donor insemination (6 cycles for women 35 years of age or older). However, this definition of infertility may vary due to state mandates or plan customization; please check plan documents.

Aetna CPB 0327, 10/26/2020

### 6.    Wellstar's 2016 Infertility Benefit Design.

As part of the bid process in 2015, Wellstar and Mercer requested, and Aetna provided, copies of Aetna's Clinical Policy Bulletins, including CPB 327.  Evans Dep. 49:4-7.

---

[2]  American Society for Reproductive Medicine, "Definitions of infertility and recurrent pregnancy loss: a committee opinion," Practice Committee of the American Society for Reproductive Medicine (Fertil Steril 2020;113:3) Definitions of infertility and recurrent pregnancy loss: a committee opinion (fertstert.org) ("ASRM 2020").

The Wellstar Plan Booklet was effective January 1, 2016, but Wellstar and Mercer continued throughout 2016 to review and revise the Plan's infertility benefit design. For example, Aetna's CPB 327 contained a provision excluding coverage for infertility services in instances where the member or their partner had a previous sterilization procedure, with or without surgical reversal. Corey Dep. 54:7-20; Corey Dep. Ex. 7 at 9859.

In June 2016, a Wellstar member requested coverage that would be barred by this provision, and Wellstar and Mercer questioned the exclusion, which was inconsistent with Wellstar's prior practice. Evans Dep. Ex. 6. On June 24, 2016, Julie Evans, Aetna's account manager for Wellstar, sent an email to Kirsten Girguis, Manager of Employee Benefits at Wellstar, acknowledging the question and offering to explore a solution: "[U]ltimately if WellStar wants it covered we WILL find a way!" *Id.* at 3825.

On June 30, 2016, Ms. Evans followed up with another email to Ms. Girguis, summarizing the infertility policy as reflected in the 2016 Wellstar Plan Booklet and Aetna CPB 327. Evans Dep. Ex. 26 at 3821-23. Ms. Evans quoted the ASRM-based definition of infertility from CPB 327 verbatim and explained, "Basically – our coverage policy for infertility treatment, IVF, and Advanced Reproductive Technologies, applies the logic that services are covered when there is 'disease' which causes the infertility. When there is voluntary sterilization that took place – you are no longer treating a disease which is causing the infertility, rather it was a voluntary procedure which caused the infertility." *Id.* at 3821. Ms. Evans then advised, "I would caution you that if WellStar approves [the member's request for coverage] because you do not feel the sterilization should be taken into consideration, that we amend your plan in total to not apply this policy to ensure that all members are treated equally." *Id.* at 3823.

On October 25, 2016, Ms. Girguis replied: "Sorry this has taken a while for us to discuss and respond. Teresa [Hamilton at Wellstar] and I discussed and we do not want WellStar team members to be restricted from this benefit due to a past vasectomy. We have never restricted this benefit before and do not want to restrict it now. So for now, please let us know what we need to do to remove the vasectomy restriction…." *Id.* at 3821. On October 28, Janie Valencia, Senior Account Manager, at Aetna, advised Ms. Girguis, "We are changing the benefit to not apply the current restrictions effective 1/1/16." AETNA-KULWICKI_0003856 at 3857.

In her October 25 email, Ms. Girguis of Wellstar also advised Aetna's Ms. Evans, "I will comb through the information you gave me to see if we have any other issues we may need to discuss with infertility." *Id.* Neither Wellstar nor Mercer raised with Aetna any additional issues regarding the infertility benefit design. Evans Decl. ¶ 18.

On November 21, 2016, Matthew Ladden from Mercer circulated a final draft of the Wellstar Plan Booklet, together with a redline showing numerous revisions as directed by Wellstar. Evans Dep. Exs. 27, 28.

With regard to the infertility benefit, the Mercer draft reflected the following:

- In the "Glossary" section, Wellstar opted to include the ASRM definition of "Infertile or Infertility," as reflected in Aetna's CPB 327, though Wellstar adopted language that deviated slightly from both ASRM and Aetna's CPB.[3] Evans Dep. Ex. 28 at 98. Aetna was not consulted about, and does not know the origin of, the modified language Wellstar chose for the Wellstar Plan; Mercer handled the drafting of the final Plan document. Evans Decl. ¶ 19(a).

---

[3] The ASRM definition referred to cycles of "regular, unprotected sexual intercourse" and Aetna's CPB 327 referred to "frequent, unprotected heterosexual sexual intercourse." The definition Wellstar adopted for its 2016 Plan Booklet referred to "timed, unprotected coitus."

- In the "Basic Infertility Expenses" section, Wellstar provided that "Covered expenses include charges made by a physician to diagnose and to surgically treat the underlying medical cause of infertility." Evans Dep. Ex. 28 at 42.

- In the "Comprehensive Infertility and Advanced Reproductive Technology (ART) Expenses" section, Wellstar removed the sterilization exclusion but retained a provision limiting infertility coverage to "A condition that is a demonstrated cause of infertility which has been recognized by a gynecologist, or an infertility specialist, and your physician who diagnosed you as infertile, and it has been documented in your medical records." *Id.*

Barbara Corey, Wellstar's Senior Vice President for Managed Care, testified that the definition of infertility included in the 2016 Wellstar Plan Booklet was consistent with generally accepted medical consensus and medical necessity standards of the kind that Wellstar, as a healthcare and hospital system, typically followed. Corey Dep. 50:10-25, 124:10-15.

Although the Wellstar Plan historically had an infertility benefit before Aetna's involvement—a benefit that was based on medical necessity—Wellstar understood that, in transitioning to Aetna, it could structure that benefit going forward however it wanted. Corey Dep. Ex. 10 at 4975; Corey Dep. 121:5-17.

Ms. Corey further testified that Wellstar understood that it could customize the design of its infertility benefit—including removal of a requirement of medical necessity—and that the benefit design ultimately reflected in the Wellstar Plan was the design Wellstar itself adopted. Corey Dep. 151:23-152:12.

### 7.    Wellstar Confirms Its Infertility Benefit Design.

After the 2016 Wellstar Plan Booklet was finalized, Mercer continued to handle the drafting of the Plan documents for 2017 through 2020.  Evans Dep. Ex. 17.

In preparing the 2017 Wellstar Plan Booklet, Wellstar and Mercer directed questions to Aetna about and specifically confirmed the cycle requirements to satisfy the definition of infertility under the Wellstar Plan.  *Id.*  Aetna was not privy to the internal discussions between Wellstar and Mercer on this issue, but neither Wellstar nor Mercer ever directed Aetna to revise the cycle requirements in the infertility benefit design.  See Evans Dep. 156:12-18, 158:22-159:4.

