IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| TARA KULWICKI, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>-v-<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. 3:22-cv-00229 (VDO)<br><br><br>February 19, 2025 |

**DEFENDANT AETNA LIFE INSURANCE COMPANY'S LOCAL RULE 56(a)(1)**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant Aetna Life Insurance Company ("Aetna"), by and through its attorneys, hereby submits its Local Rule 56(a)1 Statement of Undisputed Material Facts.

**Plaintiff and the Wellstar Plan**

1. Plaintiff Tara Kulwicki, a Georgia resident, worked for Wellstar Cobb Hospital in Atlanta, Georgia, which is part of Wellstar Health System, Inc. ("Wellstar"), a hospital and healthcare system based entirely in Georgia. Am. Compl. ¶¶ 5, 21, 26.

2. Plaintiff was enrolled in the Wellstar Employee Medical Plan ("Wellstar Plan"), an employee health benefit plan sponsored and self-funded by Wellstar. *Id.* at ¶¶ 5, 26.

3. Defendant Aetna Life Insurance Company served as the claims administrator for the Wellstar Plan from 2016 to 2023. *Id.* at ¶ 5.

4. In June 2021, Plaintiff requested infertility treatments, which Aetna denied on the ground that she did not meet the medical definition of infertility under the Wellstar Plan. *Id.* at ¶ 44. Plaintiff alleges that she is a homosexual woman and cannot satisfy the medical definition of infertility as required by the Wellstar Plan. *Id.* at ¶¶ 27-40.

**Piedmont Wellstar and Mercer**

5. The Wellstar Plan predated Aetna's retention as claims administrator. In 2015, the year prior to Aetna's involvement, Wellstar itself administered the Wellstar Plan through Piedmont Wellstar Health Plans ("Piedmont Wellstar"), a joint venture between Wellstar and Piedmont Healthcare, another Georgia-based healthcare system. Barbara Corey 10/21/24 Deposition Transcript ("Corey Dep.") 28:2-11, 89:23-90:5, 90:24-91:20.[1]

6. During this same period prior to 2016, Wellstar also sought advice from Mercer, a national health benefits consulting firm that specializes in employee benefits plan strategy and

---

[1] All Exhibits referenced herein are identified in the attached Appendix of Exhibits.

1

design.  Julie Evans 10/24/24 Deposition Transcript ("Evans Dep.") 20:14-18; Corey Dep. 97:25-98:10.  Mercer provided plan design consulting services to Wellstar and the Wellstar Plan for many years prior to 2016.  Corey Dep. 101:3-16.

7. In 2015, Wellstar terminated its claims administration function through the Piedmont Wellstar joint venture and, through a bid process handled by Mercer, solicited and retained Aetna to serve as third party claims administrator ("TPA") for the Wellstar Plan beginning in the 2016 plan year.  Corey Dep. 28:2-11, 51:4-52:6, 89:16-22; Evans Dep. 20:14-21:7.

### Creation of the 2016 Wellstar Plan Booklet

8. Beginning in the fall of 2015, Mercer and Wellstar provided Aetna with the terms and benefit design of the existing Wellstar Plan.  Evans Dep. 99:24-100:12.  Mercer and Wellstar sent Aetna copies of the 2014 and 2015 plan documents for the Wellstar Plan and directed Aetna to those documents as the starting point for the plan document for the upcoming 2016 plan year.  *Id.*; Corey Dep. 95:11-97:1.

9. Mercer was responsible for drafting the 2016 plan document.  Corey Dep. 131:4-7; Evans Dep. 38:3-10, 99:24-100:12; *see also* Corey Dep. Exs. 14, 16.

10. Wellstar, Mercer and Aetna thereafter worked collaboratively to integrate the benefit design of the Wellstar Plan into Aetna's claims handling system.  Evans Dep. 107:7-16; Corey Dep. 112:4-9.

11. The parties jointly reviewed and discussed more than 500 individual benefit design and claims processing issues relating to the Wellstar Plan.  Evans Decl. ¶ 10.  Many were largely ministerial issues, such as how Aetna would code and process certain particular benefits or claims.  *See, e.g.,* Evans Dep. Ex. 15.

12. In other instances, however, Wellstar issued substantive directives to Aetna regarding such issues as what benefits the Plan would provide and with what limits, which benefits would be subject to specific medical necessity requirements and which would not, and what language would be used to define the terms and limits of particular benefits. *See Id.* (noting, for example, to cover nutritional counseling regardless of medical necessity); Corey Dep. 55:10-16 (describing Wellstar's direction to remove an exclusion from the infertility benefit).

