# EXHIBIT A

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF CONNECTICUT

3

4    TARA KULWICKI, on behalf
     of herself and all others
5    similarly situated,

6         Plaintiff,                        CASE NO.

7    vs.                           3:22-cv-00229(VDO)

8    AETNA, INC. and AETNA
     LIFE INSURANCE COMPANY,

9

          Defendants.

10

11

12

13        VIDEOTAPE DEPOSITION OF BARBARA A. COREY

14               APPEARING REMOTE FROM

15                MARIETTA, GEORGIA

16

17                OCTOBER 21, 2024

18                  10:06 A.M.

19

20

21

22   Reported Remotely By:

23   Judith L. Leitz Moran

24   RPR, RSA, CCR-B-2312

25

Page 26

```
 1        A     I do.
 2        Q     Have you seen this document before?
 3        A     Yes.
 4        Q     And what is it?
 5        A     It's the 2021 Employee Medical Plan,
 6   summary plan document.
 7        Q     And is this the summary plan document
 8   that would apply to Ms. Kulwicki's claim and issue
 9   in this litigation?
10        A     It is.
11        Q     Okay.  And along the -- let's see.
12              Along the left-hand side, the upper
13   left-hand side of the document, depending how
14   you're centered, you might have to scroll over a
15   little bit.  It says, "Aetna Medical Plan - 2021
16   Summary Plan Description (SPD).pdf."
17              Do you see that on the upper left side of
18   the pages?
19              MR. BACHMAN:  You might have to scroll
20   over yet.  A little more.
21              MR. AUSTIN:  Where are we, Erin?  Which
22   page?
23              MS. COMITE:  The first page of the SPD.
24              MR. AUSTIN:  After the title page, the
25   one that says "Your Wellstar Employee Medical Plan
```

```
                                          Page 28

 1      Q     Okay.  We can -- we'll work through it.

 2            And why did -- why did Wellstar Health

 3   Systems start using Aetna to provide services?

 4      A     So we had been -- we had been

 5   administering that through a joint venture that we

 6   had with another health system who had been

 7   administering our health plan, and that joint

 8   venture dissolved.

 9            So we needed to hire another

10   administrator, and so Aetna was chosen as that

11   administrator at that time.

12      Q     Okay.  And with respect to this 2021

13   Wellstar Medical Plan, what services did Aetna

14   provide to Wellstar?

15      A     So Aetna provided claim payment, member

16   service, customer service services, eligibility.

17   Basically, overall administration of the medical

18   employee health plan.

19            As well as they provided support in terms

20   of the creation of documents and the clinical

21   expertise around the administration of the benefits

22   that were covered under this employee medical plan.

23      Q     Who decided what benefits would be

24   contained within the 2021 Medical Plan?

25      A     So that was a collaboration between
```

1    A    It is.

2    Q    Okay.  Do you know if Section 55th --

3  1557 of the ACA is -- is that provision that

4  prohibits discrimination?

5    A    Again, I don't know that off the top of

6  my head.

7    Q    Okay.  Is -- all right.  Is the Wellstar

8  Health System medical plans, are they subject to

9  the ACA?

10         MR. BACHMAN:  I'm going to object to the

11  form of the question, but you can answer it.

12    A    So I know that -- I can't speak to

13  whether we're subject specifically to the ACA.

14         I can speak to the fact that we are

15  subject to certain -- the plan is subject to

16  certain laws and regulations, which we are very

17  aware of, and use outside counsel to make sure that

18  we're complying with all of those requirements that

19  apply to our benefit plan, our medical benefit

20  plan.

21  BY MS. COMITE:

22    Q    And for the 2021 plan, what -- who --

23  what outside counsel did Wellstar use to ensure

24  compliance with laws and regulations?

25    A    I don't know the name of the firm.

```
                                             Page 40
```

 1      A    Typically would be the person that was in

 2    the role of Melissa Guy and Teresa Hamilton.

 3          Whoever was in that role at that time

 4    would have been the ones communicating with the

 5    ERISA attorneys.

 6      Q    Okay.  Did Aetna ever communicate with

 7    Wellstar regarding whether any of its medical plans

 8    complied with federal or state laws or regulations?

