# EXHIBIT B

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| TARA KULWICKI, on behalf of  ) | CASE NO. |
| herself and all others      ) | 3:22-CV-00229(VDO) |
| similarly situated,         ) | |
|                             ) | |
|        Plaintiff,           ) | |
|                             ) | |
|   VS.                       ) | |
|                             ) | |
| AETNA LIFE INSURANCE COMPANY,) | |
|                             ) | |
|        Defendant.           ) | |
|_____) | |

CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF

30(b)(6) AETNA LIFE INSURANCE COMPANY - JULIE EVANS

TAKEN:   October 24, 2024

TIME:    10:00 a.m.

STENOGRAPHICALLY REPORTED BY:

Brandi Bigalke, RPR, RSA, CSR NO. 084-4870

Page 20

1   just took issue with the infertility benefits that
2   were offered by Wellstar.
3           Q.    And you understand that in the 2021
4   timeframe that Plaintiff Kulwicki was an employee
5   of Wellstar Health System?
6           A.    Correct.  Yes.
7           Q.    I think you alluded to it earlier,
8   but is it true that Aetna had a contractual
9   relationship with Wellstar Health System and its --
10  relating to its employee medical benefit plans
11  during the 2021 timeframe?
12          A.    Yes, we did.  We were their claim
13  administrator from 2016 through 2023.
14          Q.    So can you give me an overview of how
15  that relationship was formed.
16          A.    Yes.  So Wellstar hired Mercer, which
17  is a very large national employee benefit
18  consultant.  They hired Mercer to perform an RFP.
19  At the time, Wellstar actually had their own health
20  plan in partnership with Piedmont.  Something
21  happened with that and Wellstar went out of that
22  relationship, which is why they asked Mercer to do
23  an RFP.  So I don't know who all they solicited as
24  far as carrier and claim administrators go, but
25  Aetna was one of them.

Page 21

1            And, you know, we responded to the
2    RFP.  We were ultimately awarded their business at
3    some point in 2020 -- I'm sorry, 2015 or 2016.  So
4    that's how the relationship began.
5            Q.    And when you say RFP, that stands for
6    request for proposal?
7            A.    Correct.  Request for proposal, yes.
8            Q.    And so is receiving these types of
9    requests for proposal something that's part of
10   Aetna's regular process of getting business?
11           A.    Well, it's -- yeah.  Yeah.  Not only
12   Aetna, but every carrier.  That's primarily how we
13   get business is through request for proposals from
14   consultants.
15           Q.    Does Aetna have some sort of like a
16   portal or a place where people deliver these RFPs?
17           A.    I don't work in that department, but
18   I believe there's either an email or a portal of
19   some sort.
20           Q.    Once Aetna receives an RFP, how does
21   the process proceed on Aetna's end in terms of
22   formulating a response to it?
23           A.    I only have knowledge of those ones
24   that I've worked on.  I actually did not work on
25   the proposal for Wellstar.  You know, typically we

Page 35

1  prohibit the continuance of the Agreement or some
2  portion thereof, the Agreement or that portion
3  shall terminate automatically as to such
4  jurisdiction on the effective date of such law or
5  interpretation; provided, however, if only a
6  portion of the Agreement is impacted, the Agreement
7  shall be construed in all respects as if such
8  invalid or unenforceable provision were omitted."
9              So my question is with respect to
10 Wellstar, did Aetna ever exercise this provision of
11 the MSA?
12             MR. AUSTIN:  I'm going to object
13 again.  I don't believe this is a topic that's in
14 the deposition notice.  So she's not a 30(b)(6)
15 designee on this topic, but she can -- and also it
16 sort of calls for a legal conclusion also.
17             But to the extent she has personal
18 knowledge, she can testify.
19             THE WITNESS:  As it relates to
20 Wellstar we never -- I don't really understand this
21 because it's very legal, but I think it's saying --
22 you're asking if we ever invoked -- terminated our
23 agreement with Wellstar.  No.  Wellstar terminated
24 their agreement with us though at the end of last
25 year, 2023.

Page 38

1  sole authority regarding benefits and provisions in
2  the self-insured portion of the Plan."
3              Did Aetna provide either of these
4  services to Wellstar?
5       A.    Yeah.  We worked in -- Mercer was on
6  point to create their SPD, if you will.  So Mercer
7  ultimately did that for them, so we did review it.
8  And there was some back and forth between us and
9  Mercer on, you know, whether or not they captured
10 the benefits accurately within the document.
11      Q.    So is it true that Aetna maintains a
12 set of standard benefit descriptions?
13      A.    To the extent that we don't have
14 standard benefits but we have standard language,
15 you know, to support whatever benefits it is that a
16 customer chooses to have.  So, you know, we have a
17 standard way of laying out what schedule benefits
18 is, but it's all based on what the customer chooses
19 to have in their plan.  We have standard
20 definitions of, you know, what's a provider, what's
21 a hospital, you know, what -- what is the
22 eligibility requirements of this plan based on what
23 the customers chose to have as those requirements.
24            MR. ETZEL:  Could we mark from the
25 previous deposition, could we bring over Exhibit 5.

