# EXHIBIT T

MASTER SERVICES AGREEMENT

MSA-868066

This master services agreement ("Agreement") between AETNA LIFE INSURANCE COMPANY, a Connecticut corporation located at 151 Farmington Avenue, Hartford, Connecticut ("Aetna"), and WELLSTAR HEALTH SYSTEM, INC., a Georgia corporation , located at 793 Sawyer Rd., Marietta Georgia 30062 ("Customer") is effective as of January 1, 2016 ("Effective Date"). Aetna and Customer are referred to herein individually as a "Party" and collectively as the "Parties."

## Recitals

A. Aetna provides administrative support services, including without limitation claims adjudication and payment, case management, and pharmacy benefit management, to self-funded employee benefit plans.

B. Customer is the parent of various affiliated entities that comprise the WellStar Health System of health care providers. Customer has established one or more self-funded employee benefits plans that provide health care coverage to certain covered persons, who are generally comprised of employees and retirees of Customer and their dependents.

C. The Customer wants to purchase certain administrative support services offered by Aetna that are specified in this Agreement, and Aetna wants to provide those services to the Customer for the compensation described herein.

D. Customer further seeks Aetna's agreement to allow Plan Participants access to Aetna's network of hospitals, physicians and other health care providers that have agreed with Aetna to provide services at agreed upon rates and who are participating in the applicable network covering the Plan Participants.

The Parties therefore agree as follows:

## Definitions

"Benefit Funding" means the payment by Customer to Aetna of amounts that Aetna pays to providers on behalf of Customer pursuant to the General Administration Schedule.

"Network Providers" are hospitals, physicians and other health care providers who have agreed with Aetna to provide services at agreed upon rates and who participate in the network being accessed by Plan Participants.

"Service" or "Services" means the service or services that Aetna will provide to Customer that are specified in this Agreement.

Master Services Agreement - 868066          1

**Exhibit
Aetna 22**

AETNA-KULWICKI_0005129

**"Services** Fees" means the compensation due to Aetna for performing the Services, as set forth in the **applicable** Fee Schedule.

**"Plan** Participant(s)" means an individual(s) who is covered by a Plan.

**"Plan"** means the self-funded employee benefit program sponsored by Customer described in Exhibit I. **Customer** is the sponsor of the Plan.

"Plan Documents" means the Summary of Benefits and Coverage, Summary Plan Description, and any other document that describes the material provisions of the Plan's benefit program.

"Runoff Claims" are claims submitted by providers after termination of this Agreement for services rendered by the providers when the Agreement was in effect.

## Agreement

### 1.    TERM

The initial term of this Agreement will be one year beginning on the Effective Date. This Agreement will automatically renew annually unless otherwise terminated pursuant to section 17 (Termination). The initial term and each successive one year renewal shall be considered an **"Agreement Period".** The schedules may provide for different start and end dates for certain Services.

### 2.    SERVICES

Aetna shall provide the Services described in the attached schedules.

### 3.    STANDARD OF CARE

Aetna and the Customer will discharge their obligations under this Agreement with that level of reasonable care which a similarly situated services provider or plan administrator, respectively, would exercise under similar circumstances. Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(1)(B) when performing any  Customer-delegated fiduciary duties pursuant to the applicable schedule.

### 4.  SERVICE FEES

The Customer shall pay Aetna the fees according to the applicable Fee Schedule(s) ("**Service** Fees").

Aetna shall provide the Customer with a monthly statement indicating the Service Fees owed for that month. The Customer shall pay Aetna the Service Fees no later than 31 calendar days after the first calendar day of the month in which the Services are provided (the **"Payment Due Date"**). The Customer shall provide with their payment either a copy of the Aetna invoice or a copy of a pre-approved invoice which meets Aetna's billing requirements. The Customer shall also reimburse Aetna for certain additional expenses, as stated in the applicable Fee Schedule(s).

Master Services Agreement - 868066                    2

All overdue amounts are subject to the late charges specified in the applicable Fee Schedule(s).

Aetna shall prepare and submit to Customer an annual report showing the Service Fees that Customer paid.

## 5.  BENEFIT FUNDING –

Customer shall pay to Aetna the Benefit Funding in the manner set forth in the General Administration Services Schedule.

## 6.  FIDUCIARY DUTY

It is understood and agreed that the Customer, as plan administrator, retains complete authority and responsibility for the Plan, its operation, and the benefits provided there under, and that Aetna is authorized to act on behalf of the Customer in connection with the Plan only to the extent expressly stated in this Agreement or as agreed to in writing by Aetna and the Customer.

Claim fiduciary responsibility is identified in the applicable Schedule.

## 7.  CUSTOMER RESPONSIBILITIES

(A) Eligibility – Customer has the sole authority to determine eligibility of persons to be Plan Participants. Aetna has no responsibility for determining whether an individual meets the eligibility requirements of the Plan, and shall refer all questions regarding eligibility to Customer.  Customer shall supply Aetna, by electronic medium acceptable to Aetna, information identifying Plan Participants, and shall notify Aetna by the tenth day of the month following any changes in the eligibility of a Plan Participant. Aetna is not required to honor a notification of termination of a Plan Participant's eligibility which Aetna receives more than 60 days after termination of such Plan Participant.

(B) Plan Documents–Aetna has reviewed the Plan Documents and determined that Aetna's claim processing systems and internal policies and procedures are consistent with the Plan Documents and that Aetna will be able to perform the Services in accordance with this Agreement. Aetna has NOT reviewed the Plan Documents for compliance with applicable law. Customer also agrees that Customer is responsible for satisfying any and all reporting and disclosure requirements imposed by law on self-funded employee benefit plans, including updating Plan Documents and issuing any summaries of material modifications to reflect any changes in benefits.  Customer is responsible for responding to Plan Participant requests for copies of Plan Documents.

(C) Notice of Plan or Benefit Change –Customer shall notify Aetna in writing of any changes in Plan Documents or Plan benefits (including changes in eligibility requirements) at least thirty (30) days prior to the effective date of such changes. Aetna will have thirty (30) days following receipt of such notice to notify Customer whether Aetna can administer the proposed changes. If a proposed change increases Aetna's costs, alters Aetna's ability to meet any performance standards or otherwise imposes substantial operational challenges, both Parties may negotiate in good faith to attempt to reach agreement on an amendment to the Service Fees or the Agreement.   If the Parties are unable to agree on an Amendment, the Parties shall submit the dispute to a Final Offer (Baseball) arbitration under the

Master Services Agreement - 868066              3

Dispute Resolution Process set forth in Section 15 of the Agreement. If a Party is unsatisfied with the result of the arbitration, the Party shall be entitled to exercise the right to terminate the Agreement on ninety (90) days' notice as set forth in Section 17 of the Agreement.

(D) Employee **Notices – The Customer** shall furnish each Plan Participant with written notice that Customer is responsible for the payment of Plan benefits. The Customer shall notify Plan Participants, in a manner that satisfies applicable law, that confidential information relating to their benefit claims may be disclosed to third parties in connection with administration of the Plan by Customer and/or Aetna.

(E) Miscellaneous – The Customer shall promptly provide Aetna with such information regarding administration of the Plan as Aetna may reasonably request from time to time. Aetna is entitled to rely on the information most recently supplied by the Customer in connection with the Services and Aetna's other obligations under the Agreement. Aetna is not responsible for any delay or error caused by the Customer's failure to furnish correct information in a timely manner, provided that Aetna shall act upon any additional information provided by Customer in a commercially reasonable manner. The Customer shall be liable for all Plan benefit payments made by Aetna in accordance with the Plan Documents provided to Aetna and this Agreement, including those payments made following the termination date or which are outstanding on the termination date.

8. RECORDS

Aetna, its affiliates and authorized agents shall use all Plan-related documents, records and reports received or created by Aetna in the course of delivering the Services ("Plan Records") in compliance with applicable privacy laws and regulations. Aetna may de-identify Plan Records and use them for quality improvement, statistical analyses, product development and other lawful, non-Plan related purposes. Plan Records shall be kept by Aetna for a minimum of seven (7) years, unless Aetna transfers all Plan Records to Customer or a designee of Customer.

9. CONFIDENTIALITY

(A) Business Confidential Information - Neither Party may use "Business Confidential Information" (as defined below) of the other Party for its own purpose, nor disclose any Business Confidential Information to any third party. However, a party may disclose Business Confidential Information to that Party's representatives who have a need to know such information in relation to the provision of Services, but only if such representatives are informed of the confidentiality provisions of this Agreement and agree to abide by them. Customer shall not disclose Aetna's provider discount or payment information to any third party, including the Customer's representatives, without Aetna's prior written consent and until each recipient has executed a confidentiality agreement reasonably satisfactory to Aetna.

Master Services Agreement - 868066          4

CONFIDENTIAL                                      AETNA-KULWICKI_0005132

Confidential Information Defined. For the purpose of this Agreement, the term "Business Confidential Information" shall mean the information disclosed by one Party ("Disclosing Party") to the other ("Receiving Party") under this Agreement, whether orally, in writing, in the form of computer data, or by visual inspection, and all analyses, compilations, summaries, extracts, and copies thereof, which information would be understood to be confidential in nature, whether or not so marked, including, without limitation, the following:

(i) as it relates to the Customer, the Customer -identifiable business proprietary data, procedures, materials, lists and systems, but does not include Protected Health Information ("PHI") as defined by HIPAA or other claims-related information.

(ii) as it relates to Aetna, the Aetna- identifiable business proprietary data, rates, fees, provider discount or payment information, procedures, materials, lists and systems.

(B) Protected Health Information - The Parties have agreed to and executed a Business Associate Agreement ("BAA") that is intended to satisfy the requirements of HIPAA/HITECH. The BAA is attached as Schedule I and incorporated herein by reference.

(C) Upon Termination - Upon termination of the Agreement, each Party, upon the request of the other, will return or destroy all copies of all of the other's Business Confidential Information in its possession or control except to the extent such Business Confidential Information must be retained pursuant to applicable law or cannot be disaggregated from Aetna's databases. Aetna may retain copies of any such Business Confidential Information it deems necessary for the defense of litigation concerning the Services it provided under this Agreement, for use in the processing Plan benefits during the Runoff Period (as defined below), and for regulatory purposes.

## 10. AUDIT RIGHTS

Customer may, at its own expense, audit Aetna books or records (including material stored electronically) that pertains to or in any way relates to the performance of this Agreement in order to audit Aetna's compliance with this Agreement ("Performance Audit"). Customer may conduct one audit per year and the audit must be completed within two years of the end of the time period being audited. Audits of any performance guarantees, if applicable, must be completed in the year following the period to which the performance guarantee results apply. Audits must be performed at the location where the Customer's claims are processed.

Master Services Agreement - 868066            5

Customer may select its own representative to conduct an audit provided that the representative is qualified by appropriate training and experience for such work and must not have "conflict of interest" with Aetna, which for purposes of this Section 10 shall mean a representative that (i) is an entity that provides the same types of services to other entities as the Services; (ii) was an employee of Aetna in the prior twelve (12) months; or (3) is a subsidiary or affiliate of a vendor that subcontracts with Aetna to provide the Services . Neither the Customer nor its representative may make or retain any record of provider discounts or information concerning treatment of drug or alcohol abuse, mental/nervous, HIV/AIDs or genetic markers.

The Customer shall provide reasonable advance notice of its intent to audit and shall complete an Audit Request Form providing information reasonably requested by Aetna. No audit may commence until the Audit Request Form is completed and executed by the Customer, auditor and Aetna. Further, the Customer or its representative shall provide Aetna with a complete listing of the claims chosen for audit at least four weeks prior to the on-site portion of the audit.

The Customer's auditors shall provide their draft audit findings to Aetna, prior to issuing the final report. This draft will provide the basis for discussions between Aetna and the auditors to resolve and finalize any open issues. Aetna shall have a right to review the auditor's final Audit Report, and may include a supplementary statement containing information and material that Aetna considers pertinent to the findings in the audit.

## 11. RECOVERY OF OVERPAYMENTS

Aetna shall reprocess any identified errors in payments of Plan benefits (other than errors Aetna reasonably determines to be *de minimus*) and seek to recover any resulting overpayment from the party receiving the overpayment twice by letter, phone or email. The Customer may direct Aetna not to seek recovery of overpayments from Plan Participants, in which case Aetna will have no further responsibility with respect to those overpayments. The Customer shall reasonably cooperate with Aetna in recovering all overpayments of Plan benefits.

If Aetna elects to use a third party recovery vendor, collection agency, or attorney to pursue recovery of an overpayment, the recovery will be credited to the Customer net of fees charged by Aetna or those entities, which shall not exceed 30% of the recovery.

Any requested payment from Aetna relating to an overpayment must be based upon documented finding or direct proof of specific claims, agreed to by both Parties and must be due to Aetna's actions or inactions. Indirect or inferential methods of proof- such as statistical sampling, extrapolation of error rate to the population, etc. – may not be used as the basis for a request for payment from Aetna of an overpayment. In addition, use of software or other review processes that analyze a claim in a manner different from the claim determination and payment procedures and standards used by Aetna shall not be used to determine overpayments.

Master Services Agreement - 868066          6

AETNA-KULWICKI_0005134

The Customer may not seek recovery of overpayments from Network Providers, but the Customer may seek recovery of overpayments from other providers once the Customer has provided Aetna notice that it will seek such recovery and Aetna has been afforded a reasonable opportunity to recover such amounts. Aetna has no duty to litigate to pursue any overpayment recovery.

## 12. INDEMNIFICATION

(A) Aetna shall indemnify the Customer, its affiliates and their respective directors, officers, and employees (only as employees, not as Plan Participants) for that portion of any loss, liability, damage, expense, settlement, cost or obligation (including reasonable attorneys' fees) ("Losses") caused directly by (i) any material breach of this Agreement by Aetna, including a failure to comply with the standard of care in section 3; (ii) Aetna's negligence, willful misconduct, fraud, or breach of fiduciary responsibility; or (iii) Aetna's infringement of any U.S. intellectual property right of a third party, arising out of the Services provided under this Agreement.

(B) The Customer shall indemnify Aetna, its affiliates and their respective directors, officers, and employees for that portion of any Losses caused directly by (i) any material breach of this Agreement by the Customer; (ii) the Customer's negligence, willful misconduct, fraud, or breach of fiduciary responsibility; (iii) the release or transfer of Plan Participant-identifiable information to the Customer or its designee, or the use or further disclosure of such information by the Customer or such designee; or (iv) in connection with the design or administration of the Plan by the Customer or any acts or omissions of the Customer as a sponsor of the Plan.

(C) The party seeking indemnification under this Agreement must notify the indemnifying party within twenty (20) days in writing of any actual or threatened action, to which it claims such indemnification applies. Failure to so notify the indemnifying party will not be deemed a waiver of the right to seek indemnification, unless the actions of the indemnifying party have been prejudiced by the failure of the other party to provide notice as indicated above.

The indemnifying party may join the party seeking indemnification as a party to such proceeding; however the indemnifying party shall provide and control the defense and settlement with respect to claims to which this section applies.

(D) The Customer and Aetna agree that: (i) health care providers are not the agents or employees of the Customer or Aetna and Aetna does not render medical services or treatments to Plan Participants; (ii) health care providers are solely responsible for the health care they deliver to Plan Participants, and neither the Customer nor Aetna is responsible for the health care that is delivered by health care providers; and (iii) the indemnification obligations of (A) or (B) above do not apply to any portion of any loss relating to the acts or omissions of health care providers with respect to Plan Participants.

Master Services Agreement - 868066          7

AETNA-KULWICKI_0005135

(E) These indemnification obligations above shall not apply to any claims caused by (i) an act, or failure to act, by one party at the direction of the other, or (ii) with respect to intellectual property infringement, the Customer's modification or use of the Services or materials that are not contemplated by this Agreement, unless directed by Aetna, including the combination of such Services or materials with services, materials or processes not provided by Aetna where the combination is the basis for the claim of infringement. For purposes of the exclusions in this paragraph, the term "Customer" includes any person or entity acting on the Customer's behalf or at the Customer's direction. For purposes of (A) and (B) above, the standard of care to be applied in determining whether each party is "negligent" in performing any duties or obligations under this Agreement shall be the standard of care set forth in section 3.

## 13. DEFENSE OF LITIGATION REGARDING BENEFIT DETERMINATIONS

Responsibility for defense of litigation regarding benefit determinations is described in the applicable Schedule.

## 14. REMEDIES

Other than in an action between the Parties for third party indemnification, neither Party shall be liable to the other for any consequential, incidental or punitive damages whatsoever.

## 15. BINDING ARBITRATION OF CERTAIN DISPUTES

Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration in Georgia, administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules") and the process set forth in the Dispute Resolution Schedule attached hereto.

## 16. COMPLIANCE WITH LAWS

Aetna shall comply with all applicable federal and state laws including, without limitation, the Patient Protection and Affordable Care Act of 2010 ("PPACA"), the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and the Employee Retirement Income Security Act of 1974 ("ERISA")

## 17. TERMINATION

This Agreement may be terminated by Aetna or Customer as follows:

(A) Termination by the Customer –Customer may terminate this Agreement, or the Services provided under one or more schedules, for any reason with or without cause, by giving Aetna at least 90 days' prior written notice of when such termination will become effective.

Master Services Agreement - 868066          8

(B) Termination by Aetna and Suspension of Claim Payments-

    (1) Aetna may terminate this Agreement, or the Services provided under one or more schedules, for any reason with or without cause, by giving Customer at least 90 days' prior written notice of when such termination will become effective.

    (2) If the Customer fails to submit Benefit Funding or fails to pay Service Fees within thirty (30) days of the Payment Due Date, Aetna has the right to cease paying claims and suspend Services until the requested funds or Service Fees have been provided. After thirty days have elapsed since the Payment Due Date, Aetna may terminate the Agreement immediately upon notice to the Customer if the Customer fails to fund Benefit Funding or pay the applicable Service Fees in full within five business days of written notice by Aetna.

(C) Legal Prohibition - If any jurisdiction enacts a law or Aetna reasonably interprets an existing law to prohibit the continuance of the Agreement or some portion thereof, the Agreement or that portion shall terminate automatically as to such jurisdiction on the effective date of such law or interpretation; provided, however, if only a portion of the Agreement is impacted, the Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(D) Responsibilities on Termination –

Upon termination of the Agreement, for any reason other than default of payment by the Customer, Aetna will continue to process Runoff Claims that are received by Aetna within 12 months following the termination date ("Runoff Period"), at no additional cost as outlined in the Medical Service and Fee Schedule MSA-868066 that is attached hereto. Runoff claims will be processed and paid in accordance with the terms of this Agreement and the applicable Plan Documents. Claims that are pended or disputed at the time that Agreement terminates will be handled to their conclusion by Aetna. Requests for benefit payments received by Aetna after the Runoff Period will be forwarded to the Customer or to a successor administrator at the Customer's expense.

Customer shall continue to submit all Benefit Funding during the Runoff Period until all outstanding Plan benefit payments have been paid or until such time as mutually agreed upon by Aetna and the Customer. The Customer's wire line and bank account from which funds are requested must remain open for one year after runoff processing ends, or two years after termination. The Customer shall be liable for all Plan benefit payments made by Aetna, including those payments made following the termination date or which are outstanding on the termination date.

Master Services Agreement - 868066      9

CONFIDENTIAL      AETNA-KULWICKI_0005137

Upon termination of the Agreement and provided all Service Fees have been paid, the Voluntary Seed Deposit that is described in Schedule K will be returned to Customer in installments according to the following schedule: one-third returned after 3 months of the Runoff Period, one-third returned after 6 months of the Runoff Period, and the remaining balance returned immediately following the end of the Runoff Period. Aetna will release to the Customer, or its successor administrator, all claim data in a mutually agreeable format, within a reasonable time period following the termination date. All costs associated with the release of such data shall be paid by the Customer.

18. GENERAL

(A) Relationship of the Parties - The Parties to this Agreement are independent contractors. This Agreement is not intended and shall not be interpreted or construed to create an association, agency, joint venture or partnership between the Parties or to impose any liability attributable to such a relationship. Each Party shall be solely responsible for all wages, taxes, withholding, workers compensation, insurance and any other obligation on behalf of any of its employees, and shall indemnify the other Party with respect to any claims by such persons.

(B) Intellectual Property - Aetna represents that it has either the ownership rights or the right to use all of the intellectual property used by Aetna in providing the Services under this Agreement (the "Aetna IP"). Aetna has granted the Customer a nonexclusive, non-assignable, royalty free, limited right to use certain of the Aetna IP for the purposes described in this Agreement. Nothing in this Agreement shall be deemed to grant any additional ownership rights in the Aetna IP to the Customer.

(C) Communications - Aetna and the Customer may rely upon any communication believed by them to be genuine and to have been signed or presented by the proper Party or Parties. For a notice or other communication under this Agreement to be valid, it must be in writing and delivered (i) by hand, (ii) by e-mail or (iii) by fax to a representative of each Party as mutually agreed upon. Notices or communications may also be sent by U.S. mail to the address below.

|  |  |
|---|---|
| If to Aetna: | If to the Customer: |
| WellStar Account Team | WellStar Health System, Inc. |
| 4630 Woodland Corporate Blvd. | 793 Sawyer Rd. |
| Tampa, FL 33614-2415 | Marietta, GA 30062 |

Master Services Agreement - 868066          10

CONFIDENTIAL                                                    AETNA-KULWICKI_0005138

(D) Force Majeure – With the exception of Customer's obligation to fund benefit payments and Service Fees, neither party shall be deemed to have breached this Agreement, or be held liable for any failure or delay in the performance of any portion of its obligations under this Agreement (except for late payment fees for Benefit Payments as set forth in the Service Fee Schedules), including performance guarantees if applicable, if prevented from doing so by a cause or causes beyond the reasonable control of the party. In the event of a Force Majeure that impacts Customer's ability to fund benefit payments and Service Fees, the grace period for payments of amounts due will be extended up to an additional 5 business days. Such Force Majeure causes include, but are not limited to: acts of God; acts of terrorism; pandemic; fires; wars; floods; storms; earthquakes; riots; labor disputes or shortages; and governmental laws, ordinances, rules, regulations, or the opinions rendered by any court, whether valid or invalid.

(E) Governing Law - The Agreement shall be governed by and interpreted in accordance with the laws of the state of Georgia , except to the extent that Georgia law is preempted by applicable federal law, including ERISA.

(F) Financial Sanctions – If Plan benefits or reimbursements provided under this Agreement violate or will violate any economic or trade sanctions, such Plan benefits or reimbursements are immediately considered invalid. Aetna cannot make payments for claims or Services if it violates a financial sanction regulation. This includes sanctions related to a blocked person or a country under sanction by the United States, unless permitted under a written office of Foreign Asset Control (OFAC) license.

(G) Waiver · No delay or failure of either Party in exercising any right under this Agreement shall be deemed to constitute a waiver of that right.

(H) Third Party Beneficiaries - There are no intended third party beneficiaries of this Agreement.

(I) Severability – If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

(J) Entire Agreement; Order of Priority - This Agreement, and the accompanying HIPAA business associate agreement, constitutes the entire understanding between the parties with respect to the subject matter of this Agreement, and supersedes all other agreements, whether oral or written, between the Parties. In the event of a conflict between the terms of this Agreement and a schedule or other attachment, the terms of the schedule or other attachment will control.

(K) Amendment – No modification or amendment of this Agreement will be effective unless it is in writing and signed by both Parties, except that a change to a party's address of record as set forth in section 18(C) (Communications) may be made without being countersigned by the other Party.

Master Services Agreement - 868066          11

CONFIDENTIAL                                                           AETNA-KULWICKI_0005139

(L) Taxes – The Customer shall indemnify Aetna and its affiliates for any taxes, assessments and penalties incurred by Aetna by reason of Plan benefit payments made or Services performed hereunder, and any interest thereon, provided that the Customer shall not be required to pay any net income, franchise or other tax, however designated, based upon or measured by Aetna's net income, receipts, capital or net worth. Additionally, if Aetna makes a payment to a third party vendor at the request of the Customer, Aetna will assume the tax reporting obligation, such as Form 1099-MISC or other applicable forms.

(M) Assignment - This Agreement may not be assigned by either Party without the written approval of the other Party. The duties and obligations of the Parties will be binding upon, and inure to the benefit of, successors, assigns, or merged or consolidated entities of the Parties.

(N) Survival - Sections 5, 8 through 13 and 17(D) shall survive termination of the Agreement.

(O) Excluded Entities. Aetna certifies that neither it, nor any of its employees assigned to the account, is currently named as an excluded entity or individual on the "List of Excluded Individuals/Entities" of the Department of Health and Human Services Office of the Inspector General ("OIG List"), the "Excluded Parties List System" of the System for Award Management ("EPLS"), the "Specially Designated Nationals List" ("SDN List") or the "Foreign Sanctions Evaders List" ("FSE List") of the Office of Foreign Assets Control that would make any such person ineligible to participate in any federal or state funded programs. Aetna shall immediately notify Customer if Aetna is named as an excluded entity on any of the aforementioned Lists.

(P) Headings. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

(Q) Subcontractors The work to be performed by Aetna under the Agreement may, at its discretion, be performed directly by it or wholly or in any part through a subsidiary, an affiliate, or under a contract with an organization of Aetna's choosing, provided that upon execution of this Agreement, Aetna shall provide a list of the subsidiaries, affiliates, and Tier 1 list (to be updated no more frequently than annually) of subcontractors that Aetna anticipate will perform Services. Aetna will remain liable for Services under the Agreement. Aetna shall assume responsibility for the payment of any compensation and expenses to subcontractors and shall hold Customer harmless from any failure to provide such compensation and expenses. Aetna agrees to impose on its subcontractors substantially similar obligations imposed upon Aetna under this Agreement with respect to security, confidentiality, and privacy laws. Aetna shall be responsible and liable for all acts of its subcontractors, their employees or agents. The Parties further agree that Customer may discuss its concerns with Aetna on particular subcontractors providing services under this Agreement if Customer reasonably determines that such subcontractor is unfit or is providing unsatisfactory services in performing Aetna's obligations.

Aetna or its subcontractors will access Customer or Plan Participant data and information from locations outside of the United States; provided that such access (i) is limited to screen viewing of the data and information, which shall, at all times, remain physically stored in the United States, (ii) is subject to security controls, including limiting such access to devices with no download, print or storage capability;

Master Services Agreement - 868066          12

and (iii) is done in accordance with and subject to a sub-BAA that is that satisfies the requirements of HIPAA/HITECH.

(R) Insurance

    (1) <u>Requirements</u>. Aetna and any subsidiaries or affiliates performing Services shall obtain and maintain all proper and necessary insurance to guard against applicable risk at its sole cost and expense, including, but not limited to, the following:

        (ii)    <u>General Liability Insurance</u> in an amount not less than $5,000,000 per occurrence, $10,000,000 General Aggregate, $10,000,000 Products and Completed Operations Aggregate.

        (iii)    <u>Workers' Compensation Insurance</u> as required by the laws of the State in which the work is being performed.

        (iv)    <u>Employers' Liability Insurance</u> with limits of $1,000,000 Per Accident/$1,000,000 Per Disease/$1,000,000 Disease Policy Limit.

        (v)    <u>Automobile Liability Insurance</u> in an amount not less than $1,000,000 per accident coverage all owned, non-owned and hired automobiles.

        (vi)    <u>Professional Liability Insurance</u> (Errors and Omissions) covering negligent acts, errors or omissions arising out of the rendering of or failure to render professional services as contracted under this Agreement, whether committed or alleged to have been committed by Aetna or by its employees, subsidiaries, affiliates, or others for whom the Aetna is legally responsible with minimum limits of $1,000,000 each claim, $3,000,000 aggregate.

        (vii)    <u>Property Insurance</u>. Aetna and any subsidiaries, affiliates, or subcontractors shall carry All-Risk Property insurance to cover risks of damage or loss to Customer property and products in its care, custody and control, as assumed under the terms of this Agreement. Valuation is to include full replacement cost.

Master Services Agreement - 868066      **13**

AETNA-KULWICKI_0005141

(viii)    Privacy & Information Security/Cyber Liability Insurance. Aetna shall
purchase and maintain Privacy & Information Security/Cyber Liability
insurance in the minimum amounts of Five Million and 00/100ths Dollars
($5,000,000) per claim and Ten Million and 00/100ths Dollars ($10,000,000)
aggregate to cover unauthorized access, failure of security, breach of
privacy perils, wrongful disclosure of information, as well as notification
costs and regulatory defense. Aetna shall purchase and maintain,
throughout the term of this Agreement, insurance covering liabilities for
financial loss resulting or arising from acts, errors, or omissions in
connection with the Services provided under this Agreement, as well as all
costs, including damages it is obligated to pay Customer, or any third-party,
which are associated with any Security Breach (as hereafter defined) or loss
of PHI or other personal data. Costs to be covered by this insurance policy
shall include without limitation: (a) costs to notify individuals whose PHI or
personal data was lost or compromised; (b) costs to provide credit
monitoring and credit restoration services to individuals whose PHI or
personal data was lost or compromised; (c) costs associated with third-party
claims arising from the Security Breach or loss of PHI or personal data,
including litigation costs and settlement costs; and (d) any investigation,
enforcement or similar miscellaneous costs. For the purposes of this
Section, "Security Breach" means (1) the failure by the Aetna to properly
handle, manage, store, destroy or otherwise control, or the unauthorized
disclosure by the Aetna of: (a) PHI or personal data in any format or (b)
third-party corporate information in any format specifically identified as
confidential and protected under a confidentiality agreement or similar
contract; (2) an unintentional violation of Aetna's or Customer's privacy
policy or misappropriation that results in the violation of any applicable data
privacy laws or regulations; or (3) any other act, error, or omission by Aetna
in its capacity as such that is reasonably likely to result in the unauthorized
disclosure of PHI or personal data. Such insurance must address all of the
foregoing without limitation if caused by an employee of Aetna. Policy must
provide coverage for wrongful acts, claims, and lawsuits anywhere in the
world. Insurer must have an A.M. Best's rating of A or better. The policy
must be kept in force during the life of the Agreement and for three (3)
years (either as a policy in force or extended reporting period) after
Agreement termination.

CONFIDENTIAL                                                                      AETNA-KULWICKI_0005142

**(Ix)** <u>Umbrella Coverage</u>. Aetna shall carry umbrella coverage of $5,000,000 ($5,000,000 per occurrence with $5,000,000 aggregate).

**(2) Extended Coverage**. If any such insurance is written on a claims-made policy form, the **policy** shall have a retroactive date prior to or coinciding with the effective date of this Agreement and shall continue for five (5) years following termination of this Agreement. In the event that a claims-made policy is canceled, terminated or non-renewed, Aetna shall obtain an extended reporting period endorsement for the remainder of the five (5)-year period.

**(3) Certificate of Insurance**. Aetna shall furnish Certificates of Insurance acceptable to Customer prior to commencement of Services, and thereafter, upon request. All insurance policies will be written by an insurance carrier authorized to do business in the state of Georgia and with an A.M. Best Rating of A or better. In no event will the coverage or limits of any insurance maintained by Aetna under this paragraph, or the lack or unavailability of any other insurance, limit or diminish in any way the obligations or liability of Aetna to Customer under this Agreement. Any acceptance of insurance certificates by Customer shall not limit or relieve Aetna of the duties and responsibilities assumed by it under this Agreement.

(S) **Subcontractor Insurance**. Aetna shall require that any subcontractor that provides Services maintain adequate insurance coverage and limits as applicable to the scope of services being performed. Aetna's agreement with subcontractors shall include insurance requirements related to the scope of services.

(T) **Recitals, Definitions and Schedules:** The Recitals, Definitions, Exhibits and Schedules are made a part of this Agreement and incorporated herein by this reference.

Master Services Agreement - 868066          15

AETNA-KULWICKI_0005143

The Parties are signing this agreement as of the date stated in the introductory clause.