Under the terms of the Wellstar Plan, Wellstar also participated in the appeal process for individual member benefit claims.  Corey Dep. 163:20-165:2.  In 2018, Aetna denied another member's request for infertility coverage under the terms of the Plan, and Wellstar reviewed and approved Aetna's decision on the ground that the "patient is not considered infertile."  Corey Dep. Ex. 19 at 1410.

### 8.    Wellstar's 2021 Plan Document.

In 2020, Wellstar terminated its relationship with Mercer and retained a new benefit design consultant, Willis Towers Watson ("WTW").  Evans Dep. 56:1-3.  Like Mercer, WTW specializes in employee benefits plan strategy and design.   WTW provided plan design consulting services to Wellstar and the Wellstar Plan for the 2021 Plan—the plan under which Ms. Kulwicki sought infertility coverage.  Evans Dep. 56:1-6; Corey Dep. 26:2-10.

The Wellstar Plan Booklet that WTW adopted for 2021, Evans Dep. Ex. 4, was different in structure, format and language from the version prepared by Mercer from 2016 to 2020.  *Compare* Evans Dep. Ex. 5 *with* Evans Dep. Ex. 4.

11

With regard to the infertility benefit, WTW adopted the same modified ASRM definition of "infertility" as in the earlier Wellstar Plan documents but moved the definition from a Glossary to the "Basic Infertility Expenses" section.  Evans Dep. Ex. 4 at 76.

WTW also retained the language from the earlier Wellstar Plan documents that defined "infertility" as a medical condition.[4]  *Id*.

### 9.    Wellstar Plan Documents and Aetna "Standard."

When Wellstar decided to remove the sterilization exclusion from its infertility benefit, Aetna's Ms. Evans advised Wellstar that Aetna's customary infertility policy "applies the logic that services are covered when there is 'disease' which causes the infertility."  Evans Dep. Ex. 26 at 3821.

Aetna's CPB 327 makes clear that customized plan language supersedes Aetna's standard policies.[5]

Wellstar's removal of the standard exclusion for individuals who underwent elective sterilization was a customized departure from Aetna's typical plan design—but Wellstar otherwise opted to retain the general design logic that infertility benefits are intended to address infertility as a medical condition.  Evans Decl. ¶ 20.

Wellstar, through Mercer and later WTW, also customized the Wellstar Plan in other ways.  For example, the definition of "infertility" that Wellstar adopted for all of its plans from 2016 through 2021, varied slightly from both ASRM and Aetna's CPB.[6]

---

[4] *See* discussion at p. 9-10, *supra*.

[5] *See* p. 7, *supra*.

[6] *See* n. 3, *supra*.

Wellstar structured its infertility benefit differently than Aetna's customary design. Aetna's standard plan design offers a "Basic Infertility" benefit and an optional "Comprehensive Infertility" benefit.  Evans Decl. ¶¶ 22-23.

Aetna's standard Basic Infertility benefit covers a wide range of diagnostic testing, as well as both medical and surgical procedures, to address medical conditions that may cause infertility. The diagnosis and treatment of these conditions are covered with no showing that the member is medically infertile.  *Id.* ¶¶ 23-24.  If, after treating the underlying condition, the member is shown to be infertile, then infertility treatments are available under Aetna's Comprehensive Infertility benefit.  *Id.* ¶ 23.

Aetna's standard Basic Infertility benefit covers a wide range of diagnostic testing, as well as both medical and surgical procedures, to address medical conditions that may cause infertility.  These services include lab studies, Ultrasounds, consultations, ovulation induction with certain medications, surgical treatments, laparoscopies, and corrective uterine surgery— again, without any showing of infertility.  *Id.* ¶¶ 23-24.

The Wellstar Plan, as developed by Mercer and later WTW, modified the structure of Aetna's standard Basic Infertility benefit.  For example, while the Aetna standard benefit covers both medical and surgical treatments, the Wellstar Plan addressed only services to "surgically treat the underlying medical cause of infertility."  Evans Dep. Ex. 4 at 7823.  Moreover, WTW's movement of the definition of infertility into the Basic Infertility section of the 2021 Wellstar Plan was inconsistent with Aetna's typical benefit description, which requires no showing of infertility to access basic infertility services.  Evans Decl. ¶ 25.

Aetna assisted Wellstar in customizing the Wellstar Plan to remove the sterilization exclusion from the infertility benefit, but Aetna was not privy to any internal discussions

between Wellstar and its two consultants, Mercer and WTW, about the additional changes Wellstar made to the design of its infertility benefit.  *Id.* ¶ 26.

### 10. Wellstar and ACA Section 1557.

In 2016, when Wellstar, Mercer and Aetna were collaborating on the 2016 Wellstar Plan Booklet, they discussed Wellstar's compliance with Section 1557 of the Affordable Care Act. On October 12, 2016, Ms. Evans of Aetna advised Ms. Girguis of Wellstar that "WellStar ultimately needs their counsel to agree and advise if they are subject to the act [ACA Section 1557]."  AETNA-KULWICKI_0003865.

On October 29, 2016, Ms. Evans advised WellStar that Aetna cannot provide legal advice to its self-insured customers, and WellStar should have its own counsel review the non-discrimination act for its applicability to their employee benefit plan.  If any plan changes were going to be needed, Ms. Evans asked Wellstar to communicate those to Aetna before November 1 for implementation on the plan renewal date in 2017.  Evans Decl. ¶ 27.  Wellstar relied on outside counsel to make sure its plans were compliant with applicable laws and regulations. Corey Dep. 38:7-20.

Neither Wellstar nor Mercer ever raised with Aetna any concern that the infertility benefit set forth in the Wellstar Plan was inconsistent with the provisions of ACA Section 1557 or directed any revisions to the Wellstar Plan on that basis.  Evans Decl. ¶ 28; *see also* Corey Dep. 40:22-41:3.

### 11. The Wellstar-Aetna Master Services Agreement.

When Wellstar retained Aetna to provide claims administration services for the Wellstar Plan, the parties entered into a Master Services Agreement ("MSA"), which governed Aetna's engagement from 2016 to 2023.  Evans Dep. Ex. 22, Evans Dep. 35:9-25.