13. Mercer acted as an intermediary for these discussions, collecting and sharing information between the parties, posing questions to Aetna on behalf of Wellstar, and relaying Wellstar's directives to Aetna. Evans Dep. 107:7-16, 20-22. Aetna typically was not privy to the internal discussions between Mercer and Wellstar on these issues. Evans Dep. 107:17-19.

14. The type of collaboration between Wellstar, Mercer and Aetna is reflected in a series of emails exchanged between the parties in October 2015. Evans Dep. Ex. 15. There, a Mercer representative advised Aetna of Wellstar's decisions on various open benefit design and claims processing issues: "Hello Aetna Team, We have reviewed the outstanding items and have listed the Wellstar team responses below." *Id.* at 3566. Wellstar issued final Plan design decisions such as:

- Wellstar directed the particular benefit language to be used in the 2016 Plan document. In some instances, Wellstar directed that the language from the existing Plan be used; in others, Wellstar elected to use language from Aetna. *Id.* at 3562.

- Wellstar directed that certain benefits would be covered regardless of medical necessity—a departure from Aetna's customary claims handling process. *Id.*

3

15. In the above instances, the ultimate decision was Wellstar's, and Mercer incorporated Wellstar's directives into the Wellstar Plan document for 2016. Corey Dep. 100:2-7, 121:14-17; Evans Dep. 101:5-13.

### The Wellstar Plan, Infertility and Medical Necessity

16. The Wellstar Plan historically offered coverage for infertility treatments, subject to a requirement of medical necessity. The Wellstar Plan documents for 2014 and 2015, the two years prior to Aetna's engagement, both provided coverage for infertility and in vitro medical services and prescriptions, but required that covered services be medically necessary, which the Plan defined, in pertinent part, as follows:

- Commonly recognized throughout the provider's specialty as appropriate for the diagnosis and/or treatment of your condition, illness, disease, or injury.
- Provided in accordance with standards of good medical practice and consistent with scientifically based guidelines of medical, research, or healthcare coverage organizations or governmental agencies that are accepted by the Plan.

Corey Dep. Ex. 10 at 4975; Corey Dep. Ex. 11 at 3582.

17. The 2014 and 2015 Plans also excluded coverage for "[s]ervices not medically necessary as determined by the Plan Administrator." Corey Dep. Exs. 10 at 4986, 11 at 3617.

### The Disease of Infertility, ASRM, and the Aetna CPB

18. The American Society for Reproductive Medicine ("ASRM") historically recognized that "[i]nfertility is a disease which generates disability as an impairment of function" and defined the disease of infertility as follows:

> Infertility is a disease historically defined by the failure to achieve a successful pregnancy after 12 months or more of regular, unprotected sexual intercourse or due to an impairment of a person's capacity to reproduce either as an individual or with her/ his partner.[2]

---

[2] American Society for Reproductive Medicine, "Definitions of infertility and recurrent pregnancy loss: a committee opinion," Practice Committee of the American Society for Reproductive

4

19. Aetna has developed Medical Clinical Policy Bulletins ("CPBs") addressing various medical diseases and conditions to provide guidance in the administration its plans.

20. Aetna's CPB 0327 addresses the disease of infertility, and throughout the relevant time period, expressly adopted the ASRM definition of infertility:

> For purposes of this policy, a member is considered infertile if he or she is unable to conceive or produce conception after 1 year of frequent, unprotected heterosexual sexual intercourse, or 6 months of frequent, unprotected heterosexual sexual intercourse if the female partner is 35 years of age or older. Alternately, a woman without a male partner may be considered infertile if she is unable to conceive or produce conception after at least 12 cycles of donor insemination (6 cycles for women 35 years of age or older). However, this definition of infertility may vary due to state mandates or plan customization; please check plan documents.

Aetna CPB 0327, 10/26/2020

### Wellstar's 2016 Infertility Benefit Design

21. As part of the bid process in 2015, Wellstar and Mercer requested, and Aetna provided, copies of Aetna's Clinical Policy Bulletins, including CPB 327. Evans Dep. 49:4-7.

22. The Wellstar Plan Booklet was effective January 1, 2016, but Wellstar and Mercer continued throughout 2016 to review and revise the Plan's infertility benefit design. For example, Aetna's CPB 327 contained a provision excluding coverage for infertility services in instances where the member or their partner had a previous sterilization procedure, with or without surgical reversal. Corey Dep. 54:7-20; Corey Dep. Ex. 7 at 9859.