 9      A    So we would rely on Aetna to help give us

10    heads up or sort of insight into best practices

11    and/or changes in laws.  They were not the sole

12    source of that.

13          But we did look to their expertise and

14    they would occasionally make us aware of things

15    that might be coming down the pike or things that

16    we should be thinking of.

17          Or if they saw something concerning in

18    our document, they would bring that to our

19    attention.

20          But it was -- it was not the sole way

21    that we ensured compliance with laws.

22      Q    Did Aetna ever communicate anything to

23    Wellstar about the infertility definition in the

24    Plaintiff's medical plan and whether or not it was

25    compliant with any federal laws or regulation?

Page 41

```
 1        A    I'm not aware of any communications where
 2   there was discussion of the legal compliance of
 3   that definition.
 4        Q    Do you have a recollection of when the
 5   Affordable Care Act became effective?
 6        A    No.  I mean, I -- I feel like it's been
 7   around forever now, so, no, I don't have an exact
 8   date in my head.
 9        Q    Were there any -- does -- did Aetna
10   conduct any reviews or audits regarding Plaintiff's
11   medical plan and whether or not it adhered to any
12   federal statutes?
13        A    Can you clarify your question?
14        Q    Sure.  Does Aetna perform any compliance
15   reviews with regard to any of Wellstar's medical
16   plans?
17        A    And tell me what you mean by
18   "compliance."
19        Q    Is there -- are there any services that
20   Aetna provides to Wellstar with regard to any of
21   its medical plans that would advise whether the
22   provisions of the medical plan were compliant with
23   federal law?
24        A    So I -- so, again, we use their template
25   as the basis.  And our assumption is that they're
```

1      Q     Okay.  I'll just read it quickly.

2            "The condition of a presumably healthy

3   covered person who is unable to conceive or produce

4   conception after:  For a woman who is under 35

5   years of age: 1 year or more of timed, unprotected

6   coitus, or 12 cycles of artificial insemination; or

7   For a woman who is 35 years of age or older: 6

8   months or more of timed, unprotected coitus, or 6

9   cycles of artificial insemination."

10           What is the purpose of this definition of

11  infertile or infertility in the 2016 medical plan?

12     A     So it's the medical definition of

13  infertility that has been used to determine

14  eligibility for those benefits.

15     Q     And where did this definition come from?

16     A     It came from the Aetna template is my

17  understanding.  And also I understand that it's the

18  clinical definition of infertility, the medical

19  definition.

20     Q     When you say "clinical definition," what

21  does that mean?  What is -- what are you referring

22  to, the clinical definition?

23     A     That if you went out into the medical

24  literature that it's a common definition used to

25  define infertility.

Page 51

1     Q     Do you know what medical literature
2  specifically?
3     A     I don't.
4     Q     This document, the 2016 Wellstar Employee
5  Medical Plan, do you know if Aetna was the claims
6  administrator for this document?
7     A     Yes, they were.  Aetna was the
8  administrator for this document.
9     Q     How do you know?
10    A     Because they were an administrator in
11 2016, claims administrator for the medical plan in
12 2016.
13    Q     Okay.  Was this the first year that
14 Wellstar Health System started using Aetna services
15 for claims administration?
16    A     Yes, that's my understanding.
17    Q     Okay.  What year would Wellstar have
18 begun communicating with Aetna regarding providing
19 services to the Wellstar Health System for its
20 employee medical plans?
21    A     It would have likely been in 2015.
22    Q     In 2015, who at Wellstar would have been
23 involved in communicating with Aetna regarding the
24 2016 employee medical plan?
25    A     So we would have done a request for