1  Q. All right. And have you seen this or
2  a similar document before?
3  A. Yes.
4  Q. And what is this?
5  A. Wellstar asked us to share our
6  clinical policy bulletin on infertility, and this
7  is that bulletin back in 2015 that we shared.
8  Q. What is a clinical policy bulletin?
9  A. It is a guide. When a plan doesn't
10 already have their own definition of medical
11 necessity for a particular service, it is a guide
12 for what medical -- medical necessity for a
13 particular service. Which, you know, again, it's
14 not necessarily what Wellstar chose completely to
15 use, but.
16 Q. Aetna's clients generally do have the
17 ability to say to Aetna that they want to just use
18 Aetna's standard definitions if that's what they
19 want, right?
20 A. If they want to, yes, they can use
21 our standard medical necessity.
22 Q. Okay. So if you look at the page
23 we're on, number 2.
24 A. Item number 2?
25 Q. Yeah. Policy notes number 2.

1  you know, material changes.  This was -- Wellstar
2  hired a new consultant effective January 1, 2021
3  that was Willis Towers Watson, and this is the
4  document that Willis Towers Watson created for
5  them.  You'll notice it looks very different than
6  the one before.  Different format.
7        Q.    Before this was sent to Wellstar
8  members, would it have to go through any process
9  with people at Aetna?
10       A.    Yes.  When we -- when a consultant or
11 customer drafts or produces their own SPD, we go
12 through it just to make sure that the benefits
13 like, you know, their coinsurance rates, deductible
14 match -- are accurately described, yes.
15       Q.    Does Aetna have to make sure that
16 it's able to administer these benefits?
17       A.    If this were like the very beginning
18 of their plan with us, yes.  But we did that back
19 in 2015, you know.  We kind of went through the
20 plans they had in place and -- during the
21 implementation process.  And even partially during
22 that RFP process we would have pointed out things
23 that we couldn't administer and we would come up
24 with alternative solutions.  But by 2021 there
25 wasn't anything we would have had to review for,

1      Q.    So you mentioned there was an RFP
2  process.
3            What information did you obtain from
4  Wellstar to sort of begin the process?  To begin
5  Aetna's process.
6      A.    We received their prior I'll say
7  claim document SPD, and that's -- and we met with
8  them, you know, to kind of go through a checklist
9  of everything we needed to implement the plan and
10 the topics, and cover like banking, and billing,
11 and all that stuff, and kind of outlined a timeline
12 for them as to, you know, how long it would take to
13 get from Point A to Point B.  And, you know, we
14 would meet with them and Mercer.
15           Mercer was very, very involved in the
16 implementation, and more than I've ever seen in a
17 traditional consultant.  Some consultants don't get
18 involved at all.  But I think Wellstar relied on
19 them pretty heavily because it was a big change for
20 them being back to a carrier for administration of
21 their claims.
22     Q.    I'll stop you there because you've
23 mentioned a couple of things I'd like to explore.
24           Why did you want their old plan?
25     A.    Because they were implementing that

Page 100

1   plan with us, so we have to have copies of what it
2   is, you know, that outlines their plan.  Like, you
3   know, what's covered, you know, what percentage
4   it's paid at, what deductibles are out of pocket.
5   Every detail we can possibly get so that we can
6   chart that out into a document we use for plan
7   coding, if you will, and then our plan coding team
8   takes that and, you know, starts coding our system
9   once everything is agreed to and signed off on and
10  whatnot.  So the prior plan document -- or is it
11  the 2016 document was critical that we get that so
12  that we knew what their benefits were.
13          Q.    Did Wellstar under its previous plan
14  offer an infertility benefit?
15          A.    They did.  They did, yes.
16          Q.    And so at least with regard to
17  infertility, you're taking that benefit and then
18  moving it forward into a new plan here?
19          A.    Correct.
20          Q.    Now, you mentioned Mercer sort of
21  generally a few times.
22                Who is Mercer and what were they
23  doing in this particular instance for Wellstar?
24          A.    Well, Mercer is one of the largest
25  employee benefit consultants in the country, and,