Wellstar Health System, Inc.          AETNA LIFE INSURANCE COMPANY:

By: _____          By: _____

Name: _Candice L. Saunders_            Name : _Mark T. Bertolini_____

 Title: _President & CEO_          Title: Chairman, Chief Executive Officer and President

Financial Verification

By: _____

Name: _____John A. Moran

Title: _____Underwriting Manager

Master Services Agreement - 868066          16

CONFIDENTIAL                                      AETNA-KULWICKI_0005144

**SCHEDULES**
**MASTER SERVICES AGREEMENT MSA-868066**
**EFFECTIVE January 1, 2016**

The Parties have agreed to incorporate the following Schedules, attached hereto, into the Agreement:

1. General Administration Services Schedule  (Schedule A)
2. Medical Service Fee Schedule (Schedule B)
3. Prescription Drug Service Fee Schedule (Schedule C)
4. Specialty Pharmacy Fee Schedule (Schedule D)
5. Medical Services Schedule (Schedule E)
6. Prescription Drug Services Schedule (Schedule F)
7. Performance Guarantee Schedule (Schedule G – Attachment 1 and Attachment 2 )
8. Dispute Resolution Process Schedule (Schedule H)
9. Business Associate Agreement Schedule (Schedule I)
11. Network Schedule (Schedule J)
12. Voluntary Seed Deposit Fund & Late Fee Calculation Schedule (Schedule K)

Master Services Agreement – 868066          **17**

AETNA-KULWICKI_0005145

**GENERAL** ADMINISTRATION **SERVICES SCHEDULE A**
MASTER SERVICES **AGREEMENT** MSA-868066
EFFECTIVE **January 1, 2016**

This General Administration Services Schedule describes **certain Services** to be performed by Aetna for the Customer pursuant to the Agreement, and is effective for the period **beginning** January 1, 2016 and ending December 31, 2020. The Services described in this General Administration Services Schedule apply generally to any medical, dental, pharmacy and behavioral health Plans that are subject to the Agreement.  Terms used but not otherwise defined in this schedule shall have the meaning assigned to them in the Agreement.

1. **CLAIM SERVICES:**

**(A)** Aetna shall process claims for Plan benefits incurred on or after the Effective Date using Aetna's normal claim determination, payment and audit procedures and applicable cost control standards in a manner consistent with the terms of the **Plan(s) and** Plan Documents, any applicable provider contract, and the Agreement. Aetna shall issue a payment of benefits and related charges on behalf of the Customer in accordance with section 5 of the Agreement, for such benefits and related charges that Aetna determines are payable under the Plan(s). With respect to any claims that Aetna denies on behalf of the Customer, Aetna shall notify the Plan Participant of the denial and of the Plan Participant's right of review of the denial in accordance with applicable law.

(B) Where the Plan contains a coordination of benefits clause or antiduplication clause, Aetna shall administer all claims consistent with such provisions and any information concurrently in its possession regarding duplicate or primary coverage. Aetna shall have no obligation to recover sums owed to the Plan by virtue of the Plan's rights to coordinate where the claim was incurred prior to the Effective Date. Aetna has no obligation to bring actions based on subrogation or lien rights, unless the Customer has elected Aetna's subrogation services as indicated in the Service and Fee Schedule.

**(C)** In circumstances where Aetna may have a contractual, claim or payment dispute with a provider, the settlement of that **dispute** with the provider may include a one-time payment in settlement to the provider or to Aetna, or may otherwise impact future payments to providers. Aetna, in its discretion, may apportion the settlement to self-funded customers, either as an **additional** service fee from, or as a credit to, the Customer, as may be the case, based upon specific applicable claims, proportional membership or some other allocation methodology, after taking into account Aetna's cost of recovery. Customer shall have the right to audit any settlement after the fact by reviewing non-confidential documents. The Customer shall remain liable after termination of the Agreement for their portion of any settlement payments arising from claims paid while an active customer.

(D) Aetna will **be** responsible for responding to CMS and Department of Treasury related to the administration of medical and pharmacy claims while Aetna is claim administrator for the WellStar Health System plans as well as during run-off period.  Aetna shall respond to CMS and Department of Treasury issues beyond run-out provided that Customer agrees to open claim wireline to accommodate any claim processing and paying of associated administrative fees.

(E) Customer shall pay Benefit Funding through Aetna's Bank of America account (described in the Banking Agreement Aetna provided to WellStar prior to execution of the Agreement), through a Customer initiated Fedwire, using the instructions provided by Aetna.

AETNA-KULWICKI_0005146

Aetna will request payment of Benefit Funding on a checks cleared basis. Aetna is not required to act on outstanding benefit checks (checks which have not been presented for payment) unless directed to do so by Customer. Customer may elect full escheat or stop pay under a separate contract, to which additional fees would apply.

After termination of the Agreement, in the absence of an escheat or stop pay contract, Aetna may place stop payment orders on all of the Customer's outstanding benefit checks after either:

(i) One year has elapsed since the Runoff Period; or

(ii) Aetna has exercised its right to suspend claim payments or terminate this Agreement as stated in section 17(B) (Termination).

At the end of any Runoff Period, the Customer may also request that Aetna perform escheat services on outstanding benefit checks for an additional charge.

Aetna will advise the Customer on Thursday of each week, or if such day is not a business day, the next following business day, of the amount that Customer must pay for Benefit Funding. Additionally, on the first business day after the last calendar day of each month, Aetna will notify the Customer of its liability for Benefit Funding not included in the prior requests for funds during the prior month. On the next Monday, or if such day is not a business day, the next following business day, Customer agrees to pay via Fedwire the additional requested Benefit Funding to cover the total amount of its liability for Plan benefits paid and related charges, as determined by Aetna, from the prior month.

In lieu of 4 days of weekly Late Wire charges, Customer has provided a Voluntary Seed Money Deposit ("Deposit") in the amount of 4 days of expected mature claims to Aetna. Aetna reserves the right to assess Deposit adequacy on an annual basis. Aetna reserves the right, upon 30 days written notice, to request additional amounts if current Deposit levels fall below 4 days of expected mature claims. Deposit will be non-interest bearing and refundable upon demand.

## 2. PLAN PARTICIPANT SERVICES:

Aetna shall establish and maintain one or more service centers, responsible for handling calls and other correspondence from Plan Participants with respect to questions relating to the Plan and Services under the Agreement.

## 3. PLAN SPONSOR SERVICES:

(A) Aetna shall assign an experienced Account Management Team to the Customer's account. This team will be available to assist the Customer in connection with the Services provided under the Agreement.

(B) Aetna shall design and install a benefit-account structure separately by class of employees, division, subsidiary, associated company, or other classification reasonably requested by the Customer.

(C) Aetna shall assist the Customer in connection with the design of the Customer's Plan, including actuarial and underwriting support reasonably requested by the Customer, provided that the Customer shall have ultimate responsibility for the content of the Plan and compliance with law in connection therewith.

Master Services Agreement – 868066        19

                                    AETNA-KULWICKI_0005147

(D) Aetna shall make employee identification cards available to Plan Participants. Upon request, Aetna will arrange for the custom printing of identification cards, with all costs borne by the Customer.

(E) Upon request of the Customer, Aetna shall provide the Customer with information reasonably available to Aetna relating to the administration of the Plans that is necessary for the Customer to prepare reports that are required to be filed with the United States Internal Revenue Service and Department of Labor.

(F) Aetna shall provide the following reports to the Customer for no additional charge:

    (1) Monthly/Quarterly/Annual Reports - Aetna shall prepare the following reports in accordance with the benefit-account structure for use by the Customer in the financial management and administrative control of the Plan benefits:

        (a) a monthly listing of funds requested and received for payment of Plan benefits;

        (b) a monthly reconciliation of funds requested to claims paid within the benefit-account structure;

        (c) a monthly listing of paid benefits;

        (d) online access to monthly, quarterly and annual standard claim analysis reports; and

        (e) if applicable, monthly, quarterly, or annual HealthFund product reports for customers with at least 100 enrolled lives in each HealthFund to be used for the financial evaluation and management of each HealthFund plan.

    (2) Annual Accounting Reports - Aetna shall prepare standard annual accounting reports detailing product specific financial and plan information including enrollment fees and/or rates for each Agreement Period.

    (3) Annual Renewal Reports – Aetna shall prepare standard annual renewal reports detailing product specific financial and plan information, including enrollment fees and/or rates for each Agreement Period.

    Any additional reporting formats and the price for any such reports shall be mutually agreed upon by the Customer and Aetna.

(G) Upon request of the Customer, for no additional charge, Aetna shall provide either of the following services in support of the preparation of Plan descriptions:

    (1) Prepare an Aetna standard Plan description, including descriptions of benefit revisions; or

    (2) Review the Customer-prepared employee Plan descriptions, subject to the Customer's final and sole authority regarding benefits and provisions in the self-insured portion of the Plan.

    Upon request of the Customer, Aetna shall prepare a non-standard Plan description, provided the Customer must agree in advance to reimburse Aetna for the costs of that work. If the Customer requires both (1) preparation and (2) review, Aetna may require an additional charge.

(H) Upon request of the Customer, Aetna will arrange for the printing of Plan descriptions, with all costs borne by the Customer.

Master Services Agreement – 868066     20

CONFIDENTIAL

AETNA-KULWICKI_0005148

(I) Upon request of the Customer, if applicable, Aetna will provide assistance in connection with the preparation of the Customer's draft Summaries of Benefits and Coverage (SBCs). Aetna may charge an additional fee for such request.

(J) The Customer acknowledges that it has the responsibility to review and approve all Plan documents and SBCs, if applicable, and shall have the final and sole authority regarding the benefits and provisions of the Plan(s), as outlined in the Customer's Plan document. Aetna shall have no responsibility or liability for the content of any of the Customer's Plan documents, or SBC's, if applicable, regardless of the role Aetna may have played in the preparation of such documents.

## 4. NETWORK ACCESS SERVICES

(A) Aetna shall provide Plan Participants with access to Network Providers who have agreed to provide services at agreed upon rates and who are participating in the applicable network covering the Plan Participants.

(B) Aetna's contracted rates with Network Providers may be based on fee-for-service rates, case rates, per diems and in some circumstances, include performance-based contract arrangements, risk-adjustment mechanisms, quality incentives, pay-for-performance and other incentive and adjustment mechanisms. These mechanisms may include payments to physicians, physician groups, health systems and other provider organizations, including but not limited to organizations that may refer to themselves as accountable care organizations and patient-centered medical homes, in the form of periodic payments and incentive arrangements based on performance. The details of such payment arrangements are available upon request. Retroactive adjustments may be occasionally made to Aetna's contract rates with Network Providers. Retroactive adjustments may occur, for example, when the federal government does not issue cost of living data in sufficient time for an adjustment to be made on a timely basis, or because contract negotiations were not completed by the end of the prior price period or due to contract dispute settlements. In all cases, Aetna shall adjust the Customer's payments of Benefit Funding accordingly. The Customer's liability for all such adjustments to Benefit Funding shall survive the termination of the Agreement.

(C) Aetna may contract with vendors who in turn are responsible for contracting with the providers who perform the health care services, and potentially for certain other services related to those providers such as claims processing, credentialing, and utilization management. Under some of these arrangements, the vendor bills Aetna directly for those services by its network of providers at the vendor's contracted rate with Aetna, and Aetna pays the vendor for those services. In certain cases, the amount billed by the vendor to Aetna, paid pursuant to the Plan, includes an administrative fee for delegated services by the vendor. As a result, the amount the vendor pays to the health care provider through the vendor's contract with the provider may be different than the amount paid pursuant to the Plan because the allowed amount under the Plan will be Aetna's contracted rate with the vendor, and not the contracted amount between the vendor and the health care provider.

(D) Customer's Plan benefit design structure for in-area network claims meets Aetna's minimum benefit design structure requirements for accessing Network Providers.  Any Plan benefit design structure changes must ensure that Plan Participants are directed and encouraged to utilize Network Providers.

(E) Aetna shall maintain an online directory containing information regarding Network Providers. Upon request and for an additional charge, Aetna shall provide the Customer with paper copies of physician directories.

(F) Aetna makes no guarantee and disclaims any obligation to make any specific health care providers or any particular number of health care providers available for use by Plan Participants or that any level of discounts or savings will be afforded to or realized by the Customer, the Plan or Plan Participants.

Master Services Agreement – 868066          21

(G) Aetna's contract with Sutter Health requires payment of claims that would otherwise be denied, such as those not medically necessary or experimental or investigational (but does not require payment for services the Plan expressly excludes from coverage, such as for cosmetic surgery). Aetna will charge the Plan for these claims in order to be able to continue providing Plan Participants with access to Sutter's services on an in-network basis. Consult your SPD text to ensure that the description of Aetna's services accommodates such arrangements.

## 5. CUSTOM NETWORKS

Plan Participants may use Customer's network of Customer-owned and affiliated providers for in-network services ("**non-Aetna network**"). With respect to the services provided by providers in the non-Aetna network ("**non-Aetna providers**"), Customer acknowledges and agrees that, any other provisions of the agreement notwithstanding:

(A) Aetna does not credential, monitor or oversee the providers or the administrative procedures or practices of any non-Aetna network;

(B) No particular discounts may, in fact, be provided or made available by any particular providers;

(C) Neither non-Aetna providers nor non-Aetna networks are contractors or subcontractors of Aetna.

See Schedule J for details regarding network configuration.

## 6. NATIONAL ADVANTAGE PROGRAM (NAP)

Unless otherwise agreed in writing, only the NAP Services selected by the Customer in the Service and Fee Schedule will be provided by Aetna.

Through NAP, Aetna either contracts with several national third-party vendors to allow Plan to access their contracted rates with Providers, or directly contracts with Providers, for medical claims that would otherwise be paid as billed, or for emergency/medically necessary services not provided within the network. If no contracted rate is available, Aetna will attempt to negotiate an Ad-Hoc Rate (case specific discount) with non-NAP participating providers for certain larger claims, or will apply Facility Charge Review, as applicable.

Definitions

As used in this section 6:

"Access Fee" means the amount(s) to be paid by Customer to Aetna for access to the Savings provided under NAP, as indicated in the Service and Fee Schedule.

"Ad-Hoc Rate" means the rate that was negotiated for a specific claim in the absence of a pre-negotiated contracted rate with a Provider.

"Provider(s)" means those physicians, hospitals and other health care providers whose services are available at a savings under NAP.

Master Services Agreement – 868066        **22**

"**Reasonable Charge Amount**" means the amount determined by Aetna to be a reasonable charge for a Plan benefit in the geographic area where such benefit was provided to the Plan Participant.

"**Savings**" means the difference between (i) the amount which would have been due or otherwise paid to Providers for Plan benefits without the benefit of NAP, and (ii) the amount due Providers for Plan benefits as a result of NAP.

(A) National Advantage Program – Facility Charge Review (FCR)

Where a contracted rate is not available under NAP, the Facility Charge Review Program provides reasonable charge allowances for most inpatient and outpatient facility claims under the Plan, and the out-of-network portion of the Plan for emergency/medically necessary services not provided within the network.

(B) National Advantage Program – Itemized Bill Review

Prior to claim adjudication when an inpatient facility claim exceeds a threshold (currently $20,000) and Aetna's contracted rate with the provider uses a "percentage of billed charges" methodology, Aetna will forward the claim to the vendor for review. The billed charges will be reviewed for billing inconsistencies and errors. The vendor examines each claim and provides Aetna with billing error detail and the amount of eligible covered (payable) charges. Aetna then pays the claim using the contracted rate, a percentage of this adjusted amount.

(C) Terms and Conditions

(1). Customer Charges For Provider Payments

Aetna agrees that for Plan benefits rendered by a Provider for which Aetna has a) accessed a contracted rate, or b) negotiated an Ad-Hoc rate, or c) applied a Reasonable Charge Amount for facility services, or d) applied an Itemized Bill Review reduction, the Customer shall be charged the amount paid to the Provider. This amount shall be equal to the contracted rate, Ad-Hoc Rate, or Reasonable Charge Amount less any payments made by the Plan Participant in accordance with the Plan.

(2). Access Fees

(a). As compensation for the services provided by Aetna under NAP for Savings achieved, Customer shall pay an Access Fee to Aetna as described in the Service and Fee Schedule (excluding Savings with respect to claims for which Aetna is liable for funding, e.g., claims in excess of an individual or aggregate stop loss point).

(b). Aetna shall provide a quarterly report of Savings and Access Fees. Access Fees may be included with claims in other reports.

(3). Plan Participant Information Regarding National Advantage Program

Customer shall, at its discretion, inform Plan Participants of the availability of NAP. Aetna and Customer shall meet and confer to ensure that Customer's Plan Document language defining reasonable charge or recognized charge is consistent with Aetna's requirements under the NAP program. Aetna shall provide

Master Services Agreement – 868066          23

                                                        AETNA-KULWICKI_0005151

information regarding participating Providers on DocFind®, Aetna's online provider listing, on our website at www.Aetna.com or by other comparable means.

Master Services Agreement – 868066          24

(4). Customer Acknowledgements

Customer acknowledges that:

(a). The NAP listing of Providers includes Providers that are (i) participating by virtue of direct contracts with Aetna and its affiliates, and (ii) participating by virtue of Aetna's contracts with unaffiliated third parties that have contracts with Providers and provide Aetna with access to these contracted rates for the purpose of NAP.

(b). Aetna does not credential, monitor or oversee those Providers who participate through third party contracts. Providers listed as participating in NAP may not necessarily be available or convenient.

(c). The following claim situations may not be eligible for NAP:

- Claims involving Medicare when Aetna is the secondary payer
- Claims involving coordination of benefits (COB) when Aetna is the secondary payer
- Claims that have already been paid directly by the Plan Participant.

(5). General Provisions

(a). Aetna's only liability to the Customer for any loss of access to a discount arising under or related to NAP, regardless of the form of action, shall be limited to the Access Fees actually paid to Aetna by the Customer for services rendered; provided, however, this limitation will not apply to or affect any performance standards set forth in the Agreement.

(b). The terms and conditions of NAP shall remain in effect for any claims incurred prior to the termination date that are administered by Aetna after the termination date.

Master Services Agreement – 868066          25

CONFIDENTIAL

AETNA-KULWICKI_0005153

MEDICAL SERVICE FEE SCHEDULE B
MASTER SERVICES AGREEMENT MSA- 868066
EFFECTIVE January 1, 2016

This Medical Service Fee Schedule is effective for the period beginning January 1, 2016 and ending December 31, 2020. The Customer is using Aetna's JP Morgan Chase account for Service Fee payments. Any reference to "Member" shall mean a Plan Participant as defined in the Agreement.

### III. Service Fees

Customer shall pay the following Service Fees. The PEPM value will be calculated based on the enrollment as of November 1of the previous plan year. This amount will be trued up based on actual enrollment for the contract year as determined by Customer and Aetna and this will occur in the year end accounting for each contract year.

| Year 1: January 1, 2016 through December 31, 2016 | | |
| --- | --- | --- |
| Service Fees Per-Employee, Per-Month (PEPM) | Choice POS II | AHF-Choice POS II |
| **Assumed Enrollment** | | |
| 7,501-10,000 | $12.08 | $14.98 |
| 10,001-12,500 | TBD | TBD |
| 12,501-15,000 | TBD | TBD |
| 15,001-20000 | TBD | TBD |

| Year 2: January 1, 2017 through December 31, 2017 | | |
| --- | --- | --- |
| Service Fees Per-Employee, Per-Month (PEPM) | Choice POS II | AHF-Choice POS II |
| **Assumed Enrollment** | | |
| 7,501-10,000 | $31.98 | $34.88 |
| 10,001-12,500 | $31.75 | $34.65 |
| 12,501-15,000 | $31.25 | $34.15 |
| 15,001-20000 | $30.81 | $33.71 |

| Year 3: January 1, 2018 through December 31, 2018 | | |
| --- | --- | --- |
| Service Fees Per-Employee, Per-Month (PEPM) | Choice POS II | AHF-Choice POS II |
| **Assumed Enrollment** | | |
| 7,501-10,000 | $31.98 | $34.88 |
| 10,001-12,500 | $31.75 | $34.65 |
| 12,501-15,000 | $31.25 | $34.15 |
| 15,001-20000 | $30.81 | $33.71 |

Master Services Agreement – 868066          26

CONFIDENTIAL                                        AETNA-KULWICKI_0005154

| Year 4: January 1, 2019 through December 31, 2019 | | |
|---|---|---|
| **Administrative Fees Per-Employee, Per-Month (PEPM)** | Choice POS II | AHF-Choice POS II |
| **Assumed Enrollment**<br>7,501-10,000 | $32.94 | $35.93 |
| 10,001-12,500 | $32.70 | $35.69 |
| 12,501-15,000 | $32.19 | $35.17 |
| 15,001-20000 | $31.73 | $34.72 |

| Year 5: January 1, 2020 through December 31, 2020 | | |
|---|---|---|
| **Administrative Fees Per-Employee, Per-Month (PEPM)** | Choice POS II | AHF-Choice POS II |
| **Assumed Enrollment**<br>7,501-10,000 | $33.93 | $37.01 |
| 10,001-12,500 | $33.68 | $36.76 |
| 12,501-15,000 | $33.16 | $36.23 |
| 15,001-20000 | $32.68 | $35.76 |

| Included Services / Programs in Above Administrative Fees | Choice POS II | AHF-Choice POS II |
|---|---|---|
| *Implementation & Communication* | | |
| $50,000 Implementation Allowance (Year 1 Only) | Included | Included |
| $100,000 Communication Allowance | Included | Included |
| $35,000 Audit Allowance (1 year only) | Included | Included |
| Designated Implementation Manager | Included | Included |
| Open Enrollment Marketing Material (non-customized) | Included | Included |
| Onsite Open Enrollment Meeting Preparation | Included | Included |
| Standard ID Cards | Included | Included |
| *General Administration* | | |
| Booklet and Cert Printing | Included | Included |
| Customized Enrollment Forms, EOBs, and ID cards | Included | Included |
| Dedicated Service Representative | Included | Included |
| Healthcare Industry Focused, Experienced Account Management Team | Included | Included |
| Designated billing, eligibility, plan set up, underwriting and drafting services | Included | Included |
| Review or draft Plan documents | Included | Included |
| Aetna Full Claim Fiduciary - Option 4 | Included | Included |
| Aetna provides external review | Included | Included |
| *Banking Information* | | |
| Wire transfer when checks cleared | Included | Included |
| ACH drawdown by Aetna | Included | Included |
| Claim funding requests: Alternate Stockpiling--each Thursday | Included | Included |
| *Member and Claim Services* | | |

Master Services Agreement – 868066          27

AETNA-KULWICKI_0005155

| | | |
|---|---|---|
| Claim Administration | Included | Included |
| Healthcare Industry Designated Member Services | Included | Included |
| Aetna Voice Advantage | Included | Included |
| Healthcare Industry Designated National Account Service Center | Included | Included |
| Plan Sponsor Liaison | Included | Included |
| Special Investigations / Zero Tolerance Fraud Unit | Included | Included |
| **Network Information** | | |
| Access to Network Providers/ Full National Reciprocity | Included | Included |
| Custom Network | Included | Included |
| **Core Management** | | |
| Utilization Management Inpatient Precertification (Designated for Healthcare Industry Clients) | Included | Included |
| Utilization Management Outpatient Precertification | Included | Included |
| Utilization Management Concurrent Review | Included | Included |
| Utilization Management Discharge Planning | Included | Included |
| Utilization Management Retrospective Review | Included | Included |
| Aetna Custom Care Management Solutions - | | |
| Aetna Custom Case Management - Designated for Healthcare Industry Clients | Included | Included |
| Aetna Compassionate Care$^{SM}$ Program (ACCP) | Included | Included |
| Infertility Case Management | Included | Included |
| Custom iTriage® | Included | Included |
| National Medical Excellence® | Included | Included |
| Beginning Right$^{SM}$ Maternity Program | Included | Included |
| Institutes of Quality® (same benefits) | Included | Included |
| Informed Health® Line - 24-hour Nurseline 1-800 # | Included | Included |
| Simple Steps To A Healthier Life ®- Health Assessment | Included | Included |
| **Behavioral Health** | | |
| Managed Behavioral Health | Included | Included |
| Behavioral Health Condition Management | Included | Included |
| **Web Tools** | | |
| DocFind® (online provider directory) | Included | Included |
| Custom DocFind® | Included | Included |
| Aetna Navigator® - Member Self Service Web | Included | Included |
| Web-Chat Technology - Virtual Assistant Ann | Included | Included |
| Online Programs | Included | Included |
| Health Decision Support – Basic | Included | Included |
| **Reporting** | | |
| 50 Hours of Ad Hoc Reports, Annual Restoration (including a buy-up of an additional 25 hours) | Included | Included |
| Aetna Health Information Advantage™ | Included | Included |
| e.Plan Sponsor Monitor™ - Level B Reporting (Standard Quarterly Utilization Reports) | Included | Included |
| Monthly Financial Claim Detail Reports | Included | Included |
| Monthly Banking Reports | Included | Included |
| Hospital Reporting Package - Tiered Benefit & Suppressed Claims | Included | Included |
| Summary of Benefits and Coverage (SBCs)–2 SBCs produced | Included | Included |
| Monthly Reports to 3rd-Party Stop Loss Vendor - Annual Charge | Included | Included |
| Daily Census | Included | Included |

Master Services Agreement – 868066          28

| **Data Integration Services** | | |
|---|---|---|
| Monthly Universal File Feeds (Outbound) | Included | Included |
| One (1) Exact Copy of Universal File (Outbound) | Included | Included |
| Monthly Reports to 3rd Party Stop Loss Vendor | Included | Included |
| **Aetna Discount Program** | | |
| at home products, books, fitness, hearing, national products and services, oral health care, vision, weight management | Included | Included |

| Claim Wire Billing (Charged through the claim wire. Not included in Above Administrative Fees) | Choice POS II | AHF-Choice POS II |
|---|---|---|
| Subrogation | 30% of recovered amount will be retained | |
| Overpayment Recovery, Coordination of Benefits, Retro Terminations, Medical Bill and Hospital Bill Audits, Workers Compensation, DRG and Implant Audits | 30% of recovered amount will be retained | |
| National Advantage™ Program | 40% of savings will be retained | |
| Facility Charge Review Fixed Determination | 40% of savings will be retained | |
| Itemized Bill Review | 40% of savings will be retained | |
| Enhanced Clinical Review – Out of Area Plan only | $0.60 PMPM ($0.50 PMPM through 3/31/2016) | |

| Optional Buy-Up Services / Programs (per-employee, per month fees (unless otherwise noted) that would be in addition to the above Administrative Fees) | Choice POS II | AHF-Choice POS II |
|---|---|---|
| ActiveHealth Management DM and Care Engine | $1.69 PMPM | $1.69 PMPM |
| ActiveHealth Management CareTeam | $0.71 PMPM | $0.71 PMPM |
| Aetna Concierge | $1.60 | $1.60 |
| Preventive Care Considerations (Paper) | $0.20 | $0.20 |
| Personal Health Record[1] | $0.50 | $0.50 |
| Member Health Engagement Plan (MHEP)[1] | $0.30 | $0.30 |
| Healthy Lifestyle Coaching | $2.20 | $2.20 |
| Healthy Lifestyle Coaching Lite | $0.72 | $0.72 |
| Aetna Healthy Actions (Incentive Reporting) | $0.15 | $0.15 |
| Behavioral Health Condition Management - Enhanced | $0.75 | $0.75 |
| Aetna Fitness Reimbursement Program (excl. fulfillment of the reimbursements) | $0.60 | $0.60 |
| Metabolic Health in Small Bytes (Monthly Classes Only, Public Classroom, Without Incentives) | $0.60 | $0.60 |
| Aetna Get Active℠ - Standard Annual Tracking Program (EE Only) | $0.55 | $0.55 |
| Aetna Get Active℠ - Branded Annual Tracking Program (EE Only) | $0.70 | $0.70 |
| Aetna Get Active℠ - Branded Annual Tracking Program - Annual Charge | $15,000 | |
| Viniyoga Stress Reduction - 1 class (12 weeks, 25-30 students) | $5,200 | |
| Mindfulness at Work (Cost of Program varies by Class Type) | $0.55 - $1.35 | $0.55 - $1.35 |
| Additional Universal Claim Files | $200 per file | |
| Institutes of Quality* (tiered benefits)[3] - Annual Charge | $20,000 | |
| ALEX* | Refer to ALEX* fee exhibit | |
| ALEX* buy-up tools | Refer to ALEX* fee exhibit | |

Master Services Agreement – 868066          29

AETNA-KULWICKI_0005157

[1] Requires the purchase of MedQuery* and Personal Health Record

[2] Requires the purchase of Beginning Right[SM] Maternity Program.

[3] This buy-up option provides flexibility to tier benefits, offering different levels of co-insurance and shifting out of pocket costs to the Plan Participant when an Aetna-designated Institute of Quality ("IOQ")is not utilized thus encouraging use of IOQs. Plan Participants will have a higher benefit when selecting care at a facility Aetna designates as an IOQ.

### IV. Service Fee Adjustment

    a. **2016 Fee Concession**. Aetna is providing a fee concession of $2,000,000 in year 1 of this Agreement (the "Fee Concession"). This Fee Concession has been provided as a per employee per month (PEPM) medical fee reduction included in the year 1 medical fee outlined above. The reduction in year one has been calculated assuming enrollment of 9,632 employees and equates to a fee reduction of $17.30 PEPM. This enrollment amount will be trued up based on actual enrollment for the contract year as agreed to by Aetna and Customer and this will occur in the year end accounting for the 2016 contract year.

    b. **Aetna Recovery** of Fee Concession. Aetna will recover the Fee Concession from Customer in years two through five of the Agreement through payments by Customer of an additional $500,000 annually for the second, third, fourth and fifth years of the Agreement (based upon the true up of the actual enrollment amount for the prior contract year as determined in each year-end accounting). These amounts will be collected in twelve (12) monthly installments as a PEPM adjustment to the monthly Service Fees, as agreed to by Aetna and Customer.

    c. **Penalty for Early Termination:** Should terminate this Agreement for any reason before December 31, 2020, WellStar will be responsible for remitting payment on any outstanding amount of the Fee Concession that has not been recovered through the installment payments set forth in section II.b.

### V. Fee Guarantee Period

Unless there is a Material Change (as defined below), the Service Fees as set forth in this schedule are guaranteed for each of the first five periods from January 1, 2016 through December 31, 2020 (each, a "Guarantee Period").

### VI. Material Change

If there is a Material Change (as defined in this section) then Aetna shall provide one hundred twenty (120) days' written notice to Customer if Aetna proposes to revise the Service Fees to address the Material Change. After Aetna provides this notice, he Parties shall, if the circumstance permits, meet and confer for a period not to exceed thirty (30) days to attempt to agree on whether any of the Service Fees should be revised, and if so, the amount of the revision. If the Parties are unable to agree on the revised Service Fees, the Parties shall submit the matter to binding final offer (baseball) arbitration. If a Party is unsatisfied with the result of the arbitration, the Party shall be entitled to exercise the right to terminate the Agreement on ninety (90) days' notice as set forth in Section 17 of the Agreement.

CONFIDENTIAL

For the purpose of this section, a Material Change includes any of the following:

a.  If, for any product:

1.  The actual number of employees enrolled falls outside of the enrollment scenarios set forth in the Schedule above.
2.  The member-to-employee ratio increases by more than 15 percent. The Parties have assumed a member-to-employee ratio of:
    -   2.02 for Choice POS II with H.S.A.
    -   2.02 for AHF-Choice POS II
3.  Maximum account structure exceeds 300 units per product. Maximum account structure includes Experience Rating Groups (ERGs), controls, suffixes, billing and claim accounts.
4.  A change in the Plan of benefits is initiated by WellStar Health System or by legislative or regulatory action.
5.  A change in the claim payment requirements or procedures, claim fiduciary option, account structure, or any other change materially affecting the manner or cost of paying benefits is initiated by WellStar Health System or by legislative or regulatory action.
6.  WellStar terminates its participation in the National Advantage™ Program (NAP), Facility Charge Review (FCR) or Itemized Bill Review (IBR) programs.
7.  Aetna or WellStar Health System changes the programs and services provided to WellStar Health System.
8.  WellStar Health System places the products and services included in this multi-year fee guarantee out to bid before December 31, 2020, this fee guarantee agreement is nullified. However, Aetna would not exercise our right to nullify the fee guarantee agreement if WellStar Health System places the products and services out to bid because Aetna service becomes unacceptable to WellStar Health System. Unacceptable service is defined as Aetna failing to achieve acceptable performance as measured by the performance guarantees which results in a penalty payout of more than 12.5% of the 25% of fees at risk.
9.  Legislation, regulation or requests of government authorities result in changes to Plan benefits.