In that agreement, Wellstar agreed that Aetna's review of the Plan Documents was limited to a determination that "Aetna's claim processing systems and internal policies and procedures are consistent with the Plan Documents and that Aetna will be able to perform the Services in the accordance with the Agreement," and specifically acknowledged that "Aetna has NOT reviewed the Plan Documents for compliance with appliable law."  Evans Dep. Ex. 22 at 5131 (original emphasis).

Wellstar also expressly retained "the final and sole authority regarding the benefits and provisions of the Plan(s), as outlined in [Wellstar'] Plan document" and agreed that "Aetna shall have no responsibility or liability for the content of any of [Wellstar's] Plan documents. . ., regardless of the role Aetna may have played in the preparation of such documents."  *Id.* at 5149

### B.    Procedural Background.

#### 1.    Plaintiff's Amended Complaint.

Plaintiff filed her original Complaint against Aetna on February 9, 2022.  After Aetna moved to dismiss that complaint, Plaintiff filed the present Amended Complaint on May 13, 2022.

> Plaintiff brings this case as a class action on behalf of herself and:
>
> All non-heterosexual individuals who: 1) were assigned "female" at birth; 2) are covered by an Aetna medical or health insurance plan that includes or is governed by the definition of "infertility" appearing in Aetna's Clinical Policy Bulletin No. 0237 [sic] or a substantively similar definition; 3) because of their sexual orientation, cannot engage in coitus; and 4) either (a) submitted a claim for infertility treatment benefits and were denied; (b) paid out-of-pocket for infertility treatment; or (c) will submit and be denied benefits, or pay-out-of-pocket, for infertility treatment.

Am. Compl. at ¶ 56.  Plaintiff asserts that because she and members of the putative class are unable to get pregnant through "unprotected coitus" with a male partner and require alternative fertility treatments, they are unfairly required to pay out-of-pocket for IUI to establish infertility.

*Id.* at ¶¶ 4, 12. This, she alleges, excludes them from full participation in the Wellstar Plan and constitutes discrimination on the basis of sexual orientation in violation of Section 1557 of the ACA. *Id.* at ¶¶ 15-18, 90.

Plaintiff asserts two counts of discrimination under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a) (the "ACA") and seeks a declaratory judgment that (1) "Defendant owes a legal duty to comply with Section 1557 of the ACA to not deny benefits for infertility treatment on the basis of sexual orientation in any of the medical plans it designs, drafts, issues, sells, or administers; (2) [r]easonable consumers would expect Defendant to comply with Section 1557 of the ACA and to provide benefits for infertility treatment to Plaintiff and the putative Class; and (3) Defendant continues to breach its legal duties by denying members of the putative Class benefits under the Medical Plan, and other medical plans throughout the country, for infertility treatment on the basis of sexual orientation." *Id.* at ¶ 91.

### 2.    Aetna's Motion to Dismiss.

On June 3, 2022, Aetna moved to dismiss Plaintiff's Amended Complaint under FRCP 12(b)(7) on the ground that Wellstar Health and the Wellstar Plan are necessary and indispensable parties under FRCP 19 over whom this Court cannot exercise jurisdiction because they are both Georgia residents. *See, generally,* Dkt. 50-1, 56, 99.

Plaintiff opposed the motion principally on the ground that her complaint alleged that Aetna "designed" the pertinent terms of the Wellstar Plan specifically for adoption by Wellstar Health, *see* Dkt. 55 at 2, 9, 13-14, 16, but offered to conduct fact discovery on the allegation: "To the extent that the Court deems it necessary to make a factual determination related to the exact apportionment of responsibilities between Aetna and employers or plan sponsors like Wellstar, Plaintiff requests discovery into, at minimum, the relationship between Defendant and the Medical Plan and its policies and training related to claim administration, all of which are in

the exclusive possession, custody, and control of Defendant." *See id.* at 14 n.7. Plaintiff also noted that the Court could reconsider Aetna's motion with the benefit of that factual record. *Id.*

The Court granted in part and denied in part Aetna's motion to dismiss on March 12, 2024. Dkt. 113.

### 3.    The parties' discovery.

In the parties' Amended Rule 26(f) Statement following the Court's ruling on Aetna's motion, Aetna noted that "Plaintiff's assertion that Aetna—and Aetna alone—designed the infertility benefit of the Wellstar Plan was the linchpin of her opposition to Aetna's motion to join Wellstar in this action" and proposed that "the parties should focus their discovery efforts first toward the resolution of this threshold issue that Plaintiff has made central to her case—specifically, Aetna's role in the design of the infertility benefit in the Wellstar Plan—before embarking on broad, class-wide discovery." *See* Dkt. 115 at 9. The Court ordered that the parties conduct "discovery relating to the Wellstar Plan design and Aetna's role with respect to said Plan." *See* Dkt. 116.

The parties thereafter developed a substantial factual record regarding the origins of the infertility benefit design of the Wellstar Plan. Aetna and Wellstar Health collectively produced over 21,000 pages of documents detailing their discussions about the benefit design of, and their respective roles in the development of, the Wellstar Plan. The parties deposed a corporate representative of Wellstar Health, as well as the Aetna employee with principal responsibility and personal knowledge of Aetna's dealings with Wellstar Health in these issues throughout the parties' relationship.

### 4.    Plaintiff's new Georgia action against Wellstar Health.

On October 15, 2024, after the document productions by Aetna and Wellstar Health in this case, Plaintiff, through her counsel in this action, filed a separate class action against

Wellstar Health in the Northern District of Georgia alleging that the Wellstar Plan, and its definition of infertility, violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3), as amended by the Civil Rights Act of 1991, and 42 U.S.C. § 1331.  Plaintiff amended her Complaint on December 19, 2024, a copy of which is attached hereto as Declaration of Sarah Reeves ("Reeves Decl.") Ex. A.  Plaintiff alleges in that action that the Wellstar Plan, and its definition of infertility, "discriminates against non-heterosexual female employees on the basis of sex (female-sexual orientation and sex-stereotyping)."  *Id.* at ¶ 23.  It specifically avers, moreover, that Wellstar had control over the plan, could have chosen to offer a different set of benefits thereunder, and is responsible for the resulting discrimination. *Id.* at ¶ 22-25.  Plaintiff's allegations against Wellstar Health in the Georgia action mirror her allegations against Aetna here.  *Compare* Am. Compl. [Dkt. 42] ¶¶ 27-41 *with* Ex. A ¶¶ 12-22.  The classes Plaintiff seeks to certify in each action are similar and embrace non-heterosexual individuals who were denied infertility coverage under the Wellstar Plan on the basis of the Plan's definition of infertility. *Compare* Am. Compl. [Dkt. 42] ¶ 56 *with* Ex. A ¶¶ 29.