23. In June 2016, a Wellstar member requested coverage that would be barred by this provision, and Wellstar and Mercer questioned the exclusion, which was inconsistent with Wellstar's prior practice. Evans Dep. Ex. 6. On June 24, 2016, Julie Evans, Aetna's account

---

Medicine (Fertil Steril 2020;113:3) Definitions of infertility and recurrent pregnancy loss: a committee opinion (fertstert.org) ("ASRM 2020").

5

manager for Wellstar, sent an email to Kirsten Girguis, Manager of Employee Benefits at Wellstar, acknowledging the question and offering to explore a solution: "[U]ltimately if WellStar wants it covered we WILL find a way!" *Id.* at 3825.

24.     On June 30, 2016, Ms. Evans followed up with another email to Ms. Girguis, summarizing the infertility policy as reflected in the 2016 Wellstar Plan Booklet and Aetna CPB 327. Evans Dep. Ex. 26 at 3821-23. Ms. Evans quoted the ASRM-based definition of infertility from CPB 327 verbatim and explained, "Basically – our coverage policy for infertility treatment, IVF, and Advanced Reproductive Technologies, applies the logic that services are covered when there is 'disease' which causes the infertility. When there is voluntary sterilization that took place – you are no longer treating a disease which is causing the infertility, rather it was a voluntary procedure which caused the infertility." *Id.* at 3821. Ms. Evans then advised, "I would caution you that if WellStar approves [the member's request for coverage] because you do not feel the sterilization should be taken into consideration, that we amend your plan in total to not apply this policy to ensure that all members are treated equally." *Id.* at 3823.

25.     On October 25, 2016, Ms. Girguis replied: "Sorry this has taken a while for us to discuss and respond. Teresa [Hamilton at Wellstar] and I discussed and we do not want WellStar team members to be restricted from this benefit due to a past vasectomy. We have never restricted this benefit before and do not want to restrict it now. So for now, please let us know what we need to do to remove the vasectomy restriction…." *Id.* at 3821. On October 28, Janie Valencia, Senior Account Manager, at Aetna, advised Ms. Girguis, "We are changing the benefit to not apply the current restrictions effective 1/1/16." AETNA-KULWICKI_0003856 at 3857.

26.     In her October 25 email, Ms. Girguis of Wellstar also advised Aetna's Ms. Evans, "I will comb through the information you gave me to see if we have any other issues we may need

6

to discuss with infertility." *Id.* Neither Wellstar nor Mercer raised with Aetna any additional issues regarding the infertility benefit design. Evans Decl. ¶ 18.

27. On November 21, 2016, Matthew Ladden from Mercer circulated a final draft of the Wellstar Plan Booklet, together with a redline showing numerous revisions as directed by Wellstar. Evans Dep. Exs. 27, 28.

28. With regard to the infertility benefit, the Mercer draft reflected the following:

   a. In the "Glossary" section, Wellstar opted to include the ASRM definition of "Infertile or Infertility," as reflected in Aetna's CPB 327, though Wellstar adopted language that deviated slightly from both ASRM and Aetna's CPB.[3] Evans Dep. Ex. 28 at 98. Aetna was not consulted about, and does not know the origin of, the modified language Wellstar chose for the Wellstar Plan; Mercer handled the drafting of the final Plan document. Evans Decl. ¶ 19(a).

   b. In the "Basic Infertility Expenses" section, Wellstar provided that "Covered expenses include charges made by a physician to diagnose and to surgically treat the underlying medical cause of infertility." Evans Dep Ex. 28 at 42.

   c. In the "Comprehensive Infertility and Advanced Reproductive Technology (ART) Expenses" section, Wellstar removed the sterilization exclusion but retained a provision limiting infertility coverage to "A condition that is a demonstrated cause of infertility which has been recognized by a gynecologist, or an infertility specialist, and your physician who diagnosed you as infertile, and it has been documented in your medical records." *Id.*

---

[3] The ASRM definition referred to cycles of "regular, unprotected sexual intercourse" and Aetna's CPB 327 referred to "frequent, unprotected heterosexual sexual intercourse." The definition Wellstar adopted for its 2016 Plan Booklet referred to "timed, unprotected coitus."

7

29. Barbara Corey, Wellstar's Senior Vice President for Managed Care, testified that the definition of infertility included in the 2016 Wellstar Plan Booklet was consistent with generally accepted medical consensus and medical necessity standards of the kind that Wellstar, as a healthcare and hospital system, typically followed. Corey Dep. 50:10-25, 124:10-15.

30. Although the Wellstar Plan historically had an infertility benefit before Aetna's involvement—a benefit that was based on medical necessity—Wellstar understood that, in transitioning to Aetna, it could structure that benefit going forward however it wanted. Corey Dep. Ex. 10 at 4975; Corey Dep. 121:5-17.