Page 52

```
 1   proposal through Mercer.  So sort of a national

 2   search for administrators.

 3           And then Aetna was selected for that.

 4   And so then the communication around that would

 5   have been through Mercer and Wellstar HR

 6   representatives.

 7      Q    And we've previously spoke about

 8   Ms. Hamilton, Ms. Guy and Ms. Girguis.

 9           Would they have been involved in 2015 in

10   the communications with Aetna regarding the

11   provisions in the employee medical plan for 2016?

12      A    So Teresa Hamilton would have been for

13   sure.  As far as Ms. Girguis and Melissa Guy, I

14   don't -- I can't recall their exact tenures of when

15   they came and left the organization to speak to

16   that.

17      Q    Do you recall anyone else that would have

18   been involved in communicating with Aetna in the

19   2015 time frame?

20      A    Again, our Mercer representatives would

21   have been involved.

22      Q    Okay.  Anyone else at -- at Wellstar?

23      A    No one that I can specifically recall.

24      Q    Do you know who Jerry Sampson is?

25      A    I do.
```

                                                            Page 54

1    definition in the 2016 Wellstar employee medical

2    plan?

3         A     So I know -- I don't know that there

4    were con- -- there was discussion on the definition

5    itself, I know that there was an edit to that

6    section that was presented to Aetna.

7         Q     And could you tell me more about that

8    edit?

9         A     There was a -- a reference to -- that

10   the -- it could not have been caused -- caused --

11   the infertility could not be caused by voluntary

12   sterilization.  That had been a criteria that was

13   then -- that was eliminated from the document.

14        Q     And who at Wellstar was involved in

15   eliminating that language from the 2016 Employee

16   Medical Plan document?

17        A     So it would have been a combination of

18   Wellstar and Mercer personnel in reviewing that

19   document, and it looks like it was Ms. Girguis,

20   Matthew Ladden and Teresa Hamilton.

21        Q     And Teresa Hamilton is a Wellstar

22   employee, correct?

23        A     She is.

24        Q     And Mr. Ladden was at Mercer.  And who

25   was the third person you said?

```
                                          Page 55
 1        A     Ms. Girguis.
 2        Q     Oh, Girguis.  I'm sorry.  Okay.  And
 3   she's with Wellstar?
 4        A     She's with Wellstar.
 5        Q     Okay.  And what was the genesis of this
 6   particular edit?
 7        A     I have no way of knowing that based on
 8   the document that we were able to -- to find --
 9   find on it.
10        Q     Okay.  Do you know why -- did -- did
11   Aetna provide advice to Wellstar regarding this
12   edit?
13        A     I wasn't able to see documented specific
14   advice.  My understanding is it was in the template
15   and in our review of that we determined that we
16   would strike that.
17        Q     Okay.  Just so I am clear.  What was in
18   the template and what was stricken?  Would you just
19   explain a little more?
20        A     Yeah.  So in the template they removed
21   the requirement, an additional requirement, that
22   the infertility is not caused by voluntary
23   sterilization of either one of the partners with or
24   without surgical reversal or a hysterectomy.
25             So that was in the original template as
```

Page 89

1    introduced as Exhibit 14 and that has been

2    published.

3    BY MR. AUSTIN:

4        Q    All right.  Tell me when you have 14

5    open.

6        A    We -- we do.

7        Q    Okay.  Before I go into the document, let

8    me back up a little bit.

9            So as I understood it, going into what

10   would -- what would become the plan year 2016,

11   Wellstar decided to look for a third-party

12   administrator to provide administration -- claims

13   administration services starting in 2016; is that

14   accurate?

15       A    I'm sorry, will you repeat that?

16       Q    Going in -- sometime prior to the plan

17   year for 2016, Wellstar sent out a request for

18   proposal, I think you said nationwide, looking for

19   a third-party administrator for the Wellstar plan

20   beginning in the year -- the calendar year or the

21   plan year 2016; is that accurate?