Page 101

1   you know, not only did they send us the RFP
2   request, but they would have analyzed, you know,
3   Aetna's -- you know, look at everybody else and
4   helped advise Wellstar in who to go with.
5               And then as far as the implementation
6   process goes, everything kind of funneled through
7   them as far as decisions that Wellstar made.  So if
8   there were any open questions as we reviewed that
9   coding document I referred to, Mercer and Wellstar
10  would confer.  We were not involved in that when
11  they met with each other.  And then Mercer would
12  ultimately get back to us and say here's the
13  answers, here's what they want to do.
14          Q.      You said they were a benefits
15  consultant.
16              What -- would Mercer had played a
17  role in assisting Wellstar with a specific design
18  of their plan?
19          A.      Yes.
20              MR. ETZEL:  Object to form.
21              MR. AUSTIN:  You can answer.
22              You can answer.  I'm not sure if
23  you --
24              THE WITNESS:  Oh, yes.  I mean, for
25  2016 the design was pretty much the same.  But

Page 107

1  your out of pocket is Y, you know.  So that's
2  usually what it entails.  And it -- what's not
3  covered under the plan, it's listed out as well in
4  the SPD.
5         Q.    So --
6         A.    Who is eligible.
7         Q.    So Ms. Waters here at Mercer in this
8  email saying, "Hello Aetna Team, We have reviewed
9  the outstanding items and have listed the Wellstar
10 team responses below in orange," correct?
11        A.    Correct.  Yes.
12        Q.    Is this sort of kind of a typical
13 example of how this process would work, that Mercer
14 and Wellstar would talk among themselves and come
15 back to you with questions or issues?
16        A.    Yes.
17        Q.    Would you have been involved in
18 exactly what Mercer and Wellstar discussed?
19        A.    No.  We were not involved at all.
20        Q.    So Mercer is funneling from Wellstar
21 various questions listed by topic here, correct?
22        A.    Correct.
23        Q.    In -- let's see.  So let's just walk
24 through a few of them.
25        A.    Okay.

Page 156

1   column that refers to the section of the SPD
2   document, correct?
3       A.   Correct.
4       Q.   And then the third column is
5   Mercer/Wellstar Questions or Language
6   Added/Changed.
7            Do you see that?
8       A.   Yes.
9       Q.   And then it says "Aetna Response" is
10  the last column.
11      A.   Yes.
12      Q.   Now, I realize -- do you -- is there
13  anything that you see here to indicate that you saw
14  this document back in 2018?
15      A.   I did not.
16      Q.   Because it's an internal document
17  between Mercer and Wellstar?
18      A.   Correct.
19      Q.   Do you recall though there were times
20  that Mercer would come to Aetna with specific
21  questions about aspects of their plan and ask you
22  for information?
23      A.   Yes.
24      Q.   Is that something that commonly
25  happens?

Page 158

1  don't recall, and I don't know if they looped me in
2  on that.
3        Q.   Do you recall having -- back in 2018
4  or after that, do you recall Mercer or Wellstar
5  ever looping you into a discussion about the cycle
6  requirements?
7        A.   I -- I don't recall ever being looped
8  in to a conversation.  Honestly, the last thing I
9  remembered ever having dialogue with them about was
10 the private sterilization requirement.
11       Q.   The next entry that's under page 43
12 is Covered ART Benefits.  And the question is
13 "Question as to whether the cycle limit is
14 accurate."
15            Do you see that?
16       A.   I do.
17       Q.   And then the answer is, "The 3 cycles
18 limit is a standard maximum and is coded as such in
19 the Aetna system."
20            Do you see that?
21       A.   Correct.  I do.
22       Q.   Again, do you recall having any
23 discussions with Wellstar or Mercer about this
24 particular issue?
25       A.   No.

Page 159

1      Q.    At any time did anyone at Mercer or
2   Wellstar come to you and say we want to change the
3   cycles, have fewer cycles, anything of that nature?
4      A.    No, they did not.
5      Q.    If Wellstar had wanted to reduce the
6   cycles or eliminate them all together, is that
7   something that they could have done?
8      A.    Yes.
9      Q.    All right.  One last document.  Let's
10  look at -- let me find the exhibit number.  It's
11  one that Mr. Etzel went over with you today early
12  on.  The Master Services Agreement.  Let me find
13  it.
14           MR. ETZEL:  22, I believe.
15           MR. AUSTIN:  22.  Yeah, there we go.
16           Then let me do one other thing here.
17  06789.
18  BY MR. AUSTIN:
19     Q.    Do you recall going through this
20  document with Mr. Etzel earlier today?
21     A.    I do.
22     Q.    Okay.  And again, I want to -- you're
23  not involved in drafting Master Services Agreements
24  or interpreting them or applying them, correct?
25     A.    No, I am not.