If one of the Material Changes identified above occurs, then the additional performance guarantees between the Parties, including, but not limited to, discount guarantees and claim-based performance guarantees, may also be modified or terminated based upon the financial conditions included in those documents.

### VII. Allowances

a.  **Implementation Allowance** – Aetna will provide Customer an implementation allowance of up to fifty thousand dollars ($50,000). Customer can use this to pay for reasonable implementation and enrollment services incurred during 2016. These funds will be available as of January 1, 2016. Aetna shall pay implementation-related expenses directly to the vendor once Customer sends Aetna the invoice(s) outlining the expenses Customer has incurred. Invoices must be submitted before December 31, 2016. Any amount of this implementation allowance that Customer does not use for expenses accrued prior to December 31 of the applicable year shall be forfeited..

    I.  **Compliance Responsibility.** Aetna will pay any implementation allowance in accordance with applicable law. Customer shall be responsible for determining if the implementation allowance, or other payments from Aetna that offset or reimburse expenses, must be credited to Plan assets, and for accounting for reporting of such payments.

Master Services Agreement – 868066          31

    ii. **Recovery upon** Termination/Reduction in Enrollment. If Customer ceases operation of the Plan or membership in the plan falls below 5,000 employee Plan Participants (excluding their dependents), Customer will be responsible for reimbursing Aetna within 31 days of an invoice for any implementation allowance amounts used during the year that Customer ceases operation of the Plan or membership drops below the above-described threshold.

  b. Communication Allowance: Aetna will provide Customer a communication allowance of up to one hundred thousand dollars ($100,000) per year that the Agreement is effective to pay for reasonable communication-related expenses. Each allowance of $100,000 will be available as of January 1 of each year. Aetna shall pay communication-related expenses directly to the vendor once Customer sends Aetna the invoice(s) outlining the expenses Customer has incurred. Invoices must be submitted before December 31 of each year for the current year. Any amount of this communication allowance that Customer does not use for expenses accrued prior to December 31 of the applicable year shall be forfeited.

    i. **Compliance Responsibility.** Aetna will pay any communication allowance in accordance with applicable law. Customer shall be responsible for determine if the communication allowance, or other payments from Aetna that offset or reimburse expenses, must be credited to Plan assets, and for accounting for reporting of such payments.

    ii. **Recovery upon Termination/Reduction in Enrollment.** If Customer ceases operation of the Plan or membership in the plan falls below 5,000 employee Plan Participants (excluding their dependents), Customer will be responsible for reimbursing Aetna within 31 days of the invoice for any communication allowance amounts used during the year that Customer ceases operation of the Plan or membership drops below the above-described threshold.

VIII. **Late Payment.** If Customer does not provide Benefit Funding for medical services on timely basis to cover benefit payments as provided in this Agreement, and/or fail to pay Service Fees on a timely basis as provided in this Agreement, Aetna will assess the following late payment charges. The charges are:

    late payment of funds to cover benefit payments: 12 percent per annum

    late payments of Service Fees after 31 day grace period: 12 percent per annum

Late payment fees shall be calculated by dividing the interest rate set forth above by 365, multiplying that amount by the amount of the late-paid amount, and then multiplying by the number of days late. Aetna may collect any incurred late payment charges through the claim wire on a monthly basis, provided there is no other special payment arrangements in-force to fund any incurred late payment charges. Aetna shall notify Customer in writing and obtain approval prior to billing any late payment charges through claim wire.

The late payment charges described in this section are without limitation to any other rights or remedies available to Aetna under the Agreement or at law or in equity for failure to pay.

Master Services Agreement – 868066    32

AETNA-KULWICKI_0005160

PRESCRIPTION DRUG SERVICE FEE SCHEDULE C
MASTER SERVICES AGREEMENT MSA- 868066
EFFECTIVE January 1, 2016

This Prescription Drug Service Fee Schedule shall be effective for the period beginning January 1, 2016 and ending December 31, 2018. Any reference to "Member" shall mean a Plan Participant as defined in the Agreement.  All capitalized terms in this Prescription Drug Service Fee Schedule shall have the meanings assigned to them in the Agreement.

CONFIDENTIAL                                                  AETNA-KULWICKI_0005161

| Effective Date 01/01/2016<br>Benefit Plan<br>3-Tier [1] | | | |
|---|---|---|---|
| **Price Points** | | **Participating Retail Pharmacy Network** | **Aetna Rx Home Delivery** |
| Brand Drugs | Guaranteed AWP Discount | Year 1: AWP – 16.00% | Year 1: AWP – 24.00% |
| | | Year 2: AWP – 16.10% | Year 2: AWP – 24.10% |
| | | Year 3: AWP – 16.20% | Year 3: AWP – 24.20% |
| | Guaranteed Dispensing Fee / Rx | Year 1: $1.00 | Year 1: $0.00 |
| | | Year 2: $1.00 | Year 2: $0.00 |
| | | Year 3: $1.00 | Year 3: $0.00 |
| Generic Drugs | Guaranteed[2] AWP Discount | Year 1: AWP – 76.00% (overall, includes MAC and non-MAC) | Year 1: AWP – 77.50% (overall, includes MAC and non-MAC) |
| | | Year 2: AWP – 76.20% (overall, includes MAC and non-MAC) | Year 2: AWP – 77.70% (overall, includes MAC and non-MAC) |
| | | Year 3: AWP – 76.40% (overall, includes MAC and non-MAC) | Year 3: AWP – 77.90% (overall, includes MAC and non-MAC) |
| | Guaranteed Dispensing Fee / Rx | Year 1: $1.00 | Year 1: $0.00 |
| | | Year 2: $1.00 | Year 2: $0.00 |
| | | Year 3: $1.00 | Year 3: $0.00 |
| | [2]Retail and Mail discount includes all generics (single-source and multi-source) | | |
| Administrative Fee – applicable to WellStar Pharmacies ("in-house Script")** | The following administrative fee will apply to prescriptions filled at WellStar Pharmacies: | Year 1: $1.50 ( Per In-House Script )* | |
| | | Year 2: $1.50 ( Per In-House Script )* | |
| | | Year 3: $1.50 ( Per In-House Script )* | |
| Rebates | Plan sponsor will receive the following minimum rebate guarantees: | Year 1: Greater of 100.00% or $54.00 Per Brand Script | Year 1: Greater of 100.00% or $145.50 Per Brand Script |
| | | Year 2: Greater of 100.00% or $58.50 Per Brand Script | Year 2: Greater of 100.00% or $157.50 Per Brand Script |
| | | Year 3: Greater of 100.00% or $63.75 Per Brand Script | Year 3: Greater of 100.00% or $172.00 Per Brand Script |

[1]To qualify for 3-tier rebates, the Plan Participants in the Plan must be covered by a plan design that contains at least three tiers, where the first tier consists of generic drugs, the second tier consists of preferred brand drugs, and the third tier consists of non-preferred brand drugs, with a minimum $15.00 retail/$30.00 mail order copay differential between the second and third tier, or in the case of co-insurance plans a minimum 1.5 times difference in the co-insurance percentage between the second and third tier (for example, if the second tier

Master Services Agreement – 868066        34

AETNA-KULWICKI_0005162

co-insurance is 20%, the third tier co-insurance must be at least 30%); for Plans that have co-insurance with minimums, there must be a minimum $15.00 retail/$30.00 mail order copay differential between the second and third tier regardless of the co-insurance percentage; if there are copay maximums, the minimum copay on the third tier must be greater than the maximum copay on the second tier. Plan designs that do not conform to the above will be considered two tier.

*Assumes 58.0% in-house (WellStar Pharmacy) utilization; Billing will be based on $1.59 Per Employee Per Month and will be reconciled to the per script fee during the year-end accounting process.

** Customer in-house pharmacy pricing will be based on a pass-through pricing arrangement. None of the pricing terms above apply to Customer in-house pharmacies (aside from the $1.50 per script administrative fee).

Aetna will adjudicate Claims through our retail pharmacy network at the lowest of U&C, MAC, or discounted AWP.
Any reference in this Prescription Drug Schedule to "Member" shall mean a Plan Participant as defined in the Agreement.

## Pricing Updates & New To Market Products
When new Specialty Products gain FDA approval, Aetna Pharmacy Management notifies Customer on a monthly basis of the availability and projected pricing of these Specialty Products. However, whether such Specialty Products will be included as Covered Services will depend on the Customer's Plan design. Aetna Pharmacy Management also notifies Customer on a monthly basis of limited distribution Specialty Products newly available through Aetna Specialty Pharmacy.

Aetna Specialty Pharmacy determines the pricing for new to market Specialty Products by considering various factors, such as acquisition cost, expected dosages, package sizes and utilization. In any case, such Specialty Products will have a minimum market introduction guarantee of AWP less 10%.

### Producer Compensation
Aetna may pay a varying producer compensation to Customer's benefit consultant for services provided to Aetna or Customer and Customer acknowledges and consents to Aetna paying such producer compensation. Information regarding the producer compensation is available through the Customer's benefit consultant or Aetna.

### Assumptions
The Service Fees and Services set forth herein are based on, among other things, the assumption that a total of 9,632 of Customer's employees will be receiving Covered Pharmacy Services through Aetna. If there is a change of greater than 15% of enrollment or in the geographic, demographic or eligible mix of the population, the Parties shall revisit the structure and/or conditions of the Pharmacy Services and Fee Schedule, and any change to the Service Fees shall be agreed to in a written amendment to the Agreement.

Master Services Agreement – 868066          35

For the purposes of Discounts, the savings percentage will be calculated by dividing the AWP less the Ingredient cost for the drugs dispensed by the AWP for such drugs. For each eligible prescription-drug claim, Calculated Ingredient Cost will be calculated at the lesser of the applicable MAC, or AWP Discount price in determining the Discount achieved for purposes of calculating Discounts, including 100% Plan Participant Cost Share Claims at the applicable calculated Discount prior to the application of the Plan Participant Cost Share. Cost Share will be calculated on the basis of the rates charged to Customer by Aetna for Covered Services except as required by law to be otherwise.

Discount and Dispensing Fee guarantees shall not apply to Compound drug claims, claims that process at U&C, direct member reimbursement (DMR) claims, Specialty drugs dispensed at a retail pharmacy, Customer in-house pharmacies and claims for products dispensed by Aetna Specialty Pharmacy. Aetna reserves the right to exclude claims for over-the-counter products, supplies, vaccines, workers compensation claims, or 340b claims from the discount and dispensing fee guarantees.

Rebates will be distributed on a quarterly basis in accordance with the following schedule:  Rebate calculations related to the first quarter will start in August of the same year, Rebate calculations related to the second quarter will start in November of the same year, Rebate calculations related to the third quarter will start in February of the following year and Rebate calculations related to the fourth quarter will start in May of the following year.  Aetna typically makes payments (as a credit to your claim wire) in the month following the rebate calculation.

Rebates are not available for Claims arising from Participating Pharmacies dispensing Prescription Drugs subject to either their (i) own manufacturer rebate contracts or (ii) participation in the 340B Drug Pricing Program codified as Section 340B of the Public Health Service Act or other Federal government pharmaceutical purchasing program. Customer shall adopt the Aetna Formulary in order to be eligible to receive Rebates as provided in the Service and Fee Schedule as set forth herein unless otherwise agree upon by Customer and Aetna. Rebates are paid on Specialty Products dispensed through Participating Pharmacies and covered under the Plan.

Rebate, Discount and Dispensing Fee Guarantees are based on the Plan in effect and as disclosed to Aetna during any Agreement Period. Accordingly, if Customer fails to disclose to Aetna that it employs, or intends to employ, a consumer driven health plan, major cost sharing changes, any utilization management program promoting Generic or OTC Drugs over Brand Drugs during any Agreement Period, Aetna reserves the right to adjust Guarantees.

Retail and Mail Order rebate guarantee components are measured individually and reconciled in aggregate on an annual basis.

Retail brand, retail generic, mail order brand and mail order generic discount and dispensing fee guarantee components are measured individually and reconciled individually on an annual basis.

Aetna reserves the right to modify its products, services, and fees, and to recoup any costs, taxes, fees, or assessments, in response to legislation, regulation or requests of government authorities. Any taxes or fees (assessments) applied to self-funded benefit plans related to The Patient Protection and Affordable Care Act (PPACA) will be solely the obligation of the plan sponsor. The pharmacy pricing that Aetna is presenting does not include any such plan sponsor liability.

Master Services Agreement – 868066          36

AETNA-KULWICKI_0005164

Aetna reserves the right to make appropriate changes to these guarantees if (a) there are any significant changes in the composition of Aetna's pharmacy network or in Aetna's pharmacy network contract compensation rates, or the structure of the pharmacy stores/chains/vendors that are contracted with Aetna, including but not limited to disruption in the retail pharmacy delivery model, and bankruptcy of a chain pharmacy, or (b) there is a change in government laws or regulations which have a significant impact on pharmacy claim costs, or (c) any material manufacturer rebate contracts with Aetna are terminated or modified in whole or in part, or (d) there is any legal action or Law that materially affects or could materially affect the manner in which Aetna administers the rebate program, or if an existing Law is interpreted so as to materially affect or potentially have a material effect on Aetna's administration of the program, or (e) there is a material change in the Plan that is initiated by the Customer which impacts Aetna's costs or (f) there is a material change in the assumption used to develop the financial offer, including but not limited to customer's expected drug utilization, plan design, average days' supply by distribution channel, alignment with proposed formulary(ies) and associated formulary management programs (where applicable), and utilization of Hepatitis C or other specialty drug products.

Customer and Aetna agree that AWP, the underlying financial basis of this Service and Fee Schedule, may become modified or discontinued by means outside of the control of Customer and Aetna, thereby impairing the financial intent of the Parties hereunder. In the event of such modification or discontinuance, the Parties agree that Aetna, in order to preserve such financial intent, may opt to (i) change the AWP source from MediSpan to another AWP source, (ii) maintain the AWP as modified but make appropriate adjustments with Customer and/or Participating Pharmacies, or (iii) change the pricing index from AWP to another industry standard index, such as Wholesale Acquisition Cost. Aetna shall provide Customer with at least ninety (90) days written notice of the option taken by Aetna together with a sufficiently detailed explanation demonstrating how such option has preserved the parties' financial intent. If ninety (90) days' notice is not practicable under the circumstances, Aetna shall provide notice as soon as practicable. If Customer disputes this explanation, the Parties agree to cooperate in good faith to resolve such dispute.

If (a) Customer terminates the Agreement prior to the date the pharmacy rebate payment is issued, or (b) the Agreement is terminated by Aetna for Customer's failure to meet its obligations to fund benefits or pay administrative fees (medical or pharmacy) under the Agreement, Aetna will be entitled to deduct deferred administrative fees or other plan expenses due to the termination date from any rebate payment due Customer following the termination date. If the Aetna Pharmacy Management (APM) plan is terminated by Customer prior to December 31, 2018, Aetna will retain any rebates earned but not issued as of the APM cancellation date. If there is a loss of enrollment greater than 15% after year 1, Aetna will retain the issued but unpaid rebates on this enrollment loss by taking the total rebates divided by the total number of employees multiplied by the number of employees that have left Aetna.  This calculation of Rebate retention is applicable to subsequent losses of enrollment and not subject to a one-time event.

Aetna's Premier Plus formulary will be used.

### Market Check

On an annual basis commencing 6 months after the effective date, Customer may, at its expense, engage a nationally-recognized consultant in the PBM market pricing industry reasonably agreeable to Aetna ("Consultant") to compare the aggregate value of the pricing terms of this Agreement with the aggregate value of the prevailing pricing terms offered to Similar Employers (the "Market Check"). The parties agree that the Market Check shall be based on the entirety of mail and retail pricing for Brand Drugs and Generic Drugs, pricing

Master Services Agreement – 868066          37

for Specialty Products, administrative fees and Rebates. Actual form, format and content of information to be provided to Aetna by Consultant for purposes of the Market Check will be mutually agreed in advance and subject to a confidentiality agreement. The term Similar Employers means those employers with (i) an equivalent range of services ("Full Service PBM Customers") and (ii) equal or lesser mail order penetration, generic dispensing rate, overall claim volume and enrolled members and (iii) similar formulary content, coverage parameters and utilization patterns which impacts overall rebate performance.

The term Full Service PBM Customers means customers which purchase (i) pharmacy management coverage on an individual basis, excluding coalitions and (ii) a similar bundle of PBM services including but not limited to retail network management, claims processing, rebate contracting and management, mail order and specialty pharmacy fulfilment, formulary development and management, and pharmacy clinical programs with a similar set of plan design incentives and features to support similar results with respect to generic dispensing rate, mail order and captive specialty pharmacy fulfilment utilization, and formulary compliance.

In order to conduct the Market Check as accurately as possible, Consultant shall take into consideration any unique circumstances that may vary among Customer and the Similar Employers such as geographic distribution of members, utilized pharmacies and mix of drugs. In the event such circumstances require Consultant to make any adjustments, Aetna shall be entitled to review such adjustments before the results of the Market Check are shared with Customer. A response will be provided within 30 days following receipt of a complete Market Check review submission. Finally, the Market Check shall reflect the average aggregate value of the pricing terms offered to a minimum of three (3) Similar Employers. Should the Market Check indicate an average aggregate value providing greater than 1.5% gross cost savings to Customer, Aetna agrees to accept the Market Check and negotiate new pricing terms with Customer.

If Customer and Aetna mutually agree to new pricing terms, the Agreement shall be amended accordingly effective as of the first day of the next Contract Year, January 1, 2017 provided that customer provides written approval for financial changes within 30 days after the after Customer and Aetna have mutually agreed to new pricing terms and Aetna receives 60 days to implement the financial changes. If Customer and Aetna fail to agree to new pricing terms, Customer may terminate the agreement without financial penalty (i.e. Customer will receive all earned but unissued Rebates) provided Aetna receives at least 90 days prior written notice.

> **Late Payment.** If Customer does not provide Benefit Funding for prescription drug services on timely basis to cover benefit payments as provided in this Agreement, and/or fail to pay Service Fees on a timely basis as provided in this Agreement, Aetna will assess the following late payment charges:
>
> - late payment of funds to cover benefit payments: 12 percent per annum
>
> - late payments of Service Fees after 31 day grace period: 12 percent per annum
>
> Late payment fees shall be calculated by dividing the interest rate set forth above by 365, multiplying that amount by the amount of the late-paid amount, and then multiplying by the number of days late.
>
> Aetna may collect any incurred late payment charges through the claim wire on a monthly basis, provided there is no other special payment arrangements in-force to fund any incurred late payment

Master Services Agreement – 868066          38

charges. Aetna shall notify Customer in writing and obtain approval prior to billing any late payment charges through claim wire.

The late payment charges described in this section are without limitation to any other rights or remedies available to Aetna under the Agreement or at law or in equity for failure to pay.

### Additional Pharmacy Programs and Services

Below is a list, by product, of prescription drug services and programs that are available to Customer. Please note the following:

- Services and programs included in the Service Fees are indicated as "Included" and Aetna is providing the service or program to Customer.
- Services and programs that are optional are noted as "Optional - No Additional Cost". Additional fees are noted where applicable.

| Categories | Included / Optional |
|---|---|
| **General Administration** | |
| **Implementation Services** | Included |
| **Account Management** | Included |
| **Customer Team Services** | Included |
| $50,000 Annual Allowance (Implementation, Communication and Audit expenses). Payment will be made to third party vendors upon receipt of invoices for the appropriate expenses. Any unused allowance monies at the end of each contract year will be forfeited. | Included |
| **Banking** | Included |
| **Standard Communication Materials** | Included |
| **ID Cards** | Included |
| **Eligibility** | Included |
| **Standard Reporting** | Included |
| **Network Administration** | |
| **Pharmacy Network Management** | Included |
| **Claim & Member Services** | |
| **Claim Administration** | Included |
| **Member Services** | Included |
| **Aetna Rx Home Delivery** | Included |
| **Patient Management** | |
| **Formulary Management** | Included |
| Custom Formulary Management - rebates are subject to change upon review | $1.00 PEPM if selected |
| **Pre-Certification** | Included |
| **Quantity Limits** | Included |
| **Internet Services** | |
| **Aetna Navigator** | Included |
| **Public Site** | Included |

Master Services Agreement – 868066        39

| Categories | Included / Optional |
|---|---|
| Secure Site (log in) | Included |
| Price A Drug$^{SM}$ | Included |
| Find-A-Pharmacy | Included |
| **Safety** | |
| Concurrent Drug Utilization Review (DUR) | Included |
| Point of Care Edits | Included |
| Safety Edits | Included |
| Expanded Age Edits | Optional - No Additional Cost |
| Expanded Gender Edits | Optional - No Additional Cost |
| Enhanced Safety Edits | Optional - No Additional Cost |
| **Member Education and Value** | |
| Controlled Substance Use Program | Included |
| Blood Glucose Monitor | Included |
| Prescription Savings Program | Included |
| ExtraCare* Health Card | Optional - No Additional Cost |
| Heart Care for Life | Optional - No Additional Cost |
| Migraine Management | Optional - No Additional Cost |
| **Generic Solutions** | |
| Save-A-Copay | Optional - No Additional Cost |
| Generic Sampling | Included |
| Generic Launch letter program (targeted at members filling certain brands at Mail Order) | Included |
| Aetna Rx Step* | Optional - No Additional Cost |
| *Custom step therapy may not be used with standard step therapy program | |
| **Specialty Solutions** | |
| Specialty Utilization Management including National Precertification | Included |
| Aetna Specialty Health Care$^{sm}$ Management | Included |
| Retail to Specialty Outreach | Included |
| Aetna Specialty Pharmacy® | Included |
| **Adherence** | |
| Aetna Rx Courtesy Start$^{sm}$ | Included |
| Aetna Rx AutoFill | Optional - No Additional Cost |
| Adherence to Drug Therapy | Optional - No Additional Cost |
| Aetna Pharmacy Advisor* | Optional - No Additional Cost |
| Gaps in Care | Optional - No Additional Cost |
| Preventative and Chronic Drug List | Optional - No Additional Cost |
| *Requires Aetna Rx AutoFill and Adherence to Drug Therapy | |
| **Access Solutions** | |
| National Network | Included |
| Maintenance Choice® - Mandatory (Requires Mandatory Mail Order) | Optional - No Additional Cost |
| Maintenance Choice® - Incentivized (Requires Incentivized | Optional - No Additional Cost |

Master Services Agreement – 868066          40

                                                    AETNA-KULWICKI_0005168

| Categories | Included / Optional |
|---|---|
| Mail Order) | |
| Maintenance  Choice* - Voluntary | Optional - No Additional Cost |
| Aetna Rx Value Network | Optional - No Additional Cost |
| Aetna Rx Preferred Network* | Optional - No Additional Cost |
| Aetna Rx Choice Network* (Includes National Network) | Optional - No Additional Cost |
| Extended Day Supply Network* (Includes National Network) | Optional - No Additional Cost |
| Retail to Mail Outreach | Optional - No Additional Cost |
| *These programs cannot be offered with Maintenance Choice or another retail network | |
| **Clinical Management** | |
| Smart Edit Technology Integrated Intelligence | Included |
| ePrior Authorization | Included |

| Programs Available at an Additional Charge | |
|---|---|
| Aetna Rx Check – Expanded Offering<br>(Includes:  Acute Frequency, Brand-to-Generic, High Utilization,<br>Therapeutic Duplication, Patient Safety, Streamlining Therapy,<br>Therapeutic Optimization, Length of Therapy, Maximum Dose,<br>Prescription Cascade & Drug Interactions) | $0.55 Per Employee Per Month |
| Aetna Healthy Actions – Rx Savings | |
| o    Care Engine Powered Condition-Based | $0.25 Per Employee Per Month |
| o    Care Engine Powered Drug-Based | $0.15 Per Employee Per Month |
| o    Drug Class Driven (Rx Claims Logic Only) | $0.15 Per Employee Per Month |
| Aetna Rx Healthy Outcomes | $0.10 Per Employee per Month or $300 Per Program Participant |

CONFIDENTIAL                                                                                          AETNA-KULWICKI_0005169

## SPECIALTY PHARMACY FEE SCHEDULE D
## MASTER SERVICES AGREEMENT MSA- 868066
## EFFECTIVE January 1, 2016

This Specialty Pharmacy Fee Schedule shall be effective for the period beginning January 1, 2016 and ending December 31, 2018. All capitalized terms in Specialty Pharmacy Fee Schedule shall have the meanings as defined in the Agreement.

Except for the specific items listed in the Exceptions or Limited Distribution tables below, Specialty Products will have the following Discounts:

| Distribution Channel | Standard Discounts | Dispensing Fee |
|---|---|---|
| Preferred | AWP - 13.50% | $0.00 |

Specialty Products will not be available through Aetna Rx Home Delivery. This schedule does not pertain to WellStar Pharmacies.

### Limited Distribution Drugs

Some Specialty Products may be subject to limited distribution or restricted access. This means that certain Specialty Products may only be available at one or a limited number of pharmacies. Limited distribution is generally due to (i) the FDA imposing restrictions on the distribution of a Specialty Product to certain pharmacies and (ii) special handling, coordination of care or patient education that cannot be handled by all pharmacies. While most Specialty Products may be ordered through Aetna Specialty Pharmacy, the Specialty Products listed below are currently not available. However, if Aetna receives a prescription order for any of these Specialty Products, it will transfer the order to a Participating Pharmacy where the Specialty Products are available and inform the prescribing physician and Plan Participant of same.

| Limited Distributed Products | | |
|---|---|---|
| ADAGEN | IRESSA | SABRIL |
| ARALAST | OFORTA | SUCRAID |
| ARCALYST | ONSOLIS | TIKOSYN |
| BERINERT | ORFADIN | TYVASO |
| CINRYZE | ORTHOCLONE | VENTAVIS |
| CYSTADANE | PROLASTIN | VISUDYNE |
| ELAPRASE | PROMACTA | XENAZINE |
| EXJADE | REMODULIN | XYREM |
| FLOLAN | RETISERT | ZAVESCA |
| ILARIS | RIASTAP | ZEMAIRA |
| IMPLANON | | |

Master Services Agreement – 868066          42

AETNA-KULWICKI_0005170

**Exceptions To Standard Pricing**

The following Specialty Products have the Discounts shown for the Preferred distribution channel.

| Therapeutic Category | Drug Name | Medication Form | Network AWP Discount | Dispensing Fee |
|---|---|---|---|---|
| ANEMIA | ARANESP | INJ | 12.50% | $0.00 |
| ANEMIA | ATGAM | INJ | 13.50% | $0.00 |
| ANEMIA | EPOGEN | INJ | 13.50% | $0.00 |
| ANEMIA | INFED | INJ | 13.50% | $0.00 |
| ANEMIA | NIFEREX | OR | 12.50% | $1.75 |
| ANEMIA | PROCRIT | INJ | 13.50% | $0.00 |
| ANEMIA | REVLIMID | OR | 12.50% | $1.75 |
| ANEMIA | VENOFER | INJ | 13.50% | $0.00 |
| ASTHMA | PULMOZYME | INJ | 13.50% | $0.00 |
| ASTHMA | TOBI | OR | 12.50% | $1.75 |
| ASTHMA | XOLAIR | INJ | 12.50% | $0.00 |
| COLONY STIMULANT | LEUKINE | INJ | 12.50% | $0.00 |
| COLONY STIMULANT | MOZOBIL | INJ | 13.50% | $0.00 |
| COLONY STIMULANT | NEUMEGA | INJ | 13.50% | $0.00 |
| COLONY STIMULANT | NEULASTA | INJ | 11.50% | $0.00 |
| COLONY STIMULANT | NEUPOGEN | INJ | 13.50% | $0.00 |
| CROHN'S DISEASE | CIMZIA | INJ | 13.50% | $0.00 |
| CROHN'S DISEASE | REMICADE | INJ | 13.50% | $0.00 |
| DEEP VEIN THROMBOSIS | ARIXTRA | INJ | 13.50% | $0.00 |
| DEEP VEIN THROMBOSIS | FRAGMIN | INJ | 13.50% | $0.00 |
| DEEP VEIN THROMBOSIS | HEPARIN | INJ | 13.50% | $0.00 |
| DEEP VEIN THROMBOSIS | INNOHEP | INJ | 13.50% | $0.00 |
| DEEP VEIN THROMBOSIS | LOVENOX | INJ | 11.50% | $0.00 |
| ENZYME REPLACEMENT | ALDURAZYME | INJ | 12.50% | $0.00 |
| ENZYME REPLACEMENT | CEREZYME | INJ | 11.50% | $0.00 |
| ENZYME REPLACEMENT | FABRAZYME | INJ | 10.25% | $0.00 |
| GROWTH HORMONE | GENOTROPIN | INJ | 10.50% | $0.00 |
| GROWTH HORMONE | HUMATROPE | INJ | 13.50% | $0.00 |
| GROWTH HORMONE | NORDITROPIN | INJ | 13.50% | $0.00 |
| GROWTH HORMONE | NUTROPIN | INJ | 12.50% | $0.00 |
| GROWTH HORMONE | PROTROPIN | INJ | 17.00% | $0.00 |
| GROWTH HORMONE | SAIZEN | INJ | 11.50% | $0.00 |
| GROWTH HORMONE | SEROSTIM | INJ | 12.50% | $0.00 |
| GROWTH HORMONE | SOMATULINE DEPOT | INJ | 13.50% | $0.00 |
| GROWTH HORMONE | SUPPRELIN LA KIT | IMPL | 13.50% | $0.00 |
| GROWTH HORMONE | TEV-TROPIN | INJ | 17.00% | $0.00 |
| GROWTH HORMONE | ZORBTIVE | INJ | 13.50% | $0.00 |

CONFIDENTIAL    AETNA-KULWICKI_0005171

| Therapeutic Category | Drug Name | Medication Form | Network | |
|---|---|---|---|---|
| | | | AWP Discount | Dispensing Fee |
| HEMOPHILIA | ADVATE | INJ | 27.00% | $0.00 |
| HEMOPHILIA | ALPHANATE | INJ | 29.25% | $0.00 |
| HEMOPHILIA | BENEFIX | INJ | 14.50% | $0.00 |
| HEMOPHILIA | FEIBA | INJ | 37.50% | $0.00 |
| HEMOPHILIA | HELIXATE | INJ | 31.00% | $0.00 |
| HEMOPHILIA | HEMOFIL | INJ | 37.50% | $0.00 |
| HEMOPHILIA | HUMATE - P | INJ | 9.25% | $0.00 |
| HEMOPHILIA | KOGENATE | INJ | 42.50% | $0.00 |
| HEMOPHILIA | MONARC | INJ | 29.25% | $0.00 |
| HEMOPHILIA | MONOCLATE | INJ | 29.25% | $0.00 |
| HEMOPHILIA | MONONINE | INJ | 27.00% | $0.00 |
| HEMOPHILIA | NOVOSEVEN | INJ | 29.25% | $0.00 |
| HEMOPHILIA | PROPLEX T | INJ | 14.00% | $0.00 |
| HEMOPHILIA | RECOMBINATE | INJ | 29.25% | $0.00 |
| HEMOPHILIA | STIMATE | INJ | 12.50% | $0.00 |
| HEMOPHILIA | XYNTHA | INJ | 29.25% | $0.00 |
| HEMOPHILIA | ALL OTHER HEMOPHILIA NOT LISTED ABOVE | INJ | 11.50% | $0.00 |
| HEPATITIS | ALFERON | INJ | 13.50% | $0.00 |
| HEPATITIS | BAYGAM | INJ | 11.50% | $0.00 |
| HEPATITIS | COPEGUS | OR | 12.50% | $1.75 |
| HEPATITIS | INFERGEN | INJ | 17.00% | $0.00 |
| HEPATITIS | HEPSERA | INJ | 13.50% | $0.00 |
| HEPATITIS | NABI HB | INJ | 13.50% | $0.00 |
| HEPATITIS | PEG INTRON | INJ | 13.50% | $0.00 |
| HEPATITIS | PEGASYS | INJ | 13.50% | $0.00 |
| HEPATITIS | REBETOL | OR | 12.50% | $1.75 |
| HEPATITIS | REBETRON | INJ | 18.00% | $0.00 |
| HEPATITIS | RIBAVIRIN (Generic) | OR | MAC | $1.75 |
| HEPATITIS | ROFERON-A | INJ | 12.50% | $0.00 |
| HEPATITIS B | TYZEKA | OR | 12.50% | $1.75 |
| HIV / AIDS | ATRIPLA | OR | 12.50% | $1.75 |
| HIV / AIDS | FOSCAVIR | INJ | 17.00% | $0.00 |
| HIV / AIDS | FUZEON | INJ | 13.50% | $0.00 |
| HIV / AIDS | ISENTRESS | OR | 12.50% | $1.75 |
| HIV / AIDS | VISTIDE | INJ | 13.50% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | CARIMUNE | INJ | 38.00% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | FLEBOGAMMA | INJ | 35.00% | $0.00 |