### III.    LEGAL STANDARDS

A motion for summary judgment should be granted where there is no genuine issue as to any material fact, and it's clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court's inquiry is a threshold one, determining only whether there is a need for a trial, or in other words, whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In determining whether to grant a motion for summary judgment, courts resolve all ambiguities and draw all reasonable inferences against the moving party, who has the burden of

demonstrating the absence of any material factual issue in dispute. *Id.* at 255. If, however, a non-moving party has failed to make a sufficient showing on an essential element of its case for which it has the burden of proof, then summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323.

A court may reconsider a motion to dismiss where a party is able to point to "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Protegrity Corp. v. Dataguise, Inc*., No. 3:13-CV-00715 VLB, 2014 WL 4716444, at *2–3 (D. Conn. Sept. 22, 2014) (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Board,* 956 F.2d 1245, 1255 (2d Cir. 1992). Although a motion to reconsider is not proper solely where the parties seek to relitigate issues already decided by the court, it is appropriate where the moving party can point to information "that might reasonably be expected to alter the conclusion reached by the court." *Id.* at *3 (*citing Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).

Similarly, when considering a motion to dismiss under Rule 12(b)(7) for failure to join a party under Rule 19, "a court may consider evidence outside of the pleadings." *Quinn v. Fishkin,* 117 F. Supp. 3d 134, 139 (D. Conn. 2015); *see also* 5C Wright & Miller, Federal Practice & Procedure § 1359 (3d ed. 2021). This is because "the Rule 19 inquiry is a fact specific and practical one." *Gibbs Wire and Steel Co., Inc. v. Johnson,* 255 F.R.D. 326, 331 (D. Conn. 2009) (*citing Polargrid LLC v. Videsh Sanchar Nigam Ltd.,* No. 04 CV 9578 (TPG), 2006 WL 2266351, at *9 (S.D.N.Y. Aug. 7, 2006).

Finally, in considering Aetna's motions under Rule 12(b)(1) and (7), the Court may consider the Wellstar Plan documents and Wellstar's administrative agreements with Aetna

because Plaintiff's Amended Complaint arises from and is based on the terms of the Wellstar

Plan. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

## IV.    ARGUMENT AND AUTHORITIES

### A.    *Benefit Design:*  Aetna is entitled to partial summary judgment on the limited factual issue that Wellstar Health was responsible for the benefit design of the Wellstar Plan.

Under Rule 56(a), a court may grant summary judgment on a "part" of a claim or

defense.  Additionally, Rule 56(f)(3) provides that the court may "consider summary judgment

on its own after identifying for the parties material facts that may not be genuinely in dispute."

And Rule 56(g) provides that the court "may enter an order stating any material fact—including

an item of damages or other relief—that is not genuinely in dispute and treating the fact as

established in the case."  The Advisory Committee notes to Rule 56 explain that partial summary

judgment is "merely a pretrial adjudication that certain issues shall be deemed established for the

trial of the case."  Fed. R. Civ. P. 56, Advisory Committee Note.

Rule 56 thus "authorizes the court to make an order establishing the uncontroverted

facts." *In re Air Crash Disaster Near Warsaw, Poland on May 9, 1987*, 979 F. Supp. 164, 167

(E.D.N.Y. 1997); *Glob. Crossing Bandwidth, Inc. v. Locus Telecomm., Inc*., 632 F. Supp. 2d

224, 238 (W.D.N.Y. 2009) ("[S]uch 'partial' summary judgment might render it unnecessary to

try those remaining issues at all, or at the very least, might take certain issues out of the case, so

that the eventual trial could be conducted more efficiently, with the focus on those areas that

remain genuinely in dispute.").

At the Court's direction, the parties conducted "discovery relating to the Wellstar Plan

design and Aetna's role with respect to said Plan." *See* Dkt. 116. The parties have developed a

substantial factual record regarding the origins of the infertility benefit design of the Wellstar

Plan.  In sum, the factual record shows the following.

The Wellstar Plan predated Aetna's relationship with Wellstar Health. Wellstar Health developed the Wellstar Plan in consultation with Mercer, a national consulting firm that specializes in employee benefits plan strategy and design. See Aetna's Rule 56(a)(1) Statement of Undisputed Material Facts ("SOF") at ¶¶ 5-6. Wellstar Health, as a sophisticated hospital and healthcare organization, also had access to and relied upon its own internal medical staff in developing the Wellstar Plan. *Id.* at ¶ 29.

In 2015, Wellstar Health, through Mercer, solicited Aetna through a bid process to serve as third-party claims administrator for the Wellstar Plan for the 2016 plan year. Aetna served in that capacity until 2023. *Id.* at ¶ 3. In preparation for the 2016 plan year, Wellstar Health, Mercer and Aetna worked collaboratively to integrate the benefit design of the Wellstar Plan into Aetna's claims handling system. The parties jointly reviewed and discussed more than 500 individual benefit design and claims processing issues relating to the Wellstar Plan. *Id.* at ¶¶ 8, 10-11. Mercer typically acted as an intermediary for these discussions, collecting and sharing information between the parties, posing questions to Aetna on behalf of Wellstar, and relaying Wellstar's plan design decisions and directives to Aetna. Aetna typically was not privy to the internal discussions between Mercer and Wellstar on these issues. *Id.* at ¶ 13.

The preexisting Wellstar Plan offered an infertility benefit, subject to a requirement that a covered service must be medically necessary "in accordance with standards of good medical practice and consistent with scientifically based guidelines of medical, research, or healthcare coverage organizations or governmental agencies that are accepted by the Plan." *Id.* at ¶ 16. In preparing the plan document for 2016, Wellstar Health, Mercer and Aetna discussed the infertility benefit, specifically and in detail, including the provisions and application of Aetna's Clinical Policy Bulletin 327 and its definition of infertility. *Id.* at ¶¶ 21-26. Wellstar Health

specifically revised Aetna's customary infertility benefit, and the application of Aetna's CPB 327 to the Wellstar Plan, by removing a particular infertility exclusion. *Id.* at ¶ 25. Wellstar Health otherwise retained the general medical necessity requirement for infertility benefits and adopted a modified version of the CPB 327 definition of infertility. *Id.* at ¶ 28.