31. Ms. Corey further testified that Wellstar understood that it could customize the design of its infertility benefit—including removal of a requirement of medical necessity—and that the benefit design ultimately reflected in the Wellstar Plan was the design Wellstar itself adopted. Corey Dep. 151:23-152:12.

### Wellstar Confirms Its Infertility Benefit Design

32. After the 2016 Wellstar Plan Booklet was finalized, Mercer continued to handle the drafting of the Plan documents for 2017 through 2020. Evans Dep. Ex. 17.

33. In preparing the 2017 Wellstar Plan Booklet, Wellstar and Mercer directed questions to Aetna about and specifically confirmed the cycle requirements to satisfy the definition of infertility under the Wellstar Plan. *Id.* Aetna was not privy to the internal discussions between Wellstar and Mercer on this issue, but neither Wellstar nor Mercer ever directed Aetna to revise the cycle requirements in the infertility benefit design. See Evans Dep. 156:12-18, 158:22-159:4.

34. Under the terms of the Wellstar Plan, Wellstar also participated in the appeal process for individual member benefit claims. Corey Dep. 163:20-165:2. In 2018, Aetna denied another member's request for infertility coverage under the terms of the Plan, and Wellstar

reviewed and approved Aetna's decision on the ground that the "patient is not considered infertile." Corey Dep. Ex. 19 at 1410.

### Wellstar's 2021 Plan Document

35. In 2020, Wellstar terminated its relationship with Mercer and retained a new benefit design consultant, Willis Towers Watson ("WTW"). Evans Dep. 56:1-3. Like Mercer, WTW specializes in employee benefits plan strategy and design. WTW provided plan design consulting services to Wellstar and the Wellstar Plan for the 2021 Plan—the plan under which Ms. Kulwicki sought infertility coverage. Evans Dep. 56:1-6; Corey Dep. 26:2-10.

36. The Wellstar Plan Booklet that WTW adopted for 2021, Evans Dep. Ex. 4, was different in structure, format and language from the version prepared by Mercer from 2016 to 2020. *Compare* Evans Dep. Ex. 5 *with* Evans Dep. Ex. 4.

37. With regard to the infertility benefit, WTW adopted the same modified ASRM definition of "infertility" as in the earlier Wellstar Plan documents but moved the definition from a Glossary to the "Basic Infertility Expenses" section. Evans Dep. Ex. 4 at 76.

38. WTW also retained the language from the earlier Wellstar Plan documents that defined "infertility" as a medical condition.[4] *Id*.

### Wellstar Plan Documents and Aetna "Standard."

39. Wellstar decided to remove the sterilization exclusion from its infertility benefit, Aetna's Ms. Evans advised Wellstar that Aetna's customary infertility policy "applies the logic that services are covered when there is 'disease' which causes the infertility." Evans Dep. Ex. 26 at 3821.

---

[4] *See* discussion at ¶ 28, *supra*.

9

40. Aetna's CPB 327 makes clear that customized plan language supersedes Aetna's standard policies.[5]

41. Wellstar's removal of the standard exclusion for individuals who underwent elective sterilization was a customized departure from Aetna's typical plan design—but Wellstar otherwise opted to retain the general design logic that infertility benefits are intended to address infertility as a medical condition. Evans Decl. ¶ 20.

42. Wellstar, through Mercer and later WTW, also customized the Wellstar Plan in other ways. For example, the definition of "infertility" that Wellstar adopted for all of its plans from 2016 through 2021, varied slightly from both ASRM and Aetna's CPB.[6]

43. Wellstar structured its infertility benefit differently than Aetna's customary design. Aetna's standard plan design offers a "Basic Infertility" benefit and an optional "Comprehensive Infertility" benefit. Evans Decl. ¶¶ 22-23.

44. Aetna's standard Basic Infertility benefit covers a wide range of diagnostic testing, as well as both medical and surgical procedures, to address medical conditions that may cause infertility. The diagnosis and treatment of these conditions are covered with no showing that the member is medically infertile. *Id*. ¶¶ 23-24. If, after treating the underlying condition, the member is shown to be infertile, then infertility treatments are available under Aetna's Comprehensive Infertility benefit. *Id*. ¶ 23.

45. Aetna's standard Basic Infertility benefit covers a wide range of diagnostic testing, as well as both medical and surgical procedures, to address medical conditions that may cause infertility. These services include lab studies, Ultrasounds, consultations, ovulation induction with

---

[5] *See* ¶ 20, *supra.*

[6] *See* n. 2, *supra.*

certain medications, surgical treatments, laparoscopies, and corrective uterine surgery—again, without any showing of infertility.  *Id.* ¶¶ 23-24.