22       A    Yes.

23       Q    Okay.  And prior to -- and the plans we

24   looked at previously, the 2014 plan and the 2015

25   plan, who was the claims administrator under those

Page 90

```
 1   plans?
 2        A    So it was Piedmont Wellstar Health Plan,
 3   which had contracted with Evolent to provide those
 4   administrative services on behalf of that health
 5   plan.
 6        Q    And the Wellstar that's in the Wellstar
 7   Piedmont is Wellstar Health System, correct?
 8        A    Wellstar Health System was a partner in
 9   that health plan, yes.
10        Q    And these documents often -- they refer
11   to administrator and administration in sort of
12   different ways at times.
13             Are you familiar with the -- the term
14   "plan administrator"?
15        A    I've heard the term "plan administrator,"
16   yes.
17        Q    And then there's the term "claims
18   administrator," correct?
19        A    Yes.
20        Q    And those are two different functions?
21        A    Well, I'd have to look at it in context
22   of the document they're used and how they're
23   defined.
24        Q    Well, certainly in 2014 and 2015,
25   Wellstar Health System was the plan sponsor,
```

Page 91

1  correct?

2       A    Yes.

3       Q    And they were self-funded plans, meaning,

4  that Wellstar paid the benefits out of its own

5  funds, correct?

6       A    Yes.

7       Q    And in that role of -- of self-funding

8  plan sponsor, are they often referred to as the

9  plan administrator?

10      A    Yes.  Again, depending on the definition

11 of the document.

12      Q    Correct.

13           But the plan administrator is the

14 different than the claim administrator, correct?

15      A    Yes.  Again, subject to the way they're

16 defined, but yes.

17      Q    And in 2014 and '15, Wellstar Piedmont,

18 that joint venture, was performing the role of

19 claim administrator, correct?

20      A    Correct.

21           MS. COMITE:  Objection, foundation.

22 BY MR. AUSTIN:

23      Q    So -- and it's similar to the role -- the

24 role that Wellstar Piedmont played in the 2014 and

25 2015 plan, that was the role that you were looking

```
                                              Page 95
 1    Wellstar, correct?
 2         A     Did you say Teresa is also with Wellstar?
 3         Q     Yes.
 4         A     Yes, that's correct.
 5         Q     And it says: "I attached the 2015 SPB
 6    above and as soon as I am finalized with PWHP on
 7    the 2015 Member Handbook I will send that to you
 8    too."
 9               Do you see that?
10         A     I do.
11         Q     Was it -- was -- would this be customary
12    to share your previous plan documents with -- with
13    Aetna to prepare the plan going forward?
14         A     It was.
15               MS. COMITE:  Objection.
16    BY MR. AUSTIN:
17         Q     I mean, why would you share these
18    previous plan documents with Aetna at this point in
19    2015?
20         A     So that they could get a feel for your
21    benefit designs and -- and what your previous --
22    what your benefit designs were for the plan.
23         Q     And by "your," you mean Wellstar?
24         A     Yeah, or any employer.
25         Q     Right.  In -- in this instance, this
```

Page 96

1    allowed Aetna to see how Wellstar's plans have been
2    constructed previously, what sorts of things they
3    covered, what sorts of things they didn't, et
4    cetera, correct?
5         A    That's right.
6         Q    And that would be a starting point for
7    creating a plan going forward for 2016?
8              MS. COMITE:  Objection, assumes facts.
9    BY MR. AUSTIN:
10        Q    You can answer.
11        A    So I would say that along with the Aetna
12   template in combination would likely be a starting
13   point for creating the new document.
14        Q    Well, let's look at the last sentence of
15   that email.  It says: "Not a lot of changes as
16   compared to the 2014 Member Handbook," and there
17   she's talking about the 2015 documents, correct?
18        A    Uh-huh.
19        Q    So "Not a lot of changes as compared to
20   the 2014 Member Handbook, so you can start using
21   that to make the 2016 SPD," correct?
22        A    Correct.
23        Q    And the 2016 SPD would be the new plan
24   starting -- Aetna would be the claims administrator
25   beginning in 2016, correct?