Master Services Agreement – 868066          44

CONFIDENTIAL                                                    AETNA-KULWICKI_0005172

| Therapeutic Category | Drug Name | Medication Form | Network | |
|---|---|---|---|---|
| | | | AWP Discount | Dispensing Fee |
| IMMUNODEFICIENCY SYNDROME | GAMIMUNE | INJ | 17.00% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | GAMMAGARD S/D | INJ | 42.50% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | GAMMAGARD LIQUID | INJ | 29.25% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | GAMUNEX | INJ | 27.00% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | PANGLOBULIN | INJ | 38.00% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | POLYGAM | INJ | 48.00% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | PRIVIGEN | INJ | 11.50% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | RHOGAM PLUS | INJ | 13.50% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | THYMOGLOBULIN | INJ | 13.50% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | VIVAGLOBIN | INJ | 37.50% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | WINRHO SDF | INJ | 13.50% | $0.00 |
| IMMUNODEFICIENCY SYNDROME | ALL OTHER IVIG NOT LISTED ABOVE | INJ | 11.50% | $0.00 |
| IMMUNOSUPPRESSION W/TRANSPLANT | ALPRAZOLAM | OR | 16.00% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | AZATHIOPRINE | OR | 16.00% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | CELLCEPT | OR | 12.50% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | CYCLOSPORINE | OR | 16.00% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | CYTOGAM | INJ | 12.50% | $0.00 |
| IMMUNOSUPPRESSION W/TRANSPLANT | GENGRAF | OR | 12.50% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | IMURAN | OR | 12.50% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | KEPIVANCE | INJ | 13.50% | $0.00 |
| IMMUNOSUPPRESSION W/TRANSPLANT | MYFORTIC | OR | 12.50% | $1.75 |

Master Services Agreement – 868066          45

AETNA-KULWICKI_0005173

| Therapeutic Category | Drug Name | Medication Form | Network | |
|---|---|---|---|---|
| | | | AWP Discount | Dispensing Fee |
| IMMUNOSUPPRESSION W/TRANSPLANT | NEORAL | OR | 12.50% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | PROGRAF | OR | 12.50% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | PROGRAF | INJ | 12.50% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | RAPAMUNE | OR | 12.50% | $1.75 |
| IMMUNOSUPPRESSION W/TRANSPLANT | SANDIMMUNE | INJ | 12.50% | $0.00 |
| IMMUNOSUPPRESSION W/TRANSPLANT | SANDIMMUNE | SOL | 12.50% | $0.00 |
| IMMUNOSUPPRESSION W/TRANSPLANT | SANDIMMUNE | OR | 12.50% | $1.75 |
| INFERTILITY | BRAVELLE | INJ | 21.75% | $0.00 |
| INFERTILITY | CETROTIDE | INJ | 16.75% | $0.00 |
| INFERTILITY | CHORIONIC GONADOTROPIN | INJ | 16.75% | $0.00 |
| INFERTILITY | FOLLISTIM AQ | INJ | 13.50% | $0.00 |
| INFERTILITY | GANIRELIX | INJ | 16.75% | $0.00 |
| INFERTILITY | GONAL F | INJ | 12.50% | $0.00 |
| INFERTILITY | LEUPROLIDE KIT | INJ | 27.00% | $0.00 |
| INFERTILITY | LUVERIS | INJ | 21.75% | $0.00 |
| INFERTILITY | MENOPUR | INJ | 21.75% | $0.00 |
| INFERTILITY | NOVAREL | INJ | 16.50% | $0.00 |
| INFERTILITY | OVIDREL | INJ | 16.50% | $0.00 |
| INFERTILITY | PREGNYL | INJ | 21.75% | $0.00 |
| INFERTILITY | REPRONEX | INJ | 21.75% | $0.00 |
| LHRH AGONIST | LUPRON | INJ | 13.50% | $0.00 |
| LHRH AGONIST | LUPRON DEPOT | INJ | 13.50% | $0.00 |
| LHRH AGONIST | PLENAXIS | INJ | 13.50% | $0.00 |
| LHRH AGONIST | ZOLADEX | INJ | 24.00% | $0.00 |
| MULTIPLE SCLEROSIS | AVONEX | INJ | 12.50% | $0.00 |
| MULTIPLE SCLEROSIS | BETASERON | INJ | 11.50% | $0.00 |
| MULTIPLE SCLEROSIS | COPAXONE | INJ | 12.50% | $0.00 |
| MULTIPLE SCLEROSIS | EXTAVIA | INJ | 11.50% | $0.00 |
| MULTIPLE SCLEROSIS | MYOBLOC | INJ | 13.50% | $0.00 |
| MULTIPLE SCLEROSIS | REBIF | INJ | 12.50% | $0.00 |
| MULTIPLE SCLEROSIS | TYSABRI | INJ | 13.50% | $0.00 |
| NEUROLOGY | BOTOX | INJ | 9.25% | $0.00 |
| NEUROLOGY | CEREBYX | INJ | 17.00% | $0.00 |
| NEUROLOGY | DYSPORT | INJ | 11.50% | $0.00 |

CONFIDENTIAL                                                                    AETNA-KULWICKI_0005174

| Therapeutic Category | Drug Name | Medication Form | Network | |
|---|---|---|---|---|
| | | | AWP Discount | Dispensing Fee |
| NEUROLOGY | CLONAZEPAM | OR | 16.00% | $1.75 |
| NEUROLOGY | LIORESAL INTRATHECAL | INJ | 17.00% | $0.00 |
| ONC - ANTIEMETIC | ANZEMET | INJ | 13.50% | $0.00 |
| ONC - ANTIEMETIC | ATROPINE | INJ | 13.50% | $0.00 |
| ONC - ANTIEMETIC | CYANOCOBALAMIN | INJ | 13.50% | $0.00 |
| ONC - ANTIEMETIC | DELTASONE | OR | 16.00% | $1.75 |
| ONC - ANTIEMETIC | DEXAMETHASONE | INJ | 13.50% | $0.00 |
| ONC - ANTIEMETIC | EMEND | INJ | 15.00% | $0.00 |
| ONC - ANTIEMETIC | HYDROXYZINE | OR | 13.50% | $1.75 |
| ONC - ANTIEMETIC | KYTRIL | INJ | 16.00% | $0.00 |
| ONC - ANTIEMETIC | METHYLPREDNISOLONE | INJ | 13.50% | $0.00 |
| ONC - ANTIEMETIC | PROCHLORAPERAZINE - CPD | INJ | 17.00% | $0.00 |
| ONC - ANTIEMETIC | TIGAN | OR | 13.50% | $1.75 |
| ONC - ANTIEMETIC | ZOFRAN | OR | 12.50% | $1.75 |
| ONC - ANTIHYPERCALCEMIC | PAMIDRONATE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | ALOXI | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | ARIMIDEX | OR | 12.50% | $1.75 |
| ONC - CHEMOTHERAPY | AVASTIN | INJ | 10.25% | $0.00 |
| ONC - CHEMOTHERAPY | BCG LIVE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | BLEOMYCIN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | CAMPTOSAR | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | CASODEX | OR | 12.50% | $1.75 |
| ONC - CHEMOTHERAPY | COSMEGEN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | CYTARABINE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | CYTOXAN | INJ | 12.50% | $0.00 |
| ONC - CHEMOTHERAPY | DAUNORUBICIN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | DOXIL | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | DOXORUBICIN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | ELITEK | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | ELIGARD | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | ELOXATIN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | ERBITUX | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | ETHYOL | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | ETOPOSIDE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | FASLODEX | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | GEMZAR | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | GLEEVEC | OR | 10.50% | $1.75 |
| ONC - CHEMOTHERAPY | HERCEPTIN | INJ | 10.50% | $0.00 |
| ONC - CHEMOTHERAPY | HYCAMTIN | OR | 12.50% | $1.75 |
| ONC - CHEMOTHERAPY | HYCAMTIN | INJ | 12.50% | $0.00 |

Master Services Agreement – 868066          47

| Therapeutic Category | Drug Name | Medication Form | Network AWP Discount | Dispensing Fee |
|---|---|---|---|---|
| ONC - CHEMOTHERAPY | HYDROXYUREA | OR | 16.00% | $1.75 |
| ONC - CHEMOTHERAPY | INTRON A | INJ | 12.50% | $0.00 |
| ONC - CHEMOTHERAPY | LEUCOVORIN | OR | 13.50% | $1.75 |
| ONC - CHEMOTHERAPY | MERCAPTOPURINE | OR | 16.00% | $1.75 |
| ONC - CHEMOTHERAPY | METHOTREXATE | INJ | 12.50% | $0.00 |
| ONC - CHEMOTHERAPY | MUSTARGEN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | MITOMYCIN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | NAVELBINE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | NEXAVAR | OR | 13.50% | $1.75 |
| ONC - CHEMOTHERAPY | NOVANTRONE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | OCTREOTIDE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | PACLITAXEL | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | PARAPLATIN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | PROLEUKIN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | RITUXAN | INJ | 12.50% | $0.00 |
| ONC - CHEMOTHERAPY | TAMOXIFEN | OR | 16.00% | $1.75 |
| ONC - CHEMOTHERAPY | TARCEVA | OR | 11.50% | $1.75 |
| ONC - CHEMOTHERAPY | TAXOTERE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | TEMODAR | OR | 12.50% | $1.75 |
| ONC - CHEMOTHERAPY | THALOMID | OR | 12.50% | $1.75 |
| ONC - CHEMOTHERAPY | TICE BCG | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | SANDOSTATIN | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | SUTENT | OR | 14.50% | $1.75 |
| ONC - CHEMOTHERAPY | VELCADE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | VINCRISTINE | INJ | 13.50% | $0.00 |
| ONC - CHEMOTHERAPY | VOTRIENT | OR | 12.50% | $1.75 |
| ONC - CHEMOTHERAPY | XELODA | OR | 12.50% | $1.75 |
| ONC - CHEMOTHERAPY | ZENAPAX | INJ | 13.50% | $0.00 |
| ONC - DIURETIC | MANNITOL | INJ | 13.50% | $0.00 |
| ONC - HEMATOPOIETIC | NEULASTA | INJ | 11.50% | $0.00 |
| ONC - HYPERCALCEMIC | AREDIA | INJ | 17.00% | $0.00 |
| ONC - HYPERCALCEMIC | ZOMETA | INJ | 13.50% | $0.00 |
| OSTEOARTHRITIS | EUFLEXXA | INJ | 13.50% | $0.00 |
| OSTEOARTHRITIS | HYALGAN | INJ | 13.50% | $0.00 |
| OSTEOARTHRITIS | ORTHOVISC | INJ | 13.50% | $0.00 |
| OSTEOARTHRITIS | SUPARTZ | INJ | 17.00% | $0.00 |
| OSTEOARTHRITIS | SYNVISC | INJ | 13.50% | $0.00 |
| OSTEOPOROSIS | FORTEO | INJ | 11.50% | $0.00 |
| OTHER | ACTHAR GEL | INJ | 13.50% | $0.00 |
| OTHER | KUVAN | OR | 13.50% | $1.75 |

Master Services Agreement – 868066          48

AETNA-KULWICKI_0005176

| Therapeutic Category | Drug Name | Medication Form | Network AWP Discount | Network Dispensing Fee |
|---|---|---|---|---|
| OTHER | INCRELEX | INJ | 13.50% | $0.00 |
| OTHER | LUCENTIS | INJ | 11.50% | $0.00 |
| OTHER | RECLAST | INJ | 13.50% | $0.00 |
| OTHER | RETISERT | INJ | 17.00% | $0.00 |
| OTHER | ROCEPHIN | INJ | 13.50% | $0.00 |
| OTHER | SOMAVERT | INJ | 13.50% | $0.00 |
| OTHER | THYROGEN | INJ | 10.50% | $0.00 |
| OTHER | VIVITROL | INJ | 10.50% | $0.00 |
| OTHER | ALL OTHER INJECTABLE DRUGS NOT LISTED | INJ | 13.50% | $0.00 |
| OTHER | TRADITIONAL ORALS, CREAMS & INHALERS | OR | 12.50% | $1.75 |
| OTHER | COMPOUNDED MEDICATIONS & SUPPOSITORIES | | 16.00% | $11.75 |
| PARKINSONS | APOKYN | INJ | 13.50% | $0.00 |
| PSORIASIS | AMEVIVE | INJ | 13.50% | $0.00 |
| PSORIASIS | SORIATANE KIT | OR | 12.50% | $1.75 |
| PSORIASIS | STELARA | INJ | 11.50% | $0.00 |
| PULMONARY ARTERIAL HYPERTENSION | ADCIRCA | OR | 16.00% | $1.75 |
| PULMONARY ARTERIAL HYPERTENSION | LETAIRIS | OR | 12.50% | $1.75 |
| PULMONARY ARTERIAL HYPERTENSION | TRACLEER | OR | 13.50% | $1.75 |
| PULMONARY FIBROSIS | ACTIMMUNE | INJ | 12.50% | $0.00 |
| RHEUMATOID ARTHRITIS | ENBREL | INJ | 12.50% | $0.00 |
| RHEUMATOID ARTHRITIS | HUMIRA | INJ | 12.50% | $0.00 |
| RHEUMATOID ARTHRITIS | HYDROXYCHLOROQUINE | OR | 16.00% | $1.75 |
| RHEUMATOID ARTHRITIS | KINERET | INJ | 13.50% | $0.00 |
| RHEUMATOID ARTHRITIS | MYOCHRYSINE | INJ | 17.00% | $0.00 |
| RHEUMATOID ARTHRITIS | ORENCIA | INJ | 13.50% | $0.00 |
| RHEUMATOID ARTHRITIS | SIMPONI | INJ | 13.50% | $0.00 |
| RSV | SYNAGIS | INJ | 13.50% | $0.00 |

**Note:** This list will be updated from time to time and may include adjunct therapies used in the treatment of complex conditions. For drugs where an AB-rated generic equivalent is available, the pricing will be according to the current MAC list.

Master Services Agreement – 868066          49

CONFIDENTIAL                                    AETNA-KULWICKI_0005177

MEDICAL SERVICES SCHEDULE E

MASTER SERVICES AGREEMENT MSA- 868066
EFFECTIVE January 1, 2016

**This Medical Services Schedule describes the medical Services being provided by Aetna to Customer, and is effective for the period beginning** January 1, 2016 and ending December 31, 2020. Unless otherwise agreed in writing, only **the Services selected by the Customer in the Medical Service Fee Schedule will be provided by** Aetna. **Additional Services may be provided at the Customer's written request under the terms of the** Agreement. **This Schedule shall supersede any previous document(s) describing the Services.**

Some programs are available to eligible employees of Customer as determined by Customer who are not otherwise covered under Plans ("**Employee**").

I.  **CLAIM FIDUCIARY**

The Customer and Aetna agree that with respect to Section 503 of the Employee Retirement Income Security Act of 1974, as amended, Aetna will be the "appropriate named fiduciary" of the Plan for the first two levels of appeal for purpose of reviewing denied claims under the Plan. The Customer understands that the performance of such fiduciary duties under ERISA necessarily involves the exercise of discretion on Aetna's part in the determination and evaluation of facts and evidence presented in support of any claim or appeal. Therefore, and to the extent not already implied as a matter of law, the Customer hereby delegates to Aetna discretionary authority to determine initial entitlement to benefits under the applicable Plan documents for each claim received, including discretionary authority to determine and evaluate facts and evidence, and discretionary authority to construe the terms of the Plan.

If the denial is upheld in the second level of appeal, Aetna will determine if the appeal is eligible for External Review Organization ("ERO"). If the appeal is eligible for ERO, then Aetna will inform the Plan Participant of his right to appeal to ERO. If the appeal is not eligible for ERO, or if the ERO upholds the denial, then Aetna will inform the Plan Participant of his right to appeal to the Customer for final review. The Customer shall be the "appropriate named fiduciary" of the Plan for the final appeal.

II. **EXTERNAL REVIEW**

The external review process will be conducted by an independent clinical reviewer with appropriate expertise in the area in question. External Review shall be available for certain "Adverse Benefit Determinations" as defined in 29 CFR 2560.503-1 as amended by 26 CFR 54.9815-2712T. It shall also be available for eligible "Final Internal Adverse Benefit Determinations", which is an eligible Adverse Determination that has been upheld by the appropriate named fiduciary (Aetna) at the completion of the internal review process or an Adverse Benefit Determination for which the appeal process has been exhausted. The External Review process shall meet the standards of the Federal Affordable Care Act and utilize a minimum of three accredited Independent Review Organizations. Independent reviewers conduct a de novo review of the information provided to them as part of the External Review process. Both Aetna and Customer acknowledge that neither Plan Participants nor providers will be penalized for exercising their right to an External Review.

Master Services Agreement – 868066          50

          AETNA-KULWICKI_0005178

Customer delegates the sole discretionary authority to make the determination regarding the eligibility for external review, under the Plan, to Aetna.

Customer acknowledges that the Independent Review Organizations that make the external review decisions are independent contractors and not agents or employees of Aetna, and that Aetna is not responsible for the decision of the Independent Review Organization.

To assist in conducting such external reviews, Customer agrees to provide Aetna with the current Plan documents, and any revised, amended, or updated versions no later than the date of any revisions, amendments, or updates.

III.   DEFENSE OF LITIGATION REGARDING BENEFIT DETERMINATIONS

In the event of a legal, administrative or other action arising out of the administration, processing or determination of a claim for Plan benefits, the Party designated in this document as the fiduciary which rendered the decision in the appeal last exercised by the Plan Participant that is being appealed ("Responsible Party") shall undertake the defense of such action at its expense and settle such action when in its reasonable judgment it appears expedient to do so, provided that when Aetna is the Responsible Party, Customer shall have the right of pre-approval in single claim litigation as follows:

For matters for which Aetna (if the Responsible Party) seeks to settle above $50,000, Aetna will consult with and seek settlement authority from the Customer.  Settlement authority will not be unreasonably withheld.   If Customer does not respond to Aetna's settlement authority request within 20 days, Aetna can settle the matter.  If Customer withholds settlement authority and insists that Aetna continue to defend, Customer will bear the additional defense costs incurred; however, should the ultimate award at trial result in an amount less than what Aetna proposed at settlement, Aetna will be responsible for additional expense costs.

If the other Party is also named as a party to such action, the Responsible Party will defend the other Party PROVIDED the action relates solely and directly to actions or failure to act by the Responsible Party and there is no conflict of interest between the Parties. Customer agrees to pay the amount of Plan benefits included in any judgment or settlement in such action. The other Party shall not be liable for any other part of such judgment or settlement, or any legal expenses or punitive damages, except to the extent provided in section 12 (Indemnification).

In any multi-claim litigation (including arbitration) disputing reimbursement for benefits for more than one Plan Sponsor, the Customer authorizes Aetna to defend and reasonably settle the Customer's benefit claims in such litigation.  Customer shall have the right to audit any settlement after the fact by reviewing non-confidential documents

CONFIDENTIAL                                          AETNA-KULWICKI_0005179

**IV. CARE MANAGEMENT** SERVICES

Aetna shall provide the following Case Management Services (except where otherwise noted).

    **1.Utilization Management**
      a.  **Inpatient and Outpatient Precertification:**
        A process for collecting information prior to an inpatient confinement (Inpatient Precertification) or selected ambulatory procedures, surgeries, diagnostic tests, home health care and durable medical equipment (Outpatient Precertification). The precertification process permits eligibility verification/confirmation, initial determination of coverage, and communication with the physician and/or Plan Participant in advance of the provision of the procedure, service or supply at issue. Outpatient precertification is not applicable to Indemnity or PPO Products.

      b.  **Concurrent Review:**
        Concurrent review encompasses those aspects of patient management that take place during the provision of services at an inpatient level of care or during an ongoing outpatient course of treatment. The concurrent review process includes obtaining information regarding the care being delivered; assessing the clinical condition, providing benefit determination, identifying continuing care needs to facilitate appropriate discharge plans, and identifying Plan Participants for other specialty programs such as Case Management or Disease Management.

      1.  **Discharge Planning:**
        This is an interdisciplinary process that assists Plan Participants as their medical condition changes and they transition from the inpatient setting. Discharge planning may be initiated at any stage of the patient management process. Assessment of potential discharge planning needs begins at the time of notification, and coordination of discharge plans commences upon identification of post discharge needs during precertification or concurrent review. This program may include evaluation of alternate care settings and identification of care needed after discharge. The goal is to provide continuing quality of care and to avoid delay in discharge due to lack of outpatient support.

      2.  **Retrospective Review:**
        Retrospective review is the process of reviewing coverage requests for initial certification after the service has been provided or when the Plan Participant is no longer in-patient or receiving the service. Retrospective review includes making coverage determinations for the appropriate level of service consistent with the Plan Participant's needs at the time the service was provided after confirming eligibility and the availability of benefits within the Plan Participant's benefit plan.

Not all services are subject to utilization management. Aetna maintains the discretion as to the particular level and intensity of these utilization management programs. The services subject to utilization review may vary from time to time.

CONFIDENTIAL        AETNA-KULWICKI_0005180

**2. Case Management** Programs:

The Aetna Case Management program is a collaborative process of assessment, planning, facilitation and advocacy for options and services to meet an individual's health needs in accordance with the Plan through communication and available resources to promote quality, cost-effective outcomes.

Those **Plan Participants** with diagnoses and clinical situations for which a specialized nurse, working with the Plan Participant and their physician, can make a material impact to the course or outcome of care and/or reduce medical costs will be accepted into the program at Aetna's discretion. Case management staff strives to enhance the Plan Participant's quality of life, support continuity of care, facilitate provision of services in the appropriate setting and manage cost and resource allocation to promote quality, cost-effective outcomes in accordance with the Plan. Case Managers collaborate with the Plan Participant, family, caregiver, physician and healthcare provider community to coordinate care, with a focus on closing gaps in the Plan Participant's care.

Aetna targets two types of case management opportunities:

- <u>Complex Case Management</u> targets Plan Participants who have already experienced a health event and are likely to have care and benefit coordination needs after the event. The objective for Case Managers is to identify care or benefit coordination needs which lead to faster or more favorable clinical outcomes and/or reduced medical costs.
- <u>Proactive Case Management</u> targets Plan Participants, from Aetna's perspective, who are misusing, over-using or under-utilizing the health care system, leading them towards avoidable and costly health events. This program's objective is to confirm gaps in Plan Participants' care leading to their over-use, misuse, or under-use, and to work with the Plan Participant and their physician to close those gaps.

Case management programs can vary based on the level of advocacy and overall intensity of the programs. The variation is determined by the changing the thresholds by which Plan Participants are identified for outreach. The various case management program options include:

- <u>**Dedicated Units, Designated Units and Care Advocate Teams (Customer currently has the Care Advocate Team Model)**</u> - These services were created to help coordinate care, support and resources for Plan Participants under one Care Unit.
    - o Aetna's Dedicated Unit provides centralized care management services for pre-certification, utilization management and Case Management.
    - o Aetna's Designated Unit is a unit team that provides centralized care management services for pre-certification, utilization management, and Case Management for a specific set of Customers, and
    - o Aetna's Care Advocate Team has customized workflows based on the Customer's needs, vendor integration, specialized outreach, and program integration. The Care Advocate Team will:
    - Help the Plan Participant understand their doctor's diagnosis and treatment plan
    - Coordinate care across all Aetna programs to help the Plan Participant to optimize use of Aetna programs,
    - Help the Plan Participant decide what questions to ask the doctor or health care provider,

Master Services Agreement – 868066          53

                                     AETNA-KULWICKI_0005181

- Introduce the Plan Participant to a disability specialist if they need to file a disability claim, and
- Support the Plan Participant throughout their treatment and recovery by making follow-up calls and helping them get the support they need.
- o These services are the basis for National Accounts Targeted Care Solutions and Custom Case Management Solutions

### 3.Aetna In Touch Care<sup>SM</sup> Programs (Not Currently Purchased By Customer):

Aetna In Touch Care Program addresses chronic and acute conditions holistically, instead of through separate case management and disease management programs. This program supports Plan Participants with an integrated program experience for the Plan Participant. Aetna's In Touch Care is condition agnostic, provides a more holistic approach to care , and a higher level of engagement supporting Plan Participants with the most risk and the greatest opportunity for health impacts.

Aetna In Touch Care identifies Plan Participants based on assessing their clinical urgency, financial impact, and clinical impact. Based on this assessment, Plan Participants are then assigned to one of three program tracks: high, moderate, or low. Plan Participants would then be targeted for either one-on-one nurse support or through virtual support, providing the appropriate level of support when needed. Plan Participants targeted for one-on-one support will be assigned a single nurse point of contact providing a holistic approach to care. This single nurse model also assigns the same nurse to the other family members for support if needed. Management interactions are tailored to match the Plan Participant's engagement preferences, such as online contact.

These services are the basis for National Accounts Aetna In Touch Care<sup>SM</sup> Solutions and Aetna In Touch Care<sup>SM</sup> Premier offerings.

### 4.Specialty Case Management Programs:

- <u>Aetna Compassionate Care<sup>SM</sup> Program ("ACCP")</u> - The Aetna Compassionate Care program provides additional support to terminally ill Plan Participants and their families. It removes barriers to hospice and provides more choices for end-of-life care so that the Plan Participant is able to spend time with family and friends outside a hospital setting.

ACCP Enhanced Hospice Benefits Package - The enhanced hospice benefits package includes the following:
- o The option for a Plan Participant to continue to seek curative care while in hospice
- o The ability to enroll in a hospice program with a 12-month terminal prognosis
- o The elimination of the current hospice day and dollar maximum plan limits
- o Respite and bereavement services are included as part of the enhanced hospice benefits. The hospice services provided through a hospice regularly include these services and are coordinated by the hospice agency providing care and the Aetna nurse case manager who precertifies care for the Plan Participant. In addition, bereavement services are available through the Aetna Employee Assistance Program ("EAP") for Customers without an EAP vendor.

Bereavement counseling shall be available to Plan Participants upon loss of a loved one, and to family and caregivers of a Plan Participant enrolled in ACCP following the death of such Plan Participant.

Master Services Agreement – 868066          54

AETNA-KULWICKI_0005182

- **Infertility Case Management:** - Aetna operates two types of infertility programs:
  - o **Basic Infertility Program** coordinates covered diagnostic services and treatment of the underlying medical causes of infertility, helps Plan Participants understand complex infertility treatments and helps control treatment costs through care coordination and patient education.
  - o **Infertility Case Management Program** provides education and information resources for Plan Participants who are experiencing infertility. Depending on the plan selected, the program may guide eligible Plan Participants to a select network of infertility providers for covered or non-covered services. If the services are covered, Aetna's Infertility Case Management Unit issues any appropriate authorizations required under the Plan.

5. **National Medical Excellence Program®/Institutes of Excellence™ /Institutes of Quality®:**
The National Medical Excellence Program was created to help arrange for access to effective care for Plan Participants with particularly difficult conditions requiring transplants or complex cardiac, neurosurgical or other procedures, when the needed care is not available in a Plan Participant's service area. The program utilizes a national network of experienced providers and facilities selected based on their volume of cases and clinical outcomes. The National Medical Excellence Program Unit provides specialized case management through the use of nurse case managers, each with procedure and/or disease-specific training. There are two networks:

- The **Aetna Institutes of Excellence (IOE)** transplant network was established to enhance quality standards and lower the cost of transplant care for Plan Participants. It is made up of a select group of hospitals and transplant centers that meet quality standards for the number of transplants performed and their outcomes, as well as access criteria for Plan Participants.

- The **Aetna Institutes of Quality (IOQ) (Not Currently Purchased by Customer)** are a national network of health care facilities that are designated based on measures of clinical performance, access and efficiency for orthopedic, cardiac, and bariatric surgery. Bariatric surgery, also known as weight loss surgery, refers to various surgical procedures to treat people living with morbid or extreme obesity.

6. **MedQuery® (Not Currently Purchased By Customer)**
The MedQuery program is a data-mining initiative, aimed at turning Aetna's data into information that physicians can use to improve clinical quality and patient safety. Through the program, Aetna's data is analyzed and the resulting information gives physicians access to a broader view of the Plan Participant's clinical profile. The data which fuels this program includes claim history, current medical claims, pharmacy, physician encounter reports, and patient demographics. Data is mined on a weekly basis and compared with evidence-based treatment recommendations to find possible errors, gaps, omissions (meaning, for example, that a certain accepted treatment regimens may be absent) or co-missions in care (meaning, for example, drug-to-drug or drug-to disease interactions). When MedQuery identifies a Plan Participant whose data indicates that there may be an opportunity to improve care, outreach is made to the treating physician based on the apparent urgency of the situation. For customers who have elected to purchase MedQuery with member messaging feature, in certain situations outreach will be made directly to the Plan Participant by MedQuery, requesting that the Plan Participant discuss with their physician, specific opportunities to improve their care.

CONFIDENTIAL                                                                    AETNA-KULWICKI_0005183

When available information reveals lack of compliance with a clinical risk, condition, or demographic-related recommendation for preventive care, a Preventive Care Consideration ("PCC") is generated. The PCC is a preventive/wellness alert sent to the Plan Participant electronically via the Plan Participant's Personal Health Record. Paper copies of a PCC, delivered via U.S. Mail, are also available as an additional purchase option.

7. **Personal Health Record (Not Currently Purchased By Customer):**
Personal Health Record ("PHR") is a collection of personal health information about an individual Plan Participant that is stored electronically. The PHR is designed so that the Plan Participant can maintain his or her own comprehensive health record. In a PHR developed by a health plan, health information is commonly derived from claims data collected during plan administration activities. Health information may be supplemented with information entered by the Plan Participant.

Aetna offers the Aetna CareEngine®-Powered PHR (for Customers who have elected this additional purchase option). The CareEngine-Powered PHR combines the basic functions of a PHR with a personalized, proactive, evidence-based messaging platform. The Plan Participant's PHR is pre-populated with health information from Aetna's claims system. Plan Participants can also input personal health information themselves. An online health assessment is available to facilitate the self-reporting process. The Aetna CareEngine-Powered PHR also offers personalized messaging and alerts based on medical claims, pharmacy claims, and demographic information, and lab reports.

**Member Health Engagement Plan ("MHEP") (Not Currently Purchased By Customer)** offering aims to help Plan Participants better identify health opportunities and take action to improve their health and wellness. MHEP features include an enhanced Plan Participant specific "to-do" list, which includes personalized tasks unique to each Plan Participant's health status and needs, and a progress bar added to the "My Health Activities" page, which visually shows the percentage of completed "to-do" list tasks. The progress bar is updated when evidence of action is collected from lab data, pharmacy claim data, medical claims data, or self-reported data.