The definition of infertility in both the Wellstar Plan and Aetna's CPB 327 adopted the prevailing ASRM definition of the medical condition of infertility. *Id.* at ¶¶ 20, 28(a). A Wellstar representative testified that the definition of infertility included in the 2016 Wellstar Plan Booklet was consistent with generally accepted medical consensus and medical necessity standards of the kind that Wellstar, as a healthcare and hospital system, typically followed. *Id.* at ¶ 29. Although the Wellstar Plan historically had an infertility benefit before Aetna's involvement—a benefit that was based on medical necessity—Wellstar understood that, in transitioning to Aetna, it could structure that benefit going forward however it wanted. *Id.* at ¶ 30. Wellstar understood that it could customize the design of its infertility benefit—including removal of a requirement of medical necessity or a definition of infertility as a medical condition—and that the benefit design of the Wellstar Plan ultimately reflected Wellstar Health's own design choices. *Id.* at ¶ 31.

There is no material dispute that Wellstar controlled the benefit design of its own Plan and that the infertility coverage the Wellstar Plan offered ultimately reflected precisely the benefit Wellstar intended to provide. Indeed, Plaintiff's counsel acknowledged as much at the pre-filing conference:

- "The facts show. . . that both Wellstar and Aetna had essentially the exact same approach to the infertility benefits that this case is about." *See* Reeves Decl. Ex. B, Transcript of Pre-Filing Conference, January 17, 2025 ("Tr."), at 10:14-19.

- "So it would not have mattered if Wellstar had said, Aetna, let's just use your standard plan off the shelf, or if Wellstar had said, let's use the language that was part of our pre-existing plan, because it's exactly the same." *Id.* at 10:20-24; *see also id.* at 11: 7-11.

- "The fact that Wellstar didn't have to say to Aetna we want your literal written terms right off the shelf, it's irrelevant because it would have been the exact same outcome had they done that because Aetna's plan structure was exactly the same." *Id.* at 17:5-10.

In sum, the infertility benefit in the Wellstar Plan that Aetna administered was "exactly the same" as the benefit in Wellstar's preexisting Plan—both treated infertility as a medical condition and provided coverage subject to a requirement of medical necessity. That Plan design was entirely Wellstar's decision, and Aetna administered the Wellstar Plan according to its terms and as Wellstar intended. This question is no longer in dispute, and Aetna is entitled to partial summary judgment on this limited factual question.

**B.    *Next Steps:*  The Court could next consider Plaintiff's novel legal theory under the ACA, but a better, more efficient, course would be to dismiss Plaintiff's complaint pursuant to Rule 19 or transfer this matter to Georgia pursuant to 28 USC § 1404(a).**

Plaintiff had no free-standing right to infertility coverage. Any right she may have had to such a health benefit in the first instance arose entirely under the terms of the health benefit plan designed and funded by her employer. Plaintiff contends that her employer's infertility coverage was discriminatory.

In this litigation, she seeks to hold *Aetna*—and *only* Aetna—responsible for that benefit under her *employer's* plan. Plaintiff makes the novel argument that the ACA requires Aetna to provide and pay for a different benefit than her employer intended; Aetna submits that the ACA

mandates no such result. Plaintiff's argument raises a purely legal question that the Court could address in the next phase of the litigation and that could be case dispositive.

But Aetna and this Court are both at a substantial disadvantage here because the employer whose plan Plaintiff challenges is not subject to jurisdiction in this district. Plaintiff has a parallel action pending in Georgia, where her employer is subject to the court's jurisdiction and where she makes the same allegation that her employer's plan was discriminatory, but she has not joined Aetna there. Aetna submits that the Plaintiff's claim can be fairly addressed—and the relief Plaintiff seeks practically achieved—only with the presence and participation of her employer under whose plan she seeks the benefit.

This Court could attempt to address Plaintiff's novel legal theory in the vacuum Plaintiff has created—without the presence of Wellstar whose plan she challenges—and Aetna proposes a process for doing so below. But this Court need not do so. Rule 19, or alternatively 28 USC § 1404(a), authorize this Court to dismiss this action, or alternatively transfer it to the Northern District of Georgia, where Plaintiff already has a parallel action challenging Wellstar's plan and where the court has effective jurisdiction over, and can provide complete relief to, all necessary parties to the dispute.

1.    **The Court could next address the legal question whether the ACA supports an action solely against the third-party administrator of a health benefit plan where the benefit design was controlled by the self-funding employer.**

Plaintiff's Plan, the Wellstar Plan, was sponsored, designed and self-funded by her employer, Wellstar Health, and was created under and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001, *et seq*. ("ERISA").[7] Congress made clear in the

---

[7] Self-funded health benefit plans are not "insurance" in the conventional sense. When a health plan is self-funded, the sponsoring employer does not purchase a commercial insurance policy to cover its plan obligations; instead, the employer designs its own coverage plan, with benefit

ERISA statute that the funding employer or its designated plan administrator—the employer commonly assumes both roles—bears the ultimate legal responsibility for the plan it creates. The plan "sponsor," which ERISA generally defines as "the employer," *see* 29 U.S.C. § 1002(16)(b), is the party that establishes or maintains the ERISA plan and its terms. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78-79 (1995) ("[P]lan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."). Finally, the self-funded "plan administrator" (distinct from a "claims administrator") is the entity so designated by the ERISA plan; and if the plan fails to designate one, it is the plan sponsor by default. 29 U.S.C. § 1002(16)(a). The claims administrator—Aetna here—is obligated under ERISA to administer a self-funded plan according to its terms. "ERISA . . . requires plans to be administered consistent with their terms," *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 591 (8th Cir. 2022), and a third-party claims administrator has no right to unilaterally alter the benefits offered under the plan. *See, e.g., Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 150 (2001) (recognizing that plans must "be administered, and benefits be paid, in accordance with plan documents").

The Office of Civil Rights ("OCR") recognized this distinction in formulating its rules implementing Section 1557 of the ACA. In its 2016 rules, OCR expressly recognized that self-funded plans are unique in that "third party administrators are generally not responsible for the benefit design of the self-insured plans they administer and that ERISA (and likely the contracts

---

claims paid from its own coffers, and retains a third-party administrator ("TPA") to process claims. *Liberty Mut. Ins. Co. v. Donegan,* 746 F.3d 497, 501 (2d Cir. 2014); *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1131 (9th Cir. 2017); *see also Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985); *FMC Corp. v. Holliday*, 498 U.S. 52, 54 (1990) (describing self-funded plans). When an employer-sponsor retains a TPA to process benefit claims for its self-funded plan, the TPA does not fund the benefits itself; the responsibility to fund the benefits remains with the plan sponsor. *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 317 (2016).

into which third party administrators enter with the plan sponsors) requires plans to be administered consistent with their terms." 81 Fed. Reg. 31,375, 31,432 (May 18, 2016). Consequently, "if a plan has a discriminatory benefit design under Section 1557, a third party administrator could be held responsible for plan features over which it has no control." *Id.* To combat this concern, the OCR stated that in processing claims that involve alleged discrimination in self-insured health plans, OCR would assess "whether responsibility for the decision or other action alleged to be discriminatory rests with the employer or the third party administrator." *Id.* In instances where the alleged discrimination "relates to the *benefit design* of a self-insured plan," as opposed to the administration of that plan, OCR will address the complaint against that employer. *Id.* (emphasis added).