46.     The Wellstar Plan, as developed by Mercer and later WTW, modified the structure of Aetna's standard Basic Infertility benefit.  For example, while the Aetna standard benefit covers both medical and surgical treatments, the Wellstar Plan addressed only services to "surgically treat the underlying medical cause of infertility."  Evans Dep. Ex. 4 at 7823.  Moreover, WTW's movement of the definition of infertility into the Basic Infertility section of the 2021 Wellstar Plan was inconsistent with Aetna's typical benefit description, which requires no showing of infertility to access basic infertility services.  Evans Decl. ¶ 25.

47.     Aetna assisted Wellstar in customizing the Wellstar Plan to remove the sterilization exclusion from the infertility benefit, but Aetna was not privy to any internal discussions between Wellstar and its two consultants, Mercer and WTW, about the additional changes Wellstar made to the design of its infertility benefit.  *Id.* ¶ 26.

### Wellstar and ACA Section 1557

48.     In 2016, when Wellstar, Mercer and Aetna were collaborating on the 2016 Wellstar Plan Booklet, they discussed Wellstar's compliance with Section 1557 of the Affordable Care Act. On October 12, 2016, Ms. Evans of Aetna advised Ms. Girguis of Wellstar that "WellStar ultimately needs their counsel to agree and advise if they are subject to the act [ACA Section 1557]." AETNA-KULWICKI_0003865.

49.     On October 29, 2016, Ms. Evans advised WellStar that Aetna cannot provide legal advice to its self-insured customers, and WellStar should have its own counsel review the non-discrimination act for its applicability to their employee benefit plan. If any plan changes were

11

going to be needed, Ms. Evans asked Wellstar to communicate those to Aetna before November 1 for implementation on the plan renewal date in 2017.  Evans Decl. ¶ 27.

50. Wellstar relied on outside counsel to make sure its plans were compliant with applicable laws and regulations.  Corey Dep. 38:7-20.

51. Neither Wellstar nor Mercer ever raised with Aetna any concern that the infertility benefit set forth in the Wellstar Plan was inconsistent with the provisions of ACA Section 1557 or directed any revisions to the Wellstar Plan on that basis.  Evans Decl. ¶ 28; *see also* Corey Dep. 40:22-41:3.

## The Wellstar-Aetna Master Services Agreement

52. When Wellstar retained Aetna to provide claims administration services for the Wellstar Plan, the parties entered into a Master Services Agreement ("MSA"), which governed Aetna's engagement from 2016 to 2023.  Evans Dep. Ex. 22, Evans Dep. 35:9-25.

53. In that agreement, Wellstar agreed that Aetna's review of the Plan Documents was limited to a determination that "Aetna's claim processing systems and internal policies and procedures are consistent with the Plan Documents and that Aetna will be able to perform the Services in the accordance with the Agreement," and specifically acknowledged that "Aetna has NOT reviewed the Plan Documents for compliance with appliable law."  Evans Dep. Ex. 22 at 5131 (original emphasis).

54. Wellstar also expressly retained "the final and sole authority regarding the benefits and provisions of the Plan(s), as outlined in [Wellstar'] Plan document" and agreed that "Aetna shall have no responsibility or liability for the content of any of [Wellstar's] Plan documents. . ., regardless of the role Aetna may have played in the preparation of such documents."  *Id.* at 5149.

12

Dated at Hartford, Connecticut this 19th day of February, 2025.

                                                            */s/ Theodore J. Tucci*
                                                            Theodore J. Tucci (ct05249)
                                                            Abby M. Warren (ct30077)
                                                            Christopher A. Costain (ct31612)
                                                            Robinson & Cole LLP
                                                            One State Street
                                                            Hartford, Connecticut 06403
                                                            Tel.: (860) 275-8200
                                                            Fax: (860) 275-8299
                                                            ttucci@rc.com
                                                            awarren@rc.com
                                                            ccostain@rc.com

                                                            Earl B. Austin
                                                            Sarah Reeves
                                                            BAKER BOTTS L.L.P.
                                                            30 Rockefeller Plaza
                                                            New York, New York 10112
                                                            Tel.: (212) 408-2500

                                                            *Attorneys for Defendant*
                                                            *Aetna Life Insurance Company*

**CERTIFICATION**

I hereby certify that on this 19th day of February, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filings. Parties may access this filing through the Court's CM/ECF System.

　　　　　　　　　　　　　　　　　　　　　*/s/ Theodore J. Tucci*
　　　　　　　　　　　　　　　　　　　　　Theodore J. Tucci