1      A     Correct.
2      Q     Okay.  So one of the things they're
3   saying here is that previously we had two
4   documents, we would like to put them into one going
5   forward, correct?
6      A     Yes.
7      Q     And that's Wellstar's direction?
8      A     That's right.
9      Q     And then the other things communicated
10  here is that Aetna can look at the 2015 plan as a
11  starting point for the 2016 plan, correct?
12          MR. BACHMAN:  Object to the --
13          MS. COMITE:  Objection.
14          MR. BACHMAN:  Go ahead.
15     A     Yes, so -- so there's going to be certain
16  -- in a -- in a plan like -- in a self-insured
17  plan, especially the one the size of Wellstar,
18  there's going to be certain custom components to
19  it.  So the reason for giving them the previous
20  documents would be so that those areas where there
21  is customization can be looked at and incorporated
22  then into what would typically be the third-party
23  administrator's template, so in this case Aetna's.
24  BY MR. AUSTIN:
25     Q     So there was another party involved here

Page 98

1    in -- that you've referred to a few times.

2              Mercer, correct?

3        A    Yes.

4        Q    Tell us who Mercer is and what they do?

5        A    So Mercer's a large consulting firm that

6    works, I think, both with payors and employers

7    around employee benefits among other expertise and

8    services they do, but that -- that was their

9    specific expertise that would have been in this

10   relationship.

11       Q    And what's -- what sort of expertise

12   would they have that would have been of assistance

13   to Wellstar in this circumstance?

14       A    So they look at what are other large

15   employers or other large systems doing with --

16   relative to overall benefit design, benefit

17   coverage.

18             They look at kind of upcoming legislative

19   things that might impact a -- a plan like ERISA.

20             They look at, you know, how do we compare

21   to other competitors and what would make sense in

22   terms of an overall plan offering so that our

23   benefits are attractive to the market.

24             And then they also look at financial

25   implications of the benefit plan designs, help with

Page 100

1   BY MR. AUSTIN:

2       Q    Because ultimately that decision, what's

3   covered and what's not, is Wellstar's decision for

4   its plan, correct?

5            MS. COMITE:  Objection.

6       A    Yes.  Ultimately, Wellstar does decide

7   what's covered.

8   BY MR. AUSTIN:

9       Q    And one of the parties that they look to

10  to help give them advice on that question was

11  Mercer, this large consulting company that

12  specializes in representing companies like

13  Wellstar?

14           MS. COMITE:  Objection, foundation.

15      A    Yes, that is one source.  Mercer is one

16  source.

17  BY MR. AUSTIN:

18      Q    In this instance Wellstar was not

19  representing Aetna, correct?

20           I'm sorry, I re -- misphrased.

21           In this instance Mercer was not

22  representing Aetna, correct?

23      A    That's correct.

24      Q    Mercer --

25      A    Wellstar was Wellstar's client.

1        Q       Right.

2        A       I mean, Mercer was Wellstar's client.

3        Q       Yeah, Mercer was retained by Wellstar and

4    was providing expert advice to Wellstar, correct?

5        A       That's right.

6        Q       And you had some discussions about the

7    plans going forward.

8                You talked about -- had answered some

9    questions about the plan in 2021 and you mentioned

10   Mercer then, too.

11               Am I to understand that Mercer was

12   involved with Wellstar throughout the period of

13   Aetna's work on -- you know, work for WellStar?

14               MS. COMITE:  Objection.

15       A       Wellstar had a long-standing relationship

16   with Mercer that crossed through this period.  That

17   relationship doesn't exist today and I don't know

18   the exact date that that changed.

19   BY MR. AUSTIN:

20       Q       You testified, though, that they were

21   advising Wellstar for the 2021 plan, correct?

22       A       Yes.  According to the emails that I

23   re- -- reviewed.

24       Q       Do you have any reason to believe they

25   didn't advise you with respect to your plans in

1    objections?

2              Let me just rephrase my question.

3    BY MR. AUSTIN:

4        Q    You've said that you understood and it

5    would be an ordinary course that in order to come

6    up with the 2016 plan document, it would be a

7    collaborative effort between Wellstar, Mercer and

8    Aetna; that's accurate, correct?

9        A    Correct.

10       Q    And what I want to know is were you

11   personally involved in any of those discussions

12   about the specific benefit design of the 2016 plan?

13             MS. COMITE:  Objection.

14       A    To my knowledge, I was not involved in

15   those specific discussions on infertility.