8. **Beginning Right® Maternity Program:**
Through an intensive focus on prevention, early treatment and education, the Beginning Right Maternity Program provides women with the tools to help improve pregnancy outcomes and control maternity-care costs through a variety of services including: risk identification, care coordination by obstetrical nurses and board certified OB/GYNs, and Plan Participant support.

CONFIDENTIAL                                        AETNA-KULWICKI_0005184

**9.Informed Health® Line:**

Informed Health Line provides Employees with toll-free 24-hour/7 day telephonic access to registered nurses experienced in providing information on a variety of health topics. The nurses can contribute to informed health care decision-making and optimal patient/provider relationships through coaching and support. Informed Health Line has added the Healthwise® Video Library to enhance the Employees access to health information.  The Employee can be sent links to health education videos from the Healthwise Video Library, via email.

The range of available service components options include:

- **Nurse Information line 1-800# Only (currently purchased by Customer).** This includes toll-free telephone access to the Informed Health Line.

- **Service Plus.** (Not currently purchased by Customer) Includes toll-free access to the Informed Health Line; introductory program announcement letter, reminder postcards mailed directly to Employee's homes; and semi-annual activity utilization report.
- **Service Green** (Not currently purchased by Customer) IHL Service Green is an environmentally friendly version of the Service Plus option.  It provides the same level of service and availability as Service Plus but instead of mailing postcards and reminders, email is used.
- **Optional Service Features.** (Not currently purchased by Customer) These features may be purchased in conjunction with the Service Plus or Service Green package and includes an additional introductory kit; and annual Plan Participant or Employee survey and comprehensive results report.

**10. Healthy Lifestyle Coaching (Not Currently Purchased By Customer):**
- **Healthy Lifestyle Coaching** – This program provides online educational materials, web-based tools and telephonic coaching interventions with a primary health coach. The program is designed to help Employees quit smoking, manage their weight, deal more effectively with stress and learn about proper nutrition and physical fitness. Support is provided through One-on-one telephonic coaching and group coaching. Additionally, Plan Participants or Employees can receive peer-to-peer support through clinically moderated online communities.
- **Healthy Lifestyle Coaching Lite** – This program provides online educational materials, web-based tools and group coaching interventions designed to help Employees quit smoking, manage their weight, deal more effectively with stress and learn about proper nutrition and physical fitness. Support is provided through group coaching. Additionally, Employees can receive peer-to-peer support through clinically moderated online communities
- **Healthy Lifestyle Coaching Tobacco Free** - This program provides support to Employees and dependents (18 and older) who want to stop using Tobacco. Employees work with a tobacco cessation specialist to examine the pros and cons of kicking the habit, set a quit date, understand the mental, physical and social aspects of using tobacco, develop strategies to overcome their urges and create a plan for staying tobacco free.
- **Healthy Weight** – This program drives employee engagement, encourages healthier lifestyle choices and helps create lasting behavioral changes. The program targets the risk factors associated with being overweight so Employees and their families can change before disease develops or complications arise.

Master Services Agreement – 868066          57

CONFIDENTIAL                                                          AETNA-KULWICKI_0005185

**11. Simple Steps To A** Healthier Life®:

Aetna has developed an internet-based comprehensive management information resource, known as "Simple Steps To A Healthier Life" (the "Simple Steps"). Employees can access Simple Steps at www.aetna.com, an online support tool which provides advice relating to disease prevention, condition education, behavior modification, and health promotion programs that may contribute to the health and productivity of Employees.

Simple Steps allows users to create a health assessment profile that generates personalized health reports. In addition to generating a health profile/assessment, Employees also have access to an action plan with links to personalized online health programs called Journeys®, offered through a relationship with RedBrick Health®. Through RedBrick Health, there is also an alternative health assessment option called RedBrick Compass™.

**12. Aetna Healthy Actions**SM (Not Currently Purchased By Customer):

Aetna Healthy Actions provides participation tracking for many of Aetna's wellness and care management programs. The participation reports generated may be used for incentive administration. Customers can use the reports to provide their own incentives, which may be HSA deposits, payroll credits, premium reductions/credits, raffles, etc. Additionally, Aetna can provide incentive administration through gift cards and credits to Employee's Health Reimbursement Arrangements (HRAs) and Health Incentive Credit (HIC) accounts.

**13. Get Active**SM **Program (Not Currently Purchased By Customer):**

Get Active is an evidence-based Employee health and wellness program that focuses on bringing employees together on teams to pursue healthy lifestyles. The program takes the form of a company-wide, multi-week exercise, walking, and weight loss competition that promotes friendly competition, group support, and camaraderie in the workplace. The site also allows for the ability to create personal challenges (exercise, sports, nutrition, smoking cessation, relaxation, etc.), find activity partners, form health-related interest groups (e.g. healthy cooking club, lunch-time walking group), and share fitness plans with colleagues.

**14. Enhanced Clinical Review (Not Currently Purchased By Customer For Other Than Out of Area Plan):**

This radiology program is designed, through a clinical prior authorization process, to promote appropriate and effective use of outpatient diagnostic imaging services and procedures. Aetna will provide these services nationally and/or regionally, and interact with, free-standing radiology and/or outpatient network facilities that provide the following services: Computed Tomography/Coronary Computed Tomography Angiograph (CT/CTA), Magnetic Resonance Tomography, Magnetic Resonance Angiography (MRIs/MRAs), Nuclear Medicine and Positron Emission Tomography (PET) and/or PET/CT Fusion, Stress Echocardiography (Stress Echo), and Diagnostic Cardiac Catherization, Sleep Studies and Cardiac Rhythm Implantable procedures (Pacemakers, Implantable Cardioverter-Defibrillators, and Cardiac Resynchronization Therapy). The Enhanced Clinical Review program will typically be administered through relationships with third parties.

CONFIDENTIAL                                                           AETNA-KULWICKI_0005186

**15. Newtopia (Not Currently Purchased By Customer)**

Aetna has partnered with Newtopia, to provide a high-touch, personalized health program to Employees and eligible dependents, which is focused on obesity and reducing an individual's metabolic syndrome risk factors. The program includes a genetic saliva testing for 3 genes (unless prohibited by state law) related to obesity, appetite and eating behavior. The program is tailored to the individual's genetic profile and health assessment, and is paired with live coaching (either online or via phone) to motivate and engage the individual.

## V. BEHAVIORAL HEALTH SERVICES

Aetna shall provide the following Behavioral Health Services (except where otherwise noted).

1. Managed Behavioral Health:

   A set of services that includes both inpatient and outpatient care management.

   - Inpatient Care Management provides phone-based utilization review of inpatient behavioral health (mental health and chemical dependency) admissions intended to contain confinements to appropriate lengths, assure medical necessity and appropriateness of care, and control costs. Inpatient Care Management provides precertification, concurrent review and discharge planning of inpatient behavioral health admissions. These services also include identification of Plan Participants for referral to a Behavioral Health Condition Management program.

   - Outpatient Care Management includes precertification on a limited number of selected services. Where precertification is required, the request for services is reviewed against a set of criteria established by clinical experts and administered by trained staff, in order to determine coverage of the proposed treatment. Where precertification is not required, cases are identified for Outpatient Case Management through the application of clinical algorithms.

2. Behavioral Health Condition Management

   The Aetna Behavioral Health Condition Management program identifies and engages Employees diagnosed with high-risk acute and chronic behavioral health conditions. Employees enrolled in the program get support with behavior change to improve overall functioning and wellness, which keeps them involved in and compliant with their treatment. The program promotes active collaboration and coordination of everyone involved in the Employee's medical and behavioral health care, including providers, family, friends and other Aetna clinical programs.

   Base Level Program (Embedded) - Triggers include: high cost claimants, re-admissions, and multiple diagnoses/co-morbidities.

   High Level Program (Optional) (Not Currently Purchased By Customer):
   This option includes quarterly utilization reports. Triggers include: base embedded triggers plus, medical or behavioral health diagnosed conditions, inpatient admission, ER visits for behavioral health.

CONFIDENTIAL                                          AETNA-KULWICKI_0005187

### 3. AbilTo

AbilTo performs outreach, on behalf of Aetna, to offer Plan Participants with certain medical conditions or those going through certain life changes, an alternative treatment setting. Outreach is made to offer behavioral health support to Plan Participants using web-based videoconferencing, online interface or telephone support, instead of a face-to-face office visit. AbilTo provides condition-specific, structured, fixed duration support. AbilTo is an in-network provider and its clinical team consists of therapists and behavioral health coaches. Each web-based videoconferencing session, online interface or telephone support session, is subject to Plan terms applicable to a behavioral health office visit, including cost share, deductible, etc.

## VI. TECHNOLOGY/WEB TOOL SERVICES

Aetna shall provide the following Technology/Web Tool Services.

### 1. DocFind®

Aetna's online participating provider directory--updated daily -- that anyone can use to locate network physicians and other health care providers such as dentists, optometrists, hospitals and pharmacies.

### 2. Aetna Navigator®

Aetna Navigator is a secure Employee website that can be used as an online resource for personalized health and financial information.

### 3. Aetna Mobile®

Aetna Mobile is a streamlined view of Aetna Navigator that can be accessed from any web-enabled mobile device.

### 4. Web-Chat Technology – Virtual Assistant Ann

Aetna's virtual assistant, nicknamed Ann, assists Plan Participants with the Aetna Navigator registration process, log in questions, or assists those who have forgotten their user name or password.

### 5. Health Decision Support:

Health Decision Support provides educational support so Employees can better understand their conditions and treatment options, including tests, procedures and surgery. This helps Employees make more informed decisions for their health care.

Health Decision Support has two options for customers. Both options offer programs for treatment, procedure and surgery decision support.

- **Basic** – Offers 30 programs. It is available to all Aetna Navigator® registered users at no additional cost to customers or employees.
- **Premium** – (optional additional purchase) Offers over 200 programs and plan sponsor-specific engagement reporting. Aetna Healthy Actions[SM] incentive tracking is available for program completion in the premium option.

CONFIDENTIAL                                                                              AETNA-KULWICKI_0005188

**6.Metabolic Health in Small Bytes:**

Metabolic Health in Small Bytes is a program promoting metabolic syndrome risk reduction and reversal. This program targets the root cause of obesity by using a holistic approach (mental, emotional, and physiological) to help Employees identify underlying reasons for their weight and what barriers may exist which impede weight loss. This program was created through a collaborative effort with Aetna, Duke Diet and Fitness, Duke Integrative Medicine and eMindful.

**7.iTriage®**

iTriage is a mobile decision support tool that is designed to increase in-network usage by Plan Participants and assist employers in managing health care costs, while providing employees with a range of appropriate treatment options. It is designed to assist Plan Participants answer the three most common medical questions: *What could be wrong?; Where can I go for treatment?; Where can I go according to my plan?* It is a unique symptom-to-provider pathway that helps Plan Participants search symptoms, conditions, and treatment options and helps them determine the most appropriate level of care in or out of their Aetna provider network.

Customer Requirements:

* Customer will be responsible for coordinating the marketing of the iTriage application to their employees for adoptions, including communicating iTriage marketing materials to employees.
* If Customer Co-Branding is included, Customer shall provide Aetna with two forms of their logo (one for use with a dark background, and another for use with a light background) in vector format no later than 30 days prior to the iTriage launch date, or as mutually agreed by the Parties. Failure to do so may result in delay in implementation.
* Customer must provide all input and materials reasonably necessary for implementation of any customizations, if applicable, no later than 30 days prior to the iTriage launch date, or as mutually agreed by the Parties. Failure to do so may result in delay in implementation.

**8.NeoCare Solutions℠ (Not Currently Purchased By Customer)**

Aetna, through its subsidiary Healthagen, LLC, ("Healthagen") will provide a consumer application, NeoCare Solutions (the "Application") to Employees whose infants have been admitted to a Neonatal Intensive Care Unit ("NICU"). The Application will include tools, content, and access to a Nurse Coach via phone or tablet device, to better engage Employee parents of NICU children and enable them to be more involved in the infant's care. A "Nurse Coach" is a Healthagen-employed, Aetna-employed, or independently contracted resource made available to Employees through the Application via chat and telephone, to provide support, answer questions, and select and send educational content that is relevant to an infant's care. A Nurse Coach is not a provider of health care services. The Application will be made available to Employees for up to the first year of their infant's life.

**9.WellMatch® (Not Currently Purchased By Customer)**

WellMatch is a web-based tool that allows Employees to shop for health care services by comparing aspects of price, quality, and convenience. WellMatch users can search for nearby in-network providers to see what their out-of-pocket cost will be, as well as applicable quality designations and patient reviews.

Master Services Agreement – 868066          **61**

CONFIDENTIAL                                        AETNA-KULWICKI_0005189

## VII. OTHER SERVICES

Aetna shall provide the following other Services (except as otherwise indicated).

1. **Teladoc (Not Currently Purchased By Customer)**
   Teladoc is a vendor that provides access to physicians who are under contract with Teladoc, to provide consultations for non-urgent care needs by telephone. The physicians made available through the Teledoc program are independent contractors and are neither employees nor agents of Teladoc or Aetna.

2. **ALEX® Benefits Advisor (Not Currently Purchased By Customer)**
   ALEX Benefits Advisor ("ABA") is an interactive, online decision support tool designed to assist employees in making their benefits elections during open enrollment. A virtual host ("ALEX") asks employees questions relevant to the type of coverage the employee may wish to buy (regarding health care needs, lifestyle, financial status, etc.) and makes plan recommendations based on those responses and Customer's benefit options. There are also several modules available for the Customer for an additional charge: Dental, Life (includes Basic/Supplemental/AD&D/Spouse/Child), Disability (includes STD/LTD), Vision (when integrated with medical coverage) and Aetna Pharmacy Savings. The Customer will have use of ABA throughout Customer's open enrollment period, and during the plan year as well for new hires or others eligible to make benefit changes during the year. Customization options are also available for purchase.

3. **Aetna Concierge (Not Currently Purchased By Customer):**
   Aetna Concierge is a level of customer service that provides a dedicated team of Aetna employees to support the delivery of high-touch, tailored service for Customers. The dedicated Aetna Concierges obtain Customer-specific training in order to serve as a single point of contact across the full-spectrum of plan and benefit offerings available to Plan Participants, even if such offerings are external to Aetna. The dedicated team is staffed with more customer service representatives than Aetna's traditional Customer Service Model, without call handle time guidelines, thereby allowing for longer, more relevant Plan Participant interactions. Aetna Concierges use their skills and training to listen for opportunities to educate and empower Plan Participants by sharing insights, providing useful information, and offering guidance through the use of Aetna tools and resources so that Plan Participants become more informed health care consumers. Aetna Concierge include a dedicated team, individual Aetna Concierges can serve as an extension of the Customer benefits team, and as an available single point of contact for Plan Participants via a dedicated, toll-free 800-number, as well as via live web chat through Aetna Navigator®.

4. **Onsite Health Screening Services (Not Currently Purchased By Customer):**
   Aetna's Onsite Health Screening Services help employers engage and educate their Employees about wellness at the workplace. These offerings provide turnkey solutions to support employers' overall wellness strategies, increase consumerism and promote informed-decision making. Offerings include Onsite Health Screenings, Workshops, Special Awareness Campaigns; and Educational Resources. Aetna may contract with nationally recognized vendors to administer Onsite Health Screening Services, and such vendors may be subject to change.

CONFIDENTIAL                                    AETNA-KULWICKI_0005190

5. **Mind-Body Stress Reduction Programs (Not Currently Purchased By Customer):**
Aetna's Mind-Body Stress Reduction programs are evidence-based mind-body solutions that target Employees with stress.

- Mindfulness at Work (in coordination with eMindful Inc.) - Teaches evidence-based stress management skills, including mindfulness awareness, breathing techniques and emotions management. Employee participants are required to have online access to participate. Customer can choose from a 12-week class; a monthly class; or combined weekly and monthly classes. All three options can be offered in a single Customer dedicated or public class setting.
- Viniyoga Stress Reduction (in coordination with American Viniyoga Institute) - Teaches tools for managing stress through Viniyoga postures (breath combined with movement), breathing techniques, guided relaxation and mental techniques. Helps reduce stress, relieve muscle tension and headaches, improves sleep and more. Program features includes 12-week onsite class for one-hour per week.

6. **Aetna Fitness Reimbursement Program (Not Currently Purchased By Customer):**
The Aetna Fitness Reimbursement Program (the "Program"), powered by GlobalFit®, is available to Employees. The Program provides reporting and reimbursement for fitness expenses, including fitness club/gym dues, group exercise class fees for classes led by certified instructor; fitness equipment purchases; personal training; and weight management and nutrition counseling sessions.

7. **ID Cards:**
Upon the Customer's request, Aetna will include third party vendor information on Plan Participant identification cards. In such event, the Customer shall indemnify Aetna, its affiliates and their respective directors, officers, and employees from that portion of any actual third party loss (including reasonable attorney's fees) resulting from the inclusion of such third party vendor information on identification cards.

8. **Subrogation Services:**
Aetna will provide subrogation/reimbursement services when the Customer's summary plan description (SPD) is finalized, available to the Customer's employees, and includes subrogation/reimbursement language.

Aetna does not delay processing or deny claims for subrogation/reimbursement purposes.

Aetna has the exclusive discretion to: (a) decide whether to pursue potential recoveries on subrogation/reimbursement claims; (b) determine the reasonable methods used to pursue recoveries on such claims, except with respect to initiation of formal litigation; and (c) decide whether to accept any settlement offer relating to a subrogation/reimbursement claim. Aetna shall advise the Customer if the pursuit of recovery requires initiation of formal litigation. In such event, the Customer shall have the option to approve or disapprove the initiation of litigation. Subrogation /reimbursement services will be delegated to an organization of Aetna's choosing.

CONFIDENTIAL          AETNA-KULWICKI_0005191

The subrogation/reimbursement fee is outlined in the Service and Fee Schedule and includes reasonable expenses such as (a) collection agency fees, (b) police and fire reports, (c) asset checks, (d) locate reports and (e) attorneys' fees. If no monies are recovered as a result of the subrogation/reimbursement service, no fee will be charged to the Customer.

Subrogation/reimbursement recoveries will be credited to the Customer net of fees charged by Aetna. Aetna does not credit individual Plan Participant claims for subrogation/reimbursement recoveries.

The Customer must notify Aetna should Customer pursue, recover by settlement or otherwise waive any subrogation/ reimbursement claim, or instruct Aetna to cease pursuit of a potential subrogation claim. Aetna will be entitled to the subrogation/reimbursement fee, which will be calculated based on the full amount of claims paid at the time the Customer settles the file or instructs Aetna to cease pursuit.

The Customer must notify Aetna of its election to terminate the subrogation/reimbursement services provided by Aetna. All claims identified for potential subrogation/reimbursement recovery prior to the date notification of such election is received, including both open subrogation files and matters under investigation, shall be handled to conclusion by Aetna and shall be governed by the terms of this provision. Aetna does not handle new subrogation/reimbursement cases on matters identified after the Customer's termination date.

Master Services Agreement – 868066          64

CONFIDENTIAL

AETNA-KULWICKI_0005192

PRESCRIPTION DRUG SERVICES SCHEDULE F
MASTER SERVICES AGREEMENT MSA- 868066
EFFECTIVE January 1, 2016

This Prescription Drug Services Schedule describes the prescription drug Services being provided by Aetna to Customer, and is effective for the period beginning January 1, 2016 and ending December 31, 2018. Unless otherwise agreed in writing, only the Services selected by the Customer in Prescription Drug Services Fee Schedule will be provided by Aetna. Additional Services may be provided at the Customer's written request under the terms of the Agreement. This Schedule shall supersede any previous document(s) describing the Services.

## I.   SCHEDULE TERM

The term of this Schedule shall be 3 years beginning on the Schedule Effective Date (referred to as the "Agreement Period").

## II.  DEFINITIONS

When used in this Prescription Drug Services Schedule and/or the Prescription Drug Services Fee Schedule, all capitalized terms shall have the following meanings if not already defined in the Agreement:

"Aetna Mail Order Pharmacy" or "Aetna Specialty Pharmacy" means a licensed pharmacy designated by Aetna to provide or arrange for Covered Services to Plan Participants and shall include a subcontractor of its choosing for the purposes of services to be performed under this Schedule and/or the Service and Fee Schedule.

"Average Wholesale Price" or "AWP" means the average wholesale price of a Prescription Drug as identified by Medispan (or other drug pricing service determined by Aetna). The applicable AWP for Prescription Drugs filled in any Participating Pharmacy will be the AWP on the date the drug was dispensed for the 11-digit NDC for the package size from which the drug was actually dispensed as reported to Aetna by such Participating Pharmacy

"Benefit Cost(s)" means the cost of providing Covered Services to Plan Participants and includes amounts paid to Participating Pharmacies and other providers. Benefit Costs do not include Cost Share amounts paid by Plan Participants. Benefit Costs do not include Service Fees. The Benefit Cost includes any Dispensing Fee paid to a Participating Pharmacy or other provider for dispensing covered medications to Plan Participants.

"Benefit Plan Design" means the terms, scope and conditions for Prescription Drug or device benefits under a Plan, including Formularies, exclusions, days or supply limitations, prior authorization or similar requirements, applicable Cost Share, benefit maximums and any other features or specifications as may be included in Plan documents, as communicated by the Customer to Aetna in accordance with any implementation procedures described herein. The Customer shall disclose to Plan Participants any and all matters relating to the Benefit Plan Design that are required by law to be disclosed, including information relating to the calculation of Cost Share or any other amounts that are payable by a Plan Participant in connection with the Benefit Plan Design.

CONFIDENTIAL                                    AETNA-KULWICKI_0005193

**"Brand Drug"** means a Prescription Drug with a proprietary name assigned to it by the manufacturer and distributor. Brand Drug does not include those drugs classified as a Generic Drug hereunder.

**"Calculated** Ingredient Cost" means the lesser of:

a) AWP less the applicable percentage Discount;
b) MAC; or
c) U&C Price.

The Calculated Ingredient Cost does not include the Dispensing Fee or sales tax, if any. The amount of the Calculated Ingredient Cost payable by the Customer is net of the applicable Cost Share.

"Claim" or "Claims" means any electronic or paper request for payment or reimbursement arising from a Participating Pharmacy providing Covered Services to a Plan Participant.

"Compound Prescription" means a Prescription Drug which would require the dispensing pharmacist to produce an extemporaneously produced mixture containing at least one Federal Legend drug, the end product of which is not available in an equivalent commercial form. For purposes of this Schedule, a prescription will not be considered a Compound Drug if it is reconstituted or if the only ingredient added to the prescription is water, alcohol, a sodium chloride solution or other common dilatants.

"Concurrent Drug Utilization Review" or "Concurrent DUR" means the review of drug utilization when an On-Line Claim is processed by Aetna at the point of sale.

"Cost Share" means that portion of the charge for a Prescription Drug or device dispensed to a Plan Participant that is the responsibility of the Plan Participant as provided in the applicable Plan, including coinsurance, copayments, deductibles and penalties, and may be a fixed amount or a percentage of an applicable amount. Cost Share will be calculated on the basis of the rates charged to the Customer by Aetna for Covered Services except as required by law to be otherwise.

"Covered Services" means Prescription Drugs, Specialty Products, over-the-counter medications or other services or supplies that are covered under the terms and conditions set forth in the description of the Plan.

"Discount" means the percentage deduction from AWP that is to be taken into account by Aetna in determining the Calculated Ingredient Cost.

"Dispensing Fee" means an amount agreed by the Customer and Aetna in consideration of the costs associated with a Participating Pharmacy dispensing medication to a Plan Participant.

"DMR Claim" means a direct member (Plan Participant) reimbursement claim.

"Formulary" or "Formularies" means the list(s) of Prescription Drugs and supplies approved by the U.S. Food and Drug Administration ("FDA") developed by Aetna which classifies drugs and supplies for purposes of benefit design and coverage decisions.

"Generic Drug" means a Prescription Drug, whether identified by its chemical, proprietary, or non-proprietary name that (a) is accepted by the U.S. Food and Drug Administration as therapeutically

Master Services Agreement – 868066          66

AETNA-KULWICKI_0005194

equivalent and interchangeable with drugs having an identical amount of the same active ingredient, or (b) is deemed by Aetna to be pharmaceutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient.

"Implementation Credit" if applicable, is a credit provided to the Customer to cover specific costs related to the transition from another vendor to Aetna and further described in the Service and Fee Schedule

"Maximum Allowable Cost" or "MAC" means the cost basis for reimbursement established by Aetna, as modified from time to time, for the same dose and form of Generic Drugs which are included on Aetna's applicable MAC List.

"MAC List(s)" means the lists of MAC payment schedules for Prescription Drugs, devices and supplies identified as readily available as a Generic Drug or generally equivalent to a Brand Drug (in which case the Brand Drug may also be on the MAC List) and developed and maintained or selected by Aetna and that, in each case, are deemed to require or are otherwise capable of pricing management due to the number of drug manufacturers, utilization and/or pricing volatility.

"Mail Order Exception List" means the list of Prescription Drugs established by Aetna that includes Brand Drugs adjudicating as Generic Drugs, trademark Generic Drugs, any Generic Drug that is manufactured by one (1) manufacturer (or multiple manufacturers, for example, in the case of "authorized" Generic Drugs), and any Generic Drug that has an AWP within twenty-five percent (25%) of the AWP of the equivalent Brand Drug. The Mail Order Exception List is subject to change.

"National Drug Code" or "NDC" means a universal product identifier for human drugs. The National Drug Code Query (NDCQ) content is limited to Prescription Drugs and a few selected OTC products. The National Drug Code (NDC) Number is a unique, eleven-digit, three-segment number that identifies the labeler/vendor, product, and trade package size.

"On-Line Claim" means a Claim that (i) meets all applicable requirements, is submitted in the proper timeframe and format, and contains all necessary Information, and (ii) is submitted electronically for payment to Aetna by a Participating Pharmacy as a result of provision of Covered Services to a Plan Participant.

"Participating Pharmacy" means a Participating Retail Pharmacy, Aetna Mail Order Pharmacy or Aetna Specialty Pharmacy.

"Participating Retail Pharmacy" means any licensed retail pharmacy that has entered into an arrangement with Aetna to provide Covered Services to Plan Participants.

"Precertification" means a process under which certain drugs require prior authorization (prior approval) before Plan Participants can obtain them as a covered benefit. The Aetna Pharmacy Management Precertification Unit must receive prior notification from physicians or their authorized agents requesting coverage for medications on the Precertification List.

"Prescriber" means an individual who is appropriately licensed and permitted by law to order drugs that legally require a prescription.

Master Services Agreement – 868066          67

"**Prescription Drug**" means a legend drug that, by law, cannot be sold without a written prescription from an authorized Prescriber. For purposes of this Schedule, insulin, certain supplies, and devices shall be considered a Prescription Drug.

"**Prospective Drug Utilization Review**" or "**Prospective DUR**" means a review of drug utilization that is performed before a prescribed medication is covered under a Plan.

"**Rebates**" shall mean certain monetary distributions made to the Customer by Aetna under the pharmacy benefit and funded from retrospective amounts paid to Aetna (i) pursuant to the terms of an agreement with a pharmaceutical manufacturer, (ii) in consideration for the inclusion of such manufacturer's drug(s) on Aetna's Formulary, and (iii) which are directly related and attributable to, and calculated based upon, the specific and identifiable utilization of certain Prescription Drugs by Plan Participants.

"**Rebate** Guarantee" means the Rebate amount that Aetna guarantees the Customer will receive as set forth in the Service and Fee Schedule.

"**Retrospective Drug Utilization Review**" or "**Retrospective DUR**" means a review of drug utilization that is performed after a Claim for Covered Services is processed.

"**Service and Fee Schedule**" means a document entitled same and incorporated herein by reference setting forth certain guarantees (if applicable), underlying conditions and other financial information relevant to Customer.

"**Single Source Generics**" means those generics having fewer than two FDA-approved Abbreviated New Drug Application (ANDA) manufacturers (not including any "authorized generics"), or alternatively generic drugs for which there is insufficient inventory and/or competition to supply market demand.

"**Specialty Products**" means those injectable and non-injectable Prescription Drugs, other medicines, agents, substances and other therapeutic products that are designated in the Service and Fee Schedule and modified by Aetna from time to time in its sole discretion as Specialty Products on account of their having particular characteristics, including one or more of the following: (i) they address complex, chronic diseases with many associated co-morbidities (e.g., cancer, rheumatoid arthritis, hemophilia, multiple sclerosis), (ii) they require a greater amount of pharmaceutical oversight and clinical monitoring for side effect management and to limit waste, (iii) they have limited pharmaceutical supply chain distribution as determined by the drug's manufacturer and/or (iv) their relative expense.

"**Step-Therapy**" means a type of Precertification under which certain medications will be excluded from coverage unless the Plan Participant tries one or more "prerequisite" drug(s) first, or unless a medical exception for coverage is obtained.

"**Usual and Customary Retail Price**" or "**U&C Price**" means the cash price less all applicable Customer discounts which Participating Pharmacy usually charges customers for providing pharmaceutical services.

"**Wholesale Acquisition Cost**" or "**WAC**" means the wholesale acquisition cost of a prescription drug as listed in the Medispan weekly price updates (or any other similar publication designated by Aetna) received by Aetna.

Master Services Agreement – 868066          68

AETNA-KULWICKI_0005196

## III. CLAIM FIDUCIARY

The Customer and Aetna agree that with respect to Section 503 of the Employee Retirement Income Security Act of 1974, as amended, Aetna will be the "appropriate named fiduciary" of the Plan for the first two levels of appeal for purpose of reviewing denied prescription drug claims under the Plan. The Customer understands that the performance of such fiduciary duties under ERISA necessarily involves the exercise of discretion on Aetna's part in the determination and evaluation of facts and evidence presented in support of any claim or appeal. Therefore, and to the extent not already implied as a matter of law, the Customer hereby delegates to Aetna discretionary authority to determine initial entitlement to benefits under the applicable Plan documents for each claim received, including discretionary authority to determine and evaluate facts and evidence, and discretionary authority to construe the terms of the Plan.

If the denial is upheld in the second level of appeal, Aetna will determine if the appeal is eligible for External Review Organization ("ERO"). If the appeal is eligible for ERO, then Aetna will inform the Plan Participant of his right to appeal to ERO. If the appeal is not eligible for ERO, or if the ERO upholds the denial, then Aetna will inform the Plan Participant of his right to appeal to the Customer for final review. The Customer shall be the "appropriate named fiduciary" of the Plan for the final appeal.

## IV. EXTERNAL REVIEW

The external review process will be conducted by an independent clinical reviewer with appropriate expertise in the area in question. External Review shall be available for certain "Adverse Benefit Determinations" as defined in 29 CFR 2560.503-1 as amended by 26 CFR 54.9815-2712T. It shall also be available for eligible "Final Internal Adverse Benefit Determinations", which is an eligible Adverse Determination that has been upheld by the appropriate named fiduciary (Aetna) at the completion of the internal review process or an Adverse Benefit Determination for which the appeal process has been exhausted. The External Review process shall meet the standards of the Federal Affordable Care Act and utilize a minimum of three accredited Independent Review Organizations. Independent reviewers conduct a de novo review of the information provided to them as part of the External Review process. Both Aetna and the Customer acknowledge that neither Plan Participants nor providers will be penalized for exercising their right to an External Review.

The Customer delegates the sole discretionary authority to make the determination regarding the eligibility for external review, under the Plan, to Aetna.

The Customer acknowledges that the Independent Review Organizations that make the external review decisions are independent contractors and not agents or employees of Aetna, and that Aetna is not responsible for the decision of the Independent Review Organization.

To assist in conducting such external reviews, the Customer agrees to provide Aetna with the current Plan documents, and any revised, amended, or updated versions no later than the date of any revisions, amendments, or updates.