OCR adopted revised rules in 2020, which even more explicitly limited applicability to health insurers. 85 Fed. Reg. 37,160, 37,171 (June 19, 2020) (the "2020 Regulations"). Under the 2020 Regulations, Section 1557 is applicable to "any health program or activity, any part of which is receiving Federal financial assistance." 45 C.F.R. § 92.3 (2020). The 2020 Regulations go on to clarify that:

> '… "health program or activity" encompasses all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance... For any entity not principally engaged in the business of providing healthcare, the requirements applicable to a "health program or activity" under this part shall apply to such entity's operations only to the extent any such operation receives Federal financial assistance….'

*Id.* While the scope of applicability is quite broad for entities principally engaged in the business of providing healthcare, other entities are covered by Section 1557 only with respect to the operations actually receiving federal assistance. The plain language of the statute makes clear that health insurers fall into the second, more narrow scope of applicability as they are not healthcare providers. 45 C.F.R. § 92.3(c) ("For the purposes of this part, any entity principally

or otherwise engaged in the business of providing health insurance shall not, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare.").[8]

The 2020 Regulations are the regulations that were in effect at the time of the conduct alleged in Plaintiff's Amended Complaint. And these regulations make clear that Aetna, a health insurer not engaged in the business of providing healthcare, is not subject to Section 1557 with respect to its operations that do not receive federal financial assistance (i.e., its business as a third-party claims administrator).[9]

Plaintiff's counsel has made clear that they seek to use this action to test a novel legal "theory."[10] Counsel acknowledges what discovery has so clearly established—that Aetna administered the Wellstar Plan to provide exactly the infertility benefit Wellstar Health intended—but argues nonetheless that Aetna must itself be required to provide a benefit different than what the Plan offered. Plaintiff's theory distills to this: that where an employer designs its self-funded health plan in a manner that a member believes is discriminatory under the ACA, the member may sue, not the employer, but rather the *claims administrator*—and *only* the claims administrator—to seek an order reforming the plan and awarding a different benefit. Plaintiff

---

[8] The preamble to the 2020 Regulations also explained that the intent of the new rule was to narrow the scope of applicability to health insurance products. 85 Fed. Reg. 37,173. Addressing comments that the language of 45 C.F.R. § 92.3(c) would "exempt[] many of the plans, products, and operations of most health insurance issuers," including third-party administrator services, the Department of Health and Human Services responded that it "agrees with commenters who stated that the overly broad reach of the 2016 Rule subjected many insurance products that were not intended to be covered by the ACA to burdensome regulation, inconsistent with Congressional intent." *Id.*

[9] OCR issued another set of revised rules, which into effect in 2024 and thus post-date Plaintiff's claims at issue here. The 2024 rules, however, affirmed that "OCR does not intend to enforce this rule against a third party administrator for a plan design that it did not design and over which it has no control." 89 Fed. Reg. 37522, 37625-37626 (April 27, 2024).

[10] *See* Tr. at 14:1-10, 23:17-21.

argues, contrary to OCR guidance, that Aetna is responsible for the benefit design of the Wellstar Plan over which it had no ultimate control.

Plaintiff's theory raises a novel question that is purely one of law, the resolution of which could be case dispositive. One path forward in this matter is for the parties to address, and the Court resolve, this controlling legal question. To be clear, Aetna does not propose that the Court resolve this legal issue on this motion. Plaintiff's counsel has indicated that they would want some discovery on this issue and, while the parties may disagree on the particulars of that discovery, Aetna agrees that some limited, phased discovery may be useful to help resolve this limited issue. For example, Mercer and WTW, the two consultants who advised Wellstar on the design of its Wellstar Plan have material information on this topic. So, one alternative is for the parties to conduct discovery pertinent to this limited legal issue and then brief the issue for resolution by the Court.

As discussed below, however, Aetna submits that this legal question must be addressed with the presence and participation of Wellstar Health—the party who not only controlled both the terms of the Wellstar Plan and the payment of any benefits, but whose acquiescence would have been *required* to permit Aetna to handle benefits adjudication in the manner sought by plaintiff. Not coincidentally, Plaintiff is now suing Wellstar in Georgia for that very reason.

> **2.    Alternatively, Aetna requests that the Court reconsider and grant Aetna's motion to dismiss on the ground that Wellstar is a necessary and indispensable party under Rule 19.**

Aetna previously moved to dismiss Plaintiff's Amended Complaint under Rule 12(b)(7) because Wellstar Health and the Wellstar Plan are necessary and indispensable parties under Rule 19 who are not subject to personal jurisdiction or venue in this district. *See* Dkt. 50. Aetna has already briefed the motion extensively (*see* Dkts. 50, 56, 99) and will not repeat, but will incorporate by reference, that briefing here.

Plaintiff opposed Aetna's motion principally on the ground that she alleged in her complaint that Aetna "designed" the pertinent terms of the Wellstar Plan specifically for adoption by Wellstar Health but offered to conduct fact discovery on the allegation. Plaintiff also noted that the Court could reconsider Aetna's motion with the benefit of that factual record, citing *Direct Energy Mktg. Ltd. v. Duke/Louis Dreyfus, LLC*, 50 F. App'x 469, 472 (2d Cir. 2002) ("Because the court found the record insufficiently developed to establish whether [absent party was indispensable], it denied the motion without prejudice and authorized further discovery."). *See* Dkt. 55 at 14 n.7.

That discovery is now complete, with the result that Plaintiff's counsel now concedes, "The facts show. . . that both Wellstar and Aetna had essentially the exact same approach to the infertility benefits that this case is about." Tr. at 10:14-19. And that "it ultimately doesn't matter [where the specific plan words came from] because the structures would have been exactly the same no matter which party did it." *Id.* at 18:20-23.