16   BY MR. AUSTIN:

17       Q    And so you don't know what was discussed

18   between Wellstar representatives, Mercer

19   representatives and Aetna representatives with

20   regard to the infertility benefit that ultimately

21   appeared in the Wellstar plan in 2016, correct?

22             MS. COMITE:  Objection.

23       A    The only knowledge I have is related to

24   the documents that were produced with respect to

25   this topic that I reviewed with a -- with counsel

Page 121

1          A    Correct.  That's an instance where we had

2    certain standards we wanted to use.  That's not

3    always the case for every medical condition.

4          Q    No, understood.

5               But again, part of this collaborative

6    process was that if Wellstar had a particular

7    benefit or particular standard that it wanted to

8    apply, it could do so, correct?

9          A    It could, but both -- but buy and large

10   we relied -- we relied on Aetna's expertise and

11   clinical guidance for the benefits.

12              But yes, we did ultimately have the right

13   if we had something different.

14         Q    The ultimate decision about what benefits

15   you provided and the language that you used was

16   Wellstar's, correct?

17         A    The ultimate decision, yes.

18         Q    I mean, even if the decision was we will

19   use Aetna's standard language, that decision was

20   Wellstar's decision, correct?

21         A    Correct.

22         Q    Okay.  Look down under line 219,

23   "Nutritional Counseling."

24              Do you see that?

25         A    Yes.

1    Q    I'm sorry, one of the deposition rules is

2    you and I can look at each other and know exactly

3    what we're talking about and not say a word, but

4    the court reporter wouldn't have anything to put

5    down.

6         So it's one of the little rules, but I

7    need you -- I need you to answer.  And you've been

8    good about that, but we didn't really remind you or

9    let you know that from the beginning.

10        And I think you mentioned that your

11   understanding is that the -- the definition that

12   was in the Wellstar plan was consistent with sort

13   of standard clinical in medical standards at the

14   time used outside of Wellstar, correct?

15   A    Correct.

16   Q    In other words, there wasn't an accepted

17   medical definition of infertility that was -- as

18   a -- as a medical condition that -- that was used

19   in the world outside of Wellstar, correct?

20   A    Correct.

21   Q    And outside of Aetna, correct?

22   A    Correct.

23   Q    Are you aware that -- do you have any

24   reason to believe that anyone -- what Aetna or

25   Wellstar or Mercer created a special definition of

1   defined."

2           Do you see that?

3       A    I do.

4       Q    Does that indicate that Mercer would

5   actually be handling the drafting and the preparing

6   of the 20 -- 2016 SPD?

7       A    It appears that way, yes.

8       Q    And you were not involved in that

9   process, and so you -- you can't say otherwise,

10  correct?

11      A    Correct.  Other than that -- but other

12  than that other email which referenced giving the

13  documents for Aetna to start on it.

14      Q    Right.  So that you gave us the -- gave

15  Aetna the previous documents as a place to start.

16  And then this -- this indicates that Mercer will be

17  preparing the 2016 SPD, correct?

18      A    Correct.

19      Q    Let's go ahead and mark as the next

20  exhibit.  It's a Wellstar document 1930.

21          Oh, wait.  No, no, let me see.  I think

22  I've already -- yeah, 1930.

23          (Deposition Exhibit 17 marked.)

24          MS. SLEEVES:  Okay, that one has been

25  marked as Exhibit 17 and it has been published.

```
                                        Page 151
 1          Correct?
 2     A    That's correct.
 3     Q    Are you generally familiar with what
 4  state mandates are?
 5     A    I am.
 6     Q    Well, what are they in general?
 7     A    They're requirements that the state --
 8  that a given state requires have to be in certain
 9  benefit plan products or designs.
10     Q    Did you use a particular state.  I know
11  Wellstar is located in Georgia.
12          Did you use a particular state for your
13  -- for compliance purposes?
14     A    Typically, it would -- Georgia for the
15  majority of our employees, but I do know that if we
16  have employees in other states that that gets taken
17  into account as well.
18     Q    All right.  And then, second, Aetna is
19  also noting in this Clinical Policy Bulletin that
20  the definition of infertility can vary depending on
21  plan customization, correct?
22     A    That's correct.
23     Q    And again, that's the ability of a plan
24  sponsor like Wellstar to customize the definition
25  to fit its particular purposes?
```

Page 152

 1       A    That's right.

 2       Q    And we saw an example where WellStar, in

 3    fact, did that in -- in the context of removing an

 4    exclusion, correct?