CONFIDENTIAL                                                    AETNA-KULWICKI_0005197

## V.  DEFENSE OF LITIGATION REGARDING BENEFIT DETERMINATIONS

In the event of a legal, administrative or other action arising out of the administration, processing or determination of a claim for Plan benefits, the Party designated in this document as the fiduciary which rendered the decision in the appeal last exercised by the Plan Participant that is being appealed ("Responsible Party") shall undertake the defense of such action at its expense and settle such action when in its reasonable judgment it appears expedient to do so, provided that when Aetna is the Responsible Party, Customer shall have the right of pre-approval in single claim litigation as follows:

For matters for which Aetna (if the Responsible Party) seeks to settle above $50,000, Aetna will consult with and seek settlement authority from the Customer.  Settlement authority will not be unreasonably held.  If Customer does not respond to Aetna's settlement authority request within 20 days, Aetna can settle the matter.  If Customer withholds settlement authority and insists that Aetna continue to defend, Customer will bear the additional defense costs incurred; however, should the ultimate award at trial result in an amount less than what Aetna proposed at settlement, Aetna will be responsible for additional expense costs.

If the other Party is also named as a party to such action, the Responsible Party will defend the other Party PROVIDED the action relates solely and directly to actions or failure to act by the Responsible Party and there is no conflict of interest between the Parties. Customer agrees to pay the amount of Plan benefits included in any judgment or settlement in such action. The other Party shall not be liable for any other part of such judgment or settlement, or any legal expenses or punitive damages, except to the extent provided in section 12 (Indemnification).

In any multi-claim litigation (including arbitration) disputing reimbursement for benefits for more than one Plan Sponsor, the Customer authorizes Aetna to defend and reasonably settle the Customer's benefit claims in such litigation.  Customer shall have the right to audit any settlement after the fact by reviewing non-confidential documents

## VI.  ADMINISTRATIVE SERVICES
Subject to the terms and conditions of this Schedule, the prescription drug Services to be provided by Aetna, as well as certain Customer obligations in connection thereto, are described below.

1.  General Responsibilities and Obligations

a.  Exclusivity
During the term of this Schedule, the Customer shall use Aetna as the exclusive provider of the Benefit Plan Design for Plan Participants covered thereby, including without limitation, for pharmacy claims processing, pharmacy network management, clinical programs, formulary management and rebate management. All terms under this Schedule and on the Service and Fee Schedule are conditioned on Aetna's status as the exclusive provider of the Benefit Plan Design. Any failure by the Customer to comply with this Section shall constitute a material breach of this Schedule and the Agreement.

CONFIDENTIAL                                                                      AETNA-KULWICKI_0005198

2. **Pharmacy** Benefit Management Services

   a. **Pharmacy Claims Processing**

      (i) <u>On-Line Claims Processing</u>. Aetna will perform claims processing services for Covered Services that are provided by a Participating Pharmacy to Plan Participants after the Effective Date, and submitted electronically to Aetna's on-line claims processing system. On-Line Claim processing services shall include confirmation of coverage, performance of drug utilization review activities pursuant to this Schedule, determination of Covered Services, and adjudication of the On-Line Claims.

      (ii) <u>DMR Claims **Processing**</u>. The Plan Participant shall be responsible for the submission of DMR Claims directly to Aetna on such form(s) provided by Aetna within the timeframe specified on the description of Plan benefits. DMR Claims shall be reimbursed by Aetna based on the lesser of: (i) the amount invoiced and indicated on such DMR Claim; or (ii) the amount the Plan Participant is entitled to be reimbursed for such claim pursuant to the description of Plan benefits.

   b. **Pharmacy Network Management**

      (i) <u>Participating Retail Pharmacies</u>. Aetna shall provide notice to the Customer of any deletions of pharmacy providers from Aetna's list of of Participating Retail Pharmacies that may have a material adverse impact on Plan Participants' access to Participating Retail Pharmacies. Aetna shall direct each Participating Retail Pharmacy to (a) verify the Plan Participant's eligibility using Aetna's on-line claims system, and (b) charge and collect the applicable Cost Share from Plan Participants for each Covered Service. Aetna will adjudicate On-Line Claims for Covered Services from Participating Retail Pharmacies using the negotiated rates that Aetna has in place with the applicable Participating Retail Pharmacy.

         A. Aetna shall require each Participating Retail Pharmacy to comply with Aetna's applicable network participation requirements. Aetna does not direct or otherwise exercise any control over the professional judgment exercised by any pharmacist dispensing prescriptions or providing pharmacy services. Participating Retail Pharmacies, including pharmacies owned and operated by Customer, are independent contractors of Aetna and Aetna shall have no liability to the Customer, any Plan Participant or any other person or entity for any act or omission of a Participating Retail Pharmacy or its agents, employees or representatives.

         B. Aetna shall adjudicate each On-Line Claim for services rendered by a Participating Retail Pharmacy at the applicable Discount and Dispensing Fee negotiated between Aetna and the Customer. For the avoidance of doubt, the Benefit Cost paid by the Customer in connection with On-Line Claims for services rendered by Participating Retail Pharmacies may or may not be equal to the Discount and Dispensing Fees negotiated between Aetna and such pharmacies. This is considered "traditional" or "lock in" pricing.

Master Services Agreement – 868066          71

CONFIDENTIAL

AETNA-KULWICKI_0005199

C. **Aetna** shall adjudicate each On-Line Claim for services rendered by a Customer-owned **pharmacy** at **the** applicable pass through pricing arrangement plus the $1.50 **administration fee.** This is considered "transparent" or "pass through" pricing. . Claims **for** Non-Customer-owned Participating Retail Pharmacies shall be adjudicated at the **applicable** lock-in pricing.

(ii) <u>Aetna Mail Order Pharmacy</u>. Aetna shall make available information regarding how Plan Participants **may access** and use the Aetna Mail Order Pharmacy on its internet website and via its member services call center. The Aetna Mail Order Pharmacy shall verify the Plan Participant's eligibility using Aetna's on-line claims system, and shall charge and collect the applicable Cost Share from Plan Participants for each Covered Service. The Aetna Mail Order Pharmacy generally will require that medications and supplies be dispensed in quantities not to exceed a 90-day supply, unless otherwise specified in the description of Plan benefits. If the prescription and applicable law do not prohibit substitution of a Generic Drug equivalent, if any, for the prescribed drug, or if the Aetna Mail Order Pharmacy obtains consent of the Prescriber, the Aetna Mail Order Pharmacy shall require that the Generic Drug equivalent be dispensed to the Plan Participant. Certain Specialty Products, some acute drug products or certain compounds cannot be ordered through the Aetna Mail Order Pharmacy. The Aetna Mail Order Pharmacy shall make refill reminder and on-line ordering services available to Plan Participants. Aetna and/or the Aetna Mail Order Pharmacy may promote the use of the Aetna Mail Order Pharmacy to Plan Participants through informational mailings, coupons or other financial incentives at Aetna's and/or the Aetna Mail Order Pharmacy's cost, unless otherwise agreed upon by Aetna and the Customer.

(iii) <u>Aetna Specialty Pharmacy</u>. Aetna shall make available information regarding how Plan Participants may access and use the Aetna Specialty Pharmacy on its internet website and via its member services call center. The Aetna Specialty Pharmacy shall verify the Plan Participant's eligibility using Aetna's on-line claims system, and shall charge and collect the applicable Cost Share from Plan Participants for each Covered Service. The Aetna Specialty Pharmacy generally will require that Specialty Drug medications and supplies be dispensed in quantities not to exceed a 30-day supply, unless otherwise specified in the description of Plan benefits. If the prescription and applicable law do not prohibit substitution of a Generic Drug equivalent, if any, to the prescribed drug, or if the Aetna Specialty Pharmacy obtains consent of the Prescriber, the Aetna Specialty Pharmacy shall require that the Generic Drug equivalent be dispensed to the Plan Participant. The Aetna Specialty Pharmacy shall make refill reminder services available to Plan Participants. Aetna and/or the Aetna Specialty Pharmacy may promote the use of the Aetna Specialty Pharmacy to Plan Participants through informational mailings, coupons or other financial incentives at Aetna's and/or the Aetna Specialty Pharmacy's cost, unless otherwise agreed upon by Aetna and the Customer. Further information regarding Specialty Product pricing and limitations is provided in the Service and Fee Schedule.

CONFIDENTIAL                                                                AETNA-KULWICKI_0005200

3. **Clinical Programs**

(i).    <u>Formulary</u> <u>Management</u>. Aetna offers several versions of Formulary options. The Formulary options implemented will be determined and communicated prior to the implementation date. Aetna grants the Customer the right to use the Formulary during the term of this Schedule solely in connection with the Plan, and to distribute or make the Formulary available to Plan Participants. The Customer acknowledges and agrees that it has sole discretion and authority to accept or reject the Formulary for the Plan. The Customer further acknowledges and agrees that the Formulary is subject to change at Aetna's sole discretion as a result of a variety of factors, including without limitation, market conditions, clinical information, cost, rebates and other factors. The Customer also acknowledges and agrees that the Formulary is the Business Confidential Information of Aetna and is subject to the requirements set forth in this Schedule and the Agreement.

(ii)    Prospective Drug Utilization Review Services. Aetna shall implement and administer as specified in the description of Plan benefits the Prospective DUR program, which may include Precertification and Step-Therapy programs and other Aetna standard Prospective DUR programs, with respect to On-Line Claims. Under these programs, Plan Participants must meet standard Aetna clinical criteria before coverage of the Prescription Drugs included in the program will be authorized; provided, however, the Customer authorizes Aetna to approve coverage of drugs for uses that do not meet applicable clinical criteria in the event of complications, co-morbidities and other factors that are not specifically addressed in such criteria. Aetna shall perform exception reviews and authorize coverage overrides when appropriate for such programs, and other benefit exclusions and limitations. In performing such reviews, Aetna may rely solely on diagnosis and other information concerning the Plan Participant deemed credible and supplied to Aetna by the requesting provider, applicable clinical criteria and other information relevant or necessary to perform the review.

(iii)   <u>Concurrent Drug Utilization Review Services</u> . Aetna shall implement and administer as specified in the description of Plan benefits its standard Concurrent DUR programs with respect to On-Line Claims. Aetna's Concurrent DUR programs help Participating Pharmacies to identify potential drug interactions, duplicate drug therapy and other circumstances where prescriptions may be clinically inappropriate for Plan Participants. Aetna's Concurrent DUR programs are educational programs that are based on available clinical literature. Aetna's Concurrent DUR programs are administered using information submitted to and available in Aetna's on-line claims system, as well as On-Line Claims information submitted by the Participating Pharmacy.

(iv)   <u>Retrospective Drug Utilization Review Services</u>. Aetna shall implement and administer as specified in the description of Plan benefits its standard Retrospective DUR programs with respect to On-Line Claims. Aetna's Retrospective DUR programs are designed to help providers and Plan Participants identify circumstances where prescription drug therapy may be clinically inappropriate or other cost-effective drug alternatives may be available. Aetna's Retrospective DUR programs are educational programs and program results may be communicated to Plan Participants, providers and plan sponsors. Aetna's Retrospective DUR programs are administered using information submitted to and available in Aetna's On-Line Claims system, as well as On-Line Claims information submitted by the Participating Pharmacy.

CONFIDENTIAL                                                      AETNA-KULWICKI_0005201

(v) <u>Aetna Rx Check Program (Not Currently Included)</u>. If purchased by the Customer as indicated on the Service and Fee Schedule, Aetna shall administer the Aetna Rx Check Program. Aetna Rx Check programs use a rapid **Retrospective** DUR approach. Claims are systematically **analyzed**, often within 24 hours of adjudication, for possible physician outreach based on **program** algorithms. The specific outreach programs are designed to promote quality, cost-effective care in accordance with accepted clinical guidelines through mailings or **telephone** calls to physicians and Plan Participants.

Aetna Rx Check will analyze Claims on a daily basis, identify potential opportunities for quality and cost improvements, and will notify physicians or Plan Participants of those opportunities. The physician-based Aetna Rx Check programs will identify:

* Certain medications that may duplicate each other's effect;
* Certain drug to drug interactions;
* Multiple prescriptions and/or Prescribers for certain medications with the    potential for misuse;
* Prescriptions for a multiple daily dose of a targeted Prescription Drug when symptoms might be controlled with a once-daily dosing; and
* Plan Participants who have filled prescriptions for brand-new medications that have an A-rated generic equivalent available that could save Plan Participants money.

Another Aetna Rx Check program will notify Plan Participants in selected plans with mail-order drug benefits when they can save money by filling maintenance prescriptions at Aetna Rx Home Delivery versus filling prescriptions at a Participating Retail Pharmacy.

(vi) <u>Save-A-Copay</u><sup>SM</sup> (Not Currently Included): If included as indicated on the Service and Fee Schedule, Aetna shall administer the Save-A-Copay program. Aetna's Save-A-Copay program is designed to encourage Plan Participants to use Generic Drugs, where appropriate and with the approval of their physician. If Plan Participants switch to a generic alternative from a brand-name product, the Plan Participant Cost Share is reduced for a three month period. In such circumstances, the Customer incurs an additional cost for such Claim equal to the amount the Cost Share is reduced.

(vii) <u>Disease Management Educational Program</u> (Not Currently Included):. If purchased by the Customer as indicated on the Service and Fee Schedule, Aetna shall administer the Disease Management Educational Program. The Disease Management Educational Program is available to customers who purchase Aetna managed prescription drug benefit management services, but not Aetna medical benefit plan services. The program consists of Plan Participant identification and outreach based on active Claims analysis for targeted risk conditions, such as asthma and diabetes. Upon identification, Plan Participants will receive a welcome kit introducing the program, complete with important information including educational materials and resources. The Customer may choose either the Asthma or Diabetes program or a combination of the two programs.

Master Services Agreement – 868066          74

                                                          AETNA-KULWICKI_0005202

(viii) <u>Aetna Rx Step®</u> (Not Currently Included):. If included as indicated on the Service and Fee Schedule, Aetna Rx Step steers Plan Participants to preferred products within 13 key drug classes that have significant savings opportunities. The Customer will have the option to select all of the 13 of these drug classes, or just choose which of the 13 they want. The goal is to help keep members safe and save money, when possible.

(ix) <u>Aetna Rx Healthy Outcomes</u> (Not Currently Included): . If purchased by the Customer as indicated on the Service and Fee Schedule, Aetna Rx Healthy Outcomes is designed to promote drug adherence and sustained positive health outcomes for Plan Participants who survive an Acute Myocardial Infarction (heart attack), Coronary Artery Stent Placement or Acute coronary syndrome.

(x) <u>Aetna Healthy Actions</u><sup>SM</sup> <u>Rx Savings</u> (Not Currently Included). If purchased by the Customer as indicated on the Service and Fee Schedule, the Aetna Healthy Actions Rx Savings program helps to reduce a Plan Participant's cost share for certain prescription drugs and can include outreach to Plan Participants and prescribing doctor to help promote adherence. It targets drugs for which compliance has been found to be most critical to realize cost savings for Plan Participants and plan sponsors. The targeted drugs treat certain chronic conditions such as diabetes, hypertension, and asthma.

(xi) <u>Disclaimer Regarding Clinical Programs</u>. Aetna's clinical programs do not dictate or control providers' decisions regarding the treatment of care of Plan Participants. Aetna assumes no liability from the Customer or any other person in connection with these programs, including the failure of a program to identify or prevent the use of drugs that result in injury to a Plan Participant.

4.  **Plan Participant Services and Programs**

Internet services including Aetna Navigator and Aetna Pharmacy Website.

Through Aetna Navigator, Plan Participants have access to the following:

*   Estimating the cost of Prescription Drugs (Price a Drug<sup>SM</sup>).
*   Prescription Comparison Tool – Compares the estimated cost of filling prescriptions at a Participating Retail Pharmacy to Aetna's Rx Home Delivery mail-order prescription service.
*   Preferred Drug List – Available for Plan Participants who wish to review prescribed medications to verify if any additional coverage requirements apply.
*   View drug alternatives for medications not on the Preferred Drug List.
*   Claim information and EOBs.

Master Services Agreement – 868066          75

AETNA-KULWICKI_0005203

**Through** the Aetna Pharmacy website, Plan Participants have access to the following:

- Find-A-Pharmacy – This service helps locate an Aetna participating chain or independent pharmacy on hundreds of medications and herbal remedies.
- Tips on drug safety and prevention of drug interactions.
- Answers to commonly asked questions about prescription drug benefits and access to educational videos.
- **Preferred Drug List** and Generic Substitution List.
- **Step Therapy List.**

S.  **Rebate Administration**

(i)  The Customer acknowledges that Aetna contracts for its own account with pharmaceutical manufacturers to obtain Rebates attributable to the utilization of certain prescription products by Plan Participants who receive benefits from customers for whom Aetna provides pharmacy benefit management services. Subject to the terms and conditions set forth in this Schedule, including without limitation, Aetna may pay to the Customer, Rebates based on the utilization by Plan Participants of rebateable Prescription Drugs administered and paid through the Plan Participant's pharmacy benefits.

(ii)  If the Customer is eligible to receive Rebates under this Schedule, the Customer acknowledges and agrees that Aetna shall retain the interest (if any) on, or the time value of, any Rebates received by Aetna prior to Aetna's payment of such Rebates to the Customer in accordance with this Schedule. Aetna may delay payment of Rebates to the Customer to allow for final adjustments or reconciliation of Service Fees or other amounts owed by the Customer upon termination of this Schedule.

(iii)  If the Customer is eligible to receive a portion of Rebates under this Schedule, the Customer acknowledges and agrees that such eligibility under paragraphs i. and ii. above shall be subject to the Customer's and its affiliates', representatives' and agents' compliance with the terms of this Schedule, including without limitation, the following requirements:

- Election of, and compliance with, Aetna's Formulary;

- Adoption of and conformance to certain benefit plan design requirements related to the Formulary as described in Service and Fee Schedule; and

- Compliance with other generally applicable requirements for participation in Aetna's rebate program, as communicated by Aetna to the Customer from time to time.

The Customer further acknowledges and agrees that if it is eligible to receive a portion of Rebates under this Schedule, such eligibility shall be subject to the condition that the Customer, its affiliates, representatives and agents do not contract directly or indirectly with any other person or entity for discounts, utilization limits, Rebates or other financial incentives on pharmaceutical products or formulary programs for Claims processed by Aetna pursuant to this Agreement, without the prior written consent of Aetna. Without limiting Aetna's right to other remedies, failure by the Customer to obtain Aetna's prior written consent in accordance with

Master Services Agreement – 868066          76

the immediately preceding sentence shall constitute a material breach of the Agreement, entitling Aetna to (a) suspend payment of Rebates hereunder and to renegotiate the terms and conditions of this Agreement, and/or (b) immediately withhold any Rebates earned by, but not yet paid to, the Customer as necessary to prevent duplicative Rebates on such drugs.

## VII. IMPORTANT INFORMATION ABOUT THE PHARMACY BENEFIT MANAGEMENT SERVICES

1. The Customer acknowledges that Aetna contracts for its own account with pharmaceutical manufacturers to obtain Prescription Drug Formulary Rebates directly attributable to the utilization of certain Prescription Drugs by Plan Participants who receive Covered Services. The Rebate amounts negotiated by Aetna with pharmaceutical manufacturers vary based on several factors, including the volume of utilization, benefit plan design, and Formulary or preferred coverage terms. Aetna may offer the Customer an amount of Rebates on Prescription Drugs that are administered and paid through the Plan Participant's pharmacy benefit. These Rebates are earned when members use drugs listed on Aetna's Formulary and preferred Specialty Products. Aetna determines each customer's Rebates based on actual Plan Participant utilization of those Formulary and preferred Specialty Products for which Aetna also has manufacturer Rebate contracts. The amount of Rebates will be determined in accordance with the terms set forth in the Customer's Pharmacy Service and Fee Schedule.

Rebates for Specialty Products that are administered and paid through the Plan Participant's medical benefit rather than the Plan Participant's pharmacy benefit will be retained by Aetna as compensation for Aetna's efforts in administering the preferred Specialty Products program. Pharmaceutical rebates earned on Prescription Drugs and Specialty Products administered and paid through the Plan Participant's pharmacy benefits represent the great majority of Rebates.

A report indicating the Plan's Rebate payments, broken down by calendar quarter, is included with each remittance received under the program, and is also available upon request. Remittances are distributed as outlined in the Prescription Drug Service and Fee Schedule. Interest (if any) received by Aetna prior to allocation to eligible self-funded customers is retained by Aetna.

Material changes to the Plan that impacting administration, utilization or demographics may impact Rebate projections and actual Rebates received. Aetna reserves the right to terminate or change this program prior to the end of any Agreement Period for which it is offered if: (a) there is any legal, legislative or regulatory action that materially affects or could affect the manner in which Aetna conducts its Rebate program; (b) any material manufacturer Rebate contracts with Aetna are terminated or modified in whole or in part; or (c) the Rebates actually received under any material manufacturer Rebate contract are less than the level of Rebates assumed by Aetna for the applicable Agreement Period. If there is any legal action, law or regulation that prohibits, or could prohibit, the continuance of the Rebate program, or an existing law is interpreted to prohibit the program, the program shall terminate automatically as to the state or jurisdiction of such law or regulation on the effective date of such law, regulation or interpretation.

Master Services Agreement – 868066          77

2.  The Customer acknowledges that from time to time, Aetna receives other payments from Prescription Drug manufacturers and other organizations that are not Prescription Drug Formulary Rebates and which are paid separately to Aetna or designated third parties (e.g., mailing vendors, printers). These payments are to reimburse Aetna for the cost of various educational programs. These programs are designed to reinforce Aetna's goals of maintaining access to quality, affordable health care for Plan Participants and the Customer. These goals are typically accomplished by educating physicians and Plan Participants about established clinical guidelines, disease management, appropriate and cost-effective therapies, and other information. Aetna may also receive payments from Prescription Drug manufacturers and other organizations that are not Prescription Drug Formulary Rebates as compensation for bona fide services it performs, such as the analysis or provision of aggregated information regarding utilization of health care services and the administration of therapy or disease management programs.

    These other payments are unrelated to the Prescription Drug Formulary Rebate arrangements, and serve educational as well as other functions. Consequently, these payments are not considered Rebates, and are not included in the Rebates provided to the Customer, if any.

3.  The Customer acknowledges that in evaluating clinically and therapeutically similar Prescription Drugs for selection for the Formulary, Aetna reviews the costs of Prescription Drugs and takes into account Rebates negotiated between Aetna and Prescription Drug manufacturers. Consequently, a Prescription Drug may be included on the Formulary that is more expensive than a non-Formulary alternative before any Rebates Aetna may receive from a Prescription Drug manufacturer are taken into account. In addition, certain Prescription Drugs may be chosen for Formulary status because of their clinical or therapeutic advantages or level of acceptance among physicians even though they cost more than non-Formulary alternatives. The net cost to the Customer for Covered Services will vary based on: (i) the terms of Aetna's arrangements with Participating Pharmacies; (ii) the amount of the Cost Share obligation under the terms of the Plan; and (iii) the amount, if any, of Rebates to which the Customer is entitled under this Schedule and Service and Fee Schedule. As a result, the Customer's actual claim expense per prescription for a particular Formulary Prescription Drug may in some circumstances be higher than for a non-Formulary alternative.

    In Plans with Cost Share tiers, use of Formulary Prescription Drugs generally will result in lower costs to Plan Participants. However, where the Plan utilizes a Cost Share calculated on a percentage basis, there could be some circumstances in which a Formulary Prescription Drug would cost the Plan Participant more than a non-Formulary Prescription Drug because: (i) the negotiated Participating Pharmacy payment rate for the Formulary Prescription Drug may be more than the negotiated Participating Pharmacy payment rate for the non-Formulary Prescription Drug; and (ii) Rebates received by Aetna from Prescription Drug manufacturers are not reflected in the cost of a Prescription Drug obtained by a Plan Participant.

4.  The Customer acknowledges that Aetna contracts with Participating Retail Pharmacies directly or through a pharmacy benefit management ("PBM") subcontract to provide the Customer and Plan Participants with access to Covered Services. The prices negotiated and paid by Aetna or PBM to Participating Retail Pharmacies vary among Participating Retail Pharmacies in Aetna's network, and can vary from one pharmacy product, plan or network to another. Under this Schedule and Service and Fee Schedule, the Customer and Aetna have negotiated and agreed upon a uniform or "lock-in" price to be paid by the Customer for all claims for Covered Services dispensed by Participating Retail Pharmacies.

Master Services Agreement – 868066          78

AETNA-KULWICKI_0005206

This uniform price may exceed or be less than the actual price negotiated and paid by Aetna to the Participating Retail Pharmacy or PBM for dispensing Covered Services. Where the uniform price exceeds the actual price negotiated and paid by Aetna to the Participating Retail Pharmacy or PBM for dispensing Covered Services, Aetna realizes a positive margin. In cases where the uniform price is lower than the actual price negotiated and paid by Aetna to the Participating Retail Pharmacy or PBM for dispensing Covered Services, Aetna realizes a negative margin. Overall, lock-in pricing arrangements result in a positive margin for Aetna. Such margin is retained by Aetna in addition to any other fees, charges or other amounts agreed upon by Aetna and the Customer, as compensation for the pharmacy benefit management services Aetna provides to the Customer. Also, when Aetna receives payment from the Customer before payment to a Participating Pharmacy or the PBM, Aetna retains the benefit of the use of the funds between these payments.

5.  The Customer acknowledges that Covered Services under a Plan may be provided by Aetna Mail Order Pharmacy and Aetna Specialty Pharmacy. In such circumstances, Aetna Mail Order Pharmacy refers to Aetna Rx Home Delivery, LLC, and Aetna Specialty Pharmacy refers to Aetna Specialty Pharmacy, LLC, both of which are subsidiaries of Aetna that are licensed Participating Pharmacies. Aetna's negotiated reimbursement rates with Aetna Mail Order Pharmacy and Aetna Specialty Pharmacy, which are the rates made available to the Customer, generally are higher than the pharmacies' cost of fulfilling orders of Prescription Drugs and Specialty Products and providing Covered Services and therefore these pharmacies realize an overall positive margin for the Covered Services they provide. To the extent Aetna Mail Order Pharmacy and Aetna Specialty Pharmacy purchase Prescription Drugs and Specialty Products for their own account, the cost therefor takes into account both up-front and retrospective purchase discounts, credits and other amounts that they may receive from wholesalers, manufacturers, suppliers and distributors. Such purchase discounts, credits and other amounts are negotiated by Aetna Mail Order Pharmacy, Aetna Specialty Pharmacy or their affiliates for their own account and are not considered Rebates paid to Aetna by manufacturers in connection with Aetna's Rebate program.

6.  The Customer acknowledges that Aetna generally pays Participating Pharmacies (either directly or through PBM) for Brand Drugs whose patents have expired and their Generic Drug equivalents at a single, fixed price established by Aetna ("Maximum Allowable Cost" or "MAC"). MAC pricing is designed to help promote appropriate, cost-effective dispensing by encouraging Participating Pharmacies to dispense equivalent Generic Drugs where clinically appropriate. When a Brand Drug patent expires and one or more generic alternatives first become available, the price for the Generic Drug(s) may not be significantly less than the price for the Brand Drug. Aetna reviews the drugs to determine whether to pay Participating Pharmacies (or PBM) based on MAC or continue to pay Participating Pharmacies (or PBM) on a discounted fee-for-service basis, typically a percentage discount off of the listed Average Wholesale Price of the drug (AWP Discount). This determination is based in part on a comparison under both the MAC and AWP Discount methodologies of the relative pricing of the Brand and Generic Drugs, taking into account any Rebates Aetna may receive from Prescription Drug manufacturers in connection with the Brand Drug. If Aetna determines that under AWP Discount pricing the Brand Drug is less expensive (after taking into account manufacturer Rebates Aetna receives) than the generic alternative(s), Aetna may elect not to establish a MAC price for such Prescription Drugs and continue to pay Participating Pharmacies (or PBM) according to an AWP Discount.

Master Services Agreement – 868066          79

AETNA-KULWICKI_0005207

In some circumstances, a decision not to establish a MAC price for a Brand Drug and its generic equivalents dispensed by Participating Pharmacies could mean that the cost of such Prescription Drugs for the Customer is not reduced. In addition, there may be some circumstances where the Customer could incur higher costs for a specific Generic Drug ordered through Aetna Mail Order Pharmacy than if such Generic Drug were dispensed by a Participating Retail Pharmacy. These situations may result from: (i) the terms of Aetna's arrangements with Participating Pharmacies (or PBM); (ii) the amount of the Cost Share; (iii) reduced retail prices and/or discounts offered by Participating Pharmacies to patients; and (iv) the amount, if any, of Rebates to which the Customer is entitled under the Schedule and the Service and Fee Schedule.

Prescription Drugs falling within the definition of the Mail Order Exceptions List may be excluded from the reconciliation of its standard pharmacy Discount and Dispensing Fee financial guarantees.

## VIII. AUDIT RIGHTS

1. **General Pharmacy Audit Terms and Conditions**

   a. Subject to the terms and conditions set forth in the Agreement and disclosures made in the Prescription Drug Service and Fee Schedule, the Customer shall be entitled to have audits performed on its behalf (hereinafter "**Pharmacy Audits**") to verify that Aetna has (a) processed Claims submitted by participating pharmacies or a pharmacy benefits manager under contract with Aetna, (b) paid Rebates in accordance with this Schedule and the Service and Fee Schedule. Pharmacy Audits may be performed at Aetna's Minnetonka, MN or Hartford, CT location.

   b. Additional Terms and Conditions

      (i) Auditor Qualifications and Requirements specific to Pharmacy Audits

      All Pharmacy Audits shall be performed solely by third party auditors meeting the qualifications and requirements of the Agreement, this Schedule and the Service and Fee Schedule. An auditor must not have "conflict of interest" with Aetna, which for purposes of this Section VII. shall mean a representative that (i) is an entity that provides the same types of services to other entities as the Services; (ii) was an employee of Aetna in the prior twelve (12) months; or (iii) is a subsidiary or affiliate of a vendor that subcontracts with Aetna to provide the Services. Neither the Customer nor its representative may make or retain any record of provider discounts or information concerning treatment of drug or alcohol abuse, mental/nervous, HIV/AIDs or genetic markers.

      Auditors may not be compensated on the basis of a contingency fee or a percentage of overpayments identified, in accordance with the provisions of Section 8.207 through 8.209 of the International Federation of Accountant's (IFAC) Code of Ethics For Professional Accountants (Revised 2004).

      All Pharmacy Audits shall be performed solely by third party auditors meeting the qualifications and requirements of the Agreement, this Schedule and the Service and Fee Schedule. An auditor

CONFIDENTIAL

AETNA-KULWICKI_0005208

must not have "conflict of interest" with Aetna, which for purposes of this Section VII. shall mean a representative that (i) is an entity that provides the same types of services to other entities as the Services; (ii) was an employee of Aetna in the prior twelve (12) months; or (iii) is a subsidiary or affiliate of a vendor that subcontracts with Aetna to provide the Services . Neither the Customer nor its representative may make or retain any record of provider discounts or information concerning treatment of drug or alcohol abuse, mental/nervous, HIV/AIDs or genetic markers.

Auditors may not be compensated on the basis of a contingency fee or a percentage of overpayments identified, in accordance with the provisions of Section 8.207 through 8.209 of the International Federation of Accountant's (IFAC) Code of Ethics For Professional Accountants (Revised 2004).

(ii) <u>Auditor Qualifications and Requirements specific to Rebate Audits</u>. Any audit of Aetna's Agreements with pharmaceutical manufacturers will be conducted by (a) one of the major public accounting firms (currently the "Big 4") approved by Aetna whose audit department is a separate standalone function of its business, or (b) a national firm approved by Aetna whose audit departments  is a standalone function of its business. In the case of either (a) or (b), Aetna's approval will not be unreasonably withheld.

(iii) Closing Meeting

In the event that Aetna and the Customer's auditors are unable to resolve any disagreement regarding draft Pharmacy Audit findings, either Aetna or the Customer shall have the right to refer such dispute to an independent third-party auditor meeting the requirements of the Agreement, this section VII and the Service and Fee Schedule and selected by mutual agreement of Aetna and the Customer. The parties shall bear equally the fees and charges of any such independent third-party auditor, provided however that if such auditor determines that Aetna or the Customer's auditor is correct, the non-prevailing party shall bear all fees and charges of such auditor. The determination by any such independent third-party auditor shall be final and binding upon the parties, absent manifest error, and shall be reflected in the final Pharmacy Audit report.