Indeed, Plaintiff, through her same counsel in this case, has now filed a separate action against Wellstar Health in the Northern District of Georgia alleging that the Wellstar Plan, and its definition of infertility, violates Title VII. Plaintiff alleges in that action that the Wellstar Plan, and its definition of infertility, discriminates against non-heterosexual female employees on the basis of sex. Plaintiff specifically alleges, moreover, that Wellstar controlled the benefit design of its own plan, could have chosen to offer a different set of benefits thereunder, and is responsible for the resulting discrimination. Plaintiff's allegations against Wellstar Health in the Georgia action thus mirror her allegations against Aetna here, and the classes she seeks to certify in each action are similar.

In sum, Plaintiff now concedes that Wellstar was the master of its own plan and has, in fact, sued Wellstar in Georgia on that very basis. The factual and procedural posture of this matter has changed dramatically since the Court originally considered Aetna's motion to dismiss, and these new developments only underscore the necessity of Wellstar's joinder to this action under Rule 19. These new developments are such as "might reasonably be expected to alter the conclusion reached by the court" in its original evaluation of Wellstar's central importance to this dispute and thus warrant the Court's reconsideration of Aetna's motion under Rule 19. *See Protegrity,* 2014 WL 4716444, at *3 (*citing Shrader,* 70 F.3d 255 at 257).

The Supreme Court has identified four interests that are relevant to the issue of joinder under Rule 19: (1) the interest of the plaintiff in having a forum; (2) a defendant's desire to avoid multiple litigations, or inconsistent relief, or sole responsibility for a liability it shares with another; (3) the interest of the absentee whom it would have been desirable to join; and (4) the interests of the courts and the public in complete, consistent, and efficient settlement of controversies. *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 109-11 (1968). A district court, when considering whether a particular party is necessary and indispensable under Rule 19, should make a fact-specific assessment of an absent party's importance to an action "in the context of the particular litigation." *Id.* at 118; *Curley v. Brignoli, Curley & Roberts Assocs.*, 915 F.2d 81, 90 (2d Cir. 1990). The analysis is a "pragmatic" one. *Ente Nationale*, 744 F. Supp. at 457; *Felix Cinematografica v. Penthouse Int'l Ltd.*, 99 F.R.D. 167, 169 (S.D.N.Y. 1983).

*First,* as to Plaintiff's interest in having a forum, the Supreme Court has noted that "the court should consider whether there is any assurance that the plaintiff, if dismissed, could sue effectively in another forum where better joinder would be possible." *Patterson*, 390 U.S. at 109

n. 3 (*citing* the Advisory Committee to the Federal Rules of Civil Procedure, Note to Rule 19). Plaintiff undeniably has another effective forum—indeed, she has now elected to sue Wellstar directly in Georgia, the only forum where Wellstar is subject to suit.   And maintaining her *separate* action in this Court merely allows Plaintiff to proceed separately against Aetna in a forum where Aetna is *unable* to join Wellstar.   But just as Plaintiff has now acknowledged that Wellstar was responsible for the Wellstar Plan, she likewise has now conceded that Georgia is the only effective forum to challenge the Wellstar Plan.   She has now herself selected the best forum for this dispute.

*Second,* as the Supreme Court's formulation makes clear, Rule 19 considers prejudice from the perspective of both the *existing party and the absent* party.   Rule 19(a) and (b) "both require the Court to determine the potential for prejudice to existing and absent parties."   *Errico v. Stryker*, 281 F.R.D. 182, 187 (S.D.N.Y. 2012); *see also* Rule 19(b)(1) (Court must consider "to what extent a judgment rendered in the person's absence might be *prejudicial to him or those already parties*.") (emphasis added).   And one of the most obvious and fundamental prejudicial harms that Rule 19 is designed to avoid is the risk of multiple or inconsistent judgments.   *See, e.g., Greer v. Carlson*, No. 1:20-cv-05484 (LTS) (SDA), 2020 WL 8340068, at *5 (S.D.N.Y. Dec. 24, 2020) (granting motion to dismiss where proceeding without party increased the likelihood of parallel federal and state court litigations, which would inevitably involve substantial overlap with present litigation and run the risk of inconsistent rulings, to the detriment of all parties); *Ente Nationale*, 744 F. Supp at 458 (allowing parallel litigations, where one court lacks jurisdiction over a missing party, would subject the named defendant to inconsistent adjudications and practically impair the interests of the missing party).

31

Here, Plaintiff now seeks to proceed with *separate actions* seeking the *same ruling* (i.e., that the Wellstar Plan is discriminatory) against *two different parties*.  This case now presents a fundamentally different procedural posture than existed when the Court originally considered Aetna's motion, and the existence of parallel actions, by itself, warrants the application of Rule 19 and the dismissal of the present action (because Wellstar cannot be joined).  "There is simply no good reason for this Court to duplicate what is being accomplished in the [other forum]," *Ente Nationale*, 744 F. Supp at 461, especially where the Georgia court would have jurisdiction over both Wellstar and Aetna that this Court lacks.

*Third*, as the Supreme Court has recognized, Rule 19 is intended to protect the interest of a "defendant [who] may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another." *Patterson*, 390 U.S. at 110.  Thus, the exclusion of a party is prejudicial where their conduct is central to the litigation.  *See, e.g., Prasai v. Int'l Nepali Literary Soc'y,* No. 14-cv-4440 (ENV) (LB), 2014 WL 4207628, at *2 (E.D.N.Y. Aug. 25, 2014) (dismissal under 19(b) where plaintiff failed to join a party whose conduct was central to the wrongdoing she alleged in her complaint); *Kermanshah v. Kermanshah*, No. 08–CV–409 (BSJ) (AJP), 2010 WL 1904135, at *4 (S.D.N.Y. May 11, 2010) (absent party prejudiced where his conduct was central to contract dispute and judgment for plaintiff would likely affect his rights).  Here, Plaintiff makes the *same claim*—that the Wellstar Plan is discriminatory—in *both* this and the Georgia case.  And the record is now undisputed that Wellstar Health, not Aetna, controlled the benefit design of its Wellstar Plan.