 5       A    That's right.

 6       Q    So, I mean, Wellstar had the ability to

 7    customize the -- the infertility benefit in its

 8    plan to its liking?

 9       A    We did.  And outside of a specific reason

10    to do that, then we relied on, again, Aetna and

11    Mercer's expertise to help us set the benefits, but

12    yes, we -- we have the ability to customize.

13       Q    And -- and Mercer certainly was available

14    and played a role in those sorts of decisions,

15    correct?

16       A    Absolutely.

17       Q    All right.  I'm going through my notes.

18    I'm getting close.  This is just a mechanical.

19            Go to Exhibit 4.  Are you with me?

20       A    Getting there.

21       Q    Yeah, that's fine.

22       A    Yes.  Yes.

23       Q    Just a housekeeping question.

24            You see the email there is from Heather

25    Schweizer at Wellstar back in its -- this is

Page 163

1       Q     All right.  Tell me when you have that.

2       A     I have -- we have it.

3       Q     Okay.  So this is another document that

4    was produced by Wellstar as part of the -- its

5    document production in this case.

6             Is this the type of document you are

7    familiar with?

8       A     It is.

9       Q     Okay.  And it refers to a review by --

10   and this is not -- I represent to you it has

11   nothing to do with Ms. Kulwicki.  The name of the

12   member has been redacted here.

13            Do you see that?

14      A     I do.

15      Q     And it refers to the Wellstar Employee

16   Medical Plan Appeals Committee.

17            Do you see that?

18      A     Uh-huh.  Yes.

19      Q     Can you tell me what that is?

20      A     So that third level appeal committee is

21   -- or that's a committee that hears third level

22   appeals.

23            So after a member has gone through the

24   two levels, the first level and the second level

25   that Aetna administers and reviews and makes

Page 164

1  determinations on, there is a third level that the

2  member can avail themselves of.

3          And in that level there's a Wellstar

4  committee that then reviews the first two appeals

5  and decisions from Aetna as well as any additional

6  information the member might have submitted.

7          And then makes a determination on that --

8  that claim as well --

9      Q    And this --

10     A    -- or that appeal.

11     Q    This Level III appeal is -- is an option

12  that's available to all of the Wellstar members,

13  correct?

14     A    That's correct.

15     Q    It's at their election whether they make

16  that appeal or not?

17     A    That's correct.

18     Q    So Aetna handles the first two levels of

19  appeal, but if a member then avails themselves of

20  the Level III appeal that the plan provides for,

21  then -- then the Wellstar Employee Medical Plan

22  Appeals Committee is involved?

23     A    That's correct.

24     Q    And in that instance it's the Wellstar

25  Medical Plan Appeals Committee and not Aetna that

Page 165

1    makes a final determination of the claim?

2        A     That's correct.

3        Q     For example, if you'll scroll down to the

4    page that starts 1410.

5        A     Okay.

6        Q     And this is a document that again was

7    produced from Wellstar's files dated October 2nd,

8    2018.  The name of the member has been redacted.

9              But you see, again, it's a -- it's a

10   discussion as -- about that particular member and a

11   review that was done by the Wellstar Medical Plan

12   Appeals Committee, correct?

13       A     That's right.

14       Q     And -- and it's -- about the middle of

15   the page, it says: "After a careful review of your

16   Third Level Appeal, the Appeals Committee has

17   decided to uphold the Aetna second level appeal

18   decision.  The rationale for this decision is noted

19   below."

20             Do you see that?

21       A     I do.

22       Q     And the first line says the "Patient is

23   not considered infertile."

24             Correct?

25       A     That's right.