2.  **Additional Claim and Rebate Audit Terms and Conditions**

   a   Rebate Audits

   Subject to the terms and limitations of this Schedule, the Agreement, and the Service and Fee Schedule including without limitation the general Pharmacy Audit terms and conditions set forth in this section VIII, the Customer shall be entitled to audit Aetna's calculation of Rebates received by the Customer as set forth below. Aetna will share the relevant portions of the applicable formulary rebate contracts, including the manufacturer names, drug names and rebate percentages for the drugs being audited. The drugs to be audited will be selected by mutual agreement of the Parties. The Parties will reasonably cooperate to select drugs for each audit that (a) represent the fewest

Master Services Agreement – 868066          81

unique manufacturer rebate contracts required for audit so that the selected drugs represent a maximum of 15% of the Customer's Rebates that are attributable to the drugs most highly utilized by Plan Participants; (b) shall be limited to (two) 2 consecutive quarters; and (c) are subject to manufacturer rebate agreements that do not contain restrictions prohibiting Aetna from disclosing to the Customer portions of such contracts concerning the rebates, payments or fees payable there under. Aetna will also provide access to all documents reasonably necessary to verify that Rebates have been invoiced, calculated, and paid by Aetna in accordance with this Schedule. The Customer is entitled to only one annual Rebate audit. Prior to the commencement of such audit, the Customer and auditor shall enter into a rebate audit confidentiality agreement acceptable to Aetna.

b. **Pharmacy Claim Audits.** Claim audits are subject to the above referenced audit standards for Rebates in the case of a physical, on-site, Claim-based audit. In the case of electronic Claim audits that follow standard pharmacy benefit audit practices where electronic re-adjudication of Claims is requested and processed off-site, the Customer may elect to audit 100% of claims. The Customer is entitled to only one annual Claim audit.

Master Services Agreement – 868066          82

AETNA-KULWICKI_0005210

## PERFORMANCE GUARANTEES SCHEDULE G

### MASTER SERVICES AGREEMENT MSA- 868066
### EFFECTIVE January 1, 2016

Aetna has agreed to provide the performance guarantees that are set forth in Attachment 1 and Attachment 2 to this Performance Guarantees Schedule. All references to "we" in the Attachments shall mean "Aetna," and all references to "you," "your" or "WellStar Health System" shall mean "Customer."

### Schedule G - Attachment 1 – Medical Performance Guarantees

**General Performance Guarantee Provisions**

Aetna Life Insurance Company, on behalf of itself and its affiliates ("Aetna", "our" or "we") provides health benefits administration and other services (set forth in this document) for the self-funded Medical and Behavioral Health plan(s) operated on behalf of WellStar Health System (also "you" or "your").

*Guarantee Period*

Each year that the Agreement is effective is referred to herein as a "Guarantee Period." Each Guarantee Period shall have performance guarantees for the performance categories that are described in the "Performance Objectives" section, or as revised by the Parties by mutual agreement. The "Maximum Fees at Risk" that are set forth in the "Performance Objectives" will be effective for the Guarantee Period that is the 12-month period from January 1, 2016 through December 31, 2016. Prior to each anniversary of the effective date of the Agreement, the Parties shall meet and confer regarding changes to the "Maximum Fees at Risk" for each performance category to be effective on the anniversary of the Agreement. If the Parties are unable to agree on a revision to the fee that will be at risk for any one or more performance category, the Maximum Fee at Risk for following Guarantee Period shall default to the amount at risk in 2016 for that performance category. The performance guarantees below will apply to the following self-funded medical plans serviced under the Administrative Services Only arrangement (through a 'Services Agreement' or 'Master Services Agreement', as the case may be, but each from this point on referred to as "Agreement").

- Aetna Choice POS II (CPII)
- Behavioral Health

These guarantees do not apply to non-Aetna benefits or non-Aetna networks.

If we process runoff claims upon termination of the Agreement, the Turnaround Time, Financial Accuracy, Payment Incidence Accuracy, and/or Total Claim Accuracy performance guarantees will not apply to runoff claims.

CONFIDENTIAL

**Medical Service Guarantee Maximum**

The maximum medical service performance guarantee penalty adjustment will be equal to **25.0 percent of** actual collected administrative service fees. Administrative service fees at risk exclude:

- Implementation/Communication Allowance(s)
- Charges for services performed which are not included on the monthly administrative service fee bill

**Aggregate Guarantee Maximum**

In no event will total collected administrative service fees be adjusted by more than **25.0 percent** due to the results of this guarantee and all other guarantees combined. "Collected fees" means those fees collected for the guarantee period as of the time of the final reconciliation of the guarantee.

**Termination Provisions**

Termination of the guarantee obligations shall become effective upon written notice by us in the event of one of the following occurrences:

i.   A material change in the plan initiated by WellStar Health System or by legislative action that impacts the claim adjudication process, member service functions or network management

ii.  Failure of WellStar Health System to meet its obligations to remit administrative service fees or fund claim payment wires under the Agreement

iii. Failure of WellStar Health System to meet their administrative responsibilities (for example, a submission of incorrect or incomplete eligibility information)

These guarantees will not apply if you terminate your Aetna medical plan in whole or in part (defined as a 50 percent or greater membership reduction from the membership we assumed in this proposal) prior to the end of the guarantee period (December 31, 2016).

**Refund Process**

We will provide you with final results for the performance guarantees when reporting is available after the end of the respective guarantee period. If necessary, we will provide a "lump sum" refund for any penalties we incurred.

Master Services Agreement – 868066          84

*Performance Objectives*

We believe that measuring the activities described below is an important indicator of how well we service your account. We're confident that the Claim Administration and Member Services provided to you will meet your high standards of performance. To reinforce your confidence in our ability to administer your program, we are offering guarantees in the following areas:

(Note: WellStar may reallocate a mutually agreeable percentage at risk to align with their needs in the specific year (i.e., if not implementation, implementation dollars at risk can move to other categories.)

| Performance Category | Minimum Standard | Maximum Fees at Risk |
|---|---|---|
| **Implementation** | | |
| • Implementation | Average evaluation score of 3.0 or higher | 2.0% |
| • ID Card Production & Distribution | 97.0% of ID cards mailed within 10-14 business days of receiving eligibility file | 2.0% |
| **Account Management** | | |
| • Overall Account Management | Average evaluation score of 3.0 or higher | 2.0% |
| • Management Reports | Paid claim reports within 45 days; Incurred claim reports within 90 days | 2.0% |
| **Plan Sponsor Services** | | |
| • Eligibility Updates | 97.0% within 2 business days, 100.0% within 5 business days | 2.0% |
| **Claim Administration** | | |
| • Turnaround Time | 90.0% of claims processed within 14 *calendar* days | 2.0% |
| • Claim Turnaround Time Tier II | 98% of claims processed within 30 calendar days | 1.0% |
| • Financial Accuracy | 99.0% | 2.0% |
| • Payment Incidence Accuracy | 97.0% | 1.0% |
| • Total Claim Accuracy | 96.0% | 1.0% |
| • Overpayment Rate | 85.0% of overpaid dollars recovered within 90 days of discovery. | 1.0% |
| **Member Satisfaction** | Positive response rate of 80.0% or higher | 2.0% |
| **Member Services** | | |
| • Average Speed of Answer | 30 Seconds | 1.0% |
| • Abandonment Rate | 1.5% | 1.0% |
| • First Call Resolution | 93.0% | 1.0% |
| • Telephone Call Quality | 97.0% | 1.0% |
| • Members Appeal Resolution Turnaround Time | At least 98.0% compliance with DOL timeliness requirements | 1.0% |
| **Total** | | 25.0% |

Master Services Agreement – 868066         85

### _Implementation_

#### _Overall Implementation Guarantee_

**Guarantee:** We utilize the implementation team concept to carefully coordinate all aspects of the implementation. An Implementation Manager is assigned to assemble your implementation team and develop an Implementation Management Plan for the conversion to the new plan of benefits. The Implementation Management Plan will outline the tasks and target dates for their completion.

Working with your team, the Implementation Manager will help determine the implementation priorities. As new information becomes available and priorities change, the Implementation Management Plan is updated. However, for the implementation to progress in a timely manner, you will be responsible for providing key information to the Implementation Manager as close to the target dates as possible (e.g., finalized account structure, finalized plan of benefits, accurate eligibility files, signed legal agreements).

This guarantee is effective for the implementation period in the first guarantee period. The implementation period begins at the initial implementation meeting and runs through the implementation sign-off.

**Penalty and Measurement Criteria:** Via timely responses to the attached Implementation Evaluation Tool (provided at the end of this guarantee section), you agree to make us aware of possible sources of dissatisfaction throughout the implementation period. Each question is given a rating of 1 - 5 with 1 = lowest, 5 = highest. We will tally the results from the evaluation tool when received. Your responses to the attached evaluation tool are used to facilitate a discussion between you, your Implementation Manager and your Account Executive regarding the results achieved. If the Implementation Evaluation Tool is not completed and returned within 30 days of receipt, it is assumed that the service provided to you is satisfactory and the guarantee is deemed met. If, at the end of the implementation process, the score of the final evaluation falls below a 3.0, (meaning that service levels have not improved) we will make a mutually agreed upon reduction in compensation. The maximum reduction will be 2.0 percent of the guarantee period administrative service fees.

#### _ID Card Production and Distribution_

**Guarantee:** We guarantee that 97.0 percent of ID cards will be produced and mailed within 10-14 business days following the receipt of _complete, accurate, & viable_ electronic enrollment files to members.

**Penalty and Measurement Criteria:** We will reduce our compensation by 2.0 percent of the guarantee period administrative service fees if we fail to produce and mail ID cards to your members within 10-14 business days of receiving the enrollment eligibility file. Our implementation team records are used to determine whether ID cards were produced and mailed within the specified time frame.

Master Services Agreement – 868066          86

CONFIDENTIAL                                                    AETNA-KULWICKI_0005214

**Account Management**

*Overall Account Management Guarantee*

**Guarantee:** We guarantee that the services (i.e., on-going financial, eligibility, drafting, benefit administration and continued customer support) provided by the Field Office Account Management Staff and/or the Employer Service Team during the guarantee period will be satisfactory to you.

**Penalty and Measurement Criteria:** Via quarterly responses to the attached Account Management Evaluation Tool provided through the following link **http://www.aetnasurveys.com/se.ashx?s=103ED34467D2D0E0**, you agree to make us aware of possible sources of dissatisfaction throughout the guarantee period. Your responses to the attached evaluation tool will evaluate account management services in the following categories:

- technical knowledge
- professionalism
- proactive management
- accessibility
- responsiveness of personnel

Each category will be given a rating of 1 - 5 with 1 = lowest, 5 = highest. We will tally the results from the report card(s) when received. The results of the survey(s) are used to facilitate a discussion between you and your Account Executive regarding the results achieved and opportunities for improvement.

If all report cards based on the frequency of the guarantee are not completed and returned within 15 days after the end of the quarter, it is assumed that the service provided to you is satisfactory and the guarantee is deemed met. If the score on the first report card and the report card(s) for the subsequent survey(s) average a 3.0 or higher, no credit is due. Satisfactory service would equal a score of 3.0 and would be based on the total average of 24 questions with a rating scale of 1 to 5. Should the score from the first report card and the average of the remaining report card(s) fall below a 3.0 (meaning that service levels have not improved), we will make a mutually agreed upon reduction in compensation. The maximum reduction will be **2.0** percent of the guarantee period administrative service fees.

*Management Reports*

**Guarantee:** We guarantee that the quarterly Aetna Informatics (Aetna Health Information Advantage™ ("AHIA")) reports will be available on the website within 45 days after the end of the reporting period. Incurred claims reports will be available on the website within 90 days after the end of the reporting period.

**Penalty and Measurement Criteria:** If we do not make the management reports available via the website during the guaranteed time frames, we will reduce our compensation. The maximum reduction will be **2.0** percent of the guarantee period administrative service fees. Our records are used to determine if the terms of this guarantee have been met.

Master Services Agreement – 868066          87

                                          AETNA-KULWICKI_0005215

### Plan Sponsor Services

*Eligibility Updates*

**Guarantee:** We guarantee that 97.0 percent of non-Open Enrollment eligibility updates (defined as the number of electronic eligibility files updated) are processed within 2 business days of receipt of complete and accurate data. We also guarantee that 100.0 percent of non-Open Enrollment eligibility updates will be processed within 5 business days of receipt of complete, accurate and viable data (if a file requires adjustments the customer will be notified by e-mail as soon as the need is identified).

**Definition:** Complete enrollment/eligibility data is defined as employee name, address, provider selection, DOB, SSN, and covered dependent information (if applicable) as well as mutually agreed upon eligibility specifications. This guarantee is contingent upon the file being transmitted successfully to us (files received after noon ET will be considered as having been received on the next business day). Any eligibility file received which must be adjusted by us using a file fix will not be included in the reconciliation. The Electronic Report (ELR) is used to determine the completeness of the data provided by you.

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.4 percent of the guarantee period administrative service fees for each full 1.0 percent that eligibility updates drop below 97.0 percent within 2 business days and 100.0 percent within 5 business days. The maximum reduction will be 2.0 percent of the guarantee period administrative service fees. Our results will be used to determine whether the terms of the guarantee have been met.

Claim Administration

*Turnaround Time (TAT)*

**Guarantee:** We guarantee that the claim TAT during the guarantee period will not exceed 14 *calendar* days for 90.0 percent of the processed claims on a cumulative basis each year.

**Definition:** We measure TAT from the claimant's viewpoint; that is, from the date the claim is received in the service center to the date that it is processed (paid, denied or pended). Weekends and holidays are included in turnaround time. In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** If the cumulative year TAT exceeds the day guarantee as stated above, we will reduce our compensation by an amount equal to 0.4 percent of the guarantee period administrative service fees for each full day that the TAT exceeds 14 calendar days for 90.0 percent of all processed claims. The maximum reduction will be 2.0 percent of the guarantee period administrative service fees.

If you have more than 3,000 enrolled members, a computer generated TAT report for your specific claims will be provided on a quarterly basis. If you have less than 3,000 enrolled members, results will be reported at the site level.

Master Services Agreement – 868066          **88**

AETNA-KULWICKI_0005216

*Turnaround Time (TAT) (Tier-2)*

**Guarantee:** We guarantee that the claim TAT during the guarantee period will not exceed 30 *calendar* days for 98.0 percent of the processed claims on a cumulative basis each year.

**Definition:** We measure TAT from the claimant's viewpoint; that is, from the date the claim is received in the service center to the date that it is processed (paid, denied or pended). Weekends and holidays are included in turnaround time. In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** If the cumulative year TAT exceeds the day guarantee as stated above, we will reduce our compensation by an amount equal to 0.2 percent of the guarantee period administrative service fees for each full day that the TAT exceeds 30 calendar days for 98.0 percent of all processed claims. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees. If you have more than 3,000 enrolled members, a computer generated TAT report for your specific claims will be provided on a quarterly basis. If you have less than 3,000 enrolled members, results will be reported at the site level.

*Financial Accuracy*

**Guarantee:** We guarantee that the financial accuracy will be 99.0 percent or higher.

**Definition:** Financial accuracy is measured using industry accepted stratified audit methodology. The results are determined by calculating the financial accuracy for a subset of claims (a stratum) and then extrapolating the results based on the size of the population and combining with the extrapolated results of the other strata. Each overpayment and underpayment is considered an error; they do not offset each other. Financial accuracy includes both manual and auto adjudicated claims.

Dollars Paid Correctly
Total Dollars Paid

We then extrapolate the results based on the size of the population and combine them with the extrapolated results of the other strata.

**Penalty and Measurement Criteria:** We will reduce our compensation by an amount equal to 0.2 percent of the guarantee period administrative service fees for each full 1.0 percent that financial accuracy drops below 99.0 percent. The maximum reduction will be 2.0 percent of the guarantee period administrative service fees.

Our audit results for the unit(s) processing your claims are used. Those results include our performance in processing ALL customers' claims handled by the unit(s) in question during the guarantee period, not just your plan's claims. The results for this guarantee are calculated using industry accepted stratified audit methodologies.

Master Services Agreement – 868066          89



AETNA-KULWICKI_0005217

*Payment Incidence Accuracy*

- **Guarantee:** We guarantee that the payment incidence accuracy will be 97.0 percent or higher.

- **Definition:** Payment incidence accuracy is measured by industry accepted stratified audit methodology. Accuracy in each stratum (a subset of the claim population) is calculated by:

Number of claims paid correctly
Total number of claims audited

We then extrapolate the results based on the size of the population and combine them with the extrapolated results of the other strata.

Penalty and Measurement Criteria: We will reduce our compensation by 0.2 percent of the guarantee period administrative service fees for each full 1.0 percent that payment incidence accuracy drops below 97.0 percent. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees.

Our audit results for the unit(s) processing your claims are used. Those results include our performance in processing ALL customers' claims handled by the unit(s) in question during the Guarantee period, not just your plan's claims. The results for this guarantee are calculated using industry accepted stratified audit methodologies.

*Total (Overall) Claim Accuracy*

Guarantee: We guarantee that the total (overall) claim accuracy will be 96.0 percent or higher.

Definition: Overall accuracy is measured using industry accepted stratified audit methodology. Accuracy in each stratum (a subset of the claim population) is calculated by:

Number of claims processed correctly
Total number of claims audited

We then extrapolate the results based on the size of the population and combine them with the extrapolated results of the other strata.

Penalty and Measurement Criteria: We will reduce our compensation by 0.4 percent of the guarantee period administrative service fees for each full 1.0 percent that total claim accuracy drops below 96.0 percent. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees.

Our audit results for the unit(s) processing your claims are used. Those results include our performance in processing ALL customers' claims handled by the unit(s) in question during the Guarantee period, not just your plan's claims. The results for this guarantee are calculated using industry accepted stratified audit methodologies.

Master Services Agreement – 868066          90

CONFIDENTIAL                                      AETNA-KULWICKI_0005218

**Overpayment Rate:**

**PG Guarantee:** We will guarantee that the annual claim overpayment recovery rate during the guarantee period will be 85.0 percent or higher.

**Definition:** The overpayment recovery rate will be defined as the refund dollars applied during the guarantee period plus 180 days, divided by the related net overpaid dollars to providers or members as validated in the Overpayment Tracking (OPT) system during the guarantee period. Net overpaid dollars are defined as validated overpayments less adjustments (overpayments logged in error or reclassified as non-overpayments). The guarantee is for overpayments handled by Shared Services only, and also includes unsolicited refunds by providers and members.

**Penalty and Measurement Criteria:** If the annual overpayment recovery rate is over 85.0 percent or better there will be no payout. If the overpayment recovery rate is below 85.0 percent, we will reduce its compensation by an amount equal to 0.1 percent of the guarantee period administrative service fees for each 0.5 percent that the overpayment recovery rate is below 85.0% percent. There will be a maximum reduction to the guarantee period administrative service fees of 1.0 percent.

_Member Satisfaction_

**Definition:** We guarantee a positive response rate of 80.0 percent or better on the standard Aetna Performance Tracking Process. The survey is based on a randomly selected sample of actively enrolled members aged 18-64. Interviews are conducted on a continuous basis throughout the year.

**Penalty and Measurement Criteria:** We will reduce our compensation by 2.0 percent of the guarantee period administrative service fees if we fail to meet a positive response rate of 80.0 percent or better. Results of the Aetna Performance Tracking Process are used as the measurement criteria. These surveys are performed based on statistically valid samples of members, by product, across all customers.

_Member Services_

_Average Speed of Answer (ASA)_

**Guarantee:** We guarantee that the ASA for the phone skill(s) providing your customer service will not exceed 30 seconds.

**Definition:** ASA is the amount of time that elapses between the time a call is received into the telephone system and the time a Customer Service Professional (CSP) responds to the call. The result is calculated as follows:

CONFIDENTIAL                                                      AETNA-KULWICKI_0005219

$$\frac{\text{Sum of all waiting times for all calls answered by the queue}}{\text{Number of incoming calls answered}}$$

ASA measures the average speed of answer for all call answered. Interactive Voice Response (IVR) system calls are not included in the measurement of ASA. In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

Penalty and Measurement Criteria: We will reduce our compensation by 0.2 percent of the guarantee period administrative service fees for each full second that the ASA exceeds 30 seconds. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees. The phone skill(s) providing your customer service are used.

*Abandonment Rate*

Guarantee: We guarantee that the average rate of telephone abandonment for the phone skill(s) providing your customer service will not exceed 1.5 percent.

Definition: The result is calculated as follows:

$$\frac{\text{Total number of calls abandoned}}{\text{Number of calls accepted into the skill}}$$

In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

Penalty and Measurement Criteria: We will reduce our compensation by 0.2 percent of the guarantee period administrative service fees for each 1.0 percent that the average abandonment rate exceeds 2.5 percent. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees. The phone skill(s) providing your customer service are used.

*First Call Resolution Rate – Outbound Call Survey*

Guarantee: We guarantee that the first call resolution rate will be 93.0 percent or higher.

Definition: We will share the first call resolution results with you annually from the accountable unit that services you. We define the first call resolution rate as the percentage of member calls resolved on the first call as reported by the member during the outbound call survey. The rate is calculated based upon first calls where the issue was within our control to resolve.

Master Services Agreement – 868066          92

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.2 percent of the guarantee period administrative service fees for each 1.0 percent that the first call resolution rate falls below 93.0 percent. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees. Results of the Outward Bound Survey are used.

*Telephone Call Quality*

**Guarantee:** We guarantee that the telephone quality rate will be 97.0 percent or higher.

**Definition:** We monitor silently or randomly record selected calls to determine if the customer service professional handled the inquiry promptly, courteously, and accurately. This monitoring is used to audit and review the effectiveness and responsiveness of our customer service professionals based on a random sample of their work.

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.2 percent of the guarantee period administrative service fees for every 1.0 percent that telephone call quality drops below 95.0 percent. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees. Our records are used to determine if the terms of the guarantee have been met.

Members Appeal resolution Turnaround Time

**Guarantee:** We will comply with Department of Labor appeal resolution time frames specified in the regulations. We guarantee that we will achieve 95.0 percent compliance on the Department of Labor appeals/grievances resolution time frames.

**Definition:** Percent of member appeals that we resolve within the specified Department of Labor (DOL) turn around times. TAT begins when the initial appeal is received at the designated appeal post office box and ends when the appeal decision upholding or denying the appeal is communicated to the member. This excludes provider appeals and appeals that are the responsibility of the plan sponsor or a vendor.

For plans offering 2 levels of appeal, the DOL turn around times for each category of appeal are shown below. (For plans offering only one level of appeal TATs are doubled.)
- Pre-Service Claim - 15 Calendar Days
- Urgent Care - 36 Hours
- Post Service Claims - 30 Calendar Days

In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** We will reduce its compensation by .1 percent of the guarantee period administrative service fees for each .1 percent that compliance with DOL resolution time frames drop below 95.0 percent. There will be a maximum reduction of 1.0 percent of the guarantee period administrative service fees. Aetna's results will be used to determine whether the terms of the guarantee have been met.

Master Services Agreement – 868066          93

AETNA-KULWICKI_0005221

**Schedule G - Attachment 2 – Pharmacy Performance Guarantees**

**General Performance Guarantee Provisions**

Aetna Life Insurance Company (ALIC) provides benefits administration and other services for the self-funded pharmacy plans. The services set forth in this document will be provided by ALIC (hereinafter "Aetna").

- **Performance Objectives**

Aetna believes that measuring the activities described below are important indicators of how well we service WellStar Health System. We are confident that pharmacy administration services provided to WellStar Health System will meet their high standards of performance. To reinforce WellStar Health System's confidence in Aetna's ability to administer their program, we are offering guarantees in the following areas:

| Performance Guarantee Category | Minimum Standard | Proposed Penalty |
|---|---|---|
| **Retail Claim Administration** | | |
| • Turnaround Time – Paper Claims | 97.0% within a weighted average of 5 business days of receipt and 99.5% within a weighted average of 10 business days of receipt | $25,000 |
| • On-Site Pharmacy Audits | 3.0% | $25,000 |
| **Mail Order Claim Administration** | | |
| • Turnaround Time – Clean Claims | 98.0% within an average of 2 business days of receipt | $25,000 |
| • Turnaround Time – Claims Requiring Intervention | 95.0% within an average of 5 business days of receipt | $25,000 |
| • Mail Order Dispensing Accuracy | 99.98% | $25,000 |
| **Member Services** | | |
| • Telephone Service Factor | 90.0% within 30 seconds | $25,000 |
| • Abandonment Rate | 3.0% | $25,000 |
| • Pharmacy First Call Resolution | 95.0% successfully resolved on the first call | $25,000 |
| **Total Guarantees** | | $200,000 |

Master Services Agreement – 868066        94

**Guarantee Period**

Each year that the Agreement is effective is referred to herein as a "Guarantee Period." Each Guarantee Period shall have performance guarantees for the performance categories that are described in the "Performance Objectives" section, or as revised by the Parties by mutual agreement. The "Maximum Fees at Risk" that are set forth in the "Performance Objectives" will be effective for the Guarantee Period that is the 12-month period from January 1, 2016 through December 31, 2016. Prior to each anniversary of the effective date of the Agreement, the Parties shall meet and confer regarding changes to the "Maximum Fees at Risk" for each performance category to be effective on the anniversary of the Agreement. If the Parties are unable to agree on a revision to the fee that will be at risk for any one or more performance category, the Maximum Fee at Risk for following Guarantee Period shall default to the amount at risk in 2016 for that performance category.

The performance guarantees shown below will apply to the self-funded Aetna Pharmacy Management plans administered under the Master Services Agreement ("Services Agreement"). These guarantees do not apply to non-Aetna benefits or networks.

**Aggregate Maximum**

In total, Aetna agrees to place $200,000 at risk for Ongoing Performance Guarantees as outlined in this document. Our offer assumes a minimum of 9,632 employee lives. Aetna reserves the right to revisit the guarantees if there is a change in enrollment of more than 15%.

**Termination Provisions**

Termination of the guarantee obligations shall become effective upon written notice by Aetna in the event of the occurrence of (i), (ii) or (iii) below:

i. a material change in the plan initiated by WellStar Health System or by legislative action that impacts the claim adjudication process, member service functions, pharmacy network management or rebates;

ii. failure of WellStar Health System to meet its obligations to remit administrative service fees or fund the WellStar Health System bank account as stipulated in the General Conditions Addendum of the Services Agreement;

iii. failure of WellStar Health System to meet their administrative responsibilities (e.g., a submission of incorrect or incomplete eligibility information).

No guarantees shall apply for a guarantee period during which the Services Agreement is terminated by WellStar Health System or by Aetna.

**Penalty Reconciliation and Refund Process**

At the end of each guarantee period, Aetna will compile the Performance Guarantees results. If necessary, Aetna will provide a refund to WellStar Health System for any penalties incurred.

Master Services Agreement – 868066          95

**Retail Claim Administration**

**Turnaround Time – Paper Claims Guarantee**

Guarantee: Aetna will guarantee that the claim payment processing turnaround time for all retail pharmacy claims submitted on paper will be 97.0% within a weighted average of 5 business days of receipt and 99.5% within a weighted average of 10 business days of receipt.

Definition: Total percentage of claims processed is measured as the **number of claims processed within specified** number of days divided by the total number of claims audited. **In the event there is an outage or when experiencing** peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply **and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.**

Penalty and Measurement Criteria: A penalty of $6,250 will apply for each 0.25% that the actual turnaround time for reimbursement of paper claims submitted falls below the guaranteed level of 97.0% within a weighted average of 5 business days of receipt and 99.5% within a weighted average of 10 business days of receipt. There will be a maximum penalty of **$25,000**. Guarantee results will be measured based on Aetna's book of business.

**On-Site Pharmacy Audits Guarantee**

Guarantee: On-site audits will be conducted for at least 3.0% of all contracted retail independent and chain pharmacies.

Definition: Total on-site audits will be measured as the number of audits conducted against the total number of contracted pharmacies. Pharmacies audited shall have a Claims volume greater than one thousand scripts (1,000) per year.

Penalty and Measurement Criteria: A penalty of $6,250 will apply for each 0.25% that the actual on-site audit percentage for all contracted retail independent and chain pharmacies falls below 3.0%. There will be a maximum penalty of **$25,000**. Guarantee results will be measured based on Aetna's book of business.

**Mail Order Claim Administration**

**Turnaround Time - Clean Claims Guarantee**

Guarantee: Aetna guarantees that at least 98.0% of all mail order claims not requiring intervention will be dispensed and shipped within an average of 2 business days of receipt.

Definition: For the respective guarantee period, turnaround time for claims, not requiring intervention is determined by assessing the average time, in business days, that it takes prescriptions to be processed and shipped from the Aetna Rx Home Delivery pharmacy. In the event there is an outage or when experiencing peak volumes, **calls** may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, **if results** are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

Master Services Agreement – 868066          96

          AETNA-KULWICKI_0005224

**Penalty and Measurement Criteria:** A penalty of $12,500 will apply for each full day that the average turnaround time of 98.0% of all mail order claims not requiring intervention exceeds an average of 2 business days. There will be a maximum penalty of **$25,000.** Guarantee results will be measured based on Aetna's book of business.

### Turnaround Time – Claims Requiring Intervention Guarantee

**Guarantee:** Aetna guarantees that at least 95.0% of all mail order claims requiring intervention will be dispensed and shipped within an average of 5 business days of receipt.

**Definition:** For the respective guarantee period, turnaround time for claims, requiring intervention is determined by assessing the average time, in business days, that it takes prescriptions to be processed and shipped from the Aetna Rx Home Delivery pharmacy. In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** A penalty of $12,500 will apply for each full day that the average turnaround time of 95.0% of all mail order claims requiring intervention exceeds an average of 5 business days. There will be a maximum penalty of **$25,000.** Guarantee results will be measured based on Aetna's book of business.

### Mail Order Dispensing Accuracy Guarantee

- Correct drug dispensed to correct member
- Correct drug, strength, dosage form
- Correct instructions provided to the member for use

**Guarantee:** Aetna guarantees that at least 99.98% of all mail order prescriptions will be dispensed correctly for drug, strength, form, instructions and patient.

**Definition:** For the respective guarantee period, total dispensing accuracy is measured as the number of prescriptions with no errors divided by the total number of prescriptions dispensed.

**Penalty and Measurement Criteria:** A penalty of $6,250 will apply for each 0.1% that the actual percentage of all mail order prescription dispensing accuracy falls below the target of 99.98%. There will be a maximum penalty of **$25,000.** Guarantee results will be measured based on Aetna's book of business.

### Member Services

### Telephone Service Factor (TSF) Guarantee

**Guarantee:** Aetna will guarantee that the telephone service factor will not fall below 80.0% of all calls responded to within 30 seconds.

Master Services Agreement – 868066          97

**Definition:** On an ongoing basis, Aetna measures telephone response time through monitoring equipment which produces a report on the telephone service factor. Total Service Factor measures the speed in which calls are answered by a Customer Service Professionals (CSPs) after being placed in queue by the auto attendant. This does not include the time the caller spent navigating through any auto attendant menus. TSF includes total calls (answered and abandoned) that are offered to CSPs. Interactive Voice Response (IVR) system calls are not included in the measurement of TSF. The TSF measure is reported as a percentage of calls answered in a specified amount of seconds. In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** A penalty of $6,250 will apply for each 0.50% that the cumulative telephone service factor falls below 80.0% for calls to be answered within 30 seconds, to a maximum penalty of $25,000. Aetna's results for the unit(s) providing member services for WellStar Health System will be used.

**Abandonment Rate Guarantee**

**Guarantee:** Aetna will guarantee that the average rate of telephone abandonment will not exceed 3.0%.

**Definition:** On an ongoing basis, Aetna measures telephone response time through monitoring equipment that produces a report on the average abandonment rate. The abandonment rate measures the total number of calls abandoned divided by the number of calls accepted into the unit. In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** A penalty of $6,250 will apply for each 0.25% that the average abandonment rate exceeds 3.0%. There will be a maximum penalty of $25,000. Aetna's results for the unit(s) providing member services for WellStar Health System will be used.