*Fourth,* the omission of a party is prejudicial where its interests are not sufficiently aligned or represented by a party to the litigation, and courts are more likely to find prejudice where the named party is not authorized to speak on behalf of absent parties.  *See, e.g., Errico*,

281 F.R.D. at 189.  Here, Aetna served only as the claims administrator of the Wellstar Plan and, under both the principles of ERISA and the provisions of its MSA with Wellstar, Aetna was required to administer the infertility benefit under the Wellstar Plan as directed by Wellstar— which Plaintiff now concedes Aetna did.  Aetna was not authorized to depart from the terms of the Wellstar Plan or to pay benefits other than as Wellstar directed, nor was Aetna empowered to reform the Plan.  It is for this very reason that OCR has made clear in its ACA guidance that it "does not intend to enforce this rule against a third party administrator for a plan design that it did not design and over which it has no control."  89 Fed. Reg. at 37627.  And that is why Plaintiff has now sued Wellstar directly in the only forum where Wellstar is subject to jurisdiction and where the court can accommodate the interests of, and afford effective relief to, all the parties.  *See. e.g.*, *Ente Nationale*, 744 F. Supp at 460 (dismissing a duplicative action under Rule 19 because "we do not believe that it would be possible for us to shape any relief we might grant to the plaintiff in a way that would accommodate, and not prejudice, the interests of the defendant and the absent parties.").[11]

*Finally*, "there remains the interest of the courts and the public in complete, consistent, and efficient settlement of controversies."  *Patterson*, 390 U.S. at 111.  Plaintiff is pursuing two

---

[11] The principles and policies underlying Rule 19 apply with particular force in litigation affecting self-funded ERISA health benefit plans, and Aetna previously has directed this Court to case law squarely holding, in circumstances substantially similar to those here, that the employer–administrator of a self-funded health plan was a necessary and indispensable party under Rule 19.  *See* Dkt. 50-1 at 19-20 (discussing *Takeda v. Nw. Nat'l Life Ins. Co.*, 765 F.2d 815 (9th Cir. 1985) and *Cuevas v. Joint Benefit Tr.*, No. 13–cv–00045–JST, 2013 WL 3578496, at *3 (N.D. Cal. July 12, 2013)); Dkt. 99 at 13-14 (discussing *Sypher v Aetna Ins. Co.*, No. 13-10007, 2014 WL 1230028 (E.D. Mich. Mar. 25, 2014) and in *Sutherland v. Disability RMS*, No. 3:16-CV-00683-JHM, 2017 WL 403574  (W.D. Ky. Jan. 30, 2017)).  *See also Hall v. LHACO, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998) ("Only the Plan and the current plan administrator can pay out benefits to [the plaintiff]" … The terms of [the plaintiff's] Plan would necessarily have to be enforced against the Plan itself and the present administrator; only from them can [the plaintiff] obtain proper subrogation a payment of benefits pursuant to the terms of his Plan.").

separate actions, one here against Aetna and another in Georgia against Wellstar, each of which seeks the exact same ruling—that the Wellstar Plan is discriminatory. Rule 19 exists precisely to prevent this type of duplicative litigation; to promote, as the Supreme Court has said, the "public stake in settling disputes by wholes, whenever possible." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 870 (2008). Allowing parallel litigations in these circumstances, would be "a *sheer waste* not only of the litigants' time and effort….but, surely equally important, a squandering of judicial time and effort [that] simply defies common sense [and that] would be unfair to the defendant and contrary to public policy and public interest." *Ente Nationale*, 744 F. Supp at 461 (*quoting Felix Cinematografica*, 99 F.R.D. at 173) (original emphasis).

For all these reasons, and given the significantly different posture of this case today, Aetna submits that the Court may reconsider Aetna's motion to dismiss. And it should be reemphasized that granting Aetna's motion will in no way impair Plaintiff's ability to pursue any of the claims she makes in this case—indeed, she can assert her claims against Aetna in the very same proceeding where she makes substantially same claims, and seeks the same relief, against Wellstar. Plaintiff can still test her novel legal theory that Aetna, as a claims administrator, can be liable under the ACA where it administers a plan as directed by the self-funding employer. But the Georgia court will have access to all the interested parties and relevant evidence and the ability to render effective relief. This Court has neither because Plaintiff has excluded—and, indeed, cannot join—the one party responsible for the Plan design she alleges is discriminatory. Rule 19 is designed to remedy precisely this circumstance.

### 3. Alternatively, Aetna requests that the Court transfer this matter to the Northern District of Georgia pursuant to 28 USC § 1404(a).

In the alternative, Aetna requests that the Court transfer this matter to the Northern District of Georgia pursuant to 28 USC § 1404(a), which provides: "For the convenience of

parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  The aims of Section 1404(a) are "to prevent waste of time, energy and money and to protect litigants, witnesses and [the] public against unnecessary inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). The district courts are given broad discretion to determine whether transfer is warranted, with convenience, fairness, and interests of justice being considered on a case-by case basis. *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006).

In the Second Circuit, in considering whether to transfer a case, the courts consider: "(1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances."  *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 480 (S.D.N.Y. 2007), *aff'd sub nom. New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010).

The same considerations supporting Wellstar's joinder under Rule 19 also justify the transfer of this matter to the Northern District of Georgia, where Plaintiff, Wellstar Health and the Wellstar Plan are all located, and where the court can address consolidation of the two existing and related actions, and where there is no question about whether the relief Plaintiff seeks is available from the entity who designed and funded her benefit.  That Wellstar is amenable to suit *only* in Georgia strongly supports a transfer to that district.  *See, e.g., AEI Life,*

*LLC v. Lincoln Ben. Life Co*., 305 F.R.D. 37, 44-45 (E.D.N.Y. 2015) (preference given to court that can "obtain[] jurisdiction over the parties and issues.").

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Aetna respectfully requests the Court grant Aetna's motion for partial summary judgment pursuant to Rule 56 or, in the alternative, dismiss Plaintiff's Amended Complaint pursuant to Rules 12(b)(7) and 19 or, in the alternative, transfer this matter to the Northern District of Georgia pursuant 28 USC § 1404(a).

Dated at Hartford, Connecticut this 19th day of February, 2025.

<u>*Theodore J. Tucci*</u>
Theodore J. Tucci (ct05249)
Abby M. Warren (ct30077)
Christopher A. Costain (ct31612)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel.: (860) 275-8200
Fax: (860) 275-8299
ttucci@rc.com
awarren@rc.com
ccostain@rc.com

Sarah Reeves (*pro hac vice*)
Earl B. Austin (*pro hac vice*)
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Tel.: (212) 408-2649
Fax: (212) 408-2449
sarah.reeves@bakerbotts.com
earl.austin@bakerbotts.com

*Counsel for Defendant*
*Aetna Life Insurance Company*

## <u>CERTIFICATION</u>

I hereby certify that on this 19th day of February, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filings.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Theodore J. Tucci*
Theodore J. Tucci