**Pharmacy First Call Resolution Guarantee**

**Guarantee:** Aetna will guarantee that 95.0% of member service calls with be successfully resolved on the first call. Resolution shall be deemed successfully resolved if there are no handoffs via resolution manager.

**Definition:** On an annual basis, Aetna will share with WellStar Health System the First Call Resolution results. The rate will be calculated based upon first calls where the issue was within Aetna's control to resolve and there were no handoffs via resolution manager.

**Penalty and Measurement Criteria:** A penalty of $6,250 will apply for each 0.25% that the First Call Resolution rate falls below 95.0%. There will be a maximum penalty of $25,000. Aetna's results for the unit(s) providing member services for WellStar Health System will be used.

CONFIDENTIAL                                                                                        AETNA-KULWICKI_0005226

DISPUTE RESOLUTION **PROCESS SCHEDULE H**
MASTER SERVICES AGREEMENT MSA-868066
EFFECTIVE January 1, 2016

1.0    Overall Scope. Except as provided in Section 15 of the Agreement, the Dispute Resolution and Binding Arbitration Process in this Schedule shall apply to all disputes between the Parties and between a Party and the sub-contractor of a Party arising out of or related in any way to this Agreement.

2.0    Purpose and Interpretation. The Parties' intend that their disputes be resolved in an efficient and timely manner. Accordingly, in interpreting and applying the provisions of this Dispute Resolution and Binding Arbitration Process, the Parties, the arbitration administrator(s), the Arbitrator, and any court of competent jurisdiction shall be guided by, and endeavor to support, the Parties' agreement to engage in as streamlined an approach to dispute resolution as possible, tailored to the specific nature of the dispute between them.

3.0    Meet-and-Confer. The Parties agree to meet and confer within thirty (30) days of a written request by either Party in an effort to resolve any dispute between them. At each meet-and-confer meeting, each Party shall be represented by persons who are authorized to enter into agreements resolving the dispute. Meet-and-confer discussions, and all documents prepared for those discussions such as agendas, spreadsheets, chronologies and the like, shall not be subject to discovery, offered as evidence, or admitted in evidence in any proceeding for any purpose. It is the Parties' intent that their meet-and-confer proceedings be frank and open and that they be protected to at least the same degree as they would be if they were conducted through a mediator. Unless otherwise agreed to by the Parties, no attorney may attend the meet-and-confer meeting(s) under this Section. The failure to conduct a meet-and-confer meeting shall not be grounds to dismiss an arbitration initiated pursuant to this Provision, but it shall constitute grounds to stay the arbitration proceedings until, in the discretion of the Arbitrator, the meet-and-confer process is complete. Any and all agreements reached by the Parties during the meet-and-confer process shall be documented and agreed to in writing by Parties.  Any such agreement that results in the clarification of contract language interpretation that was in dispute, development of a new policy or process to be followed by the Parties, or the creation of a new obligation for either Party, shall be incorporated in this Agreement through a written amendment to the Agreement.

4.0    Initiation of Arbitration. Either Party may initiate arbitration by serving on the other Party an arbitration demand setting forth a brief statement of the dispute and the relief requested ("Arbitration Demand"). The Arbitration Demand shall set forth the relief requested, including an estimate of the amount of money claimed, if any, as of the date of the Arbitration Demand, and a brief statement of how that amount was calculated. The failure of an Arbitration Demand to provide an adequate statement of the dispute, the relief requested, the amount at issue or how the amount was calculated shall not be grounds to dismiss the arbitration, but shall constitute grounds to stay the proceedings until, in the discretion of the Arbitrator, an Arbitration Demand satisfying these Arbitration Rules is met.

5.0    Administration of Arbitration. The arbitration shall be administered by the American Arbitration

CONFIDENTIAL                                                                AETNA-KULWICKI_0005227

Association in accordance with the AAA rules applicable to commercial disputes; provided, however, that the provisions of these Arbitration Rules shall control in the event of a conflict with the AAA rules.

5.1     Arbitrator: Upon mutual agreement following the initiation of any arbitration as provided herein, the Parties shall select the Arbitrator from the AAA health care panel. Otherwise, the arbitrator shall be selected from the AAA commercial panel. Each Party shall be responsible for their own fees and costs as required by AAA.

5.2     Joinder of Interested Parties and Consolidation of Claims.

5.2.1   Joinder of Interested Parties. The Parties agree that any and all proper parties may be joined in the arbitration, but the Parties agree to proceed with arbitration of all disputes between them even if third parties that cannot be compelled to participate refuse to participate. The Parties specifically waive any objection to arbitration based on the refusal of any other party that cannot be compelled to participate to be joined.

5.2.2   Consolidation of Claims. The Parties intend that their disputes shall be resolved in the most efficient manner possible. Accordingly, disputes involving the same contract provisions or Exhibits shall be consolidated. Disputes arising out of different contract provisions or Exhibits shall not be consolidated into a single arbitration absent mutual agreement. In the event of a dispute between the Parties concerning consolidation, the Arbitrator shall decide, in the exercise of sound discretion, whether the disputes should be consolidated, given the Parties' overarching intent to resolve their disputes in an efficient and timely manner.

6.0   First Case Management Conference. In the first conference with the Arbitrator, or as soon thereafter as is practicable, the Arbitrator and counsel shall discuss the nature of the dispute and an efficient process for resolving the dispute. The Arbitrator shall determine an efficient method of resolving the Parties' dispute, including, but not limited to, bifurcation of issues and phasing of hearings. For example, the Arbitrator may decide that issues of contract interpretation and law should be determined before the Parties are required to exchange information regarding damages. At the conclusion of the case management conference process, the Arbitrator shall enter a binding Case Management Order ("CMO"), which shall not be altered except by the Arbitrator.

7.0   Protection of Sensitive Materials.

7.1     Intent. The Parties recognize and agree that they have an ongoing business relationship and that this creates unusually sensitive issues with respect to the exchange of information in discovery. The Parties agree that they do not intend to use the dispute resolution process to gain access to the other Party's sensitive and proprietary business information, except to the extent that such information is necessary for the presentation of a Party's claims or defenses.

7.2     Protective Orders. The Arbitrator shall enter such protective orders as may be

Master Services Agreement – 868066          100

AETNA-KULWICKI_0005228

necessary to protect from unnecessary disclosure any sensitive and proprietary business information, and all information derived from such information, that, in the judgment of the disclosing Party, would adversely affect the disclosing Party's legitimate business interests ("Protected Materials").

7.3     Use Only For Arbitration.  All Protected Materials exchanged during the arbitration proceedings shall be used exclusively for the arbitration of the dispute.  At the conclusion of the arbitration, each Party shall return or destroy all Protected Materials obtained from the other Party during the course of the arbitration..

7.4     Filing Material Under Seal.  The Parties agree that Protected Materials exchanged during the arbitration proceedings are likely to contain competitively sensitive and proprietary information that could give third parties who gain access to such information an unfair advantage in competition or business transactions, and possibly permit price-fixing or other consequences that may cause serious harm to a Party, the Parties or the public interest.  Therefore, the Parties agree to fully cooperate with each other in ensuring that all Protected Materials exchanged during the arbitration proceedings, and all information derived from such information, is and remains fully confidential and sealed by any court or courts whose jurisdiction over any portion of the arbitration proceedings is invoked.

7.5     Confidentiality of Proceedings and Award.  The Parties, the Arbitrator, and all participants in the proceedings shall maintain in the strictest confidence all aspects of the arbitration proceedings including the Award; provided, however that a Party may disclose in court filings such information as is necessary to confirm or vacate the Award, and a Party may disclose such information as is required by law for financial reporting in the opinion of a Party's public accountants and attorneys.

8.0     Discovery.  Either Party may seek to subpoena such documents of third parties unrelated to the Parties as are necessary for the resolution of the dispute.  In addition, the Parties agree to exchange information at the time and in the manner described in this Section 7.0.

8.1     Document Exchange.  Ninety (90) days after the CMO is executed by the Arbitrator, or such longer time as is fixed by the Arbitrator via the CMO or otherwise, the Parties shall exchange documents they anticipate relying on at the arbitration hearing.  Fifteen (15) days after receiving the opposing Party's documents, each Party may submit any additional documents the Party anticipates relying on at the hearing.  If either Party identifies any documents thereafter that it anticipates relying on at the arbitration hearing, that Party shall immediately provide such documents to the other Party.  The willful failure to provide documents to the other Party that one Party reasonably believes it may seek to rely on at the hearing may be grounds for exclusion of the documents or other sanctions, in the discretion of the Arbitrator.

Master Services Agreement – 868066          101

8.2    Expert **Disclosure. One hundred and twenty (120) days after the CMO is executed, or such** longer time as is fixed by the **Arbitrator** via the CMO or otherwise, the Parties shall disclose their experts and provide a brief statement of the expected testimony of each expert. Each Party shall be entitled to take the depositions of all of the opposing Party's experts. Five (5) calendar days before the first scheduled deposition of an expert, the Party disclosing the **expert shall serve upon opposing counsel the final report of the expert setting forth the opinions of the expert and the basis for those opinions, together with all documents and information considered by the expert in formulating the expert's opinions.**

8.3    Complete Discovery/Discovery Disputes. Any further discovery shall only be allowable by order of the Arbitrator upon a showing that specifically identified information is necessary to the presentation of a Party's claims or defenses and that it is readily accessible. Notwithstanding the foregoing, unless the Parties agree otherwise, the Arbitrator shall not order or otherwise require that a party conduct extensive automated search and retrieval of electronically stored information ("ESI"), including without limitation keyword searches of e-mail or other ESI, and no adverse inferences may be drawn because a party did not conduct automated search and retrieval of ESI. All disputes concerning the scope of allowable discovery shall be resolved in the discretion of the Arbitrator. All discovery shall be completed sixty (60) days prior to the arbitration hearing, unless a different deadline is set by the Arbitrator. Depositions for discovery purposes shall not be permitted.

9.0    Pre-Hearing Disclosures. Thirty (30) days prior to the scheduled first day of the arbitration, or such time as is fixed by the Arbitrator for good cause, the Parties shall exchange a list of witnesses they intend to call (including any experts) with a short description of the anticipated direct testimony of each witness and an estimate of the length thereof, and pre-marked copies of all exhibits they intend to use at the hearing. If the documents have already been produced, they shall be identified by control numbers. If they have not been produced, they shall be produced with the list. Within fifteen (15) days of the receipt of such documents and information from the other Party, the receiving Party may provide additional statements of the expected testimony of witnesses, including experts and/or additional documents. The timing of the exchanges may be modified by the Parties and the Arbitrator as necessary to allow for an expeditious and orderly process.

10.0    Arbitration Hearing. Declarations of witnesses may be submitted in lieu of live witness testimony, provided the declarations have been produced at the time for disclosure of witness testimony in accordance with Section 7 above. Spreadsheets of accounts and responses may be submitted as evidence, provided that they were exchanged in accordance with Section 7 above. The Arbitrator shall allow cross-examination of any witness whose testimony is presented by declaration and any person or persons who prepared a spreadsheet, unless the Arbitrator determines that such examination would not materially assist the Arbitrator in resolving the dispute. Copies of documents may be admitted in evidence as originals, absent a showing by an objecting Party that the copy is unlike the original in some substantive way. The Arbitrator shall have the discretion to employ such additional or different procedures consistent with the spirit of these Arbitration Rules as the Arbitrators deem appropriate to ensure a fair hearing and resolution of the dispute.

Master Services Agreement – 868066        102

AETNA-KULWICKI_0005230

10.1   **Final Award and Remedies.**

The Arbitrator shall issue a Final Award within thirty (30) days of the conclusion of the arbitration hearing and no tentative decision shall be required. The Final Award(s) shall state findings of fact and conclusions of law. The Arbitrator shall apply Georgia law. The Arbitrator may only award compensatory damages. The Arbitrator shall not be empowered to award punitive damages, penalties, forfeitures or attorney's fees (except as sanctions, as specified herein). The Final Award shall be conclusive and binding and may be confirmed thereafter as a judgment by any state or federal court in Georgia, subject only to challenge on the grounds set forth on O.C.G.A. section 9-9-16. The validity and enforceability of the Final Award is to be determined exclusively by Georgia state courts applying Georgia law. Where the dispute involves an accounting of billings, the Arbitrator may reserve jurisdiction to ensure the proper payment of claims based on claims information submitted on spreadsheets.

10.2   Venue. The arbitration shall be conducted in Georgia. Any Party may be represented by counsel or other authorized representative.

10.3   Service.    All notices and documents less than 50 pages in length may be served via e-mail or hand delivery. All documents shall be served so as to ensure service is complete within 24 hours. Service is deemed complete upon receipt.

11.0   Waiver of Rights. By agreeing to binding arbitration as set forth in this Dispute Process, the Parties acknowledge that they are waiving certain substantial rights and protections that otherwise may be available if a dispute between them were determined by litigation in a court, including without limitation the right to seek or obtain punitive damages, the right to a jury trial, and certain rights of appeal.

Master Services Agreement – 868066          103

CONFIDENTIAL                                                                  AETNA-KULWICKI_0005231

## BUSINESS ASSOCIATE AGREEMENT SCHEDULE I :

# AMENDMENT NO. 1

### Health Insurance Portability And Accountability Act (HIPAA)

**THIS AMENDMENT** number 1 dated as of (The "Amendment") between **WELLSTAR HEALTH SYSTEM** ("Customer") and **Aetna Life Insurance Company** or any of its corporate affiliates ("Aetna") is an Amendment to Services Agreement Number MSA - 868066 between Aetna and Customer (the "Agreement") and is incorporated by reference therein. Customer represents that it has the authority to execute, and hereby executes, this Amendment for and on behalf of the Plan Sponsor's health benefit plan for which Aetna provides plan administration services ("the Plan" for the purposes of this Amendment).

In conformity with the regulations at 45 C.F.R. Parts 160-164 (the "Privacy and Security Rules") Aetna will under the following conditions and provisions have access to, maintain, transmit, create and/or receive certain Protected Health Information:

1. Definitions. The following terms shall have the meaning set forth below:

   (a) ARRA. "ARRA" means the American Recovery and Reinvestment Act of 2009

   (b) C.F.R. "C.F.R." means the Code of Federal Regulations.

   (c) Designated Record Set. "Designated Record Set" has the meaning assigned to such term in 45 C.F.R. 164.501.

   (d) Discovery. "Discovery" shall mean the first day on which a Breach is known to Aetna (including any person, other than the individual committing the breach, that is an employee, officer, or other agent of Aetna), or should reasonably have been known to Aetna, to have occurred.

   (e) Electronic Health Record. "Electronic Health Record" means an electronic record of health-related information on an individual that is created, gathered, managed and consulted by authorized health care clinicians and staff.

   (f) Electronic Protected Health Information. "Electronic Protected Health Information" means information that comes within paragraphs 1(i) or 1(ii) of the definition of "Protected Health Information", as defined in 45 C.F.R. 160.103.

   (g) Individual. "Individual" shall have the same meaning as the term "individual" in 45 C.F.R. 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. 164.502 (g).

   (h) Protected Health Information "Protected Health Information" shall have the same meaning as the term "Protected Health Information", as defined by 45 C.F.R. 160.103, limited to the information created or received by Aetna from or on behalf of Customer.

   (i) Required By Law. "Required By Law" shall have the same meaning as the term "required by law" in 45 C.F.R. 164.103

   (j) Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

   (k) Breach. "Breach" means the unauthorized acquisition, access, use or disclosure of Protected Health Information which compromises the security or privacy of such information, except where an unauthorized person to whom such information is disclosed would not reasonably have been able to retain such information. Breach does not include:

      (i) any unintentional acquisition, access, or use of Protected Health Information by an employee or individual acting under the authority of Aetna if:

         (I) such acquisition, access or use was made in good faith and within the course and scope of the employment or other professional relationship of such employee or individual, respectively, with Aetna; and

         (II) such information is not further acquired, accessed, used or disclosed by any person; or

      (ii) any inadvertent disclosure from an individual who is otherwise authorized to access Protected Health Information at a facility operated by Aetna to another similarly situated individual at the same facility; and

         (ii) any such information received as a result of such disclosure is not further acquired, accessed, used or disclosed without authorization by any person.

**Master Services Agreement – 868066**         104

(l) Security Incident. "Security Incident" has the meaning assigned to such term in 45 C.F.R. 164.304.

(m) Standard Transactions. "Standard Transactions" means the electronic health care transactions for which HIPAA standards have been established, as set forth in 45 C.F.R., Parts 160-162.

(n) Unsecured Protected Health Information. "Unsecured Protected Health Information" means Protected Health Information that is not secured through the use of a technology or methodology specified by guidance issued by the Secretary from time to time.

2    Obligations and Activities of Aetna

(a) Aetna agrees to not use or disclose Protected Health Information other than as permitted or required by this Appendix or as Required By Law.

(b) Aetna agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by this Appendix.

(c) Aetna agrees to mitigate, to the extent practicable, any harmful effect that is known to Aetna of a use or disclosure of Protected Health Information by Aetna in violation of the requirements of this Appendix.

(d) Aetna agrees to report to Customer any Security Incident of the Protected Health Information not allowed by this Appendix of which it becomes aware, except that, for purposes of the Security Incident reporting requirement, the term "Security Incident" shall not include inconsequential incidents that occur on a daily basis, such as scans, "pings" or other unsuccessful attempts to penetrate computer networks or servers containing electronic PHI maintained by Aetna.

(e) Aetna agrees to report to Customer any Breach of Unsecured Protected Health Information without unreasonable delay and in no case later than sixty (60) calendar days after Discovery of a Breach. Such notice shall include the identification of each Individual whose Unsecured Protected Health Information has been, or is reasonably believed by Aetna, to have been, accessed, acquired, or disclosed In connection with such Breach. In addition, Aetna shall provide any additional information reasonably requested by Customer for purposes of investigating the Breach. Aetna's notification of a Breach under this section shall comply in all respects with each applicable provision of Section 13400 of Subtitle D (Privacy) of ARRA, 45 C.F.R. 164.410, and related guidance issued by the Secretary from time to time.

(f) Aetna agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Aetna on behalf of Customer, agrees to the same restrictions and conditions that apply through this Appendix to Aetna with respect to such information.

(g) Aetna agrees to provide access, at the request of Customer, and in the time and manner designated by Customer, to Protected Health Information in a Designated Record Set, to Customer or, as directed by Customer, to an Individual in order to meet the requirements under 45 C.F.R. 164.524.

(h) Aetna agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Customer directs or agrees to pursuant to 45 C.F.R. 164.526 at the request of Customer or an Individual, and in the time and manner designated by Customer.

(i) Aetna agrees to make (i) internal practices, books, and records, including policies and procedures, relating to the use and disclosure of Protected Health Information received from, or created or received by Aetna on behalf of, Customer, and (ii) policies, procedures, and documentation relating to the safeguarding of Electronic Protected Health Information available to the Secretary, in a time and manner designated by the Secretary, for purposes of the Secretary determining Customer's or Aetna's compliance with the Privacy and Security Rules.

(j) Aetna agrees to document such disclosures of Protected Health Information as would be required for Customer to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. 164.528.

(k) Aetna agrees to provide to Customer the information collected in accordance with this Section to permit Customer to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in

Master Services Agreement – 868066          105

CONFIDENTIAL

AETNA-KULWICKI_0005233

accordance with 45 C.F.R. 164.528. In addition, with respect to information contained in an Electronic Health Record, Aetna shall document, and maintain such documentation for three (3) years from date of disclosure, such disclosures as would be required for Customer to respond to a request by an Individual for an accounting of disclosures of information contained in an Electronic Health Record, as required by Section 13405(c) of Subtitle D (Privacy) of ARRA and related regulations issued by the Secretary from time to time. Aetna agrees to provide to Customer the information collected in accordance with this Section to permit Customer to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. 164.528. In addition, with respect to information contained in an Electronic Health Record, Aetna shall document, and maintain such documentation for three (3) years from date of disclosure, such disclosures as would be required for Customer to respond to a request by an Individual for an accounting of disclosures of information contained in an Electronic Health Record, as required by Section 13405(c) of Subtitle D (Privacy) of ARRA and related regulations issued by the Secretary from time to time.

(l) With respect to Electronic Protected Health Information, Aetna shall implement and comply with the administrative safeguards set forth at 45 C.F.R. 164.308, the physical safeguards set forth at 45 C.F.R. 310, the technical safeguards set forth at 45 C.F.R. 164.312, and the policies and procedures set forth at 45 C.F.R. 164.316 to reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Customer. Aetna acknowledges that, effective the later of the Effective Date of this Appendix or February 17, 2010, (i) the foregoing safeguards, policies and procedures requirements shall apply to Aetna in the same manner that such requirements apply to Customer, and (ii) Aetna shall be subject to the civil and criminal enforcement provisions set forth at 42 U.S.C. 1320d-5 and 1320d-6, as amended from time to time, for failure to comply with the safeguards, policies and procedures requirements and any guidance issued by the Secretary from time to time with respect to such requirements.

(m) With respect to Electronic Protected Health Information, Aetna shall ensure that any subcontractors that create, receive, maintain, or transmit Electronic Protected Health Information on behalf of Aetna, agree to comply with the applicable requirements of Subpart C of 45 C.F.R. Part 164 by entering into a contract that complies with 45 C.F.R. Section 164.314.

(n) If Aetna conducts any Standard Transactions on behalf of Customer, Aetna shall comply with the applicable requirements of 45 C.F.R. Parts 160-162.

(o) Aetna acknowledges that, effective the later of the Effective Date of this Appendix or February 17, 2010, it shall be subject to the civil and criminal enforcement provisions set forth at 42 U.S.C. 1320d-5 and 1320d-6, as amended from time to time, for failure to comply with any of the use and disclosure requirements of this Appendix and any guidance issued by the Secretary from time to time with respect to such use and disclosure requirements.


3. Permitted Uses and Disclosures by Aetna

3.1 General Use and Disclosure

Except as otherwise provided in this Appendix, Aetna may use or disclose Protected Health Information to perform its obligations under the Agreement, provided that such use or disclosure would not violate the Privacy and Security Rules if done by Customer or the minimum necessary policies and procedures of Customer.


3.2 Specific Use and Disclosure Provisions

(a) Except as otherwise provided in this Appendix, Aetna may use Protected Health Information for the proper management and administration of Aetna or to carry out the legal responsibilities of Aetna.

(b) Except as otherwise provided in this Appendix, Aetna may disclose Protected Health Information for the proper management and administration of Aetna, provided that disclosures are Required By Law, or Aetna obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was

Master Services Agreement – 868066          106

AETNA-KULWICKI_0005234

disclosed to the person, and the person notifies Aetna of any instances of which it is aware in which the confidentiality of the information has been breached in accordance with the Breach and Security Incident notifications requirements of this Appendix.

(c) Aetna shall not directly or indirectly receive remuneration in exchange for any Protected Health Information of an Individual without Customer's prior written approval and notice from Customer that it has obtained from the Individual, in accordance with 45 C.F.R. 164.508, a valid authorization that includes a specification of whether the Protected Health Information can be further exchanged for remuneration by Aetna. The foregoing shall not apply to Customer's payments to Aetna for services delivered by Aetna to Customer.

(d) Except as otherwise provided in this Appendix, Aetna may use Protected Health Information to provide data aggregation services to Customer as permitted by 45 C.F.R. 164.504(e)(2)(i)(B).

(e) Aetna may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with 45 C.F.R. 164.502(j)(1).

4.  Obligations of Customer

    4.1 Provisions for Customer to Inform Aetna of Privacy Practices and Restrictions

        (a) Customer shall notify Aetna of any limitation(s) in its notice of privacy practices of Customer in accordance with 45 C.F.R. § 164.520, to the extent that such limitation(s) may affect Aetna's use or disclosure of Protected Health Information.

        (b) Customer shall provide Aetna with any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information, to the extent that such changes affect Aetna's uses or disclosures of Protected Health Information.

        (c) Customer agrees that it will not furnish or impose by arrangements with third parties or other Covered Entities or Business Associates special limits or restrictions to the uses and disclosures of its PHI that may impact in any manner the use and disclosure of PHI by Aetna under the Services Agreement and this Appendix, including, but not limited to, restrictions on the use and/or disclosure of PHI as provided for in 45 C.F.R. 164.522.

    4.2 Permissible Requests by Customer
        Customer shall not request Aetna to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy and Security Rules if done by Customer.

5.  Term and Termination

    (a) Term. The provisions of this Appendix shall take effect on the effective date of the Services Agreement, and shall terminate upon expiration or termination of the Services Agreement, except as otherwise provided herein.

    (b) Termination for Cause. Without limiting the termination rights of the parties pursuant to the Services Agreement and upon either party's knowledge of a material breach by the other party, the non-breaching party shall either:

        (i). Provide an opportunity for the breaching party to cure the breach or end the violation, or terminate the Agreement, if the breaching party does not cure the breach or end the violation within the time specified by the non-breaching party;

        (ii). Immediately terminate the Agreement, if cure of such breach is not possible;

        (iii). If neither termination nor cure is feasible, the non-breaching party shall report the violation to the Secretary.

    (c) Effect of Termination.
        The parties mutually agree that it is essential for Protected Health Information to be maintained after the expiration of the Agreement for regulatory and other business reasons. The parties further agree that it would be infeasible for Customer to maintain such records because Customer lacks the necessary system and expertise. Accordingly, Customer hereby appoints Aetna as its custodian for the safe keeping of any record containing Protected Health Information that Aetna may determine it is appropriate to retain. Notwithstanding the expiration

Master Services Agreement – 868066          107

AETNA-KULWICKI_0005235

of the Services Agreement, Aetna shall extend the protections of this Appendix to such Protected Health Information, and limit further use or disclosure of the Protected Health Information to those purposes that make the return or destruction of the Protected Health Information infeasible.

6. Miscellaneous

   (a) Regulatory References. A reference in this Appendix to a section in the Privacy and Security Rules means the section as in effect or as amended, and for which compliance is required.

   (b) Amendment. The Parties agree to take such action to amend this Agreement from time to time as is necessary for Customer and Aetna to comply with the requirements of the HIPAA Privacy Rule, the HIPAA Security Rule, the HITECH Act, and HIPAA, as amended.

   (c) Survival. The respective rights and obligations of Aetna under Section 5(c) of this Appendix shall survive the termination of this Appendix.

   (d) Interpretation. Any ambiguity in this Appendix shall be resolved in favor of a meaning that permits Customer to comply with the Privacy and Security Rules.

   (e) No third party beneficiary. Nothing express or implied in this Appendix or in the Services Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations, or liabilities whatsoever.

   (f) Governing Law. This Appendix shall be governed by and construed in accordance with the same internal laws as that of the Agreement.

The parties hereto have executed this Appendix with the execution of the Services Agreement.

Aetna Life Insurance Company

Signature: John A. Moran

Title: Regional Director

Date: February 25, 2016

WellStar Health System, Inc.

Signature

Title: EVP Chief Compliance Officer

Date 2/25/16

LEGAL APPROVED

Master Services Agreement – 868066          108

CONFIDENTIAL

AETNA-KULWICKI_0005236

NETWORK SCHEDULE J

**WellStar Custom Employee Provider Network – Aetna Network Provider Types added to fill in network gaps:**

| | |
|---|---|
| ABA | Applied Behavioral Analysis |
| AC | Ambulatory Surgicenter |
| BAA | Behavioral Analysis Assistant |
| BH1 | Delegated PM Behavioral Health Provider Group |
| BHG | Multi Behavioral Health Provider Group |
| CH | Children's Hospital |
| CP | Clinical Psychologist |
| DA | Diagnostic Testing Center |
| DAC | Drug and Alcohol Counselor |
| DE | Independent Durable Medical Equipment |
| DI | Dialysis Center |
| HA | Home Health Agency |
| HI | Home Infusion |
| HS | Freestanding Hospice |
| LB | Independent Lab |
| LHO | Long Term Acute Care Hospital |
| LPC | Licensed Professional Counselor |
| MT | Marriage/Family Therapy |
| NP | Walk In Clinics |
| NPS | Neuropsychologist |
| OT | Occupational Therapist |
| PT | Physical Therapist |
| PC | Pastoral Counselor |
| PED | Pediatrics – Emory/Kids Health First, TCHN |
| PN | Psychiatric Nurse |
| PSH | Psychiatric Hospital, Acute & Long Term |
| SA | Substance Abuse Facility |
| SW | Clinical Social Worker |
| OBGYN | Reproductive Specialists |

**WellStar Employee (Custom) Network Set-up:  WellStar Service Area\*\***

In Network = The WellStar Employee Plan Network, including Aetna network gap providers

Out of Network = Aetna Network Providers and "out of network" providers – In Service Area plans only.  Aetna network providers were added so that in the event that WellStar employees chose to go "out of network" to an Aetna provider, the Aetna Discount would apply, giving the WellStar benefit plan (and the member) access to the contracted rate.  Out of Network providers are paid at "no discount" (billed amount) unless they happen to be part of the National Advantage Program.  National Advantage Program provider discounts vary.  Aetna retains 40% of the discount on NAP discounts.  The 40% is charged back to WellStar via the Claim Wire.

Master Services Agreement – 868066        109

AETNA-KULWICKI_0005237

## NETWORK SCHEDULE J – Continued

**WellStar Network Set-up:  WellStar Outside of Service Area\*\* / "Out of Area" Plan**

In Network = Aetna Network Providers outside the WellStar Service Area and WellStar Network providers within the WellStar Service Area (in the event the out of area employee/members travel into the WellStar service area).

Out of Network = All non-contracted providers.  Out of Network providers are paid at "no discount" (billed amount) unless they happen to be part of the National Advantage Program.  National Advantage Program provider discounts vary.  Aetna retains 40% of the discount on NAP discounts.  The 40% is charged back to WellStar via the Claim Wire.

\*\*WellStar Service Area defined as of January 1, 2016 as the following 29 counties:

1. Barrow
2. Bartow
3. Butts
4. Carroll
5. Cherokee
6. Clayton
7. Cobb
8. Coweta
9. Dawson
10. DeKalb
11. Douglas
12. Fayette
13. Forsyth
14. Fulton
15. Gwinnett
16. Haralson
17. Heard
18. Henry
19. Jasper
20. Lamar
21. Meriwether
22. Morgan
23. Newton
24. Paulding
25. Pickens
26. Pike
27. Rockdale
28. Spalding
29. Walton

CONFIDENTIAL                                                                                    AETNA-KULWICKI_0005238

**SCHEDULE K**
**WellStar Health System, Inc.**
**Voluntary Seed Deposit Fund & Late Fee Calculation**

WellStar Health System, Inc. has deposited funds with Aetna in order to avoid paying late fees for funding claims up to 4 calendar days from the date Aetna sends the wire request to WellStar for medical and prescription drug claim funding.

The Seed Fund was calculated using 12 months of medical and prescription drug claim data as provided by Mercer. Based on 12 months of data, WellStar paid $90,449,084 in medical and prescription drug claims.

This amount ($90,449,084) is divided by the number of banking days in 2016 (250 days) and divided by the number of days that WellStar will be late in funding claims (4 days).

Therefore, the voluntary seed deposit fund amount total was calculated to be: $1,447,185.

$$(90,449,084/250*4 = 1,447,185)$$

**Late fees** are calculated by Aetna as follows. In the event WellStar funds claims beyond the agreed timeframe (4 calendar days beyond the request date) or pays Administrative Fees late (beyond the 31 days from the 1st of the month.)

Late Claim Funding = The annual interest rate (12%) is applied to the number of days late divided by 365, multiplied by the amount of the wire request. Example: $600,000 funding request 5 days late: 5/365 x $600,000 x 12% = $968.30

Late Administrative Fee Payment = the annual interest rate (12%) is applied to the number of days late divided by 365 multiplied by the amount due. Example: $100,000 administrative fees paid 5 days late: 5/365 x $100,000 x 12% = $164.38

Master Services Agreement – 868066          **111**

CONFIDENTIAL
AETNA-KULWICKI_0005239